UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

DAVID C. LETTIERI,

                              Plaintiff,

                                                              3:24-CV-0102
v.                                                            (GTS/ML)

DAVID GASKA, et al.,

                              Defendants.

_____

APPEARANCES:                                      OF COUNSEL:

DAVID C. LETTIERI
  Plaintiff, *Pro Se*
Devens Federal Medical Center
Post Office Box 879
Ayer, Massachusetts 01432

MIROSLAV LOVRIC, United States Magistrate Judge

## REPORT and RECOMMENDATION

### I.    BACKGROUND

#### A.    Procedural History

On April 25, 2025, the undersigned issued a report and recommendation that thoroughly

outlined the procedural history in this matter to date.  (Dkt. No. 56 at 2-3.)  On August 18, 2025,

District Judge Glenn T. Suddaby accepted and adopted the undersigned's report and

recommendation in its entirety.  (Dkt. No. 63.)  Judge Suddaby granted Plaintiff leave to amend

his claims against Defendants Gaska, Withers, Maston, Broome County Humane Society,

Broome County Sheriffs, Harting, Brown, Broome County Sheriff Does #1 through #5,

Bonanno, Tokaish, Garver, Hockwater, Schidmet, Briegueal, FBI Agents #1 through #6, New

York State Trooper Doe #1, Town of Colesville, Daniels, Wyoming County Sheriffs, and McGunnis. (*Id*.) On September 26, 2025, Plaintiff filed a Third Amended Complaint, which is currently pending before the Court for a review pursuant to 28 U.S.C. § 1915A. (Dkt. No. 69.)

### B.       Third Amended Complaint

Construed as liberally[1] as possible, Plaintiff's Third Amended Complaint appears to allege violations of Plaintiff's rights by Defendants Broome County, Wyoming County Sheriffs, David Gaska, Karen Maston, the Broome County Humane Society, Joel L. Daniels, Michael Hockwater, Eric Schidmet,[2] Broome County District Attorney Office, Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Broome County Sheriff Doe #3, Federal Agent Doe #1, Federal Agent Doe #2, Federal Agent Doe #3, Federal Agent Doe #4, Federal Agent Doe #5, Federal Agent Doe #6, Miroslav Lovric, Town of Colesville, Paul Powell, Department of Justice, Bradley McGunnis, Paul E. Bonanno (also known as Pauly B), Megan A. Tokaish,[3] Federal Bureau of Investigation, Randall E. Garver, Jenelle Briegueal,[4] Leon Brown, Benjamin Harting,[5]

---

[1]     The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

[2]     It is unclear whether the spelling of this defendant's last name is Schidmet or Schmict. (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 2.) For consistency, the undersigned refers to this individual as "Defendant Schidmet."

[3]     It is unclear whether the spelling of this defendant's last name is Tokaish or Tokiash. (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 3.) For consistency, the undersigned refers to this individual as "Defendant Tokaish."

[4]     It is unclear whether the spelling of this defendant's last name is Briegueal or Brigueal. (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 3.) For consistency, the undersigned refers to this individual as "Defendant Briegueal."

[5]     It is unclear whether the spelling of this defendant's last name is Hurting or Harting. (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 3.) For consistency, the undersigned refers to this individual as "Defendant Harting."

New York State Troopers, New York State Trooper Doe, Diana Withers,[6] and Lawrence Joseph

Vilardo (collectively "Defendants").[7]  (*See generally* Dkt. No. 69.)

The Third Amended Complaint alleges that on November 5, 2020, Plaintiff was taken

from his property while government agents conducted a search in violation of Fed. R. Crim. P.

41.  (Dkt. No. 69 at 4.)  Plaintiff alleges that he was informed that his lawyer was on the way and

Defendants Garver, Hockwater, and McGunnis "assaulted and threatened [Plaintiff] with their

guns."  (*Id*. at 4-5.)

Plaintiff alleges that he did not authorize any agent to give his house keys to anyone "in

which [Defendant] Schidmet had done."  (*Id*. at 5.)  Plaintiff alleges that there have been a series

of burglaries at his house in violation of his rights.  (*Id*.)

Plaintiff alleges that the undersigned makes it impossible to seek justice because a

lawsuit must be "'approved' which denies access to the courts and [violates Plaintiff's] First

[A]mendment right to redress the government."  (Dkt. No. 69 at 5.)

The Third Amended Complaint alleges that Defendant Broome County Humane Society

was banned from Plaintiff's house after an incident on August 11, 2020, during which,

Defendant Gaska killed some of Plaintiff's animals including rats, guinea pigs, and rabbits.  (*Id*.)

Plaintiff alleges that the undersigned "doesn't understand law which this was just a fact of

---

[6]    It is unclear whether the spelling of this defendant's last name is Withers or Wither. (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 3.)  For consistency, the undersigned refers to this individual as "Defendant Withers."

[7]    The Clerk of the Court is directed to add the following individuals and entities to the docket as defendants in this action: (1) Broome County, (2) Broome County District Attorney's Office, (3) Miroslav Lovric, and (4) Lawrence Joseph Vilardo.  (Dkt. No. 69 at 2-3.)  The Third Amended Complaint appears to refer to individuals previously identified as FBI Agents #1 through #6 as Federal Agent Doe #1 through #6.  (*Compare* Dkt. No. 39 at 1, *with* Dkt. No. 69 at 2-3.)  In addition, the Third Amended Complaint does not assert any claims against the Broome County Sheriffs, Broome County Sheriff Doe #4, or Broome County Sheriff Doe #5 and those parties should be terminated from this action.  (*See generally* Dkt. No. 69.)

matter." (*Id*.) Plaintiff alleges that he brought another lawsuit regarding Defendant Gaska's wrongful killing of Plaintiff's cat. (*Id*.)

Plaintiff asserts that this matter is about his female Pomeranian dog that was wrongfully taken without a warrant. (Dkt. No. 69 at 5.) Plaintiff alleges that on August 11, 2020, Defendant Gaska tried to sexually assault the female Pomeranian dog. (*Id*. at 6.) Plaintiff alleges that on May 17, 2023, Defendant Garver admitted that he deleted the security footage of Defendant Gaska's acts on August 11, 2020. (*Id*.)

Plaintiff alleges that Defendant Powell did not issue a search warrant to take his Pomeranian dog on November 5, 2020. (Dkt. No. 69 at 6.) Plaintiff alleges that at some unspecified time, Defendant Broome County Humane Society requested a hearing—that Defendant Powell granted—and obtained a court order directing Plaintiff to pay $20,000. (*Id*.)

The Third Amended Complaint alleges that Plaintiff made arrangements for his mother to take care of the dog during his incarceration but that Defendant Broome County Humane Society refused the request "because of wanting to extort [P]laintiff for money." (*Id*. at 7.)

Plaintiff alleges that he does not know the status of the dog but "it is certain [that Defendant] Broome County Humane Society had put the dog to sleep for cost matters." (Dkt. No. 69 at 7.)

Plaintiff alleges Defendant Withers created a false report of an evaluation of the Pomeranian dog at the request of Defendants Broome County Sheriff's and Broome County Humane Society. (*Id*. at 7.)

Plaintiff alleges that Defendant Gaska stated that Defendant Broome County Humane Society has "help" from law enforcement, which Plaintiff interpreted to mean that Defendant Gaska is dating Defendant Briegueal. (*Id*. at 8.)

4

Based on these factual allegations, the Third Amended Complaint sets forth seventy-seven causes of action many of which, relate to what Plaintiff perceives as unconstitutional violations that took place within the confines of other civil rights actions Plaintiff has filed in other District Courts.  (Dkt. No. 69 at 9-60; *see, e.g.,* Dkt. No. 69 at 25-26.)  As relief, Plaintiff seeks, among other things, monetary damages, judgement in the other actions be vacated, transfer of his actions in the District Court for the Western District of New York to this Court, a hearing on the merits of "imminent danger" in several actions that Plaintiff was denied IFP status on based on a finding of three-strikes, and the return of his dog alive.  (Dkt. No. 69 at 60-67.)

Plaintiff has paid the filing fee.  (Docket entry dated 11/18/2024.)  However, due to Plaintiff's status as a "prisoner" defined by 28 U.S.C. § 1915A(c) and the fact that he seeks redress from a government entity or officer or employee, this Court must screen the Third Amended Complaint pursuant to 28 U.S.C. § 1915A(b).  *See Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004); 28 U.S.C. § 1915A(a).

## II.     LEGAL STANDARDS

### A.     Legal Standard Governing Review of The Complaint

The legal standard governing review of a pleading pursuant to 28 U.S.C. § 1915A(b) was discussed at length in the Report and Recommendation issued by the undersigned dated April 25, 2025. (Dkt. No. 56 at 6.)

### B.     Legal Standard Governing Statute of Limitations in 42 U.S.C. § 1983 Actions

The legal standard governing the statute of limitations in 42 U.S.C. § 1983 actions was discussed in the Report and Recommendation issued by the undersigned dated April 25, 2025. (Dkt. No. 56 at 6-8.)

III.    ANALYSIS

A.    **Claims Against Defendants Department of Justice, Federal Bureau of Investigation, New York State Troopers, and Powell**

Judge Suddaby's Order dated August 19, 2025, dismissed Plaintiff's claims against Defendants Department of Justice, Federal Bureau of Investigation, New York State Troopers, and Powell without leave to amend.  (Dkt. No. 63 at 2.)  As a result, to the extent that the Third Amended Complaint is construed as asserting claims against those entities and individual, I recommend that they be dismissed.

In the alternative, I recommend that Plaintiff's claims against Defendants Department of Justice and Federal Bureau of Investigation be dismissed based on the doctrine of sovereign immunity as set forth in the undersigned's Report and Recommendation dated April 25, 2025. (Dkt. No. 56 at 9-10.)  Moreover, I recommend that Plaintiff's claims against Defendant New York State Troopers be dismissed based on the doctrine of immunity pursuant to the Eleventh Amendment as set forth in the undersigned's Report and Recommendation dated April 25, 2025. (Dkt. No. 56 at 11.)  Finally, I recommend that Plaintiff's claims against Defendant Powell be dismissed based on the doctrine of judicial immunity as set forth in the undersigned's Report and Recommendation dated April 25, 2025.  (Dkt. No. 56 at 13-15.)

B.    **Claims Against Defendants Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Broome County Sheriff Doe #3, Federal Agent Doe #1, Federal Agent Doe #2, Federal Agent Doe #3, Federal Agent Doe #4 Federal Agent Doe #5, Federal Agent Doe #6, Bonanno, Tokaish, Brown, Harting, and New York State Trooper Doe**

As set forth in the undersigned's Report and Recommendation dated April 25, 2025, "[d]ismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff."  *Cipriani v. Buffardi*, 06-CV-0889, 2007 WL 607341, at *1 N.D.N.Y. Feb. 20, 2007) (Kahn, J.) (citing *Gonzalez v. City of*

*New York*, 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

Although the Third Amended Complaint names Defendants Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Broome County Sheriff Doe #3, Federal Agent Doe #1, Federal Agent Doe #2, Federal Agent Doe #3, Federal Agent Doe #4 Federal Agent Doe #5, Federal Agent Doe #6, Bonanno, Tokaish, Brown, Harting, and New York State Trooper Doe in the caption of the Third Amended Complaint, the body fails to indicate any action that they took or failed to take. (*See generally* Dkt. No. 69); *Dean v. Annucci*, 22-CV-0746, 2023 WL 2325074, at *6 (N.D.N.Y. Mar. 2, 2023) (Sannes, C.J.) (quoting *Cipriani*, 2007 WL 607341, at *1).

As a result, I recommend that all claims against Defendants Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Broome County Sheriff Doe #3, Federal Agent Doe #1, Federal Agent Doe #2, Federal Agent Doe #3, Federal Agent Doe #4 Federal Agent Doe #5, Federal Agent Doe #6, Bonanno, Tokaish, Brown, Harting, New York State Trooper Doe be dismissed for failure to state a claim upon which relief may be granted.

## C.    Claims Against Defendant Wyoming County Sheriffs

As set forth in the undersigned's Report and Recommendation dated April 25, 2025, under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington v. County of Sullivan,* 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of*

*Nassau*, 15-CV-6487, 2019 WL 4754326, at \*14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.").

As a result, I recommend that Plaintiff's claims against Defendant Wyoming County Sheriff's Department be dismissed because it is not an entity that is amenable to suit.  *See Dudley v. Hochul*, 24-CV-0048, 2024 WL 1906584, at \*9 (N.D.N.Y. May 1, 2024) (Lovric, M.J.) (recommending dismissal of claims against the Onondaga County Sheriff because it was "not an entity amenable to suit."), *report and recommendation adopted*, 2024 WL 2399913 (N.D.N.Y. May 23, 2024) (Hurd, J.); *Taranto v. Putnam Cnty*., 21-CV-2455, 2023 WL 6318280, at \*15 (S.D.N.Y. Sept. 28, 2023) (dismissing claims against the defendant Putnam County Sheriff's Office because it was "not a suable entity.").

Moreover, as alluded to by Judge Suddaby in his Decision and Order dated August 19, 2025, the proper venue for any claims that Plaintiff attempts to assert against Defendant Wyoming County Sheriffs is in the District Court for the Western District of New York.  (Dkt. No. 63 at 3).

Venue in an action such as this is governed by 28 U.S.C. § 1391(b), which provides, in pertinent part, that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

8

28 U.S.C. § 1391(b).  "In the event of a finding that venue is improper, a court is empowered to dismiss the action or, alternatively, if the interest of justice dictates, to transfer the case to any district in which it could have been brought."  *Glover v. Goord*, 06-CV-1037, 2007 WL 2454193, at *6 (N.D.N.Y. Aug. 22, 2007) (Kahn, J., adopting report and recommendation of Peebles, M.J.) (citing 28 U.S.C. § 1406(a); *Goldawr, Inc. v. Heiman*, 369 U.S. 463, 465-67 (1962)).

The Third Amended Complaint alleges that Defendant Wyoming County Sheriffs is located in Warsaw, New York.  (Dkt. No. 69 at 4); *Glover*, 2007 WL 2454193, at *6 (noting that Wyoming County is "located in the Western District.").  Since it appears that the Western District would be the appropriate forum for any claims against Defendant Wyoming County Sheriff, I recommend in the alternative, that Plaintiff's claims against it be dismissed pursuant to 28 U.S.C. § 1406(a).[8]

### D.      Claims Against Defendant Town of Colesville

As set forth in the undersigned's Report and Recommendation dated April 25, 2025, a municipality may not be held liable solely because it employs a tortfeasor.  (Dkt. No. 56 at 12-13); *Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 36 (2010).  "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Adams v. City of Syracuse*, 21-CV-0650, 2025

---

[8]      Plaintiff also alleges that Defendant McGunnis is located in Warsaw, New York.  (Dkt. No. 69 at 4.)  Thus, to the extent that the assigned District Judge rejects the analysis set forth below in Part III.E. of this Report and Recommendation, I recommend that, in the alternative, Plaintiff's claims against Defendant McGunnis be dismissed based on improper venue pursuant to 28 U.S.C. § 1406(a).

WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)).

A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

The Third Amended Complaint fails to allege facts plausibly suggesting that employees of Defendant Town of Colesville violated Plaintiff's constitutional rights through the enforcement of a custom or policy. As a result, I recommend that any claim against Defendant Town of Colesville be dismissed for failure to state a claim upon which relief may be granted.

### E.       Claims Against Defendants Gaska, Hockwater, Schidmet, and McGunnis

Plaintiff's claims against Defendant Gaska, Hockwater, Schidmet, McGunnis, and Garver are untimely.

Title 42 U.S.C. § 1983 establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983); *see also Myers v. Wollowitz*, 95-CV-0272, 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (McAvoy, C.J.) (Section 1983 "is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights."). In order to state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must allege that (1) "some person has deprived him of a federal right," and (2) "the person who has deprived him of that right acted under color of state . .

10

. law." *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

The events purportedly giving rise to Plaintiff's claims against Defendant Gaska occurred on August 11, 2020. (Dkt. No. 69 at 5-6.) Plaintiff's claims against Defendants Hockwater and McGunnis relate to their alleged threatened use of their guns against Plaintiff on November 5, 2020. (*Id.* at 4-5.) Plaintiff's claims against Defendant Schidmet relate to him allegedly giving Plaintiff's house key to another individual on November 5, 2020.[9] (*Id.* at 5.)

Claims pursuant to Section 1983 have a three-year statute of limitations. *Bailey v. Tricolla*, 94-CV-4597, 1995 WL 548714, at *3 (E.D.N.Y. Sept. 12, 1995) (noting that in the absence of a congressional dictate as to a limitations period, we apply the most appropriate state statute of limitations, which for 1983 actions is the general personal injury statute setting forth a limitations period of three years); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (noting that the applicable limitations period for § 1983 actions in New York is three years).

Thus, because Plaintiff did not file this action until January 22, 2024, more than three years after the limitations accrued, it is time-barred unless a tolling principle applies so as to excuse the delay.[10]

---

[9]    Plaintiff also appears to ambiguously allege that at an unspecified time he was falsely convicted of an unspecified crime because Defendants Garver, Hockwater, and Schidmet "lied under oath claiming it was the plaintiff when the 'supposed' victim stated the supposed person had own snakes not a dog." (Dkt. No. 69 at 46.) This vague and conclusory allegation is insufficient to plausibly suggest that Plaintiff's constitutional rights were violated. Plaintiff does not allege when Defendant Garver, Hockwater, and Schidmet allegedly testified, what the substance of their testimony was, or how the testimony contributed to his alleged false conviction. (*See generally* Dkt. No. 69.)

[10]    The failure to file an action within the limitations period is an affirmative defense, and thus, a plaintiff is not required to plead that the case is timely filed. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). Dismissal is appropriate, however, where the existence of an

Tolling is not warranted under the circumstances alleged in the Third Amended Complaint. "Although the Second Circuit recognizes the continuing violation doctrine, it has qualified that the doctrine applies only to claims 'composed of a series of separate acts that collectively constitute one unlawful practice,' or 'claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment.'" *Hall v. Clinton Cnty.*, 18-CV-1405, 2020 WL 1923236, at *5 (N.D.N.Y. Apr. 21, 2020) (Suddaby, C.J.) (quoting *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015)). Moreover, equitable tolling is available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act," and "the party acted with reasonable diligence throughout the period" to be tolled. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005); *see also Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) ("Equitable tolling is an extraordinary measure that applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances."). I recommend that the Court decline to find the continuing violation doctrine or equitable tolling applicable to Plaintiff's claims and find that there is no other apparent basis for tolling the statute of limitations.

Contrary to Plaintiff's assertion, his incarceration does not toll the statute of limitations. (Dkt. No. 69 at 5-6.) Indeed, the Second Circuit rejected an analogous argument set forth by the plaintiff in *Montague v. City of Rochester*, 22-1598-pr, 2022 WL 16558154, at *2 (2d Cir. Nov. 1, 2022) where he argued that his "status as a prisoner [was] a 'rare and exceptional

---

affirmative defense, such as the statute of limitations, is plain from the face of the pleading. *See Walters v. Indus. and Commercial Bank of China, Ltd.*, 651 F.3d 280, 293 (2d Cir. 2011) ("[D]istrict courts may dismiss an action *sua sponte* on limitations grounds in certain circumstances where the facts supporting the statute of limitations defense are set forth in the papers plaintiff himself submitted.") (internal quotation marks and citation omitted); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (affirming *sua sponte* dismissal of complaint as frivolous on statute of limitations grounds).

circumstance[ ]' that prevented him from filing a petition either before or after his incarceration."

*Montague*, 2022 WL 16558154, at \*2 (citing *Zerilli-Edelglass v. N.Y. City Transit Auth.*, 333

F.3d 74, 80 (2d Cir. 2003); *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (prisoner not

entitled to equitable tolling of statute of limitations for § 1983 claim); *Hizbullahankhamon v.*

*Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (solitary confinement insufficient to toll statute of

limitations where prisoner had other opportunities to file)).

As a result, I recommend that any claims against Defendants Gaska, Hockwater,

Schidmet, McGunnis, and Garver be dismissed as untimely.

**F.      Claims Against Defendant Garver**

Plaintiff's claims against Defendant Garver related to his alleged threatened use of a gun

against Plaintiff on November 5, 2020, is untimely as set forth above in Part III.E.  (Dkt. No. 69

at 4-5.)  Plaintiff also alleges that on May 17, 2023, Defendant Garver admitted that he deleted

"security footage of David Gaska['s] acts of August 11, 2020."  (*Id.* at 6.)

Plaintiff does not allege that the surveillance footage of Defendant Gaska that Defendant

Garver deleted was exculpatory or that it related in any way to Plaintiff's underlying criminal

proceeding.  (Dkt. No. 69); *see Kweller v. County of Broome*, 25-CV-0343, 2025 WL 3280821,

at \*35 (N.D.N.Y. Nov. 25, 2025) (Brindisi, J.) (citing *Morse v. Futso*, 804 F.3d 538, 547 (2d Cir.

2015) (holding that government officials can be liable for fabricating evidence through false

statements or omissions including deleting exculpatory electronic data).  Hence, the Third

Amended Complaint fails to allege facts plausibly suggesting that Defendant Garver's alleged

deletion of the video deprived Plaintiff of his constitutional rights.

13

## G.    Claims Against Defendant Withers

Plaintiff alleges that at an unspecified time, Defendant Withers created a false evaluation of the female Pomeranian dog at the request of Defendants Broome County Sheriff's and Broome County Humane Society.  (Dkt. No. 69 at 7, 38.)  This conclusory allegation is insufficient to plausibly suggest that Plaintiff's constitutional rights were violated by Defendant Withers.  More specifically, the Third Amended Complaint fails to assert what false information was contained in the report, if the report was utilized in a way that was detrimental to Plaintiff, or any right of Plaintiff's that was infringed by the false report.  (*See generally* Dkt. No. 69.)

## H.    Claims Against Defendant Matson

Plaintiff alleges that Defendant Matson informed Plaintiff that it is Defendant Broome County Humane Society's policy "to pick and choose what 'cases' to investigate.  Thus there is a pattern of abuse of position.  Since there was reports made by the plaintiff of a person committing animal abuse."  (Dkt. No. 69 at 7.)

"[T]he duty to investigate criminal acts (or possible criminal acts) almost always involves a significant level of law enforcement discretion. That discretion precludes any 'legitimate claim of entitlement' to a police investigation." *Harrington v. Cnty. of Suffolk*, 607 F.3d 31, 35 (2d Cir. 2010) (citations omitted).  The general "duty" of law enforcement to maintain public order and safety is not a duty owed to any particular person or group.  *Harrington*, 607 F.3d at 35.  Hence, there is no constitutional violation for Defendants Broome County Humane Society or Matson in choosing which allegations to investigate and pursue.  As a result, I recommend that Plaintiff's claims against Defendant Matson be dismissed for failure to state a claim upon which relief may be granted.

14

I.      **Claims Against Defendant Briegueal**

Plaintiff alleges that Defendant Gaska stated that Defendant Broome County "Humane Society has 'help' from law enforcement which" Plaintiff interpreted to mean that Defendant Gaska is dating Defendant Briegueal.  (Dkt. No. 69 at 8.)  The Third Amended Complaint fails to allege facts plausibly suggesting that Defendant Briegueal violated Plaintiff's constitutional rights.[11]

J.      **Claims Against Defendant Broome County Humane Society**

The Third Amended Complaint appears to allege that Plaintiff's female Pomeranian dog was unlawfully seized without a warrant on November 5, 2020.  (Dkt. No. 69 at 5-6.)  However, the statute of limitations with respect to any unlawful seizure claim likely expired for the reasons set forth above in Part III.E. of this Report and Recommendation.

In the alternative, I recommend that any unlawful seizure claim against Defendant Broome County Humane Society be dismissed for failure to state a claim upon which relief may be granted.

The Third Amended Complaint appears to surmise that at some point in time, Defendant Broome County Humane Society possibly euthanized the dog "for cost matters."  (Dkt. No. 69 at 7.)  The legal standard governing the removal or killing of a companion animal was set forth in the undersigned's Report and Recommendation dated April 25, 2025.  (Dkt. No. 56 at 16-17.)

The allegations in the Third Amended Complaint are too speculative at this juncture to plausibly suggest a Fourth Amendment seizure claim related to any euthanasia of Plaintiff's dog.

---

[11]     The Third Amended Complaint also alleges in a conclusory fashion that at an unspecified time Defendant Briegueal intimidated Plaintiff's unnamed witness.  (Dkt. No. 69 at 36-37, 46.) This blanket assertion is also insufficient to plausibly allege that Defendant Briegueal violated Plaintiff's constitutional rights.

(Dkt. No. 69 at 7.)  Plaintiff acknowledges that he does not know the current status of his dog and merely surmises that it is possible the dog has been euthanized for "cost matters."  (*Id*.)  This is insufficient to plausibly suggest the killing of his dog.

As a result, I recommend that Plaintiff's Fourth Amendment unlawful seizure claim related to the alleged killing of his dog be dismissed for failure to state a claim upon which relief may be granted.[12]

Further, to the extent that the Third Amended Complaint is construed as asserting an excessive fine claim pursuant to the Eighth Amendment, I recommend that it be dismissed because the payment at issue was not punitive in nature and instead was "remedial" to recoup the cost of caring for Plaintiff's dog.  (Dkt. No. 69 at 6-7); *Lewis v. City of New York*, 24-CV-2336, 2025 WL 50291, at \*1 (S.D.N.Y. Jan. 8, 2025).  In addition, the Third Amended Complaint fails to allege facts plausibly suggesting that the civil penalty or fine imposed were grossly disproportional.  *Lewis*, 2025 WL 50291, at \*1.

**K.     Claims Against Defendant Daniels**

The Third Amended Complaint appears to allege that Defendant Daniels acted as an attorney with respect to the legal proceedings related to Plaintiff's Pomeranian female dog.  (Dkt. No. 69 at 6.)

It is axiomatic that court-appointed attorneys do not become state actors by virtue of their appointment.  *See Rodriguez v. Weprin*, 116 F.3d 62, 65–66 (2d Cir. 1997) ("[I]t is well-established that court-appointed attorneys performing a lawyer's traditional functions as counsel to defendant do not act 'under color of state law' and therefore are not subject to suit under 42

---

[12]     To the extent that Plaintiff attempts to assert a claim against Defendant Broome County Humane Society alleging a violation of due process, I recommend that it be dismissed for the reasons set forth in the Report and Recommendation dated April 25, 2025.  (Dkt. No. 56 at 18.)

U.S.C. § 1983."); *see also O'Donoghue v. U.S. Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020) ("Private attorneys are generally not 'state actors' for purposes of § 1983."). Because Defendant Daniels was not acting as a state actor in his alleged representation, I recommend that Plaintiff's claims against him be dismissed for failure to state a claim.

**L.      Claims Against Defendants Lovric and Vilardo**

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209.

Plaintiff asserts claims that appear to arise from the efforts of the undersigned and Defendant Vilardo in our capacities as a judges assigned to Plaintiff's various federal civil rights actions. (Dkt. No. 69 at 6-8, 11-23, 25-31, 33-39, 41-44, 52-53.) The undersigned and Defendant Vilardo are therefore immune from suit under the doctrine of judicial immunity. As a result, I recommend that Plaintiff's individual capacity claims against Defendants Lovric and Vilardo be dismissed based on the doctrine of judicial immunity pursuant to 28 U.S.C. §§ 1915(e)(2)(B)(iii), 1915A(b)(2).

Moreover, I recommend that Plaintiff's official capacity claims against Defendants Lovric and Vilardo be dismissed based on the doctrine of sovereign immunity. *Rech v. Siragusa*, 23-CV-6039, 2023 WL 2559409, at *5 (W.D.N.Y. Mar. 3, 2023) (citing *F.D.I.C. v. Meyer*, 510 U.S.

471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)) (dismissing the plaintiff's claims against

federal judges in their official capacities as "barred by sovereign immunity.").[13]

### M.    Claims Against Defendant Broome County

A municipality may be held liable if a plaintiff can assert that a policy or custom of that

municipality caused the constitutional violation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658,

692-94 (1978).  "A policy or custom may be established by any of the following: (1) a formal

policy officially endorsed by the municipality; (2) actions or decisions made by municipal

officials with decision-making authority; (3) a practice so persistent and widespread that it

constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a

failure by policymakers to properly train or supervise their subordinates, such that the

policymakers exercised 'deliberate indifference' to the rights of the plaintiff."  *Moran v. Cnty. of*

*Suffolk*, 11-CV-3704, 2015 WL 1321685, at \*9 (E.D.N.Y. Mar. 24, 2015) (citing *Parker v. City*

*of Long Beach*, 563 F. App'x 39 (2d Cir. 2014) (failure to train); *Matusick v. Erie Cnty. Water*

*Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Hines v. Albany*

*Police Dep't*, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of*

*Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (failure to train or supervise); *Missel v. Cnty. of*

*Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a person with

policymaking authority for the municipality)).

"Naked boilerplate allegations against a [municipality] are not sufficient to demonstrate a

custom, practice or policy of conducting unlawful arrests."  *Brown v. City of New York*, 12-CV-

3146, 2014 WL 5089748, at \*9, n.12 (S.D.N.Y. Sept. 30, 2014); *see Plair v. City of New York*,

---

[13]    Moreover, for the reasons set forth above in Part III.C. of this Report and
Recommendation, venue for any claims that Plaintiff asserts against Defendant Vilardo likely lie
in the District Court for the Western District of New York.

18

789 F. Supp. 2d 459, 469 (S.D.N.Y. 2011) (holding that for a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations" that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy).

Construing Plaintiff's Third Amended Complaint liberally, he lists Defendant Broome County and employees of Broome County—Defendants Broome County Sheriff Doe #1, Broome County Sheriff Doe #2, Broome County Sheriff Doe #3, Harting, and Brown—as parties to this action but as set forth above in Part III.B. of this Report and Recommendation, Plaintiff fails to allege any action taken by these individuals in the body of his pleading.  (Dkt. No. 69 at 3.)  Without any underlying constitutional violation, I recommend that his *Monell* claim against Defendant Broome County be dismissed.  *See Robinson v. Williams*, 22-CV-0982, 2023 WL 3352758, at *5 (N.D.N.Y. Jan. 12, 2023) (Lovric, M.J.) (citing *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010)) (dismissing a *Monell* claim where there was no underlying constitutional claim), *report and recommendation adopted* 2023 WL 2986825 (N.D.N.Y. Apr. 18, 2023) (Suddaby, J.); *see Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

As a result, I recommend that any claim against Broome County be dismissed.

**N.      Claims Against Defendant Broome County District Attorney's Office**

A "District Attorney's Office is an agency of the State of New York." *Woodward v. Office of Dist. Atty.*, 689 F. Supp. 2d 655, 659 (S.D.N.Y. 2010) (citing *Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir. 1993) ("When prosecuting a criminal matter, a district

attorney in New York State, acting in a quasi-judicial capacity, represents the State not the county." (citation omitted)).  Accordingly, I recommend that Plaintiff's claims against Defendant Broome County District Attorney's Office be dismissed as barred by the Eleventh Amendment.

### O.    State Law Claims

Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that the Court decline to exercise jurisdiction over any state law claims.  *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if . . . the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").[14]

## IV.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05

---

[14]    The undersigned notes that the allegations in this action appear to be substantially similar to those set forth in *Lettieri v. Matson*, 3:24-CV-0434, which was dismissed based on the three-strikes rule.  *Lettieri v. Matson*, 24-CV-0434, 2024 WL 4689006, at *1-2 (N.D.N.Y. Nov. 6, 2024).

(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires.").  An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.").  Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[15]

In this instance, I conclude that any further amendments to Plaintiff's Third Amended Complaint would be futile.  Plaintiff has already amended his pleading three times and failed to correct the deficiencies identified by the Court in his prior pleadings.  (Compare Dkt. No. 56, *and* Dkt. No. 63, *with* Dkt. No. 69.)  Any additional amendments to Plaintiff's Third Amended Complaint are not likely to be productive.  As a result, I recommend that all claims in Plaintiff's Third Amended Complaint be dismissed without leave to amend.  *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the

---

[15]     *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.' "); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that Plaintiff's Third Amended Complaint (Dkt. No. 69) be **DISMISSED without leave to amend**; and it is further;

**ORDERED** that the Clerk of the Court shall add Defendants Broome County, Broome County District Attorney's Office, Miroslav Lovric, and Lawrence Joseph Vilardo to the docket as parties to this action; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this report and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[16]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[17]  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: April _7_, 2026
      Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[16]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[17]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to

serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

⚑ KeyCite Blue-Striped Flag

Appeal Filed by   Adams v. City of Syracuse,   2nd Cir.,   October 17, 2025

2025 WL 2772081

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,

v.

CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

### MEMORANDUM-DECISION AND ORDER

Anne M. Nardacci, United States District Judge:

## I. INTRODUCTION

**\*1** On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

## II. BACKGROUND[3]

### A. The Parties

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

### B. Relevant Events

#### 1. May 1, 2016

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

### 2. May 6, 2016

#### a. 941 James Street

**\*2** At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

#### i. 911 call

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

#### ii. Police response

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

**\*3** Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him."[5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

**\*4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?" [6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

**\*5** Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed

Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

**3. Criminal Investigations Division**

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication." [7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

**\*6** The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed." [8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

**\*7** Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

 *8  Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

**\*9** Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do," [9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced and not false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....

(g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....

(h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and

(i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

 **\*10**  According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

   **b. Officer Cecile**

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the

male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

   **c. Officer Tolone**

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

   **d. Other Police Reports**

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

**5. Criminal Prosecution**

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff[10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

**\*11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter.[11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1st with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.

> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.

> **\*12** ....

> This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.

I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt.

No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

#### a. Plaintiff's Capacity

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

**\*13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

#### 6. Additional Investigation by CID

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic

state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

**\*14** *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

### D. Procedural History

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

### E. Plaintiff's Claims

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

### III. STANDARD OF REVIEW

**\*15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993). A court first determines

"whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.*, No. 12-cv-00900, 2013 WL 3207312, at \*4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *accord Gibbs-Alfano v. Burton*, 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *accord R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian*, 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson*, 477 U.S. at 249-50, 106 S.Ct. 2505).

### IV. DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from

which a jury could find that certain of the individual police officers prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

**\*16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

### A. False Arrest under Section 1983 and New York law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not

consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*, 992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, 153 F.4th 169, 179 (2d Cir. 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also* *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

### 1. Plaintiff's Detention at 941 James Street

**\*17**  Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case. [14] *See, e.g., United States v. Lefebvre,* 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario,* 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla,* 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice,* 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: ['] the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and

the physical treatment of the suspect, including whether or not handcuffs were used.[']") (quoting *United States v. Perea,* 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

**\*18**  Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice,* 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice,* 873 F.3d at 167. *See also United States v. Newton,* 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice,* 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku,* 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

### 2. Probable Cause

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id*. The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id*. Ms. Goldych also indicated that the man's name was Pete. *Id*. Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

**\*19**  Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964), 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

**\*20**  At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." 843 F.3d at 99. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id.* at 100, 101. As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id.* at 109. The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a "green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York*, 874 F.3d 338, 350 (2d Cir. 2017) ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos*, 536 F.3d 155, 160 n.4 (2d Cir. 2008) ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort*, 874 F.3d at 350 ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New York*, 841 F.3d 72, 78 (2d Cir. 2016) ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (1983)).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos*, 536 F.3d at 161. A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

### 3. Subsequent Information

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers*, 153 F.4th at 179 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley*, 992 F.3d at 136); *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

### a. Plaintiff's Continued Detention Prior to His Interrogation

**\*21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti*, 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins*, 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

### b. Plaintiff's Interrogation

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21.[17]

**\*22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444, 120 S.Ct. 2326).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced

his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

**\*23** Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.,* Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally

acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch, J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

**\*24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739,

89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.")); *see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons, [18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

### B. Malicious Prosecution under Section 1983

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562, 144 S.Ct. 1745, 219 L.Ed.2d 262 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019.

*See, e.g., Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury*, 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

**\*25** Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano*, 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta*, 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g., Werkheiser v. Cnty. of Broome*, 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort*, 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello*, 612 F.3d at 163); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell,[19] *see, e.g., Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser*, 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York*, 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello*, 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti*, 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y.

Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

**\*26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkheiser*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at \*13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at

all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey,[20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

**\*27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at \*13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants.[21]

**C. Fabricated Evidence under Section 1983**

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting

*Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also Ortiz*, 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's]

testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting *United States v. Ocampo-Guarin*, 968 F.2d 1406, 1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

**\*28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants. [22]

**D. *Monell* Claim**

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." *Alexander*, 132 F.4th at 160 (citing *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't. of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet*,

619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

**\*29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion)). The Second Circuit has set forth the following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

"First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green*, 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants

Adams v. City of Syracuse, Slip Copy (2025)

largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

**\*30**  The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit is true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12. [23] Following that conclusion are signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at \*11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own

testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis*.") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state," [24] Dkt. No. 85-11 at 9.

**\*31**  At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61, 131 S.Ct. 1350). But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-

employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 972 N.Y.S.2d 169, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.*, 972 N.Y.S.2d 169, 995 N.E.2d at 135 (citing *Valdez v. City of New York*, 18 N.Y.3d 69, 936 N.Y.S.2d 587, 592, 960 N.E.2d 356 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

#### F. Qualified Immunity for the Individual Defendants

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause

to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

**\*32** "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti, 124 F.3d at 128*, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of

the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at *3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir.

2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 51 A.D.2d 432, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

**\*33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact—such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735, 131 S.Ct. 2074).[25]

**G. John Does 1-100**

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

## V. CONCLUSION

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

## Footnotes

1    The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2    This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3    Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4    A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5    During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6    Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

7       Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8       Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9       The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10      Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11      From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12      The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13      To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14      It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15      Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

16 The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.*, Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

17 Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

18 Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legree v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

19 Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

20 Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

21 To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

22 To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

23 This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

24 It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC,

https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25 Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted earlier. *Id.* at 219-220; *see also Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656, 134 S.Ct. 1861). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

1995 WL 548714
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

John BAILEY, etc., Plaintiff,
v.
Detective Philip TRICOLLA et alia, Defendants.

No. CV–94–4597 (CPS).
|
Sept. 12, 1995.

MEMORANDUM AND ORDER

SIFTON, Chief Judge.

**\*1** This is a civil rights action brought pro se by plaintiff John Bailey on behalf of himself and his minor daughter Natasha Bailey. The defendants are New York City Police Detective Philip Tricolla, Detective Douglas Hopkins, Detective Ortiz, Detective A. Semioli and an unnamed employee of Channel 9 News, "John Doe." Interpreting plaintiffs' complaint liberally, as required by *Haines v. Kerner,* 404 U.S. 519 (1972), several federal and state claims are stated. Plaintiffs assert claims under 42 U.S.C. § 1983 based on the Fourth, Eighth and Fourteenth Amendments. The following federal claims are asserted by John Bailey on his own behalf: (1) that his Fourth Amendment right was violated when his property was illegally searched and seized by Detectives Tricolla, Semioli, and others, (2) that his Eighth Amendment right was violated when the detectives failed to stop an attack on plaintiff while in their custody, and (3) that his 14th Amendment right to due process was violated when the detectives filed false police reports and perjured themselves testifying at his trial. The following state claims are also asserted: (1) that an unidentified man who reportedly worked for Channel 9 News battered plaintiff John Bailey while he was in the custody of Detectives Tricolla and Hopkins, (2) that the detectives engaged in abuse of process when they filed false police reports concerning plaintiff's conduct, and (3) on behalf of Natasha Bailey, plaintiff John Bailey asserts that Detective Ortiz took her from her mother and used excessive force to do so.

On February 10, 1995, plaintiff moved for leave to amend the complaint to name "Channel 9 Broadcasting Systems, any and all Affiliates and or Sponsor's and Newscasters, and anyone and everyone responsible for the broadcasting of the Channel 9 news story shown on the Channel 9 news on or about June 7, 1991, in which the plaintiff was assaulted both physically then verbally with false slanderous stat[e]ments that implied plaintiff's guilt."

There are two motions to dismiss before the Court. In the first, defendant Detectives Tricolla, Hopkins, Ortiz, and Semioli move to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that the complaint is barred by the statute of limitations and that the defendants are immune from suit. In the second, defendant "John Doe," a Channel 9 News Reporter, moves to dismiss the complaint on two grounds. First, pursuant to Rule 12(b)(1), defendant Doe argues that this Court lacks subject matter jurisdiction over him because, as a news reporter, "John Doe" is not a "person" within the meaning of 42 U.S.C. § 1983. Second, pursuant to Rule 12(b)(6), Doe asserts that the complaint is barred by the statute of limitations.

On March 29, 1995, this Court received a sworn affidavit and supplementary exhibits from plaintiff John Bailey seeking to establish that his complaint was filed within the statute of limitations. Defendants have not had responded to this material. For the reasons set forth below, defendants' motions to dismiss certain claims based on absolute immunity are granted in part and denied in part. The city defendants' motion to dismiss the remaining claims statute of limitations grounds is denied. Defendant Doe's motion to dismiss the complaint as to himself is granted. Plaintiff's motion to amend the complaint as set forth in their motion is denied. Plaintiffs' motion for the appointment of counsel for the plaintiff Natasha Bailey is granted, and this action is stayed pending the appointment of counsel and guardian ad litem for the minor plaintiff.

BACKGROUND

**\*2** The following facts are taken from the plaintiff's complaint and, for the purposes of this motion, are presumed to be true and are regarded in a light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232 (1974). Plaintiffs' complaint alleges constitutional injury arising from several incidents. On June 6, 1991, plaintiff John Bailey was arrested by Detective Tricolla and "a great many other Detectives." At the time of the arrest, detectives searched and seized plaintiff's property including a bill of sale for a .25 caliber automatic, firearms, ammunition, a gun registration, a firearms lock box, several keys, two wallets, and other items. Detective

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 56 of 260

Bailey v. Tricolla, Not Reported in F.Supp. (1995)

Semioli is specifically accused of stealing plaintiff's transit badge and buspass I.D. On the day of plaintiff's arrest, June 6, 1991, Detective Ortiz questioned Natasha Bailey, plaintiff John Bailey's daughter, and took her away from her mother by force. On June 7, 1991, between 2 and 5 a.m. plaintiff was being escorted in handcuffs by Detectives Tricolla and Hopkins through the main lobby of the 71st police precinct when plaintiff was hit by defendant "John Doe," a man he later learned was employed by Channel 9 News. Detectives also are accused of filing false police reports concerning John Bailey and Natasha Bailey and are accused of perjuring themselves when testifying at plaintiff's trial.

In the motion to amend the complaint, plaintiff alleges that these events were broadcast on Channel 9 News on or about June 7, 1991.

DISCUSSION

Subject Matter Jurisdiction

Defendant Doe has argued that this court lacks subject matter jurisdiction.[1] Plaintiffs filed their suit under 42 U.S.C. § 1983. Defendant Channel 9 news reporter "John Doe" contends that he is not a "person" within the meaning of § 1983, and that this Court therefore lacks subject matter jurisdiction over him. Defendant cites no case law to support this proposition but relies solely on the plain meaning of the statute.[2] This Court has also found nothing that would lend defendant's position support.

In one § 1983 case involving a journalist, *Fitzpatrick v. Wert,* 432 F.Supp. 601 (W.D.N.Y.1977), inmates sued news reporters who reported and commented on a statement made by the president of a prison guards' union. Plaintiffs alleged that defendant news reporters were involved in a conspiracy to deprive plaintiffs of equal protection under the law. *Id.* at 603. The suit was dismissed as frivolous. The reporters were held not liable under § 1983 because they were engaged in exercising their constitutionally protected rights. *Id.* However, neither in *Fitzpatrick* nor anywhere else in the extant case law has a court held that journalists were or were not "persons" within the meaning of the statute. The proper issue before the Court is whether defendant "John Doe" was acting "under color of any statute, ordinance, regulation, custom, or usage, of any State...." 42 U.S.C. § 1983. This is an issue more appropriately dealt with as a 12(b)(6) motion

to dismiss, since acting under color of state law is an element of pleading a § 1983 cause of action. *Gomez v. Toledo,* 446 U.S. 635, 640 (1980). Moreover, when a district court has both a 12(b)(1) and 12(b)(6) motion before it, the "preferable approach, if the 12(b)(1) motion essentially challenges the existence of a federal cause of action, is for the court to find jurisdiction and then decide the 12(b)(6) motion." *Jones v. State of Georgia,* 725 F.2d 622 (11th Cir.) (citing *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.), *cert. denied,* 454 U.S. 897 (1981)), *cert. denied,* 469 U.S. 979 (1984). Accordingly, this Court has subject matter jurisdiction over this defendant.

**\*3** As to defendants Detective Philip Tricolla, Detective Douglas, Detective Hopkins, Detective Ortiz, and Detective A. Semioli, this Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1343(a)(3) and (4)[3] which specifically provides jurisdiction over § 1983 actions. Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 which provides district courts with jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States.

City Defendants' Statute of Limitations Defense

Defendants argue that the statute of limitations bars all of plaintiffs' claims except the allegation that detectives perjured themselves at the plaintiff's trial. There are three elements needed to determine whether a claim falls within the statute of limitations: (1) when the period of limitations accrued, (2) how long the period runs for, and (3) whether the period has been tolled by reason of incapacity. Federal law determines when an action accrues. *Morse v. University of Vt.,* 973 F.2d 122, 125 (2d Cir.1992); *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920 (1981).

The statutory period for bringing a § 1983 action accrues on the day when plaintiff " 'knows or has reason to know' of the injury which is the basis of his action." *Pauk v. Board of Trustees,* 654 F.2d 856, 859 (2d Cir.) (quoting *Singleton* ), *cert. denied,* 455 U.S. 1000 (1982). Furthermore, the "proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful." *Chardon v. Fernandez,* 454 U.S. 6, 8 (1991). Plaintiff's claims accrued on different dates. Plaintiff's property was searched and seized on June 6, 1991, at the time of his arrest, and on June 7, 1991, plaintiff was allegedly assaulted by defendant "John Doe" while in the custody of defendant Detectives Tricolla

Bailey v. Tricolla, Not Reported in F.Supp. (1995)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 57 of 260

and Hopkins. Plaintiff clearly had immediate knowledge of both of these events, and thus any cause of action arising therefrom accrued at that time.

Congress provided no explicit statute of limitations for § 1983 claims. As a result, there was much confusion as to which state limitations statute to apply until the Supreme Court, in *Wilson v. Garcia,* 471 U.S. 261 (1985), decided that the states' general personal injury statute of limitations should be applied to all § 1983 claims. *Id.* at 276. When a state has more that one personal injury statute of limitations, as is the case in New York, § 1983 claims are governed by the state's residual or general personal injury statute of limitations rather that by the statute of limitations for an enumerated intentional tort. *Owens v. Okure,* 488 U.S. 235 (1989). Under New York CPLR § 214, the general personal injury statute of limitations is three years. Therefore, in New York, a plaintiff must commence his § 1983 action within three years of the date the cause of action accrues. *See Perez v. Police Dept. of the City of New York,* 872 F.Supp. 49, 51 (S.D.N.Y.1994).

 **\*4**  Plaintiff John Bailey signed and notarized his complaint on May 16, 1994. However, the complaint was date-stamped "received" on July 11, 1994, by the Southern District pro se office and stamped as filed with the Southern District of New York on September 13, 1994. In a supplemental affidavit filed on March 29, 1995, plaintiff attests that he prepared and mailed the complaint to the Southern District for filing on May 17, 1994, and requested a return receipt. Plaintiff has annexed to his affidavit a copy of his certified mail receipt, addressed to the U.S. District Court at 40 Centre St., New York, N.Y. and showing a post office stamp of May 17, and a copy of the returned receipt, signed and dated May 26, 1994.

Rule 3 of the Federal Rules of Civil Procedure determines when a civil rights action commences. It simply states "[a] civil action is commenced by filing a complaint with the court." Fed.R.Civ.P. 3. Incarcerated litigants are afforded more leeway when they file pleadings because of their inability to file papers personally with the clerk of the court. Thus, for example, litigants may file a complaint by handing it to prison authorities, *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993) (discussing *Houston v. Lack,* 487 U.S. 266 (1988)), *modified by* 25 F.3d 81 (2d Cir.1994); *Lewis v. Richmond City Police Dept.,* 947 F.2d 733, 734 (4th Cir.1991), or may file an appeal in the same manner. *LaBounty v. Adler,* 933 F.2d 121 (2d Cir.1991).

At least one court has held that a return receipt dated within the limitations period suffices to prove receipt by the clerk and therefore filing, even if the clerk's office stamps the pleading "received" or "filed" on later dates. *Cooper v. City of Ashland,* 871 F.2d 104, 105 (9th Cir.1989). Generally, file stamps are far from dispositive of a statute of limitations issue. In *Mays v. New York City Police Dept,* 701 F.Supp. 80, 83 n. 6 (S.D.N.Y.1988), *aff'd,* 888 F.2d 1376 (2d Cir.1989), it was held that "[w]hen a pro se plaintiff's complaint is received by the Court within the statutory period, as here, and official filing is delayed by the Court's consideration of plaintiff's request for leave to proceed *in forma pauperis,* the action will be deemed timely for purposes of the statute of limitations." *See also Salahuddin v. Harris,* 657 F.Supp. 369, 373 n. 3 (S.D.N.Y.1987). The key inquiry is whether the clerk's office had actual control; papers placed in a night depository box after hours on the last day of the limitations period are deemed timely notwithstanding a local rule that such papers would be deemed filed the following day, because the papers placed in the box were held to be in the clerk's "actual possession." *Greenwood v. State of N.Y., Office of Mental Health,* 842 F.2d 636, 639 (2d Cir.1988); *see also Martin v. Demma,* 831 F.2d 69, 71 (5th Cir.1987) (district court's acceptance of date on clerk's stamps as dispositive was error). Plaintiff's production of the post office return receipt showing that his complaint was received at the Southern District clerk's office within the limitations period meets his burden of producing evidence to show that his papers were timely filed sufficient to warrant denial of the motion to dismiss at this time. The denial of this motion is without prejudice if discovery uncovers additional evidence relating to this matter.

Alleged False Police Reports and Perjured Testimony

 **\*5**  Plaintiff also claims that defendant detectives filed false police reports and lied while testifying at his trial. Even if timely filed, these claims cannot withstand a motion to dismiss.

Generally, police officers have available a defense of only qualified immunity. *Pierson v. Ray,* 386 U.S. 547 (1967). However, defendant detectives are correct that officers serving as witnesses have absolute immunity from civil liability for their testimony. *Briscoe v. LaHue,* 460 U.S. 325 (1983). As the Supreme Court held in *Briscoe,* "the common law provided absolute immunity from subsequent damages liability for all persons—governmental or otherwise —who were integral parts of the judicial process." *Id.* at 335.

Section 1983 does not abrogate this traditional immunity. Examining the legislative history of the Ku Klux Klan Act of 1871, 17 Stat. 13 (now codified at 42 U.S.C. §§ 1983 and 1985, *inter alia* ), the Supreme Court found nothing to "support petitioners' contention that Congress intended to provide a § 1 damages remedy against police officers or any other witnesses." *Id.* at 341. The Court specifically noted that, although "some defendants might indeed be unjustly convicted on the basis of knowingly false testimony by police officers ... the alternative of limiting the official's immunity would disserve the broader public interest." *Id.* at 345. In light of *Briscoe,* defendant detectives are absolutely immune from this § 1983 action with respect to their testimony at plaintiff's trial.

Plaintiff's allegations that the police officers filed false police reports against him also fails to state a claim. "[T]he mere filing of the false police reports, by themselves and without more, [does] not create a right of action in damages under 42 U.S.C. § 1983." *Landrigan v. City of Warwick,* 628 F.2d 736, 744–45 (1st Cir.1980). Plaintiff's claims could be cast as a cause of action for malicious prosecution. Allegations of malicious prosecution do not ordinarily state a claim under § 1983. *Easterhouse v. Felder,* 910 F.2d 1387, 1407 (7th Cir.1990), *cert. denied,* 498 U.S. 1067 (1991); *Gunderson v. Schueter,* 904 F.2d 407, 409 (8th Cir.1990); *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). The filing of false police reports may bring a claim for malicious prosecution within the scope of § 1983. *Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). However, an essential element of such a claim is that the proceeding must terminate in plaintiff's favor, and plaintiff has not alleged this key fact. *Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994). If plaintiff were convicted but believes that he was wrongly convicted, his proper remedy is not a claim for damages but rather an appeal, a collateral attack in state court, or a habeas petition in federal court. Plaintiffs thus have no cognizable § 1983 claim for the alleged filing of false reports. [4]

**\*6** Since the only other argument advanced by the city defendants is the statute of limitations and since that argument fails as noted above, their motion to dismiss the complaint is granted only with respect to the alleged false reports and false testimony and is denied in all other respects.

Claims Against Defendant "John Doe"

The "under color" of law provision of § 1983 does not require that the defendant be an officer of the State. *Dennis v. Sparks,* 449 U.S. 24 (1980). However, for the conduct of a private party to fall within the "under color" language, that conduct must be supported by state action, usually in the form of a conspiracy. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 163 (1970) (defendant restaurant owner who refused to serve Caucasian woman in the company of African American students was acting under color of law within the meaning of § 1983 because of his participation in a conspiracy with local police to deprive plaintiff of her rights). State support which transforms private action into state action may take many forms. In plaintiff's case, the only support given to "John Doe" was the inaction of the detectives who witnessed the battery. This level of support, if it can be called support at all, cannot qualify as state action because the complaint fails to allege that the attack was the result of a joint venture with the detectives. *See United States v. Price,* 383 U.S. 787 (1966). In *Price,* private actors charged with conspiring with local police to injure three men came within the scope of the statute because the private persons acted as willful participants in a joint activity with the state or its agents. *Id.* at 794. The Second Circuit has repeatedly held that § 1983 conspiracy claims must "contain more than mere conclusory allegations ... [and that] a plaintiff should not plead mere evidence; he should make an effort to provide some 'details of time and place and the alleged effect of the conspiracy.' " *Dwares v. City of New York,* 985 F.2d 94, 99–100 (2d Cir.1993) (quoting 2A Moore's Federal Practice ¶ 8.17[6], at 8–109 to 8–110 (2d ed. 1992)).

Even though pro se complaints are read very broadly under *Haines,* the Court is nevertheless limited to addressing the face of a pleading. *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985). A claim of conspiracy between defendant detectives and defendant Channel 9 news reporter cannot be inferred from the facts presented in the complaint, and the complaint is dismissed as to this John Doe defendant.

Plaintiff's state law claims against defendant Doe are also dismissed Under any reading of the complaint, these claims can only be for assault, libel, or some other intentional tort. The state law claims are subject to New York's one-year statute of limitations for intentional torts, CPLR § 215, rather than the three-year period for negligence actions or § 1983 claims. This period has clearly expired as to all claims against Doe. Accordingly, the complaint is dismissed as to defendant Doe.

Bailey v. Tricolla, Not Reported in F.Supp. (1995)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 59 of 260

**\*7** For similar reasons, plaintiff's motion to amend the complaint is also denied. The amendment seeks to name Channel 9 Broadcasting Systems and others as defendants in a slander or libel action. These actions are also subject to the one-year statute of limitations. Since the proposed amendment would be futile, plaintiff's motion is denied.

Natasha Bailey

Natasha Bailey is represented by her father, plaintiff John Bailey. Under the Federal Rules of Civil Procedure, capacity to sue is determined by the law of the state in which the district court is held. Fed.R.Civ.P. 17(b). Rule 17(b) reads in relevant part: "The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of the individual's domicile ... [i]n all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held...." Wright and Miller comment on this rule, noting that state law determines the capacity of the guardian as well as the plaintiff: "[a]s has been seen in the preceding sections, the first two sentences of Rule 17(b) deal with an individual suing on his own behalf and with the capacity of corporations. The third sentence of the rule provides that in all other cases capacity to sue or be sued is to be determined by the law of the state in which the district court is held. This portion of the rule applies principally to individuals who are suing in a representative capacity, including executors and administrators, guardians, trustees, and receivers appointed by a state court." Wright & Miller, Federal Practice and Procedure: Civil § 1565. Under New York law, an infant [5] cannot prosecute an action in person. The Federal Rules of Civil Procedure allow a representative to sue on behalf of an infant. Fed.R.Civ.P. 17(c). However under New York law the infant must appear by a parent who has "legal custody" [6] or guardian ad litem. "Unless the court appoints a guardian ad litem, an infant shall appear by the guardian of his property or, if there is no such guardian, by a parent having legal custody, or, if there is no such parent by another person or agency having legal custody...." N.Y.Civ.Prac.L. & R. 1201 (McKinney 1995). To have legal custody, a parent must have physical custody. *Otero on Behalf of Otero v. State,* 159 Misc.2d 35, 602 N.Y.S.2d 501, 502 (1993). An incarcerated parent cannot have legal custody and therefore may not bring suit on behalf of an infant. *Id.* at 502. Since plaintiff John Bailey is currently incarcerated at Franklin Correctional Facility in Malone, N.Y., he is not competent to bring this action on his daughter's behalf. [7]

For the foregoing reasons defendant Channel 9 news reporter "John Doe's" motion to dismiss is granted. Plaintiffs' claims against the defendant detectives arising out of their testimony at his trial or from the alleged filing of false police reports are also dismissed. Plaintiff's motion to amend the complaint is denied. The claims on behalf of Natasha Bailey are dismissed without prejudice. Plaintiff's applications for appointment of *pro bono* counsel are denied subject to renewal upon a showing sufficient to permit the determination required by *Cooper v. S. Sargenti Co., Inc.,* 877 F.2d 170 (2d Cir.1989), concerning the merits of the case.

**\*8** The Clerk is directed to mail a copy of the within to all parties.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 548714

---

**Footnotes**

1 Though "John Doe" is not specifically identified in the complaint, process was served on Channel 9 at their offices at 445 Park Avenue, New York City, and was accepted by a person named Brenda Woodman. This Court has received a motion and supporting affidavit filed by attorneys for WWOR (Channel 9) on behalf of "John Doe." The affidavit states that "Defendant 'John Doe,' Channel 9 News Reporter, respectfully requests that this court dismiss plaintiff's Complaint." The defendant has not raised objections to either service or personal jurisdiction but, instead, to subject matter and to the merits of the case. By filing this motion, then, he has consented to personal jurisdiction.

2    The statute reads in pertinent part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, or the District of Columbia subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceedings for redress." 42 U.S.C. § 1983 (1988).

3    "(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: ...

   (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

   (4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

4    The Court declines to consider the instant complaint as a habeas petition under 18 U.S.C. § 2254, because it is impossible to determine whether the claims were properly exhausted. If Bailey intends to seek habeas relief, he should file an appropriate petition.

5    An infant is defined as a "person who has not attained the age of eighteen years." N.Y.Civ.Prac.L. & R. 105 (McKinney 1994).

6    See Villafane v. Banner, 87 Misc.2d 1037, 387 N.Y.S.2d 183 (1976).

7    Generally, no statute of limitations will run against an infant until he or she attains the age of 18, the age of majority in New York. Section 208 of the NYCPLR in pertinent part reads, "If a person entitled to commence an action is under a disability because of infancy or insanity at the time the cause of action accrues, and the time otherwise limited for commencing the action is three years or more and expires no later than three years after the disability ceases, or the person under disability dies, the time within which the action must be commenced shall be extended to three years after the disability ceases or the person under the disability dies...." However, in an action for personal injuries sustained by the infant, the statute of limitations does not bar the adult representative from bringing suit on behalf of the infant. Hilburger v. Cottman, 196 Misc. 106, 91 N.Y.S.2d 721 (1949) ("to compel an infant ... to await h[er] majority before bringing an action because [s]he had failed to act within the generally prescribed statutory period would create an anomalous situation ... an infant's right of action is continuing and suit may be brought at any time during his minority."). Here, since John Bailey cannot legally represent Natasha because of his incarceration, another representative is required.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5089748
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Robert K. BROWN, Plaintiffs,
v.
The CITY OF NEW YORK et al., Defendants.

No. 12CV3146–LTS–GWG.
|
Signed Sept. 30, 2014.

*MEMORANDUM OPINION AND ORDER*

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Robert K. Brown ("Plaintiff") brings this action against Defendants the City of New York ("City of New York") and New York City Police Department ("N.Y.P.D.") Officers Marcus McCoy ("McCoy") and Stephen Janec [1] ("Janec," collectively, "Defendants"), pursuant to 42 U.S.C. § 1983, asserting federal claims for false arrest, unlawful imprisonment and malicious prosecution, as well as state law claims for false arrest and intentional infliction of emotional distress, stemming from Plaintiff's December 13, 2010, arrest and subsequent imprisonment. [2] Defendants move for summary judgment, pursuant to Federal Rule of Civil Procedure 56, arguing that there was probable cause to arrest the Plaintiff; that any search and/or imprisonment of the Plaintiff was lawful; that Plaintiff fails to state a claim for malicious prosecution; and that, to the extent that Plaintiff intends to bring any state law claims, those claims are meritless. The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1367. The Court has considered carefully the parties' submissions and arguments and, for the following reasons, the Defendants' motion is granted in its entirety.

*BACKGROUND* [3]

Plaintiff was arrested on December 13, 2010, shortly after 1:00 p .m., in the vicinity of 84th Street and Park Avenue in Manhattan, New York. (Def. 56.1 St. ¶ 8.) Earlier that day, two men, identified as E.K. and O.M., had called the authorities to report that the van that they were using, which belonged to Wynne Plumbing and Heating, had been broken into while it was parked on 85th Street. (*Id.* ¶ 6.) Defendants McCoy and Janec responded to the complaint, which they heard about over the police radio. (*Id.* ¶ 7.) [4]

The two complainants, E.K. and O.M., told Officer McCoy that they had seen Plaintiff in the driver's seat of the van, attempting to start the ignition in the van and that, when E.K. followed Plaintiff as he attempted to flee, the Plaintiff waved a hammer near E.K.'s face and said something to the effect of "wait a second." (Def. 56.1 St. ¶¶ 9–11.) Officer Janec's memo book indicates that he watched a surveillance video of the parked van at 1:25 p.m., after Plaintiff was arrested. (Lulich Decl., Ex. L.) In his opposition to Defendants' motion for summary judgment, Plaintiff repeatedly alleges that, because he cannot be seen in the video, it exonerates him, and that McCoy violated his rights and was complicit in a false arrest and malicious prosecution by suppressing or withholding the "exculpatory" video. The Court has reviewed the security video, a copy of which was provided to the Court by the Defendants. It shows only a partial view of the van and neither the passenger side door of the van, through which the Plaintiff is accused of having entered, nor pedestrian traffic approaching the door on that side of the vehicle is visible. (Lulich Decl., Ex. M.)

E.K. and O.M. identified Plaintiff as the person who had broken into their van and he was arrested near the scene of the crime, at 84th Street and Park Avenue. (Def. 56.1 St. ¶¶ 7–9.) When he was arrested, a backpack containing, among other things, a hammer, screwdrivers and a knife, was vouchered as evidence belonging to the Plaintiff. (Lulich Decl., Ex. H.) Plaintiff denies that the hammer, screwdrivers and knife were his, and asserts that they were actually plumbing tools belonging to E.K. and O.M. that were found on the ground. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. (ECF docket no. 43) at ECF p. 63.) Plaintiff also alleges that he had been "in a pizzaria[sic] having coffee-tea and pastries with a woman at 86th Street and the corner of Lexington Avenue," and then had walked up 84th Street to Park Avenue to pick up a car that he had borrowed, before he was arrested. (Pl. 56.1 St. ¶ 7; Pl. Mem. in Opp. at ECF p. 21.) Plaintiff contends that Defendants McCoy and Janec pulled up in the police car next to Plaintiff and jumped out of the car, that one of the police officers had a gun in his hand and that they handcuffed the Plaintiff and forcefully searched him before putting him in the back seat of the police car. (Pl. Mem. in Opp at ECF p. 21.)

**\*2**  Plaintiff alleges that he was then made to wait in the police car with the heater running full blast and that, as a diabetic with high blood pressure and asthma, he suffered from having his blood circulation restricted by the handcuffs with the heat running so high. (*Id.*) According to Plaintiff, when Defendants McCoy and Janec returned to the police car he told them that he was having breathing problems and heart palpitations and they arranged to have an ambulance meet them at the police station and take him to the hospital. (*Id.*) [5] Plaintiff states that he was returned to the police station six to eight hours later, after being treated at the hospital, and that Defendant McCoy, while processing Plaintiff's paperwork, made a comment to the effect of "what was being done to the plaintiff was not right and that this is not what he joined the police department for." (*Id.* at ECF p. 24.) Plaintiff further alleges that Detective Lisa Moran, who had been involved in an arrest of Plaintiff on November 3, 2010, told Plaintiff that "[y]ou will not be getting out of jail this time because I will be making sure of it." (*Id.*)

Plaintiff's arrest was processed at the 19th Precinct and his pants and shirt from the time of his arrest were vouchered as evidence. (Def. 56.1 St. ¶ 12.) Plaintiff alleges that he remained naked (or in his underwear) and handcuffed for approximately ten minutes, before he was given back his "Red, White and Blue Jacket, his underwear, undershirt, and tan boots along with hospital pajamas to wear." (Pl. 56.1 St. ¶ 12.) (*Compare* Pl. Mem. In Opp. at ECF p. 26 with Lulich Decl., Ex. B., Tr. 111:9–112:6 .)

At the time of his arrest, Plaintiff was on parole and was in violation of the conditions of his parole. [6] (Def. 56.1 St. ¶¶ 4–5, 8.) On November 3, 2010, Plaintiff had been arrested for, among other crimes, criminal possession of stolen property and unlawful use of a motor vehicle. (*Id.* ¶ 4.) The November 3, 2010, charges were pending in New York County Supreme Court under case number 2010–05448 at the time of the arrest that forms the basis of Plaintiff's allegations in this case. Plaintiff had not reported the November 3, 2010, arrest to his parole officer and had missed at least four mandatory check-ins with that officer by December 13, 2010. (*Id.* ¶ 5.) [7]

On December 14, 2010, Plaintiff was arraigned for attempted grand larceny in the fourth degree, menacing in the third degree, auto stripping in the third degree, criminal mischief in the fourth degree, and possession of burglar's tools under New York County Criminal Court number 2010NY091520. (*Id.* ¶ 13.) E.K. and O.M. identified the Plaintiff as the perpetrator of the break-in of their van and signed affidavits attesting

to this. Plaintiff's bail was set at $1.00 because there was a parole hold on Plaintiff. (Def. 56 .1 St. ¶ 13.) [8] Following his arraignment, Plaintiff was remanded into custody of the New York City Department of Correction ("DOC") for violating his parole—not because of the criminal charges arising out of the December 13, 2010, incident. (*Id.* ¶ 14.)

**\*3**  From December 13, 2010, until March 28, 2012, the charges under New York Supreme Court case no.2010–05448 and New York Country Criminal Court docket no. 2010NY091520 were both pending against the Plaintiff as separate actions. (*Id.* ¶ 15.) During the criminal proceedings in New York County Supreme Court case no.2010–0558, Plaintiff was evaluated by at least two mental health professionals and found to be unfit to proceed to trial. (*Id.* ¶ 16.) In July 2011, Plaintiff was transferred to the Mid–Hudson Psychiatric Center, upon an Order of Commitment, and was treated there until September 2011, when he was transferred back into custody at Riker's Island. (*Id.;* Pl. 56.1 St. ¶ 16.)

On March 14, 2012, following a bench trial, Plaintiff was convicted of criminal possession of stolen property in the fourth degree and unauthorized use of a vehicle in the second degree, under case number 2010–05448. (Pl. 56.1 St. ¶ 17; Def. 56.1 St. ¶ 17.) [9] On March 28, 2012, Plaintiff was sentenced to two to four years on each charge. (Def. 56.1 St. ¶ 17.) However, if Plaintiff had been tried and convicted of the charges brought under docket number 2010NY09150, any sentence would statutorily have been required to run concurrently with, and not have exceeded, the sentence already imposed under case 2010–05548. Therefore, on April 10, 2012, the charges relating to the instant arrest under case number 2010NY091520 were dismissed as covered by Plaintiff's conviction in case number 2010–05448. (Def. 56.1 St. ¶ 18.) [10] Neither Defendant McCoy nor Janec testified in any of Plaintiff's criminal proceedings. (*Id.* ¶ 19.) From December 14, 2010, to March 28, 2012, Plaintiff was incarcerated because he violated parole prior to the December 13, 2010, arrest and from March 28, 2012, he was incarcerated pursuant to his conviction in case number 2010–05448. (*Id.* ¶ 22.) The only period during which Plaintiff was held on account of the charges for which he was arrested on December 13, 2010, was from the time of the arrest until his December 14, 2010, arraignment on the charges.

*DISCUSSION*

Under Federal Rule of Civil Procedure 56(a), a Court should grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that it is entitled to summary judgment, *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and a "material fact" is one that might affect the outcome of a suit under governing law. *See Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir.2003). When reviewing the record, the Court must assess the evidence in "the light most favorable to the [non-moving party]" and resolve all ambiguities and draw all inferences in its favor. *Tufariello v. Long Island R. Co.,* 458 F.3d 80, 85 (2d Cir.2006). However, the party opposing summary judgment must put forth more than a "scintilla of evidence," *Anderson,* 477 U.S. at 252, and "cannot defeat the motion by relying on the allegations in [its] pleading, or on conclusory statements." *Gottlieb v. Cnty. of Orange,* 84 F.3d 511, 518 (2d Cir.1986) (internal citation omitted). To defeat the motion, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial ." *Anderson,* 477 U.S. at 248.

**\*4** Where a plaintiff is proceeding pro se, the Court must read the plaintiff's papers liberally and interpret them "to raise the strongest arguments that they suggest." *Triestman v. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal citation omitted). However, a "pro se party's bald assertions cannot overcome a motion for summary judgment" and the plaintiff must provide the court with "some basis to believe that his version of relevant events is not fanciful." *Yearwood v. LoPiccolo,* No. 95 CV 2544, 1998 WL 474073, at \*3 (S.D.N.Y. Aug. 10, 1998) (internal quotation marks and citations omitted); *see also Saldana v. Local 32B–32J Serv. Emps. Int'l Union,* No. 03 CV 1853, 2005 WL 66895, at \*2 (S.D.N.Y. Jan. 12, 2005) ("[e]ven a pro se plaintiff [ ] cannot withstand a motion for summary judgment by relying merely on the allegations of a complaint").

*Individual Defendants McCoy and Janec*

*False Arrest Claim*
Defendants move for summary judgment on Plaintiff's false arrest claim, which is asserted as a Fourth Amendment violation claim pursuant to 42 U.S.C. § 1983, as well as under New York state law. Plaintiff opposes the motion, arguing that it should be denied because the evidence would support a finding that the arrest was illegal, for lack of probable cause. A section 1983 claim for false arrest is "substantially

the same" in all relevant respects as a claim for false arrest under state law. *See Jocks v. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003). Thus, in order to state a claim for false arrest, a plaintiff must show that "(1) the defendant intended to confine plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003) (quoting *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)); see also *Hart v. City of New York,* No. 11 CV 4678(RA), 2013 WL 6139648, at \*3 (S.D.N.Y. Nov.18, 2013).

"[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006). " 'Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Torraco v. Port Authority of New York and New Jersey,* 615 F.3d 129, 139 (2d Cir.2010) (quoting *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004)). "[T]he probable cause standard is far below that of reasonable doubt." *Husbands v. City of New York,* 335 F. App'x 124, 127 (2d Cir.2009). "The inquiry is limited to whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir.2013) (internal quotation marks and citation omitted). Courts must look to the totality of the circumstances, keeping in mind that "probable cause does not require absolute certainty." *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006) (internal quotation marks and citations omitted).

**\*5** Police officers do not have an affirmative duty to investigate allegations made by a complaining witness prior to effectuating an arrest. See *Jaegly,* 439 F.3d at 153. Police have probable cause to arrest if they receive "information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth." *Miloslavsky v. AES Eng'g Soc'y Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), aff 'd, 993 F.2d 1534 (2d Cir.1993). "The veracity of citizen complaints [sic] who are the very victims of the very crime they report to the police is assumed." *Id.* Finally, even "the fact that an innocent explanation may be consistent with the facts alleged ... does not negate probable cause." *Waldron v.* Milana, —— F.App'x ——, 2013 WL 4733215, at \*3 (2d Cir.2013) (internal quotation marks and citation omitted).

Here, it is undisputed that Defendants McCoy and Janec responded to a report made by the two complaining victims, O.M. and E.K., regarding a vehicle break-in the vicinity of 85th Street and Madison Avenue. (Def. 56.1 St. ¶¶ 6–7.) O.M. and E.K. told Defendant McCoy that they saw the Plaintiff attempting to break into the van and E.K. told the police that the Plaintiff held up a hammer and told him to "wait a second." (*Id.* ¶¶ 8–11.) Plaintiff was arrested in the vicinity of Park Avenue and 84th Street, within half an hour of the time of the break-in, after having been identified by the victims. (*Id.* ¶ 8.) These circumstances are sufficient as a matter of law to establish the absolute defense of probable cause. *See, e.g., Bacci v. Fairway Mkt.,* No. 06 CV 2407(DAB), 2008 WL 2139132, at *6–7 (S.D.N.Y. May 19, 2008) (finding probable cause for petit larceny and possession of stolen property where police officers were informed by employee that the employee observed plaintiff attempting to leave with unpaid for items concealed on his person). Plaintiff's argument that probable cause was lacking turns principally on his contention that, having seen the surveillance video immediately after the arrest, Defendant McCoy should have understood that the complainants' accusations were baseless. As explained above, however, the surveillance video does not exonerate Plaintiff because, although he is not seen in it, the van door that he is alleged to have broken into and that side of the van are not visible. Plaintiffs' arguments thus have no evidentiary basis and are insufficient to frame a genuine factual dispute as to the existence of probable cause.

Defendants' motion for summary judgment on Plaintiff's federal and state law false arrest claims as against Defendants McCoy and Janec is granted. To the extent that Plaintiff also asserts claims of false imprisonment, they are dismissed as well, because false arrest and false imprisonment are synonymous under New York law. *See Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991).

*Unlawful Search Claim*

Plaintiff appears to allege that he was subject to an unlawful strip search following his arrest, but he does not assert this cause of action as a separate claim. (See, e.g., Compl. ¶ 4; Pl. Mem. in Opp. at ECF p. 25.) Reading Plaintiff's papers in the light most favorable to him, however, the Court assumes that Plaintiff intends to assert such a claim. According to Plaintiff, after his arrest, while he was being processed, members of the N.Y.P.D.'s Emergency Services Unit collected his clothing and then left him alone and naked or with underwear only for approximately ten minutes before bringing him some hospital

pajamas and telling the Plaintiff to put back on his socks, boots and heavy jacket. (Pl. Mem. in Opp. at ECF p. 26.) [11]

**\*6** Even drawing all inferences in Plaintiff's favor, the search of Plaintiff was justified as a matter of law, both as a search pursuant to a lawful arrest and as a reasonable penological measure to protect the safety of the other inmates. *See Illinois v. Lafayette,* 462 U.S. 640, 645–46, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ("[a] custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification"; "[a]t the stationhouse, it is entirely proper for the police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed."); see also *Florence v. Board of Chosen Freeholders of County of Burlington,* —— U.S. ——, 132 S.Ct. 1510, 182 L.Ed.2d 566 (2012) (holding that the practice of conducting a strip search on all arrestees, regardless of severity of the underlying offense or individualized suspicion of possession of contraband, does not violate the Fourth Amendment). "[I]f an arrestee is taken to the police station, that is no more than a continuation of the custody inherent in the arrest status.... The governmental interests underlying a stationhouse search of the arrestee's person and possessions may in some circumstances be even greater than those supporting a search immediately following arrest." *Lafayette,* 462 U.S. at 645. However, the Fourth Amendment requires that strip searches of inmates be reasonable, see *Hodges v. Stanley,* 712 F.2d 34, 35 (2d Cir.1983) (per curiam) (citing *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)) and that "the need for a particular search [ ] be balanced against the resulting invasion of personal rights," *Florence,* 132 S.Ct. at 1516 (2012) (citation omitted). In determining whether a particular strip search is reasonable, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell,* 441 U.S. at 559 (collecting cases).

Here, there was a reasonable suspicion that Plaintiff was engaged in criminal activity as he was found with burglar's tools and a knife at the time of his arrest near the vicinity of the crime, and was identified by two complaining witnesses. After his arrest, it was reasonable to search Plaintiff when processing him, both for evidence from the alleged crime and for safety reasons. *Arnold v. Westchester Cnty.,* No. 09 CV 3727, 2012 WL 336129, at *11 (S.D.N.Y. Feb.3, 2012) ("prison officials have an obligation to take reasonable

measures to protect the safety of the prison's inmates."), *report & rec. adopted* by 2012 WL 841484 (S.D.N.Y. Mar 13, 2012). The approximately ten-minute delay in which Plaintiff was naked or wearing underwear that Plaintiff contends occurred while he was waiting for his clothing to be returned, while likely unpleasant for the Plaintiff, does not make the search unreasonable or unlawful. Defendants' motion for summary judgment is granted as to Plaintiff's unlawful search claim as against Defendants McCoy and Janec.

*Malicious Prosecution Claim*

 **\*7** Plaintiff also asserts a section 1983 claim for malicious prosecution in violation of his Fourth Amendment rights. The law imposes "a heavy burden on malicious prosecution plaintiffs." *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004) (citation omitted). To prevail on a section 1983 claim for malicious prosecution, a plaintiff must first establish the elements of a malicious prosecution claim under state law. See, e.g., *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989). "To recover on a claim of malicious prosecution under New York law, a plaintiff must establish four elements: that (1) the defendant either commenced or continued a criminal proceeding against him; (2) that the proceeding terminated in his favor; (3) that there was no probable cause for the criminal proceeding; and (4) that the criminal proceeding was instituted in actual malice." *Russo v. State of N. Y.,* 672 F.2d 1014, 1018 (2d Cir.1982) (internal citations omitted). In addition to satisfying the state law elements, for a section 1983 claim to succeed there must also be a showing of "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *See Rohman v. New York City Transit Authority (N.Y.CTA),* 215 F.3d 208, 215 (2d Cir.2000). Defendants are entitled to summary judgment dismissing Plaintiff's malicious prosecution claim for three principal reasons: there is no evidence that Defendants "initiated" the prosecution within the meaning of the relevant legal standards; there was probable cause to support the prosecution; and the prosecution was not terminated in Plaintiff's favor.

"Initiation in [the context of malicious prosecution] is a term of art," involving more than merely reporting a crime and giving testimony. "It must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act ... One who does no more than disclose to a prosecutor all material information within his knowledge is not deemed to be the initiator of the proceeding." *Rohman,* 215 F.3d at 217 (internal quotation marks and citations omitted). An arrest

alone "cannot serve as the predicate deprivation of liberty required by the Fourth Amendment because it occurred prior to [a defendant's] arraignment and without a warrant." *Singer v. Fulton County Sheriff,* 63 F.3d 110, 116–17 (2d Cir.1995). "Once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by the intervening acts of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." *Jouthe v. City of New York,* No. 05 CV 1374(NGG), 2009 WL 701110, at \*11 (E.D.N.Y. March 10, 2009) (internal quotation marks and citation omitted).

Plaintiff argues that Defendant McCoy initiated the prosecution against the Plaintiff by signing the criminal complaint and that Defendant Janec helped to initiate the prosecution by signing the supporting affidavit. However, although McCoy swore out the criminal court complaint, the information regarding Plaintiff's alleged activities was obtained from the two complaining victims. Merely signing the criminal complaint and/or reporting the material information known to the officer does not override the independent prosecutorial judgment of the assistant district attorney in deciding whether to bring charges. Plaintiff also seems to allege that Defendants McCoy and Janec initiated the prosecution by withholding the security video from the District Attorney's Office Office, when the video would have allegedly exonerated him. However, there is no evidence in the record to support this contention. In fact, the Voluntary Disclosure Form, signed by the assistant district attorney, indicates that the District Attorney's Office was in possession of the video. (*See* Lulich Decl., Ex. N. "Voluntary Disclosure Form.") There is also no evidence to support Plaintiff's contention that the video exonerates him.

 **\*8** Even if Defendants McCoy and Janec could be found to have "initiated" Plaintiff's prosecution, the "existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Savino,* 331 F.3d at 72 (2d Cir.2003). "The determination of probable cause in the context of malicious prosecution is essentially the same as for false arrest, 'except that [a claim for malicious prosecution] must be evaluated in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest.' " *Danielak v. City of New York,* No. 02 CV 2349, 2005 WL 2347095 at \* 10 (E.D.N.Y. Sept.26, 2005) (internal quotation marks and citation omitted), aff'd, 209 F. App'x 55 (2d Cir.2006). "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v.*

*Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996). Here, no new facts came to light after Plaintiff's arrest, and both E.K. and O.M. remained consistent in their identification of plaintiff and their accusations against him. N.Y.P.D. records further show that Defendant McCoy vouchered evidence (e.g. screwdrivers, a hammer etc.) that supported the complaining victims' allegations following plaintiff's arrest, suggesting that the strength of the evidence against plaintiff increased after his arrest. Nor does the record support Plaintiff's allegation that the security video proves his innocence.

As Plaintiff has not established the first two elements of his malicious prosecution claim, the claim necessarily fails. However, there are also no facts from which the Court could infer that defendants were motived by actual malice, see, e.g., *Fulton v. Robinson,* 289 F.3d 188, 198 (2d Cir.2002) (affirming grant of summary judgment for defendants after the plaintiff failed to present evidence of actual malice), or that the proceedings were terminated in Plaintiff's favor, which only occurs when the final disposition of the case: (1) involves the merits and (2) tends to indicate the accused's innocence as opposed to a dismissal of cumulative charges. See, e.g., *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997). "Where a prosecution did not result in an acquittal, it is generally not deemed to have ended in favor of the accused, for purposes of a malicious prosecution claim, unless its final disposition is such as to indicate the accused's innocence." *Fulton,* 289 F.3d at 196. As explained above, the record indicates that the charges were dismissed as duplicative for sentencing purposes of charges on which Plaintiff had already been convicted and sentenced. That outcome is not indicative of Plaintiff's innocence of the dismissed charges. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's claim for malicious prosecution against Defendants McCoy and Janec and that claim is dismissed.

*Municipal Liability*

 **\*9** Plaintiff also asserts a claim under 42 U.S.C. § 1983 against the City of New York. In order to state a claim against a municipality under section 1983, a plaintiff must adequately allege that a deprivation of his constitutional rights was caused by an official policy or custom of that municipality. *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 692–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because Plaintiff has failed to present evidence that demonstrates that his constitutional rights were violated, the city is entitled as a matter of law to summary judgment dismissing Plaintiff's section 1983 claims against it. *See Askins v. Doe No. 1,*

727 F.3d 248, 253 (2d Cir.2013) ("[u]nless a plaintiff shows that he has been the victim of a federal law tort committed by persons for whose conduct the municipality can be responsible, there is no basis for holding the municipality liable[;] *Monell* does not create a stand-alone cause of action under which a plaintiff may sue over a governmental policy, regardless of whether he suffered the infliction of a tort resulting from the policy"). If a plaintiff fails to plausibly allege that municipal employees violated his or her constitutional rights, the plaintiff's *Monell* claim "necessarily fails as well" as against the municipal entity. *Kajoshaj v. New York City Dep't of Educ.,* —— F. App'x ——, 2013 WL 5614113, at \*4 (2d Cir. Oct 15, 2013). [12] Plaintiff's state law claims against the city based on respondeat superior or agency theories, for false arrest, false imprisonment and malicious prosecution are also dismissed, for lack of evidence indicating commission of the underlying violations.

*Remaining State Law Claim*

Plaintiff's papers may be read liberally to assert a state law claim for intentional infliction of emotional distress. As the Court is granting summary judgment dismissing all of Plaintiff's federal causes of action, the Court declines to exercise jurisdiction of any remaining state law claims. See 28 U.S.C. § 1367(c)(3); *see also, Marcus v. AT & T Corp.,* 138 F.3d 46, 57 (2d Cir.1998) ("where the federal claims are dismissed before trial, the state claims should be dismissed as well").

*CONCLUSION*

For the foregoing reasons, Defendants' motion for summary judgment is granted. Plaintiff's federal and state law claims for false arrest, false imprisonment, and malicious prosecution, and any federal claim for illegal search, are dismissed. The Court declines to exercise supplemental jurisdiction of any remaining state law claims, which are dismissed without prejudice to litigation in state court.

This Memorandum Order resolves docket entry number 30.

The Clerk of Court is hereby requested to enter judgment in Defendants' favor and close this case.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the

purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

**All Citations**

 **\*10**  SO ORDERED.

Not Reported in F.Supp.3d, 2014 WL 5089748

---

## Footnotes

1       Plaintiff refers to Defendant Janec as "Janee" in his papers.

2       In his Complaint and his opposition to Defendants' Motion for Summary Judgment, Plaintiff also appears to allege that he was subject to an unlawful search, although he does not assert this as a separate claim.

3       Facts recited as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there is no non-conclusory contrary factual proffer. Citations to the parties' respective Local Civil Rule 56.1 Statements ("Def. 56.1 St." or "Pl. 56.1 St.") incorporate by reference the parties' citations to underlying evidentiary submissions.

4       Plaintiff argues that there was no 911 call made to the police officers. (Pl 56.1 St. ¶ 6; see also Pl. Mem. In Opp. (ECF docket entry no. 43) at ECF pp. 40, 55.) Although Plaintiff cites to a New York City Police Department "Stop, Question & Frisk Report," which indicates that the police officers were not on a radio run on the afternoon of Plaintiff's arrest (*see id.,* Ex. F); the New York City Police Complaint Report from the same incident indicates that the victims' complaint was received by the police over the radio (see Declaration of Aimee K. Lulich ("Lulich Decl."), Ex. E). For the purposes of the instant motion, it does not matter how the police officers first heard about the complaint, as the victims identified the Plaintiff once the officers had arrived on the scene.

5       The claims relating to the handcuffs are mentioned for the first time in his opposition and Plaintiff has not pleaded claims for excessive force in this case.

6       In 2007, Plaintiff had been convicted of unauthorized use of a motor vehicle in the second degree, and sentenced to two to four years in prison. Plaintiff was incarcerated from October 20, 2007, to August 31, 2010, when he was released subject to the conditions of parole. (Def. 56.1 St. ¶ 3.) As part of his parole conditions, plaintiff was required to report any arrest to his parole officer and to check-in with his parole officer once a week. (*Id.*)

7       In his opposition submission, Plaintiff contends that he did report the November 3, 2010, arrest to his parole officer (Pl. 56.1 St. ¶ 5), and denies that his parole was revoked, but his deposition testimony was to the contrary. *See* Lulich Decl., Ex. B., Tr. 78:121–22.

8       Plaintiff disputes that the bail was set at $1.00 because there was a parole hold on Plaintiff, but admits that it was set at $1.00. (Pl. 56.1 St. ¶ 13.)

9       Although the Certificate of Disposition proffered by Defendants refers to a conviction upon a plea, in the sentencing transcript proffered by Plaintiff in his opposition papers, the sentencing judge discusses a bench trial and the evidence presented therein. (*See* Pl. Mem. in Opp., Ex. A, at ECF pp. 90–97; ECF docket entry no. 43–1, at ECF pp. 1–3.)

10      Plaintiff disputes that the charges were dismissed as being "covered by his felony conviction and sentence" and proffers his own assertion that there was a final determination in his favor. (Pl. 56.1 St. ¶ 18.) Defendants'

version is, however, corroborated by the disposition documentation proffered by Plaintiff in his opposition and by Defendants in support of this motion—the Certificate of Disposition of the charges arising from the December 13, 2010, arrest notes "DISM–CONVICTION UNRELATED DKT 5448–2010" and a "Record of Court Action" reads in relevant part "Dismissed as covered by Ind. 5448/2010." (*See* Pl. Opp. Mem., Ex. R., ECF docket entry no. 44–10, at ECF pp. 14–15; Lulich Decl., Ex. J.)

11    Defendants argue that neither of the named Defendant officers conducted the search, but this is a disputed issue of fact, as Plaintiff claims that the Defendants were personally involved or, at the very least, failed to intervene.

12    Furthermore, aside from naked boilerplate allegations against the City of New York in his opposition, the Plaintiff has also not sufficiently demonstrated that the City of New York had a custom, policy, or practice of conducting unlawful arrests, searches, or engaging in malicious prosecution so as to sustain a section 1983 claim.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 69 of 260

Brown v. Peters, Not Reported in F.Supp. (1997)

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,
v.
Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

**Attorneys and Law Firms**

Kenneth Brown, State Court Institute–Greene, Waynesburg, PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The Capitol Albany, NY, for defendants Peters, Herman Stewart, Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant Attorney General, Carl N. Lundberg, Chief Legal Counsel, South Carolina Department of Probation, Columbia, SC, for defendants Bishop, Magee, Barton, McMahan, and Stanford, Carl N. Lundberg, of Counsel.

DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–Recommendation by Magistrate Judge Daniel Scanlon, Jr., duly filed on April 17, 1997. Following ten days from the service thereof, the Clerk has sent me the entire file, including any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an amended complaint alleging the specific acts committed by the individuals named as defendants which Brown claimed violated his constitutional rights. Brown filed an amended complaint on March 21, 1996. In his amended complaint, Brown alleged that defendants violated his rights under the Eighth and Fourteenth Amendments by failing to process properly his interstate compact paperwork, resulting in Brown being imprisoned pursuant to a parole hold when in fact he had never violated the conditions of his parole. For a more complete statement of Brown's claims, see his amended complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made a motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On August 19, 1996, defendants Bishop, Magee, Barton, and McMahan made a motion to dismiss the complaint against them or, in the alternative, for summary judgment. Dkt. No. 20. On October 17, 1996, defendants Herman, Stewart, and Stanford made a motion to dismiss for failure to state a claim. Dkt. No 34. On April 17, 1996, Magistrate Judge Scanlon recommended that all defendants' motions to dismiss be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the magistrate judge's report-recommendation, having been granted additional time in which to do so. Dkt. No. 52. In addition, Brown filed on June 9, 1997, a motion for leave to file a second amended complaint and a copy of his proposed amended complaint. Dkt. No. 53. I turn first to the last motion filed, Brown's motion for leave to amend his complaint a second time.

Brown seeks to file a second amended complaint "setting forth in detail the personal involvement of each defendant and how their acts of commission and omission served to deprive plaintiff of Constitutionally secured rights." Dkt. No. 53. The district court has discretion whether to grant leave to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993). In exercising that discretion, the court should freely grant leave to amend when justice so requires. Fed.R.Civ.P. 15(a). However, the court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional allegations against the named defendants. However, the additional allegations fail to cure the deficiency which

Case 3:24-cv-00102-GTS-ML Document 102 Filed 04/07/26 Page 70 of 260

Brown v. Peters, Not Reported in F.Supp. (1997)

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, *2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P. 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrier v. Leonardo,* 1991 WL 44838, *1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, *2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, *1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, *1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Case 3:24-cv-00102-GTS-ML Document 102 Filed 04/07/26 Page 71 of 260

Brown v. Peters, Not Reported in F.Supp. (1997)

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

## CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

## ORDER and REPORT–RECOMMENDATION

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

## BACKGROUND

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In

October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 72 of 260

Brown v. Peters, Not Reported in F.Supp. (1997)

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 73 of 260

Brown v. Peters, Not Reported in F.Supp. (1997)

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dimiss should be granted.

### B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

### C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

### D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

### E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

### CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

**Footnotes**

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady County Jail;
Cheryl Clark, M.D.; Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

### *DECISION and ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at *1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

**\*2** WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 76 of 260

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order. [1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

**Footnotes**

1     Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

---

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 118169
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Lakim CROWN, Plaintiff,

v.

Warden WAGENSTEIN; Parker T. # 10639 of
Emergency Response Unit, et al., Defendants.

No. 96 CIV. 3895(MGC).
|
March 16, 1998.

**Attorneys and Law Firms**

Lakim Crown, Brooklyn, for Plaintiff, Pro Se.

Paul A. Crotty, Esq., Corporation Counsel of the City of New York, Attorney for Defendants Wangenstein and Parker, New York, By Renee R. Nebens, Esq.

OPINION AND ORDER

CEDARBAUM, J.

**\*1** This is an action for damages brought by a pro se plaintiff pursuant to 42 U.S.C. § 1983. Defendant Wangenstein moves, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the complaint for failure to state a claim upon which relief can be granted against him in either his personal or official capacity. For the reasons discussed below, defendant's motion is granted.

The complaint alleges that on November 28, 1995, while plaintiff was incarcerated at New York City's Otis Bantum Correctional Center ("OBCC"), plaintiff was assaulted by a number of correction officers. (Compl. at 3–4). As a result, plaintiff alleges that he sustained injuries to his head, neck, back, and right leg. (Compl. at 4). In addition to the officers involved in the assault, plaintiff sues Wangenstein, the warden of OBCC at the time of the alleged assault.

Discussion

A motion to dismiss for failure to state a claim must be granted if, when viewed in the light most favorable to the plaintiff and when all allegations of the complaint are accepted as true, it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle him to relief. *Bolt Electric, Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). In addition, a complaint and supporting papers prepared by a pro se plaintiff must be read liberally and interpreted to "raise the strongest arguments they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995).

When an individual defendant is sued under § 1983, that defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to an award of damages. *See Wright v.. Smith,* 21 F.3d 496, 501 (2d Cir.1994). For a claim under § 1983, a complaint sufficiently alleges personal involvement of a supervisory official if it alleges one of the following: (a) direct participation in the alleged wrong; (b) failure to remedy a violation after receiving notice of it; (c) creation of a policy or custom under which unconstitutional practices occur; or (d) grossly negligent management of subordinates who cause the constitutional violation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official capacity is treated as a claim against the municipality itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). Section 1983 imposes liability on municipalities only when the action that is alleged to be unconstitutional implements or executes an official policy or custom. *See Monell v. Department of Social Services,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

From the complaint, it is unclear whether Wangenstein is being sued in his personal or official capacity. However, pro se complaints, if possible, should be construed as asserting both claims. *Jackson v. Dinkins,* 1995 WL 657075 at \*1 (S.D.N.Y. Nov.8, 1995)(citing *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.)("a plaintiff who has not clearly identified in her complaint the capacity in which the defendant is sued should not have the complaint automatically construed as focusing on one capacity to the exclusion of the other"), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)).

**\*2** The complaint does allege an assault by certain members of the OBCC Emergency Response Unit. (Compl. at 3–4). It alleges that while the plaintiff was making a telephone call, members of the Emergency Response Unit entered housing area 1N and defendant Parker verbally harassed the plaintiff, and with the assistance of other members of the Emergency Response Unit, assaulted him. (Compl. at 3–4). However, the complaint does not allege the personal involvement of Warden Wangenstein. The complaint mentions Warden

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 78 of 260

**Crown v. Wagenstein, Not Reported in F.Supp. (1998)**

Wangenstein only in the caption, and fails to allege any act or omission by Wangenstein. *See Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)(Edelstein, J.)(finding mere inclusion of warden's name in a complaint insufficient to allege personal involvement).

As for Warden Wangenstein's liability in his official capacity, the complaint fails to allege a municipal policy or custom that defendant was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation prevents a finding of liability for defendant Wangenstein in his official capacity. *See Monell,* 436 U.S. at 694.

Conclusion

Because the complaint fails to state a claim against Warden Wangenstein upon which relief can be granted, the motion to dismiss defendant Wangenstein is granted.

SO ORDERED

**All Citations**

Not Reported in F.Supp., 1998 WL 118169

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2325074
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

William M. DEAN, Plaintiff,
v.
Anthony J. ANNUCCI, et al., Defendants.

9:22-CV-0746 (BKS/ML)
|
Signed March 2, 2023

**Attorneys and Law Firms**

WILLIAM M. DEAN, Plaintiff, Pro Se, 11-B-0996, Marcy
Correctional Facility, P.O. Box 3600, Marcy, NY 13403.

AIMEE COWAN, ESQ., Ass't Attorney General, HON.
LETITIA JAMES, New York State Attorney General,
Attorney for Defendants, The Capitol, Albany, NY 12224.

## DECISION AND ORDER

BRENDA K. SANNES, Chief United States District Judge

## I. INTRODUCTION

 **\*1** Plaintiff William Dean commenced this action pursuant
to 42 U.S.C. § 1983 ("Section 1983") by filing a pro
se civil rights complaint together with an application for
leave to proceed in forma pauperis ("IFP") and a motion
for preliminary injunctive relief. Dkt. No. 1 ("Compl.");
Dkt. No. 6 ("IFP Application"); Dkt. No. 4 ("Preliminary
Injunction Motion"). [1] By Decision and Order entered on
September 10, 2022, this Court granted plaintiff's IFP
Application, and following review of the complaint pursuant
to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b),
dismissed several claims and defendants from this action, and
found that plaintiff's First Amendment mail tampering claims
against defendants Debejian, Sheehan, and Leone survived
sua sponte review and required a response. Dkt. No. 10
("September 2022 Order"). The Court also directed these
defendants to respond to plaintiff's Preliminary injunction
Motion within thirty (30) days of service. *Id.* at 28.

Thereafter, counsel appeared on behalf of defendants
Debejian, Sheehan, and Leone, and plaintiff filed a motion
for default judgment as well as discovery requests. *See*
Dkt. Nos. 15 and 20 ("Notices of Appearance"); Dkt. No.

25 ("Discovery Requests"); Dkt. No. 26 ("Motion for
Default Judgment"). By Text Order entered on December 9,
2022, Magistrate Judge Miroslav Lovric directed the Clerk
to strike the Discovery Requests from the docket based
on a determination that the filing violates N.D.N.Y. L.R.
26.2[,]" and advised plaintiff that the Court "does not accept
the filing of discovery materials, such as, Interrogatories,
Document Requests, Discovery Responses, etc., unless the
court specifically directs such documents be filed or when
submitted in support of a motion filed pursuant to Rule
37 of the Federal Rules of Civil Procedure." Dkt. No.
27 ("Discovery Order"). Days later, counsel answered the
complaint on behalf of defendants Debejian, Sheehan, and
Leone, and a Mandatory Pretrial Discovery and Scheduling
Order was issued. Dkt. No. 28 ("Answer"); Dkt. No. 30
("Scheduling Order").

On December 19, 2022, the Court received a letter request
from plaintiff to amend and supplement his complaint,
together with a proposed amended and supplemental
complaint. Dkt. No. 32 ("Letter Request to Amend"); Dkt.
No. 32-1 ("Am. Compl.").

By Decision and Order entered on December 22, 2022,
the Court denied the Preliminary injunction Motion without
prejudice and denied the Motion for Default Judgment. Dkt.
No. 33 ("December 2022 Order").

Presently before the Court are the following: (1) plaintiff's
Letter Request to Amend and proposed amended and
supplemental complaint, Dkt. No. 32; (2) plaintiff's appeal of
a portion of the Scheduling Order, Dkt. No. 34 ("Appeal of
the Scheduling Order"); (3) counsel's letter request that the
Court review plaintiff's proposed amended and supplemental
complaint in accordance with 28 U.S.C. § 1915(e)(2)(B)
and 28 U.S.C. § 1915A(b), Dkt. No. 36 ("Counsel's Letter
Regarding the Amended Complaint"); and (4) plaintiff's
motion for reconsideration of the December 2022 Order, Dkt.
No. 38 ("Motion for Reconsideration").

 **\*2** Counsel has opposed plaintiff's Appeal of the Scheduling
Order and Motion for Reconsideration. Dkt. Nos. 39, 42.

## II. PLAINTIFF'S LETTER REQUEST TO AMEND
Rule 15(a) of the Federal Rules of Civil Procedure allows a
party to amend its pleading "once as a matter of course within:
(A) 21 days after serving it, or (B) if the pleading is one to
which a responsive pleading is required, 21 days after service
of a responsive pleading or 21 days after service of a motion

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 80 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave[, and] [t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a).

Rule 15(d) of the Federal Rules of Civil Procedure allows a party, "[o]n motion and reasonable notice, ... to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d). A party may supplement to include subsequent occurrences "absent prejudice to the nonmoving party." *Albrecht v. Long Island R.R.*, 134 F.R.D. 40, 41 (E.D.N.Y. 1991). "It is also proper to permit the filing of a supplemental pleading to add additional parties." *Tobin v. Rell*, No. 3:05-CV-1079, 2007 WL 1520111, at *2 (D. Conn. May 18, 2007) (citing *Griffin v. County School Bd. of Prince Edward County*, 377 U.S. 218, 227 (1964)). In the case of proposed amendments where new defendants are to be added, the Court must also look to Rule 21 of the Federal Rules of Civil Procedure, which states that a party may be added to an action "at any time, on just terms." Fed. R. Civ. P. 21.

The standard for a motion to supplement is the same as for a motion to amend the pleadings under Fed. R. Civ. P. 15(a). *Klos v. Haskell*, 835 F. Supp. 710, 715 (W.D.N.Y. 1993) (Fisher, M.J.), *adopted by* 835 F. Supp. at 713 (W.D.N.Y. 1993) (Telesca, D.J.). Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000); *see also Couloute v. Ryncarz*, No. 11-CV-5986, 2012 WL 541089, at *3 (S.D.N.Y. Feb. 17, 2012) (quoting *Monahan*, 214 F.3d at 283). The decision to grant or deny a motion to amend or supplement is committed to the sound discretion of the trial court and the court's decision is not subject to review on appeal except for abuse of discretion. *Nettis v. Levitt*, 241 F.3d 186, 192 (2d Cir. 2001); *Fielding v. Tollaksen*, 510 F.3d 175, 179 (2d Cir. 2007). [2]

**\*3** Counsel concedes that plaintiff's proposed amended and supplemental complaint was filed as of right, and has not raised any objection to the manner in which the submission was presented to the Court. *See* Dkt. No. 36. Accordingly, plaintiff's Letter Request to Amend is granted insofar as plaintiff wishes for the Court to consider his proposed amended and supplemental complaint as the operative pleading. The Clerk is directed to file the proposed amended

and supplemental complaint as the amended complaint, which the Court must now review for sufficiency in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). Counsel's Letter Regarding the Amended Complaint is granted in this regard.

## III. SUFFICIENCY OF THE AMENDED COMPLAINT

### A. The Complaint and September 2022 Order

In his original complaint, plaintiff asserted claims based on alleged wrongdoing that occurred during his confinement at Marcy Correctional Facility ("Marcy C.F."). *See generally* Compl. The complaint named the following officials as defendants: (1) Cathy Sheehan, the Deputy Acting Commissioner and Counsel for the New York State Department of Corrections and Community Supervision ("DOCCS"); (2) C.F. Leone, the Supervising Librarian and Law Library Coordinator for DOCCS; (3) former Marcy C.F. Deputy Superintendent of Programs ("DSP") Debejian; (4) Patrick Reardon, the Superintendent of Marcy C.F.; (5) P. Dormey, Counsel for DOCCS; (6) Pat Collver, Acting DSP at Marcy C.F.; (7) Jeffrey McKoy, Deputy Commissioner of Programs; (8) DOCCS Commissioner Annucci; (9) New York State Attorney General Letitia James; and (10) DOCCS. Compl. at 1-5.

The complaint was construed to assert the following claims against the named defendants: (1) First Amendment access-to-courts claims; (2) First Amendment mail tampering claims; and (3) Fourteenth Amendment equal protection claims. September 2022 Order at 12.

After reviewing the complaint pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A, the Court found that only plaintiff's First Amendment mail tampering claims against defendants Debejian, Sheehan, and Leone survived sua sponte review. *See* September 2022 Order at 27. Plaintiff's Section 1983 claims for money damages against DOCCS were dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment, and his remaining claims were dismissed without prejudice for failure to state a claim upon which relief may be granted. *Id*.

### B. Overview of the Amended Complaint

Because plaintiff is proceeding in forma pauperis and is an inmate suing government employees, his amended and

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 81 of 260

supplemental complaint must be reviewed in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b). The legal standard governing the dismissal of a pleading for failure to state a claim pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) was discussed at length in the September 2022 Order and it will not be restated in this Decision and Order. *See* September 2022 Order at 2-4.

As with the original complaint, plaintiff's amended and supplemental complaint alleges wrongdoing associated with the conditions of his confinement at Marcy C.F., and reasserts Section 1983 claims against the same ten defendants. *See generally*, Am. Compl. Although the 156-page pleading, which is both rambling and at times repetitive, includes each of the allegations set forth in the original complaint, it also includes several new allegations regarding state court actions that plaintiff has initiated since 2011 in furtherance of his effort to overturn his criminal conviction, as well as allegations regarding how those actions were impacted by the denials of copying and mailing services that plaintiff experienced. *See* Am. Compl., ¶¶ 1-86, 96, 101, 260-275, 377, 413-429, 442. The amended complaint also contains supplemental allegations of mail tampering since the last alleged incident of wrongdoing discussed in the original complaint. *Id.*, ¶¶ 87-171.

**\*4** Liberally construed, the amended complaint asserts the following claims against DOCCS and the named defendants in their individual and official capacities:[3] (1) First Amendment interference with access-to-courts claims; (2) First Amendment mail tampering claims; and (3) Fourteenth Amendment equal protection claims.[4]

**\*5** Plaintiff seeks money damages and injunctive relief. Am. Compl. at 154-55. For a more complete statement of plaintiff's claims, reference is made to the amended complaint.

### C. Analysis

#### 1. Eleventh Amendment Immunity

The Eleventh Amendment has long been construed as barring a citizen from bringing a suit against his or her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens

or Subjects of any Foreign State."); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890); *Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the claims asserted in plaintiff's amended complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *Dawkins v. State of New York,* No. 5:93-CV-1298 (RSP/GJD), 1996 WL 156764 at \*2 (N.D.N.Y. 1996).

As noted in the September 2022 Order, "[s]tate immunity extends not only to the states, but also to state agencies." *See* September 2022 Order at 14 (citations omitted). Furthermore, the Eleventh Amendment bars suits for damages against state officials acting in their official capacities. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985) (a claim for damages against state officials in their official capacity is considered to be a claim against the State and is therefore barred by the Eleventh Amendment); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir. 1993) ("To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir. 1993) ("[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities.")

Accordingly, insofar as plaintiff seeks monetary damages under Section 1983 against DOCCS or any other defendant in his or her official capacity, such claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) as barred by the Eleventh Amendment.[5]

#### 2. Defendant James

**\*6** "Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi,* No. 9:06-CV-889 (GTS/DRH), 2007 WL 607341, at \*1 (N.D.N.Y. Feb. 20, 2007) (citing *Gonzalez v. City of New York,*

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 82 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

No. 97-CV-2246, 1998 WL 382055, at *2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, No. 96-CV-3895, 1998 WL 118169, at *1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

Here, plaintiff names New York State Attorney General Letitia James as a defendant, but the body of the amended complaint lacks any allegations of wrongdoing by this official. *See generally*, Am. Compl. Furthermore, the Court has no basis to plausibly infer that this official, who is not employed by the New York State Department of Corrections and Community Supervision, possessed the authority to address, in any respect, the alleged wrongdoing detailed in the amended complaint. *See, e.g., Kregler v. City of New York*, 821 F. Supp. 2d 651, 658-59 (S.D.N.Y. 2011) ("Because it is undisputed that Schwam and Keenaghan were subordinates and thus lacked the authority to prevent the alleged constitutional violation caused by their supervisor, Kregler's claim of deliberate indifference fails as a matter of law."); *Kuolkina v. City of New York*, 559 F. Supp. 2d 300, 317 (S.D.N.Y. 2008) (dismissing claims against state officials who "did not have the authority to take action with respect to any constitutional violation plaintiffs may have suffered" (collecting cases)).

For these reasons, plaintiff's Section 1983 claims against defendant James are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Access-to-Courts Claims

The legal standard governing First Amendment access-to-courts claims was discussed at length in the September 2022 Order, and will not be restated herein. *See* September 2022 Order at 16-19.

In light of plaintiff's new allegations regarding state court actions that were dismissed in 2021, and complications he has experienced in other proceedings that seek to obtain evidence he believes is necessary to challenge his criminal conviction, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's access-to-courts claims against defendants Debejian, Sheehan, Leone,

McKoy, and Collver survive sua sponte review and require a response insofar as these claims are based on these officials denying plaintiff access to copies and/or mail to which he was allegedly entitled. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion. [6]

**\*7** The Court, however, reaches a different conclusion with respect to defendants Annucci, Dormey, and Reardon.

### (a) Defendant Annucci

The amended complaint alleges that defendant Annucci (1) is responsible for overseeing each DOCCS correctional facility, (2) "has a[n] inherent and ethical duty to see that any and all ... unlawful or unconstitutional practices/violations are brought to his direct attention[,]" (3) has "direct knowledge" of "problems" plaintiff has experienced with obtaining legal copies for court filings through "being provided several copies of letters and complaints sent to him ... since on or about April 17, 2021[,]" and (4) has failed to investigate, "respond[ ] or correct[ ] the problems for more than 17 months[.]" Am. Compl. at 4-8.

The amended complaint, however, also alleges that defendant Sheehan received the same letters and complaints as defendant Annucci regarding plaintiff's inability to obtain legal copies for court filings, and has "correspond[ed]" with plaintiff regarding his copying and mailing issues. Am. Compl. at 9-10. The amended complaint further alleges that on certain occasions after defendants Debejian and Collver denied a request made by plaintiff for legal copies, these officials advised plaintiff that "Albany counsel agreed" that plaintiff was not entitled to his requested copies because he "had advances in the excess of $20.00 on the books already[.]" *Id.* at 15.

The law is well-settled that a senior-ranking official such as the DOCCS Commissioner is entitled to delegate decision-making authority over matters to other officials such as the Deputy Commissioner and Counsel for DOCCS. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (finding no personal involvement where DOCCS Commissioner referred inmate's letters to subordinates); *Amaker v. Goord*, No. 98-CV-3634, 2002 WL 523371, *16 (S.D.N.Y. Mar. 29, 2002) (holding that sending letters to commissioner, which were responded to by other prison officials, was insufficient to establish supervisory liability); *Walker v. Pataro*, No. 99-

CV-4607, 2002 WL 664040, at \*12 (S.D.N.Y. Apr. 23, 2002) ("[W]here a supervisory official like the Commissioner of Corrections ... receives letters or similar complaints from an inmate and does not personally respond, the supervisor is not personally involved and hence not liable.... [T]he Commissioner and individual prison Superintendents receive innumerable letters and other forms of inmate complaints and delegate subordinates to handle them ... Thus, if mere receipt of a letter or similar complaint were enough, without more, to constitute personal involvement, it would result in liability merely for being a supervisor, which is contrary to the black-letter law that § 1983 does not impose respondeat superior liability."). Furthermore, the Second Circuit recently clarified that "there is no special rule for supervisory liability." *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id.* (quoting *Iqbal*, 556 U.S. at 676); *see also Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (noting that a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Thus, the alleged failure by defendant Annucci to respond to plaintiff's letters is not enough to plausibly suggest that he was personally involved in the alleged wrongdoing. *See, e.g., Braxton v. Bruen*, No. 9:17-CV-1346 (BKS/ML), 2021 WL 4950257, at \*6 (N.D.N.Y. Oct. 25, 2021) ("Even before *Tangreti*, receipt by a supervisory official of a letter from an inmate, without more, has been insufficient to establish the official's personal involvement in a § 1983 constitutional claim." (collecting cases)); *Quirk v. DiFiore*, No. 20-CV-5027, 2022 WL 268976, at \*3 (S.D.N.Y. Jan. 28, 2022) (dismissing Section 1983 claim against Chief Judge DiFiore where complaint alleged only that this official failed to respond to a letter sent to her by the plaintiff on one occasion, which is insufficient to plausibly suggest her personal involvement in the alleged constitutional violation); *Tripathy v. Schneider*, No. 21-CV-6392, 2021 WL 4504461, at \*3 (W.D.N.Y. Oct. 1, 2021) (dismissing Section 1983 claim against Commissioner of New York State Department of Corrections and Community Supervision and Governor of New York where complaint alleged only that these officials "failed to respond" to plaintiff's complaints of wrongdoing, noting that "the failure to respond to letters protesting unconstitutional actions and/or requesting an investigation is, without more, insufficient to establish personal involvement"); *Peck v. Cnty. of Onondaga, New York*, No. 5:21-CV-651, 2021 WL 3710546, at \*10 (N.D.N.Y. Aug. 20, 2021) ("Peck's allegation that Conway failed to remedy the discriminatory conduct against her at the Sheriff's Office after June 18, 2020 essentially argues that he was deliberately indifferent to an ongoing violation.... Yet *Tangreti* demands more.... Plaintiff must allege that Conway actively participated in a constitutional violation, and this allegation does not further that end."), *reconsideration denied*, 563 F. Supp. 3d 18 (N.D.N.Y. 2021); *Brown v. Montone*, No. 17-CV-4618, 2018 WL 2976023, at \*4 (S.D.N.Y. June 13, 2018) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.") (quoting *Allah v. Annucci*, No. 16-CV-1841, 2017 WL 3972517, at \*7 (S.D.N.Y. Sept. 7, 2017)); *cf. McCrary v. Marks*, 836 Fed. App'x 73, 74 (2d Cir. 2021) (explaining that where "the most [plaintiff] alleged is that [defendant] received his letter and directed someone at the [agency] to respond to it[, t]hat is clearly not enough to state a claim").

\*8 Accordingly, plaintiff's access-to-courts claim against defendant Annucci is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### (b) Defendant Dormey

The amended complaint alleges that defendant Dormey has had "direct ... contact ... with [plaintiff's] ... immediate family via email in response to their complaints on [plaintiff's] behalf" regarding copying and mailing issues. Am. Compl. at 11. The amended complaint lacks any allegations regarding what plaintiff's family members communicated to defendant Dormey, what he said in response, or when these communications occurred. Furthermore, even assuming these allegations plausibly suggest that defendant Dormey was made aware of plaintiff's issues with access to legal copies and mail at some point, awareness alone is not enough to plausibly suggest that this official was personally involved in the alleged deprivations that plaintiff suffered, particularly because at the time of the alleged violations, plaintiff alleges that other "Albany" officials considered and dismissed his complaints. *See, e.g., Johnson v. Owens*, No. 9:20-CV-0982 (LEK/CFH), 2022 WL 958127, at \*7 (N.D.N.Y. Mar. 30, 2022) ("[S]imply stating that an official was, at some point, made aware of violations, without more, is not sufficient to plausibly allege personal involvement." (citing *Gawlik v.*

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 84 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

*Semple*, No. 20-CV-564, 2021 WL 4430601, at *13 (D. Conn. Sept. 27, 2021) ("Gawlik alleges only that those defendants were made aware of the confiscation of his religious items after the fact and failed to take action.... [T]hose allegations are insufficient—in the aftermath of *Tangreti*—to support a claim for money damages against supervisory officials.")));  *Fabrizio v. Smith*, No. 9:20-CV-0011 (GTS/ML), 2021 WL 2211206, at *10 (N.D.N.Y. Mar. 10, 2021) ("In the Complaint, Plaintiff alleged that Mauro and Smith were personally involved because they failed to remedy ongoing First Amendment violations after becoming aware of the retaliation through grievances and appeals.... In light of *Tangreti*, Plaintiff's attempt to plead personal involvement based upon the denial of a grievance and/or appeals, lacks merit because it does not plausibly suggest '[t]he factors necessary to establish' a First Amendment retaliation claim."), *report and recommendation adopted by* 2021 WL 2211023 (N.D.N.Y. June 1, 2021); *Smart v. Annucci*, No. 19-CV-7908, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("That [Defendants] failed to act on Plaintiff's complaints ... cannot support the inference that these Defendants, through '[their] own individual actions, [have] violated the Constitution.' "); *Sealey*, 116 F.3d at 51.

Accordingly, plaintiff's access-to-courts claim against defendant Dormey is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### (c) Defendant Reardon

The amended complaint alleges that plaintiff complained to defendant Reardon about his inability to obtain legal copies on and after July 22, 2021, and filed a grievance "directed to him on or about September 29, 2021[,]" and defendant Reardon simply responded by "assigning [plaintiff's] grievance [and] letters to the DSP, IGP, and IRC." Am. Compl. at 13-14.

**\*9** As with plaintiff's claim against defendant Annucci, defendant Reardon's alleged decision to defer to other officials to address plaintiff's complaints is not enough to plausibly suggest that he was personally involved in the alleged wrongdoing, particularly because plaintiff alleges that "Albany counsel" was involved in at least some of the determinations that plaintiff was not entitled to certain copies. *See Sealey*, 116 F.3d at 51; *Perez v. Annucci*, No. 20-CV-8069, 2021 WL 5568005, at *4 (S.D.N.Y. Nov. 29, 2021) ("Even

assuming the signature on the grievance denial belongs to Supt. Griffin, the denial itself merely reflects that Griffin deferred his decision to the results of the investigation of a medical professional, and thus does not establish personal involvement in the denial of plaintiff's medical care."), appeal dismissed (Apr. 1, 2022); *Vega v. Artus*, 610 F. Supp. 2d 185, 199 (N.D.N.Y. 2009) (stating that facility superintendent's act of "referring [plaintiff's] letters to staff for investigation is not sufficient to establish [his] personal involvement"); *Farid v. Goord*, 200 F. Supp. 2d 220, 235 (W.D.N.Y. 2002) (dismissing claims of personal involvement against supervisory official who merely sent grievances "down the chain of command for investigation").

Accordingly, plaintiff's access-to-courts claim against defendant Reardon is dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### 4. Mail Tampering Claims

The legal standard governing First Amendment mail tampering claims was discussed at length in the September 2022 Order, and will not be restated herein. *See* September 2022 Order at 16-19.

Mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's mail tampering claims against defendants Debejian, Sheehan, Leone, McKoy, and Collver survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

For the same reasons discussed above in Section III.C.3, plaintiff's mail tampering claims against defendants Annucci, Dormey, and Reardon are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

#### 5. Equal Protection Claims

The legal standard governing Fourteenth Amendment equal protection claims was discussed at length in the September

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 85 of 260

2022 Order, and will not be restated herein. *See* September 2022 Order at 23-24.

Although the amended complaint differs from the original complaint in that plaintiff now alleges that he suffers from multiple disabilities, *see* Am. Compl. at 85, the amended complaint is devoid of any allegations which plausibly suggest that plaintiff was intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *See Village of Willowbrook,* 528 U.S. at 564 (2000); *DeMuria,* 328 F.3d at 706. In fact, as with the original complaint, the amended complaint fails to identify any individuals treated differently than plaintiff under a similar situation.

Stated differently, the amended complaint lacks any allegations which plausibly suggest that (1) other inmates with insufficient funds for copying services and postage have been allowed to make copies of, or mail, certain types of legal documents that plaintiff has not been allowed to copy or mail, and/or (2) plaintiff has been denied copy and mailing services because of his disability. Instead, plaintiff's allegations that he was denied "equal protection" are entirely conclusory, which is not enough to survive sua sponte review. *See Iqbal,* 556 U.S. at 678 (concluding that a pleading that only "tenders naked assertions devoid of further factual enhancement" will not survive sua sponte review) (internal quotations and alterations omitted); *Twombly,* 550 U.S. at 555 ("[A] plaintiff's obligation ... requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."); *Thomas v. Pingotti,* No. 9:17-CV-0300 (GTS/DEP), 2017 WL 3913018, at *7 (N.D.N.Y. Sept. 6, 2017) ("Conclusory allegations of disparate treatment or a plaintiff's personal belief of discriminatory intent are patently insufficient to plead a valid claim under the Equal Protection clause.").

**\*10** Accordingly, plaintiff's equal protection claims are once again dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim against them upon which relief may be granted.

## IV. MOTION FOR RECONSIDERATION

A court may justifiably reconsider its previous ruling if: (1) there is an intervening change in the controlling law; (2) new evidence not previously available comes to light; or (3) it becomes necessary to remedy a clear error of law or to prevent manifest injustice. *Delaney v. Selsky,* 899 F. Supp. 923, 925 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Doe v. New York City*

*Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir. 1983)). The standard for granting a motion for reconsideration is strict. *Shrader v. CSX Transportation, Inc.,* 70 F.3d 255, 257 (2d Cir. 1995). A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* [7] Thus, a motion for reconsideration is not to be used for "presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple.'" *Sequa Corp. v. GBJ Corp.,* 156 F.3d 136, 144 (2d Cir. 1998).

Here, plaintiff seeks reconsideration of the December 2022 Order, apparently based on his belief that the rulings in that Order were legally incorrect in light of documents plaintiff had and had not received as of the date his motion was filed. *See* Dkt. No. 33. [8]

After thoroughly reviewing plaintiff's motion and affording it due consideration in light of his status as a pro se litigant, the Court finds that plaintiff presents no basis for reconsideration of the December 2022 Order. Based upon a review of the relevant law and its application to the facts of this case, the Court concludes that its previous decision was legally correct and did not work a manifest injustice. Thus, plaintiff's motion for reconsideration of the December 2022 Order is denied in its entirety.

## V. APPEAL OF THE SCHEDULING ORDER

"A district court judge reviewing a magistrate judge's non-dispositive ruling may not modify or set aside any part of that order unless it is clearly erroneous or contrary to law." *Gregory v. Stewart's Shops Corp.,* No. 14-CV-0033, 2016 WL 5409326, at *2 (N.D.N.Y. Sept. 28, 2016) (citing *Labarge v. Chase Manhattan Bank,* No. 95-CV-173, 1997 WL 583122, at *1 (N.D.N.Y. Sept. 3, 1997)); 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a). "A finding is clearly erroneous if the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Malowsky v. Schmidt,* No. 15-CV-666, 2017 WL 5496068, at *2 (N.D.N.Y. Jan. 9, 2017). "An order is contrary to law when it fails to apply or misapplies relevant statutes, case law, or rules of procedure." *Id.* at *2; *see also In re Hulley Enters. Ltd.,* 400 F. Supp. 3d 62, 70 (S.D.N.Y. 2019); *E.E.O.C. v. First Wireless Grp., Inc.,* 225 F.R.D. 404, 405 (E.D.N.Y. 2004). As such, a Magistrate Judge's order is clearly erroneous and contrary to law where the Magistrate applies an incorrect legal standard. *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 119 F.R.D. 625, 626 (E.D.N.Y. 1988).

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 86 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

**\*11** Plaintiff appeals the Scheduling Order insofar as it (1) prohibits him from serving counsel with written discovery demands until sixty days after entry of the Scheduling Order, and (2) limits defendants to providing only 300 free pages of documents in the mandatory disclosures and requires that plaintiff prepay for copies of documents in excess of this amount. *See* Appeal of the Scheduling Order.

Insofar as plaintiff challenges the timing of service of written discovery, more than sixty (60) days has passed since the entry of the Scheduling Order, and the written discovery period is therefore now open. As a result, plaintiff's challenge to this portion of the Scheduling Order is denied as moot.

Insofar as plaintiff challenges the provision of the Scheduling Order that requires him to prepay for documents in excess of 300 pages that may be in counsel's possession, the Scheduling Order requires defendants to provide plaintiff with "the documents in the care, custody, or control of any defendant or the defendant's employer if the employer is a public entity such as the New York State Department of Corrections and Community Supervision (DOCCS) related to the claims or defenses in the case[,]" provided that the total number of pages of the copies being produced does not exceed 300 pages. *See* Scheduling Order at 2-3. The Scheduling Order further states as follows:

> If ... the total number of pages of the copies being produced by either plaintiff(s) or defendant(s) exceeds 300, the producing party may make such documents available to the discovering party for inspection upon reasonable notice. If, after such inspection, the discovering party wishes to obtain copies of any such documents, copies of the first 300 pages requested shall be provided at the expense of the producing party. Any pages in excess of 300 shall be produced only upon the prepayment by the discovering party of the costs of reproduction of any pages beyond 300 at the rate of $.25 per page.

These requirements and restrictions are neither clearly erroneous nor contrary to law. Indeed, contrary to plaintiff's contention, the Scheduling Order in no way prevents him from reviewing more than 300 pages of documents in defendants' possession related to the claims or defenses in this case. Thus, this aspect of plaintiff's appeal is also denied.

If, following this Decision and Order, defendants' counsel represents to plaintiff that counsel is in possession of more than 300 pages of documents related to the claims or defenses in the case, and plaintiff determines, after reviewing these documents, that he does not possess, and therefore is in need of, more than 300 pages of these documents, he may bring the issue to the Court's attention, at which time plaintiff's concern will be ripe for consideration, and may warrant a modification to the free page limit.

**VI. CONCLUSION**
**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's Letter Request to Amend (Dkt. No. 32) is **GRANTED** insofar as plaintiff wishes for the Court to consider his proposed amended and supplemental complaint (Dkt. No. 32-1) as the operative pleading. The Clerk is directed to docket the proposed amended and supplemental complaint (Dkt. No. 32-1) as the amended complaint, which is accepted for filing and is the operative pleading; and it is further

**ORDERED** that Counsel's Letter Regarding the Amended Complaint (Dkt. No. 36) is **GRANTED** insofar as counsel sought the Court's review plaintiff's proposed amended and supplemental complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further

**\*12 ORDERED** that upon review of the amended complaint in accordance with 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b), the following claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's First Amendment access-to-courts claims against defendants Debejian, Sheehan, Leone, McKoy, and Collver based on these officials allegedly denying him access to copies and/or mail to which he was entitled; and (2) plaintiff's First Amendment mail tampering claims against defendants Debejian, Sheehan, Leone, McKoy, and Collver; and it is further

**ORDERED** that plaintiff's Section 1983 claims against DOCCS and each named defendants in his or her official

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 87 of 260

capacity are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted and as barred by the Eleventh Amendment;[9] and it is further

**ORDERED** that all remaining Section 1983 claims are **DISMISSED** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the Clerk shall **TERMINATE** all defendants other than Debejian, Sheehan, Leone, McKoy, and Collver from the docket; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with copies of the amended complaint, to the United States Marshal for service on defendants McKoy and Collver;[10] and it is further

**ORDERED** that upon the completion of service on defendants McKoy and Collver, a response to plaintiff's amended complaint be filed by these defendants and defendants Debejian, Sheehan, and Leone, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff's motion for reconsideration of the December 2022 Order (Dkt. No. 38) is **DENIED** as set forth above; and it is further

**ORDERED** that plaintiff's appeal of a portion of the Scheduling Order (Dkt. No. 34) is **DENIED** as set forth above; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions; motions will be decided on submitted papers, without oral argument, unless otherwise ordered by this Court. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

 **\*13** **ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2325074

---

**Footnotes**

1       By Order entered on July 14, 2022, plaintiff's initial application to proceed IFP was denied as incomplete and the action was administratively closed. Dkt. No. 5. Thereafter, plaintiff filed his IFP Application and the inmate authorization required in this District and the Clerk was directed to reopen this action and restore it to the Court's active docket. *See* Dkt. Nos. 6, 7, 8.

2       The Local Rules of Practice of the Northern District of New York require that a motion to amend or supplement be supported by a proposed pleading. N.D.N.Y.L.R. 7.1(a)(4). A plaintiff seeking to supplement a pleading must submit a proposed pleading which is limited to "transactions or occurrences or events which have

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 88 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

occurred since the date of the pleading that the party seeks to supplement," and which contains paragraphs numbered consecutively to the paragraphs contained in the pleading that it seeks to supplement. *Id.*

3    The amended complaint also identifies three officials that were allegedly involved in the identified wrongdoing, who are not named as defendants based on plaintiff's alleged fear of retaliation. *See* Am. Compl. at 148-149. While the Court is sympathetic to plaintiff's concerns, it is not for the Court to decide which officials should or should not be named as defendants. *See Levesque v. New York*, No. 8:13-CV-825, 2014 WL 4437629, at *8 (N.D.N.Y. Sept. 8, 2014) ("The court cannot provide legal advice to a litigant."). Since plaintiff acknowledges not naming these three officials as defendants, the Court does not construe the amended complaint to assert any claims against them. *See* Fed. R. Civ. P. 10(a) ("[T]he title of the complaint must name all the parties."); *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible" for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims); *Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007) ("If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case.").

4    The amended complaint also expressly alleges a due process violation, a violation of plaintiff's rights to a fair trial, and purports to assert a conspiracy claim. *See* Am. Compl. at 151-52. Insofar as the amended complaint attempts to assert a Fourteenth Amendment substantive due process claim based on plaintiff's alleged inability to make legal copies and send outgoing legal mail and access the courts, for the reasons discussed in the September 2022 Order, the Court once again finds that the First Amendment guides the Court's analysis of this alleged wrongdoing. *See* September 2022 Order at 12 n.4. Insofar as the amended complaint references a fair trial claim, the Court does not construe the pleading to assert any such claim in light of the absence of any allegations which plausibly suggest that any of the named defendants played any role in the criminal conviction that resulted in plaintiff's current confinement. *See Kayo v. Mertz*, 531 F. Supp. 3d 774, 800 (S.D.N.Y. 2021) ("The elements of a § 1983 fair trial claim are: 'an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result.' ") (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277 (2d Cir. 2016)). Finally, insofar as the amended complaint alleges that the named defendants "conspired with the New York State Police" by denying him access to legal copies and mail, plaintiff has failed to identify which officials he believes conspired to violate his constitutional rights, or explain how. Thus, the Court declines to construe the amended complaint to assert any additional claims under a conspiracy theory. *See Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002) (noting that to state a claim for conspiracy under Section 1983, the complaint must allege that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on the plaintiff, and (2) an overt act was committed in furtherance of that goal); *see also Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir. 1983) (holding that "[a] complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss"); *Brown v. City of Oneonta,* 106 F.3d 1125, 1133 (2d Cir. 1997) (holding that complaints containing only conclusory, vague or general allegations of a conspiracy to deprive a person of constitutional rights do not state a claim for relief). The Court would add only that because an alleged conspiracy to violate an individual's rights under Section 1983 is not an independent claim, but rather a theory of liability, plaintiff need not prove a conspiracy to succeed on any of his underlying claims that survive sua sponte review herein. *See Clark v. City of Oswego*, No. 5:03-CV-202(NAM/DEP), 2007 WL 925724, at *7 (N.D.N.Y. Mar. 26, 2007) ("A plaintiff asserting a Section 1983 conspiracy claim must first prove a violation of the underlying constitutional right, ..., or in other words, a civil conspiracy claim do[es] not set forth an independent cause of action but rather is sustainable only after an underlying tort claim has been established[.]" (internal quotation marks and citations omitted)).

5    In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court established an exception to state sovereign immunity in federal actions where an individual brings an action seeking injunctive relief against a state official

Case 3:24-cv-00102-GTS-ML Document 102 Filed 04/07/26 Page 89 of 260

Dean v. Annucci, Not Reported in Fed. Supp. (2023)

for an ongoing violation of law or the Constitution. Under the doctrine, a suit may proceed against a state official in his or her official capacity, notwithstanding the Eleventh Amendment, when a plaintiff, "(a) alleges an ongoing violation of federal law, and (b) seeks relief properly characterized as prospective." *See In re Deposit Ins. Agency*, 482 F.3d 612, 618 (2d Cir. 2007) (quotations and citations omitted); *see also Santiago v. New York State Dep't of Corr. Serv.*, 945 F.2d 25, 32 (2d Cir. 1991) (holding that such claims, however, cannot be brought directly against the state, or a state agency, but only against state officials in their official capacities).

6     The September 2022 Order dismissed plaintiff's First Amendment claims insofar as plaintiff sought to challenge the constitutionality of the DOCCS Directives governing advancements for legal copies and postage. *See* September 2022 Order at 22. For the reasons discussed in the September 2022 Order, insofar as plaintiff has reasserted any such claims in his amended complaint, these claims are once again dismissed.

7     Generally, motions for reconsideration are not granted unless "the moving party can point to controlling decisions or data that the court overlooked - matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader*, 70 F.3d at 257.

8     Plaintiff does not suggest that there has been an intervening change in the controlling law, nor has he presented new evidence which was not previously available. Instead, plaintiff's motion raises concerns regarding his alleged health issues and difficulties determining what documents he has been provided by the Court and defendants. *See generally*, Dkt. No. 33.

9     Generally, when a district court sua sponte dismisses claims brought by a pro se plaintiff, the plaintiff will be allowed to amend. *See Gomez*, 171 F.3d at 796. However, an opportunity to amend is not required with respect to claims with defects that are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Pucci v. Brown*, 423 Fed. App'x 77, 78 (2d Cir. 2011).

10    Because Aimee Cowan, on behalf of the Office of the New York State Attorney General, has appeared in this action as counsel for defendants Debejian, Sheehan, and Leone, the Clerk need not issue summonses for these defendants.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 90 of 260

2024 WL 1906594
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ellis Davon **DUDLEY**, II, Plaintiff,
v.
Governor Kathy **HOCHUL**, of New York; New York State; Dr. James V. McDonald; Randal B. Caldwell; Megan Johnson; Christina F. Dejoseph; Sandra Milner; Jeffrey A. Domachowski; Karen Stanislaus; Arlene Bradshaw; Julie A. Cecile; Onondaga County Sheriff; Patricia L. DeRue; Sue Ottaviano; Julie A. Cerio; Katie Boyea; David M. Primo; Martha E. Mulroy; Michelle Pirro Baily; Unkown; Hiscock Legal Aid; and Dep't of Health and Soc. Servs., Defendants.

5:



24
-
CV
-
0048
(DNH/ML)
|
Signed May 1, **2024**

**Attorneys and Law Firms**

ELLIS DAVON **DUDLEY**, II, Plaintiff, Pro Se, Post Office Box 7124, Syracuse, New York 13261.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent this *pro se* Complaint (Dkt. No. 1) together with an application to proceed *in forma pauperis* ("IFP") (Dkt. No. 2) and a motion for permission to file electronically in ECF (Dkt. No. 3) filed by Ellis Davon **Dudley**, II ("Plaintiff") to the Court for review. For the reasons discussed below, I (1) grant Plaintiff's IFP application (Dkt. No. 2), (2) recommend that Plaintiff's Complaint (Dkt. No. 1) be dismissed in its entirety without leave to amend, and (3) deny without prejudice Plaintiff's motion for permission to file electronically (Dkt. No. 3).

**I. BACKGROUND**

Liberally construed,[1] Plaintiff's Complaint asserts that his rights were violated by Defendants Governor Kathy **Hochul**, New York State, Dr. James V. McDonald, Randal B. Caldwell, Megan Johnson, Christina F. Dejoseph, Sandra Milner, Jeffrey A. Domachowski, Karen Stanislaus, Arlene Bradshaw, Julie A. Cecile, Onondaga County Sheriff, Patricia L. DeRue, Sue Ottaviano, Julie A. Cerio, Katie Boyea, David M. Primo, Martha E. Mulroy, Michelle Pirro Baily, Unknown, Hiscock Legal Aid, and Department of Health and Social Service (collectively "Defendants"), who were all involved in Plaintiff's state court family proceedings. (*See generally* Dkt. No. 1.)

The Complaint is difficult to decipher (*id.*), but alleges that Plaintiff has two minor children, whom Plaintiff refers to as "blue child" and "pink child" throughout the Complaint. (Dkt. No. 1 at 2.) The Complaint provides a timeline of Plaintiff's experiences with the New York State Family Court system dating back to July 9, 2019. (*Id.*) The crux of Plaintiff's grievance appears to be that (1) the court-ordered child support is excessive, (2) Plaintiff and his family have somehow "lost" their nationality because of the family court proceedings, and (3) Plaintiff's wages were garnished to pay his court-ordered child support and he did not consent to the seizure of his property. (*See generally* Dkt. No. 1.)

The Complaint appears to assert the following nine causes of action: (1) a claim of racketeering, (2) a claim that Plaintiff's rights pursuant to the First Amendment and 42 U.S.C. § 1983 were violated; (3) a claim that Plaintiff's rights pursuant to the Second Amendment and 42 U.S.C. § 1983 were violated; (4) a claim that Plaintiff's rights pursuant to the Fourth Amendment and 42 U.S.C. § 1983 were violated; (5) a claim that Plaintiff's rights pursuant to the Fifth Amendment and 42 U.S.C. § 1983 were violated; (6) a claim that Plaintiff's rights pursuant to the Sixth Amendment and 42 U.S.C. § 1983 were violated; (7) a claim that Plaintiff's rights pursuant to the Eighth Amendment and 42 U.S.C. § 1983 were violated; (8) a claim that Plaintiff's rights pursuant to the Thirteenth Amendment and 42 U.S.C. § 1983 were violated; and (9) a claim that Plaintiff's rights pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983 were violated. (Dkt. No. 1 at 6.) As relief, Plaintiff seeks damages in the "amount of 20 million dollars or a full disclosure of all contract terms for a consideration to acceptance at the agreement of terms of competition. As well [as] an immediate stop to the organization tasks with damaging and seizure [of Plaintiff's] property." (*Id.*)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 91 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

**\*2** Plaintiff also filed an application to proceed IFP. (Dkt. No. 2.)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $405, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [2] After reviewing Plaintiff's IFP application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed IFP is granted. [3] (*Id.*)

## III. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974); *see Fitzgerald v. First East Seventh Street Tenants Corp.*, 221 F.3d 362, 364 (2d Cir. 2000) (a district court "may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee[.]"); *see also Pflaum v. Town of Stuyvesant, Columbia Cnty., N.Y.*, 11-CV-0335, 2016 **WL** 865296, at \*1, n.2 (N.D.N.Y. Mar. 2, 2016) (Suddaby, C.J.) (finding that the Court had the power to address and dismiss additional theories of the plaintiff's retaliation claim *sua sponte* because those theories were so lacking in arguable merit as to be frivolous).

In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that

a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasis added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 [2007]). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not shown–that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (internal citation and punctuation omitted).

**\*3** "In reviewing a complaint ... the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties ... have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Alleging "Racketeering"

To the extent that the Complaint is construed as alleging a claim pursuant to 18 U.S.C. § 1691 et seq., ("RICO") I recommend that it be dismissed. [4]

It is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 92 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Section 1964 establishes a private right of action for individuals who are harmed by racketeering activity. 18 U.S.C. § 1964. This private right of action permits a plaintiff to bring a RICO claim for sustaining injuries "in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Generally, a plaintiff bringing a civil RICO claim under "Section 1962(c) must allege that (1) the defendant has violated the substantive RICO statute, and (2) the plaintiff was injured in his business or property 'by reason of a violation of section 1962.' " *Malvar Egerique v. Chowaiki*, 19-CV-3110, 2020 WL 1974228, at \*7 (S.D.N.Y. Apr. 24, 2020) (quoting *Moss v. Morgan Stanley, Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citing 18 U.S.C. § 1962(c))), *vacated in part on other grounds by Weiss v. David Benrimon Fine Art LLC*, 20-CV-3842, 2021 WL 6128437 (2d Cir. Dec. 28, 2021) (summary order). More specifically, to assert a civil RICO claim under Section 1962(c), a plaintiff must allege the following elements: "(1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). Additionally, a plaintiff asserting a civil RICO claim must plead facts plausibly suggesting a resulting "domestic injury" to their business or property. *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2111 (2016).

 **\*4** The Complaint fails to allege facts plausibly suggesting the existence of an "enterprise" within the meaning of RICO. More specifically, Plaintiff fails to allege facts plausibly suggesting that Defendants constitute, control, or participate in any enterprise with a distinguishable existence or purpose. *See Mackin v. Auberger*, 59 F. Supp. 3d 528, 543 (W.D.N.Y. 2014) ("Plaintiff fails to allege that [the defendants] had a common or shared purpose or that they functioned as a continuing unit."). In addition, the Complaint fails to allege any facts plausibly suggesting that Defendants functioned as a continuing unit. "Without such an enterprise, a RICO claim like [Plaintiff]'s must fail." *Liang v. City of New York*, 10-CV-3089, 2013 WL 5366394, at \*13 (E.D.N.Y. Sept. 24, 2013); *see also Peterson v. City of New York*, 11-CV-3141, 2012 WL 75029, at \*3-4 (S.D.N.Y. Jan. 9, 2012) (dismissing the plaintiff's RICO claim because "[t]he existence of a RICO enterprise is a necessary element for liability" and the plaintiff failed to allege facts plausibly suggesting the existence of a RICO enterprise).

Moreover, the Complaint fails to allege facts plausibly suggesting a pattern of racketeering activity. 18 U.S.C. §

1961(5) (To sufficiently allege a "pattern of racketeering activity," a plaintiff must allege at least two acts of "racketeering activity" that occur within ten years of each other); *Westester Cnty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 608 (S.D.N.Y. 2015) (emphasis in original) (quoting *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 242 (2d Cir. 1999)) (To qualify as a "pattern" of racketeering activity, the predicate acts "must be from the crimes listed in [Section] 1961(1) and they must be 'related, *and* ... amount to or pose a threat of continued criminal activity.' "). The Complaint fails to allege any acts of racketeering activity and instead merely uses the word "racketeering" in a conclusory fashion without facts plausibly suggesting the commission of any predicate acts. (*See generally* Dkt. No. 1.)

For each of these alternative reasons, I recommend that Plaintiff's RICO claim be dismissed.

### B. Claims Pursuant to 42 U.S.C. § 1983

After carefully considering Plaintiff's claims pursuant to 42 U.S.C. § 1983, I recommend that they be dismissed for three reasons.

First, to the extent that there are final state court orders or judgments that Plaintiff asks this Court to overturn, those claims are barred by the *Rooker-Feldman* doctrine. *Porter v. Nasci*, 24-CV-0033, **2024 WL** 1142144, at \*4 (N.D.N.Y. Mar. 15, **2024**) (Dancks, M.J.) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291-92 (2005); *Dorce v. City of New York*, 2 F.4th 82, 101 (2d Cir. 2021)) ("Under the *Rooker-Feldman* doctrine, a federal district court lacks authority to review a final state court order or judgment where a litigant seeks relief that invites the federal district court to reject or overturn such a final state court order or judgment."). "This includes when a litigant seeks relief that invites a federal district court to reject or overturn a final decision of a New York Family Court as to a child support dispute brought in that state court." *Porter*, **2024 WL** 1142144, at \*4 (citing *Sims v. Kaufman*, 23-CV-7927, **2024 WL** 757338, at \*4 (S.D.N.Y. Feb. 14, **2024**)) (additional citation omitted); *see also Fernandez v. Turetsky*, 14-CV-4568, 2014 WL 5823116, at \*4 (E.D.N.Y. Nov. 7, 2014) (collecting cases in support of the proposition that "[c]ourts have repeatedly invoked the [*Rooker-Feldman*] doctrine in cases ... in which plaintiffs challenge family court decrees setting child support arrears."), *aff'd*, 645 F. App'x 103 (2d Cir. 2016). Therefore, to the extent Plaintiff seeks to challenge a final judgment of Onondaga County Family Court or the Oneida County Family Court, any

such claim is barred by the *Rooker-Feldman* doctrine. *See, e.g., Phillips v. Wagner*, 22-CV-0833, 2022 **WL** 17406092, at *3 (N.D.N.Y. Nov. 4, 2022) (Lovric, M.J.) ("Plaintiff's claims, while not entirely clear, seem to challenge an order ... in which the Family Court determined that he owes child support .... Plaintiff's claims for relief are barred by the *Rooker-Feldman* doctrine ....") (citation omitted), *report and recommendation adopted*, 2022 **WL** 17403441 (N.D.N.Y. Dec. 2, 2022) (Hurd, J.), *appeal dismissed*, No. 23-68, 2023 **WL** 4445323 (2d Cir. Apr. 25, 2023).

 **\*5** Alternatively, "in the event the underlying family court proceedings are pending, such claims are likely barred by the *Younger* abstention doctrine." *Walker v. O'Connor*, 22-CV-0581, 2022 **WL** 2341420, at *6 (N.D.N.Y. June 29, 2022) (Dancks, M.J.) (citing *Younger v. Harris*, 401 U.S. 37 (1971); *Amato v. McGinty*, 21-CV-0860, 2022 **WL** 226798, at *11 (N.D.N.Y. Jan. 26, 2022) (Dancks, M.J.)), *report and recommendation adopted*, 2022 **WL** 2805462 (N.D.N.Y. July 18, 2022) (Hurd, J.). "*Younger* generally requires federal courts to abstain from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings." *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Younger*, 401 U.S. at 43-44). "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D" Const. Corp.*, 282 F.3d at 198 (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). Courts in this circuit have found these conditions to be satisfied in matters involving child support issues. *See, e.g., Cogswell v. Rodriguez*, 304 F. Supp. 2d 350, 357 (E.D.N.Y. 2004) (applying the *Younger* abstention doctrine to dismiss claims which arose from "pending state court proceedings involving child support.") (citation omitted); *Tomczyk v. New York Unified Ct. Sys.*, 19-CV-2753, 2019 **WL** 2437849, at *3 (E.D.N.Y. June 10, 2019) (citing *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69, 72-73 (2013) ("[T]his Court abstains under *Younger* from interfering in Plaintiff's ongoing state-court proceedings, involving divorce and child support issues and 'implicat[ing] a State's interest in enforcing the orders and judgments of its courts.' ")). "Accordingly, to the extent that the child support issues are continuing in Family Court, the Court should abstain from interfering with that process." *Bowman v. Morris*, 19-CV-0097, 2019 **WL** 5150196, at *6 (N.D.N.Y. Apr. 10, 2019) (Stewart, M.J.) (citations omitted), *report*

*and recommendation adopted*, 2019 **WL** 3759174 (N.D.N.Y. Aug. 9, 2019) (Sannes, J.).

Second, Plaintiff's claims are likely barred pursuant to the domestic relations exception to the jurisdiction of federal courts. ***Dudley*** *v. Montaque*, 24-CV-0223, **2024 WL** 1464346, at *4 (N.D.N.Y. Apr. 4, **2024**) (Dancks, M.J.) (citing *Marshall v. Marshall*, 547 U.S. 293, 308 (2006); *Oliver v. Punter*, 22-CV-3580, 2022 **WL** 3228272, at *3 (E.D.N.Y. Aug. 10, 2022) ("The domestic relations exception to federal jurisdiction divests the federal courts of power to issue divorce alimony and child custody decrees .... This exception also extends to child support determinations and the enforcement thereof.") (internal quotations and citations omitted)) ("under the domestic relations exception to the jurisdiction of federal courts, cases involving divorce, alimony, and child custody remain outside this Court's jurisdiction."). Accordingly, this Court lacks jurisdiction to adjudicate a claim involving issues of child custody and support. *See Rotondo v. New York*, 17-CV-1065, 2017 **WL** 5201738, at *4 (N.D.N.Y. Oct. 31, 2017) (Peebles, M.J.) ("[I]t is manifestly clear that plaintiff's claims implicate the domestic-relations exception to federal court jurisdiction. Plaintiff challenges a state-court's determination denying him relief from a family court's child support order, and plaintiff's requests for relief include removal of the family court proceeding to federal court."), *report and recommendation adopted*, 2017 **WL** 5198194 (N.D.N.Y. Nov. 9, 2017) (Sharpe, J.); *Cruz v. New York*, 17-CV-0510, 2017 **WL** 6021838, at *7 (N.D.N.Y. Oct. 27, 2017) (Dancks, M.J.), *report and recommendation adopted*, 2017 **WL** 6001833 (N.D.N.Y. Dec. 4, 2017) (Sannes, J.) (collecting cases in support of the proposition that "[c]laims involving child custody, support, and visitation brought in federal district court in this Circuit have regularly been dismissed for lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction.").

Third, the claims against Defendants are not cognizable.

### 1. Claims Against Defendant Hochul

Sovereign immunity bars Plaintiff's claims for damages against Defendant Hochul in her official capacity. Sovereign immunity extends to "actions for the recovery of money from the state" against "state agents." *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Hans v.*

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 94 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

*Louisiana*, 134 U.S. 1, 15 (1890)). A lawsuit brought against officials of a government entity in their official capacities is "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Because Plaintiff's claims for damages against Defendant **Hochul** in her official capacity is effectively an "action[ ] for the recovery of money from the state," *Leitner*, 779 F.3d at 134, sovereign immunity bars them.

 *\*6** Moreover, to the extent that Plaintiff's claims against Defendant **Hochul** in her official capacity seek prospective relief and to the extent that Plaintiff's claims are construed as against Defendant **Hochul** in her individual capacity, I recommend that they be dismissed for failure to allege Defendant **Hochul's** personal involvement in any constitutional violation. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)); *see Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) (holding that in order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered."); *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted) ("[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal."). The Second Circuit has made clear that "there is no special rule for supervisory liability," and a "plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020). Here, although Plaintiff names Defendant **Hochul** as a party, the body of the Complaint lacks any allegations of wrongdoing by her. (*See generally* Dkt. No. 1.) As a result, I recommend that Plaintiff's claims against Defendant **Hochul** be dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B).

### 2. Claims Against Defendant New York State

As set forth above, sovereign immunity pursuant to the Eleventh Amendment bars individuals from suing states in federal court, unless Congress abrogates states' immunity or a state consents to suit. *See* U.S. Const. Amend. XI; *Gollomp v. Spitzer*, 568 F.3d 355, 365-66 (2d Cir. 2009). Accordingly,

I recommend that Plaintiff's claims asserted against the New York State be dismissed pursuant to Section 1915(e)(2)(B)(i).

### 3. Claims Against Defendant McDonald

The Complaint identifies Defendant McDonald "as the commissioner of the Department of Health in New York State." (Dkt. No. 1 at 1.) To the extent that the Complaint is construed as asserting claims against Defendant McDonald in his official capacity, he is immune from suit pursuant to the Eleventh Amendment.

Moreover, to the extent that the Complaint is construed as asserting claims against Defendant McDonald in his individual capacity, I recommend that they be dismissed for failure to assert his personal involvement in any constitutional violation.

### 4. Claims Against Defendant Caldwell

Judges are absolutely immune from suit for claims seeking damages for any actions taken within the scope of their judicial responsibilities. *See Mireles v. Waco*, 502 U.S. 9, 11-12 (1991). Generally, "acts arising out of, or related to, individual cases before [a] judge are considered judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "[E]ven allegations of bad faith or malice cannot overcome judicial immunity." *Bliven*, 579 F.3d at 209. Judicial immunity does not apply when a judge takes action outside his or her judicial capacity, or when a judge takes action that, although judicial in nature, is taken "in the complete absence of all jurisdiction." *Mireles* 502 U.S. at 11-12; *see also Bliven,* 579 F.3d at 209-10 (describing actions that are judicial in nature). However, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump v. Sparkman*, 435 U.S. 349, 356 (1978).

Plaintiff asserts claims that appear to arise from the efforts of Defendant Caldwell, in his capacity as a family court judge in Oneida County. (Dkt. No. 1 at 6.) Defendant Judge Caldwell is therefore immune from suit under the doctrine of judicial immunity. As a result, I recommend that Plaintiff's claims against Defendant Caldwell in his individual capacity be dismissed based on the doctrine of judicial immunity.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 95 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Moreover, I recommend that Plaintiff's claims against Defendant Caldwell in his official capacity be dismissed pursuant to the Eleventh Amendment. *See Sundwall v. Leuba,* 28 F. App'x 11, 12 (2d Cir. 2001) (citing *K & A Radiologic Tech. Servs., Inc. v. Comm'r of the Dep't of Health,* 189 F.3d 273, 278 (2d Cir. 1999)) (holding that "state officers, if sued in their official capacities, are immunized from suit by private citizens under the Eleventh Amendment."); *King v. New York State,* 23-CV-3421, 2023 WL 5625440, at *4 (E.D.N.Y. Aug. 31, 2023) (citing *Thomas v. Martin-Gibbons,* 857 F. App'x 36, 37 (2d Cir. 2021) (affirming dismissal of *pro se* Section 1983 claims against the State of New York and a state court judge in his official capacity based on Eleventh Amendment immunity)) ("Eleventh Amendment immunity extends to state officials acting in their official capacities, including state court judges."); *Aron v. Becker,* 48 F. Supp. 3d 347, 366-67 (N.D.N.Y. 2014) (McAvoy, J.) (dismissing the plaintiff's claims against a state court judge in his official capacity based on the doctrine of Eleventh Amendment immunity).

### 5. Claims Against Defendants Johnson, Ottaviano, Boyea, and Primo

**\*7** The Complaint alleges that Defendant Johnson was an "Onondaga Family Court attorney" who was tasked with conducting a "virtual meeting call for the Onondaga County family Courthouse." (Dkt. No. 1 at 2.) The Complaint alleges that Defendant Ottaviano was a court assistant who postponed a hearing that was scheduled for February 15, 2023. (Dkt. No. 1 at ¶ 18.) The Complaint alleges that Defendant Boyea was a "Secretary" who emailed a modified custody order signed by Defendant Cecile. (Dkt. No. 1 at ¶ 23.) Finally, the Complaint alleges that Defendant Primo is the Clerk of the Court in Onondaga County Family Court (Dkt. No. 1 at ¶ 10) and he notified the parties of a hearing scheduled on July 20, 2023 (*id.* at ¶ 22).

"As a general principle, a government attorney is entitled to absolute immunity when functioning as an advocate of the state in a way that is intimately associated with the judicial process." *Mangiafico v. Blumenthal,* 471 F.3d 391, 396 (2d Cir. 2006) (citing *Imbler v. Pachtman,* 424 U.S. 409, 430 (1976)). Judicial immunity has been extended to judicial law clerks, the New York State Chief Administrative Judge, court attorneys, and the chief clerks of several state courts. *Jackson v. Pfau,* 523 F. App'x 736, 737-38 (2d Cir. 2013) (citing *Rodriguez v. Weprin,* 116 F.3d 62, 66 (2d Cir. 1997)).

As a result, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo in their individual capacities be dismissed, because they are immune from suit.[5] *See Leftridge v. Judicial Branch,* 22-CV-0411, 2023 WL 4304792, at *9 (D. Conn. June 30, 2023) (dismissing the plaintiff's claims against the state court clerks of court based on the doctrine of quasi-judicial immunity where "their alleged actions arose out of or related to [plaintiff]'s child support and child custody proceedings."); *Braithwaite v. Tropea,* 23-CV-1431, 2023 WL 4207907, at *4 (E.D.N.Y. June 27, 2023) (citing *Jackson v. Pfau,* 523 F. App'x 736, 737-38 (2d Cir. 2013) (affirming dismissal pursuant to Section 1915(e)(2)(B) of pro se plaintiff's Section 1983 claims against the Chief Clerks of several state courts based on the doctrine of judicial immunity)) (dismissing as frivolous the plaintiff's claims against the clerk of the court because he was entitled to absolute immunity); *Mendez v. Johnson,* 22-CV-6811, 2022 WL 3587600, at *2 (S.D.N.Y. Aug. 22, 2022) (citing *inter alia, Chmura v. Norton, Hammersley, Lopez & Skokos Inverso PA,* 17-CV-2164, 2018 WL 2138631, at *2 (D. Conn. May 9, 2018) (extending judicial immunity to a clerk of court); *Manko v. Ruchelsman,* 12-CV-4100, 2012 WL 4034038, at *2 (E.D.N.Y. Sept. 10, 2012) (same)) (noting that courts have routinely granted judicial immunity to "government officials, including clerks of court and other court employees, for their acts that assist a judge in the performance of his or her judicial duties.").

**\*8** Moreover, I recommend that Plaintiff's claims against Defendants Johnson, Ottviano, Boyea, and Primo in their official capacities as employees of the Onondaga Family Court be dismissed because the Onondaga Family Court is an arm of the New York state court system and New York State is immune from suit pursuant to the Eleventh Amendment. *Braithwaite,* 2023 WL 4207907, at *4 (collecting cases) (holding that the plaintiff's claims against the Chief Clerk of the Suffolk County Court in his official capacity are barred by the Eleventh Amendment).

### 6. Claims Against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily

Plaintiff's claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily relate to their capacities as Onondaga County Family Court judges. (*See generally* Dkt. No. 1.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants Dejoseph, Cecile,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 96 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

Cerio, Mulroy, and Pirro Baily in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, claims against Defendants Dejoseph, Cecile, Cerio, Mulroy, and Pirro Baily in their official capacities are essentially claims against New York State, which is immune from suit pursuant to the Eleventh Amendment.

### 7. Claims Against Defendants DeRue and Domachowski

Plaintiff's claims against Defendants DeRue and Domachowski relate to their roles as Onondaga County Family Court support magistrates. (*See generally* Dkt. No. 1.) As set forth above in Part IV.B.4. of this Order and Report-Recommendation, Defendants DeRue and Domachowski in their individual capacities are immune from suit pursuant to the doctrine of absolute judicial immunity. *See Miller v. Primo*, 23-CV-1051, 2023 **WL** 6379325, at *6 (N.D.N.Y. Sept. 29, 2023) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against "Defendants DeRue and Domachowski, who acted as the support magistrate judges" and finding that such claims "are barred under the doctrine of judicial immunity"), *report and recommendation adopted by* 2023 **WL** 754323 (N.D.N.Y. Nov. 14, 2023) (Sannes, C.J.). Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, claims against Defendants DeRue and Domachowski in their official capacities are essentially claims against New York State, and are immune from suit pursuant to the Eleventh Amendment.

### 8. Claims Against Defendant Stanislaus

"The law is clear that court referees are entitled to absolute judicial immunity from liability with respect to acts taken in the scope of their duties." *Khrapko v. Splain*, 389 F. Supp. 3d 199, 205 (W.D.N.Y. 2019) (citing *Green v. Kadilac Mortg. Bankers, Ltd.*, 936 F. Supp. 108, 115 (S.D.N.Y. 1996); *Weiss v. Feigenbaum*, 558 F. Supp. 265, 272 (E.D.N.Y. 1982)); *accord Witcher v. Moriber*, 21-CV-6168, 2022 **WL** 1085297, at *2 (E.D.N.Y. Apr. 11, 2022) (citing *Wilson v. Wilson-Polson*, 446 F. App'x 330, 331 (2d Cir. 2011) (allegations that a New York State Family Court referee violated plaintiff's procedural due process rights failed in light of the referee's absolute immunity to suit); *Topolski v. Wrobleski*, 13-CV-0872, 2014 **WL** 2215761, at *3 (N.D.N.Y. May 29, 2014) ("Judicial immunity is so broad that judges and referees 'are not liable

to civil actions for their judicial acts, even when such acts ... are alleged to have been done maliciously or corruptly.' "); *Renner v. Stanton*, 13-CV-1676, 2013 **WL** 1898389, at *3 (E.D.N.Y. May 7, 2013) (dismissing claims against Family Court Referee based on judicial immunity)).

 **\*9** As a result, I recommend that Plaintiff's claim against Defendant Stanislaus in her individual capacity be dismissed based on the doctrine of absolute judicial immunity. *See Miller Ex v. Primo*, 22-CV-0680, 2022 **WL** 16556060, at *5 (N.D.N.Y. Sept. 29, 2022) (Lovric, M.J.) (recommending dismissal of the plaintiff's claims against Defendant Stanislaus because she was entitled to absolute judicial immunity as a court attorney referee), *report and recommendation adopted by* 2022 **WL** 16551700 (N.D.N.Y. Oct. 31, 2022) (Sannes, C.J.).

Moreover, as set forth above in Part IV.B.4. of this Order and Report-Recommendation, any claim against Defendant Stanislaus in her official capacity is essentially a claim against New York State, which is immune from suit pursuant to the Eleventh Amendment.

### 9. Claims Against Defendant Bradshaw

Based on the allegations contained in the Complaint, it appears that Defendant Bradshaw was an attorney appointed to represent one of Plaintiff's minor children. (Dkt. No. 1 at ¶ 16.) The Second Circuit has held that "law guardians who act as 'attorney[s] for the child' are not state actors for the purposes of suits filed pursuant to § 1983." *Milan v. Wertheimer*, 808 F.3d 961, 964 (2d Cir. 2015).

As a result, I recommend that Plaintiff's claims against Defendant Bradshaw be dismissed.

### 10. Claims Against Defendant Onondaga County Sheriff

Defendant Onondaga County Sheriff is merely a department of a municipality, and thus, is not amenable to suit. *See White v. Syracuse Police Dep't*, 18-CV-1471, 2019 **WL** 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 **WL** 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a

department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")) ("Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal ... department does not have the capacity to be sued as an entity separate from the municipality in which it is located."), *report and recommendation adopted*, 2019 **WL** 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). As a result, I recommend that Plaintiff's claims against Defendant Onondaga County Sheriff be dismissed because it is not an entity amenable to suit. [6]

### 11. Claims Against Defendant Hiscock Legal Aid

**\*10** The Complaint alleges that Defendant Hiscock Legal Aid and attorneys employed by it represented the mother of Plaintiff's minor children during the State Family Court proceedings. (Dkt. No. 1 at ¶ 5.) Notwithstanding the appointment of Defendant Hiscock Legal Aid as legal representation, it was not a state actor for purposes of 42 U.S.C. § 1983. "Although [Defendant Hiscock Legal Aid was] supplied and funded by the state, [it] act[ed] according to the best interests of [its] client with 'no obligation to the mission of the state.' " *Milan*, 808 F.3d at 964 (quoting *Meeker v. Kercher*, 782 F.2d 153, 155 (10th Cir. 1986)) (internal quotation omitted).

As a result, I recommend that Plaintiff's claims against Defendant Hiscock Legal Aid be dismissed.

### 12. Claims Against Defendant Department of Health and Social Service

It is unclear based on the allegations in the Complaint if Defendant Department of Health and Social Service is a division of New York State or Onondaga County. To the extent that it is a department of New York State, it is immune from suit pursuant to the Eleventh Amendment as set forth in Part IV.B.1 of this Order and Report-Recommendation. To the extent that Defendant Department of Health and Social Service is a department of Onondaga County, it is not amenable to suit pursuant as set forth above in Part IV.B.10 of this Order and Report-Recommendation. [7]

### 13. Claims Against Defendants Milner and Unknown

"Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff." *Cipriani v. Buffardi*, 06-CV-0889, 2007 **WL** 607341, at \*1 (N.D.N.Y. Feb. 20, 2007) (Kahn, J.) (citing *Gonzalez v. City of New York*, 97-CV-2246, 1998 **WL** 382055, at \*2 (S.D.N.Y. July 9, 1998)); *see also Crown v. Wagenstein*, 96-CV-3895, 1998 **WL** 118169, at \*1 (S.D.N.Y. Mar. 16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York*, 953 F. Supp. 95, 99 (S.D.N.Y. 1997) (same).

The Complaint names Milner and Unknown as defendants, but the body lacks any allegations of wrongdoing by these individuals. (*See generally* Dkt. No. 1.) As a result, I recommend that the claims against them be dismissed for failure to state a claim upon which relief may be granted.

For each of these alternative reasons, I recommend that the Complaint be dismissed in its entirety.

### V. OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 **WL** 599355, at \*1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [8]

Case 3:24-cv-00102-GTS-ML     Document 102     Filed 04/07/26     Page 98 of 260

Dudley v. Hochul, Not Reported in Fed. Supp. (2024)

**\*11** Here, better pleading could not cure the deficiencies described above. As a result, I recommend that Plaintiff's Complaint be dismissed without leave to replead.

## VI. PLAINTIFF'S MOTION TO OBTAIN ECF LOGIN AND PASSWORD

In light of the recommended disposition of this case, Plaintiff's motion for ECF login and password is denied without prejudice. (Dkt. No. 3.) "Because this court is recommending dismissal at this time, the court will deny [P]laintiff's motion to obtain ECF privileges without prejudice." *Amato v. McGinty*, 17-CV-0593, 2017 **WL** 9487185, at \*11 (N.D.N.Y. June 6, 2017) (Baxter, M.J.), *report and recommendation adopted*, 2017 **WL** 4083575 (N.D.N.Y. Sept. 15, 2017) (D'Agostino, J.); *see Mahmood v. United States Gov't*, 20-CV-0207, 2020 **WL** 3965125, at \*3 (N.D.N.Y. Mar. 17, 2020) (Stewart, M.J.) (same), *report and recommendation adopted*, 2020 **WL** 1808206 (N.D.N.Y. Apr. 9, 2020) (D'Agostino, J.).

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's IFP application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's motion to obtain an ECF login and password (Dkt. No. 3) is **DENIED without prejudice**; and it is further respectfully

**RECOMMENDED** that the **COURT DISMISS WITHOUT PREJUDICE AND WITHOUT LEAVE TO AMEND** Plaintiff's Complaint (Dkt. No. 1) in its entirety pursuant to 28 U.S.C. § 1915(e); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Order and Report-Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [9] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b) (1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2024 WL 1906594

---

## Footnotes

1       The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2       The language of that section is ambiguous because it suggests an intent to limit availability of IFP status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making IFP status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

3       Plaintiff is reminded that, although his IFP application has been granted, he is still required to pay fees that he may incur in this action, including copying and/or witness fees.

4       Under General Order #14 and N.D.N.Y. L.R. 9.2, a party who files a RICO claim must also file a Civil RICO statement within thirty days after the filing date of the Complaint. Despite thirty days having elapsed since

the filing of his Complaint, Plaintiff has failed to file a Civil RICO statement. (*See generally* docket sheet.) As a result, I recommend that, in the alternative, Plaintiff's RICO claim be dismissed. *See Poole v. Bendixen*, 20-CV-0697, 2021 **WL** 3737780, *12 (N.D.N.Y. Aug. 24, 2021) (Suddaby, C.J.); *Murphy v. Onondaga Cnty.*, 18-CV-1218, 2022 **WL** 819281, *6 (N.D.N.Y. Mar. 18, 2022) (Sharpe, J.).

5      In the alternative, I recommend that Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed because the Complaint fails to allege the personal involvement of them in any alleged constitutional deprivation, which is a prerequisite to an award of damages under 42 U.S.C. § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Here, although Plaintiff names Defendants Johnson, Ottaviano, Boyea, and Primo as parties to the action, the body of the Complaint lacks any allegations of wrongdoing by them. (*See generally* Dkt. No. 1.) As a result, I recommend that, in the alternative, Plaintiff's claims against Defendants Johnson, Ottaviano, Boyea, and Primo be dismissed for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2)(B).

6      Even if Plaintiff's claims against Defendant Onondaga County Sheriff were liberally construed as against Onondaga County, I would recommend that they be dismissed. There is no basis for municipal liability alleged in the Complaint. Plaintiff essentially complains of a discrete incident, during which an officer or individual employed by Defendant Onondaga County Sheriff did not act properly. (Dkt. No. 1 at 4.) There is no indication that Plaintiff can assert a policy or custom which would support municipal liability based on these facts. In addition, none of Plaintiff's allegations reflect a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of Onondaga County.

7      Further, as set forth above in note 6, *supra*, to the extent that the Complaint is liberally construed as alleging a claim against Onondaga County, it fails to allege any basis for municipal liability.

8      *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

9      If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                           © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 2399913
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ellis Davon DUDLEY, II, Plaintiff,
v.
Governor Kathy HOCUL et al., Defendants.

5:24-CV-48
|
Signed May 23, 2024

### Attorneys and Law Firms

ELLIS DAVON DUDLEY, II, Plaintiff, Pro Se, P.O. Box 7124, Syracuse, NY 13261.

### ORDER ON REPORT & RECOMMENDATION

DAVID N. HURD, United States District Judge

**\*1** On January 11, 2024, *pro se* plaintiff Ellis Javon Dudley, II ("plaintiff") filed this action alleging that the named defendants violated his civil rights in connection with certain family-court proceedings being conducted under New York State law. Dkt. No. 1. Along with his complaint, plaintiff moved for leave to proceed *in forma pauperis* ("IFP Application"), Dkt. No. 2, and for leave to file documents electronically, Dkt. No. 3.

On May 1, 2024, U.S. Magistrate Judge Miroslav Lovric granted plaintiff's IFP Application, denied his request to file electronically, and advised by Report & Recommendation ("R&R") that plaintiff's complaint be dismissed *without* leave to amend. Dkt. No. 5. As Judge Lovric explained, plaintiff's RICO claims were procedurally deficient and substantively meritless, while plaintiff's 42 U.S.C. § 1983 claims were barred by various claim-preclusion principles. *Id.*

Plaintiff has not filed objections, and the time period in which to do so has expired. *See* Dkt. No. 5. Upon review for clear error, the R&R is accepted and will be adopted. *See* FED R. CIV. P. 72(b).

Therefore, it is

ORDERED that

1. The Report & Recommendation is ACCEPTED;

2. Plaintiff's complaint is DISMISSED without leave to amend.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2024 WL 2399913

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 101 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

🚩 KeyCite Yellow Flag

Distinguished by [Gazzola v. County of Nassau,](#) E.D.N.Y., June 23, 2022

2019 WL 4754326
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

John GLEESON in His Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Margaret Gleeson in Her Own Right and as Co-Administrator of the Estate of John P. Gleeson, Deceased, Donna Dempsey on behalf of and as the Natural Parent and Guardian of (he Property of both E.A.G., an Infant, and J.P.G., an Infant, Plaintiffs,

v.

COUNTY OF NASSAU, Nassau County Correctional Center, Nassau County Sheriff's Department, Michael J. Sposato Individually and as Sheriff of Nassau County, Armor Correctional Health Services, Inc., Armor Correctional Health Services of New York, Inc., Nassau County Corrections Officers, "John Does 1-10" in their Individual and Official Capacities, Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20" in (heir Individual and Official Capacities, Defendants.

15-CV-6487 (AMD) (RL)
|
Signed 09/30/2019

**Attorneys and Law Firms**

[James A. Pascarella](#), The Pascarella Law Firm PLLC, Mineola, NY, for Plaintiffs.

[Christopher D. Clarke](#), [JoAnne Filiberti](#), [Peter James Johnson, Jr.](#), [Michael Gerard Dempsey](#), Leahey & Johnson, P.C., [John J. Doody](#), [Jamie Elizabeth Greenfield](#), [Kenneth G. Gerard](#), Lewis Brisbois Bisgaard & Smith, LLP, New York, NY, [Liora M. Ben-Sorek](#), Nassau County Attorney's Office, Mineola, NY, for Defendants County of Nassau, Nassau County Sheriff's Department.

[Christopher D. Clarke](#), [JoAnne Filiberti](#), [Peter James Johnson, Jr.](#), [Michael Gerard Dempsey](#), Leahey & Johnson, P.C., [Jamie Elizabeth Greenfield](#), [John J. Doody](#), [Kenneth G. Gerard](#), Lewis Brisbois Bisgaard & Smith LLP, New York,

NY, [Liora M. Ben-Sorek](#), Nassau County Attorney's Office, Mineola, NY, for Defendants Nassau County Correctional Center, Michael J. Sposato.

[Jamie Elizabeth Greenfield](#), [John J. Doody](#), [Kenneth G. Gerard](#), [Dale Nicholson McLaren](#), Lewis Brisbois Bisgaard & Smith LLP, [Cathleen Kelly Rebar](#), [Frank V. Kelly](#), Stewart Bernstiel Rebar & Smith, New York, NY, for Defendants Armor Correctional Health Services, Inc., Armor Correctional Health Services, Inc. Employees and Agents, "John and Jane Does 11-20".

[John J. Doody](#), [Dale Nicholson McLaren](#), [Jamie Elizabeth Greenfield](#), [Kenneth G. Gerard](#), Lewis Brisbois Bisgaard & Smith, LLP, [Cathleen Kelly Rebar](#), [Frank V. Kelly](#), Stewart Bernstiel Rebar & Smith, New York, NY, for Defendant Armor Corectional Health Services of New York, Inc.

[Jamie Elizabeth Greenfield](#), [John J. Doody](#), [Kenneth G. Gerard](#), Lewis Brisbois Bisgaard & Smith LLP, New York, NY, for Defendant Nassau County Corrections Officers, "John Does 1-10".

## MEMORANDUM & ORDER

[ANN M. DONNELLY](#), District Judge.

**\*1** The plaintiffs brought this action against Nassau County, Nassau County Correctional Center ("NCCC"), Nassau County Sheriff's Department, Nassau County Sheriff Michael J. Sposato (collectively the "County defendants"), Armor Correctional Health Services, Armor Correctional Health Services of New York (collectively the "Armor defendants"), and unnamed corrections officers and health services employees, in connection with the death of John P. Gleeson, who died while he was detained at the NCCC. (ECF No. 1.) The plaintiffs—surviving members of Mr. Gleeson's family—brought federal claims pursuant to [42 U.S.C. § 1983](#), alleging inadequate medical care under the Fourteenth Amendment, and state law claims for wrongful death and intentional infliction of emotional distress. (*Id.*) On November 19, 2018, the defendants moved for summary judgment. (ECF Nos. 57, 60.) For the reasons that follow, the defendants' motion is granted in part, and denied in part.

## BACKGROUND [1]

1. *Medical Services at the NCCC*

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 102 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

The NCCC is a correctional facility operated by the Nassau County Sheriff's Department, an agency of Nassau County. (ECF No. 69), Pls.' 56.1 Counter-Statement in Response to County defendants ("Pls.' 56.1 (County)" ¶¶ 2-3.) [2] Between 1999 and 2000, the United States Department of Justice ("DOJ") investigated conditions at the NCCC. (*Id.* ¶¶ 20-21.) On September 11, 2000, the DOJ found that the NCCC was deliberately indifferent to its inmates' medical and mental needs, and that corrections officers at the NCCC had a practice of using excessive force. (*Id.* ¶ 22.) The DOJ sued Nassau County in this Court on April 22, 2002. (*Id.* ¶ 23.) The parties entered into a settlement agreement the same day, dismissing the case subject to the County's compliance with certain terms to improve conditions at the NCCC. (*Id.* ¶ 23-25.)

**\*2** The settlement agreement included specific policies and programs that the NCCC would develop and implement to improve inmate health care, including: (i) written medical policies, procedures, and protocols relating to initial health assessments, sick calls, emergency care, and medical records (*Id.* ¶ 28); (ii) new inmate health screenings that included the inmates' input about their medical history, current medication, allergy information, and immunization history (*Id.* ¶ 29); (iii) a written chronic care disease management program (*Id.* ¶ 34); and (iv) a written functional quality improvement program that included self-evaluations, recommendations for clinical guidelines, and internal peer reviews (*Id.* ¶ 38). To implement the quality improvement program, the NCCC was required to establish a Quality Improvement Committee ("QIC") chaired by a physician. (ECF No. 74-1, ¶¶ 55-56.) The terms of the settlement required the QIC to have ten monthly meetings each year to "review the status of health care provided to inmates," and to report its work to the Sheriff each month. (*Id.*)

On May 5, 2008, the parties filed a stipulation to dismiss the case because of the NCCC's substantial compliance with the settlement agreement. (*Id.* ¶ 53.) The Honorable Leonard Wexler "so ordered" the stipulation of dismissal on March 20, 2008. (*Id.* ¶ 55.)

2. *The NCCC's Contract with Armor*
On July 20, 2009, the County sought proposals from third-party organizations to provide medical, behavioral, and dental health care at the NCCC. (*Id.* ¶ 56.) The County's request specified that bidders must meet the standards of all DOJ settlement agreements. (*Id.* ¶¶ 57-62.)

On October 13, 2009, the Armor defendants [3] submitted a bid in which they acknowledged and agreed to meet the standards of the settlement agreement, adding that Armor "had experience complying with DOJ requirements having inherited a situation ... in which the DOJ cited the facility and the former healthcare provider." (*Id.* ¶¶ 64, 67.) A committee that included representatives from the County's Office of Management and Budget, Department of Health, Office of Mental Health, the Sheriff's Department, and the County Attorney's Office evaluated Armor's proposal, and gave it the highest score of the six other proposals. (*Id.* ¶¶ 85-87.) Armor and the NCCC entered into a proposed contract on March 18, 2011. (*Id.* ¶ 88.)

Pursuant to the contract, Armor agreed to provide services consistent with the standards established by the settlement agreement. (*Id.* ¶ 90.) Armor agreed, for example, to "develop and maintain a chronic care disease management program, consistent with nationally accepted disease guidelines[,]" (*id.* ¶ 96), and to "perform medical and mental health intake screenings within four hours of an inmate's admission to the NCCC." (*Id.* ¶ 93.) The contract also expressly incorporated the services outlined in Armor's contract proposal (*id.* ¶ 90), which included plans to install an electronic medical records system (ECF No. 57-3, Armor Contract 2011-2013 ("2011 Armor Contract") at 92, 228-31) and a protocol for approving referrals to offsite specialists (*id.* at 194-97). In its cost proposal, Armor allocated $78,688 of the contract cost for the installation of the electronic medical records system in the first year of the contract. (*Id.* at 92.) Armor represented that it emphasized "medical necessity" when it screened requests for offsite treatment; according to Armor, its process reduced "unnecessary offsite trips" and resulted in "substantial savings in security costs and NCCC overhead." (*Id.* at 194-97.) Under Armor's protocol, an Armor clinician initiated the process by submitting a specialist's request form to Armor's Director of Utilization Management and Medical Director of Utilization Management, both of whom were in Florida. (*Id.*) The directors reviewed the request to determine whether it was a "medical necessity" and either approved it or deferred it to be reevaluated within 30 days. (*Id.*)

**\*3** On April 18, 2011, the proposed contract was submitted to the Rules Committee of the Nassau County Legislature for approval. (Pls.' 56.1 (County) ¶ 106.) Michael Golio, Commanding Officer of the Sheriff's Department's Legal Unit at the NCCC, spoke in favor of the proposed contract, and

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 103 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

highlighted its accountability and high standards of care: "The second part of this contract is the care standards, and that's why we have the performance indicators, the performance measurements, and the financial penalties. We don't have anything of that sort currently with [the Nassau University Medical Center]." [4] (*Id.* ¶ 110.) The Rules Committee approved the contract and, on May 5, 2011, the Nassau County Executive signed the contract with Armor. (*Id.* ¶¶ 112-13.)

On June 11, 2011, only eleven days after Armor began providing medical care at the NCCC, an inmate, Roy Nordstrom, died of an acute myocardial infarction. (ECF No. 71-31.) On September 18, 2012, the New York State Commission of Correction's Medical Review Board [5] issued a report addressed to Sheriff Sposato and copied to Edward P. Mangano, who was the Nassau County Executive at the time. The Medical Review Board concluded that Mr. Nordstrom died as a result of "grossly incompetent" medical care, and issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(*Id.* at 9.)

The County's two-year contract with Armor expired on May 31, 2013. (Pls.' 56.1 (County) ¶ 114.) On August 1, 2013, the County extended its contract with Armor to run until May 31, 2015. (*Id.* ¶ 119.)

### 3. *John Gleeson's Medical History*

Mr. Gleeson, 40 years old at the time of his death, had a history of hereditary angioedema. He went to the hospital for swelling beginning in 2002, and was diagnosed with hereditary angioedema in 2007 or 2008. (ECF No. 57-11, Margaret Gleeson Dep. ("M.G. Dep."), 105:6-16, 107:8-11.) Hereditary angioedema, which typically results from a quantitative or functional deficiency of the C1 esterase inhibitor protein, is a disorder that causes recurrent, severe swelling in the extremities, gastrointestinal tract, face, throat, and airways. (ECF No. 71-6, ¶ 10.) Left untreated, the airway swelling can lead to asphyxia and death. (*Id.*)

Mr. Gleeson took prednisone (a steroid) and Benadryl (an antihistamine) for his angioedema. (M.G. Dep. 123:8-22.) If the swelling moved from his hands to his chest or neck—which was more serious—Mr. Gleeson went to the emergency room. (*Id.*) His mother estimated that he went to the emergency room about ten times for angioedema. (*Id.* 109:4-10.)

### 4. *John Gleeson's Incarceration and Death at the NCCC*

**\*4** In May of 2014, Mr. Gleeson was arrested for stealing scrap metal wire. On May 28, 2014, a Nassau County grand jury charged him with burglary in the third degree. (Pls.' 56.1 (County) ¶ 120.) Mr. Gleeson was admitted to the NCCC the following day, May 29, 2014, where he was held as a pretrial detainee until his death on July 14, 2014. (*Id.* ¶ 121.); *see also* (Pls.' 56.1 (Armor) ¶¶ 4, 9.) In a health assessment on the day he was admitted, Mr. Gleeson reported asthma as his only significant illness, and that Flexeril (a muscle relaxant) and Percocet (pain medication) were his only medications. [6] (ECF No. 62-1, Armor Medical Records, at 5.) [7] Mr. Gleeson did not disclose that he had hereditary angioedema during the assessment.

On June 10, 2014, Mr. Gleeson filled out a sick call request form, complaining that his arm was swollen and that he had "some kind of reaction." (*Id.* at 13.) A nurse visited him that night and noted on the call form that his swollen arm was "chronic." (*Id.*) A physician's assistant ("PA") saw Mr. Gleeson the next day; Mr. Gleeson had difficulty breathing,

pain and difficulty swallowing, and swelling in his left shoulder, neck, and throat. (*Id.* at 29.) The PA treated Mr. Gleeson with a nebulizer, prednisone, and Benadryl, and noted "R/O angioedema" on the urgent care assessment form. (*Id.*) On a chronic care clinic form completed the same day, the PA wrote the following in the section for assessing Mr. Gleeson's conditions: "asthma, HTN, ? angioedema." (*Id.* at 61.) (question mark in the original).

On June 17, 2014, Mr. Gleeson went to the medical unit, complaining of swelling in his hands, arms, trunk, legs, knees, and other parts of his body. (*Id.* at 28.) Dr. Sanchez saw him, and ordered a blood-draw to test for an "autoimmune disease" and the levels of C1 esterase inhibitor in his blood. (*Id.*) Mr. Gleeson returned to Dr. Sanchez a week later, on June 24, 2014, so that the doctor could examine swelling in his right upper extremity and to discuss the results of the blood tests. (*Id.* at 27.) Dr. Sanchez ordered a re-draw of the C1 Esterase test—the original specimen was not frozen as required by laboratory protocol [8]—and wrote "Rheumatology consult" on Mr. Gleeson's progress note. (*Id.*) On July 1, 2014, a PA saw Mr. Gleeson for an "Urgent Care Assessment" because of swelling on both sides of his neck; once again, the PA prescribed prednisone and Benadryl. (*Id.* at 26.) On the assessment form, under "known medical conditions of [the] patient," the PA listed "asthma, HTN, [and] recurrent episodes of edema ..." (*Id.*) A separate note on the form reads "Rheum consult." (*Id.*)

Mr. Gleeson spoke frequently with his mother throughout his incarceration. (*Id.* ¶ 126.) Although neither of them mentioned angioedema specifically, they did discuss his recurring problems with swelling. (*Id.* ¶¶ 128-132.) Ms. Gleeson had known of her son's angioedema diagnosis since 2007 (M.G. Dep. 105:6-16, 107:8-11), but did not mention the condition in conversations with her son, never urged him to discuss his condition with doctors, and never tried to speak with any officials at the NCCC about her son's condition. (Pls.' 56.1 (County) ¶¶ 132, 135); (Pls.' 56.1 (Armor) ¶ 11.) On July 1, 2014, Mr. Gleeson told his mother that his neck and throat "swelled up again ... huge today," and that he had been given Benadryl. (ECF No. 57-12, CD of Recorded Phone Calls, 710A20JQ, 4:36-5:06.) His mother replied, "Why don't they send you to the hospital for God's sake?" (*Id.*) Mr. Gleeson said that the doctor told him that he was "on the list to see a different doctor.... a rheumatologist." (*Id.*) Ms. Gleeson responded, "Ok good, just let them figure it out, let them worry about it." [9] (Pls.' 56.1 (County) ¶ 134.)

**\*5** On July 14, 2014, at 2:40 p.m., Mr. Gleeson complained to Corrections Corporal Carmine Accordino that his throat was swollen. (Pls.' 56.1 (County) ¶ 150.) Corporal Accordino relayed Mr. Gleeson's complaint to Nurse James in the medical unit, who responded that Mr. Gleeson should fill out a sick call sheet because the unit was busy. (*Id.* ¶¶ 151-52.) At 3:00 p.m., Mr. Gleeson complained again about his swollen throat. (*Id.* ¶ 153.) Corporal Accordino relayed his message to the medical unit. (*Id.*) This time, Nurse James directed Corporal Accordino to send Mr. Gleeson to the medical unit, where Mr. Gleeson checked in at 3:10 p.m. (*Id.* at ¶¶ 153-55.) According to the urgent care assessment form, Mr. Gleeson had swelling on his left neck and left hand. (Armor Medical Records at 23.) Under a section of the form entitled "DX," the diagnosis is listed as "R/O hereditary angioedema (C1 esterase)." (*Id.*) Mr. Gleeson was again prescribed prednisone and Benadryl. (*Id.*) He returned to his cell between 3:45 and 4:00 p.m. (Pls.' 56.1 (County) ¶ 155.)

At 8:55 p.m., Mr. Gleeson told Corrections Officer Del Re that his throat was sore and that he needed to go to the medical unit. (*Id.* ¶ 156.) He got to the medical unit at 9:15 p.m., with redness in his throat and swelling of his left tonsil. (Armor Medical Records at 22.) The doctor prescribed an antibiotic, and sent Mr. Gleeson back to his cell at about 9:25 p.m. (Pls.' 56.1 (County) ¶ 158.)

When he returned to his cell, Mr. Gleeson's condition worsened, prompting fellow inmates to yell for help. (ECF No. 74-39, ¶ 4.) [10] Fifteen minutes later, at 10:16 p.m., Mr. Gleeson told Corrections Officer Rubeanau that he could not breathe. (Pls.' 56.1 (County) ¶ 159.) Officer Rubeanau saw that Mr. Gleeson had a significantly swollen throat and trouble breathing, and notified the medical unit of his condition. [11] (*Id.* ¶¶ 160-61.) Corrections Officer Cavanaugh escorted Mr. Gleeson to the medical unit, and Dr. Sanchez and R.N. Qui examined him at 10:20 p.m. (*Id.* at ¶¶ 163-64.) The progress note from that night states that Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (Armor Medical Records at 24.)

The Armor medical team believed that Mr. Gleeson was suffering from an exacerbation of asthma, and gave him albuterol with a nebulizer. (*Id.*) Minutes into the treatment, Mr. Gleeson stood up, said that he could not breathe, and collapsed. (*Id.* at 63.) The Armor medical staff administered an EpiPen, directed Officer Cavanaugh to call 911, and initiated CPR treatment until the EMT arrived fifteen minutes later, at approximately 10:45 p.m. (*Id.* at 62.) The paramedics

tried to intubate Mr. Gleeson twice, but were unsuccessful. (*Id.*) At 10:56 p.m., the paramedics took Mr. Gleeson to Nassau University Medical Center, where he died at approximately 11:20 p.m. (Pls.' 56.1 (County) ¶¶ 167-69.)

5. *County Response.*

The day after Mr. Gleeson died, July 15, Dr. Marylyn Martin-Naar, an Armor medical director, filled out a death summary report. (Armor Medical Records at 65.) Dr. Martin-Naar wrote that Mr. Gleeson had three diagnoses, including "R/O Acquired Angioedema." (*Id.*) Dr. Martin-Naar also noted that Mr. Gleeson's treatment plan included prednisone and Benadryl, and that "next steps" included referrals to a rheumatologist and allergist to address the patient's "history of recurrent swelling of body parts." (*Id.*) In her initial findings, Dr. Martin-Naar wrote "low esterase inhibitor level" and that the "impression was R/O acquired angioedema." (*Id.* at 66.)

**\*6** On October 31, 2014, the Nassau County Office of the Medical Examiner determined that Mr. Gleeson died from cardiorespiratory arrest due to laryngeal edema and angioedema. (Pls.' 56.1 (County) ¶ 174.) A year later, on September 15, 2015, the Commissioner of the New York State Commission of Corrections, Dr. Phyllis Harrison-Ross, published a final report of the Medical Review Board's investigation into Mr. Gleeson's death. [12] (*Id.* ¶ 175.) The report is addressed to Sheriff Sposato, and copied to Norma L. Gonsalves, the Presiding Officer of the Nassau County Legislature at the time. (*See* ECF No. 57-22, New York State Commission of Correction's Final Report: In the Matter of the Death of John Gleeson ("NYSCOC Report").) The Board's investigation included interviews with medical and prison personnel, and a review of the relevant medical records. (*Id.*) The Board was highly critical of the way that the Armor medical staff treated Mr. Gleeson:

> Gleeson had a history of Hereditary Angioedema that went unrecognized, misdiagnosed, and improperly treated by the medical providers from Armor Inc. The Medical Review Board has found that Armor Inc.'s delivery of healthcare in this matter was incompetent and deficient due to a lack of adequate protocol, lack of coordination, lack of effective communication, and deficient medical

knowledge by the physicians and midlevel clinicians. This was compounded by a healthcare record that was unorganized, incomplete, and in selected sections illegible. The Medical Review Board finds that Armor Inc., in its contracted locations in New York State, has engaged in a pattern of inadequate and neglectful medical care and questions their ability to meet and provide for the healthcare needs of jail inmates. Had John Gleeson been provided with competent medical care by Armor Inc. in a timely manner, been properly referred to a specialist, received a correct diagnosis, and received proper medical treatment, his death may have been prevented.

(*Id.* ¶ 1.)

The Board was especially critical of the Armor medical staff's failure to refer Mr. Gleeson to a specialist, once it became clear that its treatments were ineffective:

> After four separate clinical encounters with unresolved angioedema with an unknown etiology and refractory to provided treatment, a referral to a specialist (Rheumatologist) should have been of highest priority. The Medical Review Board finds that the medical providers of Armor Inc. at the NCCC lacked the clinical knowledge to recognize that Gleeson was symptomatic of Hereditary Angioedema and continued him on an ineffective course of treatment including antihistamines and steroids. Hereditary Angioedema will not respond to therapy including steroids and antihistamines ... Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper

treatment, his terminal event may have been prevented.

(*Id.* ¶ 13.)

The Board ended the report with specific recommendations:

- that Armor establish an organized and uniform health record system for inmate health and mental care;

- that Armor utilize a system that assigns a single case manager for each inmate's care; and

- that Armor conduct a quality review of the care it gave Mr. Gleeson, with particular focus on "[w]hy a referral to a specialist (rheumatology) was not expedited for Gleeson ...?" "[w]hy medical staff did not consider an immediate transfer to a hospital for Gleeson after repeated complaints of edema ...?" and "[w]hy medical providers failed to recognize that the prescribed medications would be ineffective, failed to obtain an accurate C1 Esterase reading ... and failed to recognize current medications may actually be trigger mechanism?"

**\*7** (*Id.* at 7-8.)

The Board also directed the Nassau County Legislature to investigate whether Armor was fit to serve as a correctional medical care provider, with "[s]pecific attention ... to Armor's pattern of failing to properly manage patients' chronic medical needs, failing to maintain proper and organized patient records, and failing to provide hospitalization for patients when clinically indicated." (*Id.*)

Nevertheless, in mid-2015, the County entered into another two-year contract extension with Armor, from June 1, 2015, to May 31, 2017. (Pls.' 56.1 (County) ¶ 211.)

On October 17, 2016, the Nassau County Office of the Comptroller issued a review of Armor's and the County's performance under the contract. (ECF No. 71-4, Comptroller Report.) [13]  The Comptroller found that Armor's manual records system was inadequate, inefficient, and error prone, that it had high nursing and doctor turnover, and that it failed to document required background and reference checks. (*Id.* at ii.) The Comptroller underscored the Medical Review Board's finding that Armor was responsible for five inmate deaths at the NCCC from 2011 to 2015, and the

Board's direction in the last three reports that Armor pay "specific attention" to its "pattern of failing to properly manage patients' chronic medical needs ..." (*Id.* at 20-26.) The Comptroller recommended that Armor computerize its records and "strengthen its quality control process to assure medical forms are completed thoroughly and are signed, dated and legible." (*Id.* at ii.) The Comptroller also recommended that Armor "take immediate steps to hire and retain a quality medical staff." (*Id.*)

The Comptroller also found that the NCCC "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (*Id.*) The NCCC did not have a medical professional on staff to oversee Armor despite the contractual agreement for a Health Care Administrator, who was to "oversee administration and monitor compliance with this agreement on behalf of the County[.]" (*Id.* at 8-9) (quoting 2011 Armor Contract at 12.) The Sheriff's Department designated a registered nurse as the Health Contract Administrator; the nurse left in August of 2013, after which the position remained vacant until 2016. [14]  (*Id.*) Moreover, New York State Correction Law required that the Board of Supervisors of Nassau County appoint a "reputable physician authorized to practice medicine as physician" to the NCCC. (*Id.*) (citing N.Y. Correct. Law § 501 (McKinney 2019).) The "County Physician," like the Health Contractor Administrator, was to oversee "Armor's work and the medical care provided to the Correctional Center's patients." (*Id.*) The NCCC did not have a County Physician at any point during the Armor contract. (*Id.*) The contract also required Armor to submit monthly reports to the Health Contract Administrator measuring the quality and quantity of its services. (2011 Armor Contract § 4.) The Assistant Attorney General's affirmation, (ECF No. 71-17), discussed below, found that Armor's reports did not include data on approximately half of the twenty-four indicators required by the contract, including medical sick call statistics, mental health statistics, and initial assessment statistics. (*Id.* ¶ 33.)

**\*8** Because of its lack of oversight, the NCCC failed "to assess performance indicators and assess associated penalties as provided for in the contract[.]" (Comptroller Report at ii.) Indeed, the County assessed no penalties on Armor during the contract period—despite negotiating for 27 different performance indicators and several tiers of penalties. (*Id.* at 16-17.) Most critically, the County did not fine Armor $155,000 (the highest penalty provided for in the contract) for its failure to achieve NCCHC accreditation. [15]  Instead, the

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 107 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

County waived the requirement, without seeking the County Executive's approval. (*Id.* at 16.)

In 2016, the State of New York sued Armor, alleging that it had provided substandard medical care to inmates at the NCCC and the Niagara County Jail. [16] *People v. Armor Correctional Health Medical Services*, Index No. 450835/2016. The parties eventually settled the case, and Armor agreed "not to bid on or enter into any contract with any municipality in New York State for the provision of jail health services" for a three-year period. (ECF No. 80-3, ¶ 13.) Dorothea Caldwell-Brown, an Assistant Attorney General, submitted the results of her investigation in a sworn affirmation. [17] (ECF No. 71-17, Affirmation of Assistant Attorney General Dorothea Caldwell-Brown ("AAG Affirmation").) The investigation "revealed that Armor did not meet its contractual obligations, as evidenced by its inadequate self-auditing and continuous quality improvement processes, deficient sick call, deficient medical and mental health services, inadequate referrals to specialists, failure to maintain accurate and complete medical records and inadequate staffing." (*Id.* ¶ 11.) According to the affirmation, the Medical Review Board had found that five deaths between 2011 and 2015 at the NCCC, including Mr. Gleeson's, involved "egregious lapses in medical care." (Id. ¶ 9.)

The affirmation cited Mr. Gleeson's death as emblematic of Armor's "clear reluctance to send inmates for outside specialty care even when the inmates' medical condition cries out for attention often as assessed by Armor's own clinicians at NCCC." (*Id.* ¶¶ 150-162.) According to the affirmation, Armor's medical records demonstrated that "an Armor clinician referred [Mr. Gleeson] to a rheumatologist on two separate occasions" but that "Armor never ensured that the rheumatologist referral actually take place." (*Id.* at ¶ 162.) Armor's self-audits, the investigation found, reflected "a consistent pattern of inappropriate and failed practices relating to referrals to off-site specialists," including frequent failures to render a decision to deny or approve the request. (*Id.* at ¶¶ 153-57.)

**\*9** The County paid Armor $49.7 million from June 1, 2011 through December 31, 2015. (Comptroller Report at i.) In March of 2016, the County issued a new RFP for medical services at the NCCC. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## DISCUSSION

### I. The Plaintiffs' Section 1983 Claim

To prevail on a Section 1983 claim, a plaintiff must establish that a person acting under color of state law deprived him of a federal right. *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing 42 U.S.C. § 1983). A municipality is subject to liability for damages under Section 1983 for the unconstitutional acts of its employees "where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers." *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

The essence of the plaintiffs' claims is that Mr. Gleeson died as a result of deliberate indifference on the part of medical staff and prison officials at the NCCC, and that the defendants are liable for Mr. Gleeson's death because they had a policy or custom of delivering inadequate healthcare to NCCC inmates, which caused Mr. Gleeson's death. In seeking summary judgment, the defendants argue that the NCCC medical staff and prison officials were not deliberately indifferent to Mr. Gleeson's health. They say that they cannot be held liable even if Mr. Gleeson's death resulted from

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 108 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

deliberate indifference because there was no policy or custom to provide inadequate healthcare.

#### a. *Deliberate Indifference*

"To establish a constitutional claim arising out of inadequate medical care, an inmate must prove that prison or jail officials were deliberately indifferent to his serious medical needs." *Gomez v. County of Westchester*, 649 Fed. Appx. 93, 95 (2d Cir. 2016) (citing *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir. 2003)). A pretrial detainee's claims of inadequate medical care are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. *See generally Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted); *Iancovangelo v. Correctional Medical Care, Inc.*, 624 Fed. Appx. 10, 12 (2d Cir. 2015) (citation omitted).

 **\*10**  Under the Fourteenth Amendment, a plaintiff's claim for deliberate indifference to a serious medical need is analyzed under a two-part test. "First, the alleged deprivation of adequate medical care must be 'sufficiently serious.' " *Grimmet v. Corizon Med. Asssocs. of N.Y.*, No. 15-CV-7351, 2017 WL 2274485, at \*3 (S.D.N.Y. May 24, 2017) (quoting *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)). "Second, the defendant must have acted with deliberate indifference, or a 'sufficiently culpable state of mind.' " *Id.* (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

#### i. Sufficiently Serious Deprivation

I first decide whether the Mr. Gleeson experienced a medical deprivation that was "sufficiently serious." There must be an actual "deprivation of adequate medical care," that is, a failure by prison officials "to take reasonable measures" in response to a medical condition. *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)). Second, the deprivation must be "sufficiently serious." *Id.* at 280. Because "the objective component of an Eighth Amendment [or Fourteenth Amendment] claim is necessarily contextual and fact specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (internal quotation marks and citation omitted). If the unreasonable medical care "is a failure to provide any treatment for an inmate's medical condition,

courts examine whether the underlying medical condition is sufficiently serious," *Salahuddin*, 463 F.3d at 280, such as the existence of "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Arriaga v. Gage*, No. 16-CV-1628, 2018 WL 1750320, at \*6 (S.D.N.Y. Apr. 6, 2018) (quoting *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citation omitted)). If a plaintiff alleges that the prison provided inadequate care—rather than a failure to provide any treatment—the inquiry focuses on "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract[.]" *Smith*, 316 F.3d at 185 (citing *Chance v. Armstrong*, 143 F.3d 398, 702-03 (2d Cir. 1998)).

The defendants do not dispute that Mr. Gleeson suffered from a serious illness—hereditary angioedema—which causes recurrent attacks of severe swelling in the extremities, gastrointestinal tract, face, and airways. The disorder can be fatal when left untreated, particularly if the swelling has spread to the patient's neck and airway. Although the record does not show that Mr. Gleeson alerted the medical staff that he had hereditary angioedema, he made frequent complaints of his symptoms—including recurrent swelling and shortness of breath—to the medical staff. In four visits to the medical unit, Mr. Gleeson's symptoms of hereditary angioedema were progressively more serious, but the staff gave him the same treatment—a steroid and an antihistamine. Moreover, although the records reflect that medical personnel thought he should see a rheumatologist, Mr. Gleeson never saw a rheumatologist or any specialist. The New York State Commission of Corrections concluded that this treatment was plainly inadequate, criticizing Armor for continuing Mr. Gleeson on an "ineffective course of treatment including antihistamines and steroids" when "a referral to a specialist (Rheumatologist) should have been of highest priority." (NYSCOC Final Report, ¶ 13.)

 **\*11**  In my view, the plaintiffs have raised a triable issue of material fact about whether medical officials at the NCCC responded adequately to Mr. Gleeson's serious medical needs. *See Johnson v. Wright*, 234 F. Supp. 2d 352, 360 (S.D.N.Y. 2002) ("The fact that a plaintiff received regular medical care does not preclude a finding of deliberate indifference where the course of treatment was largely ineffective and the defendant declined to do anything more to attempt to improve the plaintiff's situation.") (quotation marks and citations omitted).

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 109 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

### ii. Sufficiently Culpable State of Mind

The second element of a Fourteenth Amendment claim for inadequate medical care is that the defendant acted with "deliberate indifference" to the inmate's medical care. *Salahuddin*, 467 F.3d at 280 (citation omitted). In *Darnell v. Pineiro*, 849 F.3d 17, 32-36 (2d Cir. 2017), the Second Circuit held that a pretrial detainee need not demonstrate subjective awareness on the part of the official in a condition-of-confinement case. Since *Darnell*, district courts in this circuit have held that a pretrial detainee in a medical inadequacy case may establish deliberate indifference objectively.[18] *See Richardson v. Correctional Medical Care, Inc.*, No. 17-CV-0420, 2018 WL 1580316, at *4 (N.D.N.Y. Mar. 28, 2018) (collecting cases); *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 718-19 (S.D.N.Y. Mar. 31, 2017) ("After *Darnell*, deliberate indifference is now defined objectively ... rather than ask whether the charged official knew of and disregarded an excessive risk to inmate health or safety, courts are to instead determine whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety.") (quotation marks and citation omitted). A pretrial detainee suing for deliberate indifference under the Fourteenth Amendment, is "required to show only that the prison official acted with objective recklessness, or that the defendant 'knew or should have known' that 'an excessive risk to health or safety' would result." *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849, F.3d at 35). "As before, however, more than negligence is required to hold a defendant liable for violating" the Fourteenth Amendment. *Id.*

The plaintiffs have raised a triable issue of material fact about whether the medical officials knew or should have known about Mr. Gleeson's angioedema and the risks it posed to his health. Although Mr. Gleeson did not disclose that he had angioedema during his initial health assessment, doctors suspected almost immediately that angioedema was responsible for his swelling episodes. In fact, a physician's assistant noted angioedema as a possible diagnosis after Mr. Gleeson's first interaction with the medical staff. (Armor Medical Records at 61.) After his second visit to the medical unit, Dr. Sanchez ordered blood tests to measure Mr. Gleeson's levels of the C1 esterase inhibitor, a protein responsible for hereditary angioedema. (*Id.* at 27-28.) On the day of his death, Mr. Gleeson reported to the medical unit twice with neck swelling and redness in his throat; doctors again noted the possibility of hereditary angioedema, but sent him back to his cell with the same ineffective treatment

of steroids and antihistamines. (*Id.* at 23.) According to the progress note from that day, Mr. Gleeson had a past medical history of "asthma, hives, angioedema, and HTN." (*Id.* at 24.) Given their suspicions of hereditary angioedema, the doctors knew, or should have known, that Mr. Gleeson's symptoms were indicative of a potentially fatal condition. A reasonable jury could find that their failure to act amounted to deliberate indifference.

### b. *Parties Responsible for the Deliberate Indifference*

**\*12** The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted). However, a municipal government, or a private entity acting under color of state law, *Bektic-Marrero v. Goldberg*, 850 F. Supp. 2d 418, 432 (S.D.N.Y. 2012), can be liable for the unconstitutional acts of its employees if the plaintiff can prove the existence of a municipal policy or custom that caused the constitutional violation. *Monell*, 436 U.S. at 690-91.

The only individuals named by the plaintiffs are "John Does 1-10"—corrections officers at the NCCC (ECF No. 1 ¶ 52), "John and Jane Does 11-20"—physicians, nurses, physician's assistants, and nurse practitioners employed by Armor (*Id.* ¶ 53), and Sheriff Michael J. Sposato. The plaintiffs assert *Monell* liability against the County of Nassau, the NCCC, the Nassau County Sheriff's Department, Armor Correctional Health Services, Inc., and Armor Correctional Health Services of New York.

The Armor defendants argue that the plaintiffs cannot sustain a Section 1983 action against "John Doe" and "Jane Doe" defendants at this point in the case. The County defendants argue that the claims against Sheriff Sposato should be dismissed because the complaint does not include sufficient allegations about his personal involvement in the constitutional violation. The County defendants also argue that the Court should dismiss claims against the NCCC and the Sheriff's Department because both are non-suable, administrative arms of the County of Nassau. Finally, all defendants argue that they cannot be held liable for Mr. Gleeson's death because the plaintiffs have not demonstrated the existence of a policy or practice that caused the constitutional violation.

### i. John Doe and Jane Doe Defendants

The defendants move for summary judgment as to the Section 1983 claims against the John Doe and Jane Doe defendants because they have not been identified, and any effort to name them now as defendants would be time-barred. The plaintiffs respond that the identities of the specific employees who personally inflicted the constitutional injuries are "irrelevant" because the entity defendants are responsible pursuant to *Monell.* (ECF No. 73 at 4.) In other words, the plaintiffs do not intend to press their claims against the individual doctors, nurses, corrections officers, and other staff at the NCCC responsible for Mr. Gleeson's constitutional injuries.

On January 17, 2017, Magistrate Judge Arlene R. Lindsay set a February 23, 2017 deadline for any request to join additional parties or amend the pleadings. Nevertheless, even though they learned the identities of relevant county and Armor employees through document discovery, (*see, e.g.*, Armor Medical Records), the plaintiffs have not sought to amend the complaint to name the "John Doe" corrections officers or the "John and Jane Doe" employees of Armor.

The applicable statute of limitations period in New York is three years for a Section 1983 action, *Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (citation omitted), and the statute of limitations begins to run once the plaintiff knows of the injury on which its claim is based. *See Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994). The plaintiffs learned of Mr. Gleeson's death on July 14, 2014. Because substituting a named party for a John Doe defendant does not "relate back" to the complaint under Rule 15(c)(3), *Sepulveda v. City of New York*, No. 01-CV-3117, 2003 WL 22052870, at *2 (S.D.N.Y. Sept. 2, 2003), the plaintiffs' Section 1983 claims against the "John Doe" and "Jane Doe" defendants are dismissed as time-barred. *See, e.g., Vineyard v. County of Nassau*, 329 F. Supp. 2d 364, 369-60 (E.D.N.Y. 2004); *Cantave v. New York City Police Officers*, No. 09-CV-2226, 2011 WL 1239895, at *8 (E.D.N.Y. Mar 28, 2011).

### ii. Sheriff Michael J. Sposato

**\*13** The defendants argue that the plaintiffs cannot sue Sheriff Sposato in his individual capacity because the complaint includes no allegations that Sheriff Sposato was personally involved in the constitutional deprivation. The plaintiffs respond that the record reveals numerous examples of Sheriff Sposato's personal involvement in failing to supervise Armor's performance. The question for the Court is whether the plaintiffs have raised a triable issue of fact about Sheriff Sposato's personal involvement in the constitutional violations.

A supervisory official will not be found liable under Section 1983 simply by virtue of his "high position of authority." *Villafane v. Sposato*, No. 16-CV-3674, 2017 WL 4179855, at *12, (S.D.N.Y. Aug. 22, 2017) (quoting *Al-Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir. 1989)), *report and recommendation adopted*, 2017 WL 4157220 (E.D.N.Y. Sept. 15, 2017). Rather, a plaintiff in a Section 1983 action must show that the supervisor was personally involved in a constitutional violation by either: (1) directly participating in the violation; (2) failing to remedy the wrong after it comes to his attention; (3) creating a policy or custom under which unconstitutional practices occur, or allowing the continuation of such custom and policy; (4) being grossly negligent in supervising subordinates who committed the wrongful acts; or (5) failing to act on information indicating that unconstitutional acts are occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). [19]

While there is no evidence that Sheriff Sposato participated directly in the violation (factor one), or was alerted to Mr. Gleeson's ongoing mistreatment and failed to intervene (factor two), there are issues of fact precluding summary judgment as to Sheriff Sposato's personal involvement under the third, fourth, and fifth factors. Indeed, as Sheriff, he was entrusted with supervisory responsibility for Armor. For example, the four final reports from the NYSCOC in the record are addressed to Sheriff Sposato, and each faults Armor for egregiously inadequate care. Sheriff Sposato received one report, before Mr. Gleeson's death, in which the Commission found that Armor "was grossly incompetent," and recommended that the Nassau County Executive "conduct an inquiry into the fitness of Armor ... as a correctional medical care provider." (ECF No. 71-31, at 9.) Furthermore, the Sheriff's Department—headed by Sheriff Sposato—did not appoint a doctor to be the Health Contract Administrator from 2011 to 2016, and the nurse who held the position left in 2013; the Sheriff's Department left the position completely vacant until 2016, when it appointed an interim HCA and published job postings for a permanent position. Finally, the contract required that Sheriff Sposato receive written reports from the Quality Improvement Committee. The Attorney General's investigation found that these reports

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 111 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

failed to include data on approximately half of the twenty-four indicators required by the contract.

A reasonable jury could find that Sheriff Sposato should have known about the risk of constitutional violations because he received the report questioning Armor's fitness as a medical care provider.[20] *Villafane*, 2017 WL 4179855, at * 14 (to establish personal involvement under the fourth factor, "a plaintiff must demonstrate that the defendant knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately ... but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk ...") A reasonable jury could also find that, in the aftermath of the NYSCOC report, Sheriff Sposato's failure to designate a Health Contract Administrator, or otherwise monitor or discipline Armor medical personnel through the tools available to him from the contract, allowed Armor's practice of inadequate medical care to continue unabated. Accordingly, the motion for summary judgment as to Sheriff Sposato in his personal capacity is denied.[21]

### iii. NCCC and NCSD

**\*14** It is well established that neither the Nassau County Correction Center nor the Nassau County Sheriff's Department are suable entities. *See Joseph v. Nassau Cty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at \*3 (E.D.N.Y. Apr. 19, 2013) (collecting cases). Rather, they are administrative arms of Nassau County without a separate legal identity from the County. *Campbell v. Sposato*, 15-CV-1958, 2015 WL 9267222, at \*5 (E.D.N.Y. Nov. 17, 2015) (interpreting the Nassau County Charter), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015). Accordingly, I grant summary judgment in favor of the NCCC and NCSD, and dismiss them from this action.

### iv. Armor

As noted above, a prerequisite to recovery under Section 1983 "is that the alleged constitutional violation be committed by one acting under color of law." *Bektic-Marrero*, 850 F. Supp. 2d at 426 (citing *West v. Atkins*, 487 U.S. 42, 48-50 (1988)). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter

how discriminatory or wrongful." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (citations and internal quotation marks omitted).

The parties agree that the Armor defendants "are considered to be state officials ... [d]espite being privately owned and operated entities[.]" (ECF No. 60-5, Armor Defs.' Br. at 9); *see also Ryan v. County of Nassau*, No. 12-CV-5343, 2016 WL 11500151, at \*7 (E.D.N.Y. Mar. 31, 2016) ("Since Armor was hired to fulfill the state's constitutional obligation to provide necessary medical care for its inmates, the Court finds that it was a state actor that can be sued pursuant to Section 1983.") (citations and internal quotation marks omitted). "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal government and not to private entities acting under color of state law, case law has extended the *Monell* doctrine to private § 1983 defendants acting under color of state law." *Dilworth v. Goldberg*, No. 10-CV-2224, 2011 WL 3501869, at \*24 (S.D.N.Y. July 28, 2011), *report and recommendation adopted*, 2011 WL 4526555 (S.D.N.Y. Sept. 30, 2011). Therefore, a private entity acting under color of state law will be liable for the constitutional violations of its employees if they resulted from the entity's policies or customs. *Id.*

A plaintiff may satisfy the "policy or custom" requirement by establishing "(1) a formal policy; (2) action taken or decisions made by policymakers that caused the violation; (3) a practice so persistent and widespread that it constitutes a 'custom or usage;' or (4) a failure to properly train or supervise [entity] employees." *Byvalets v. New York City Hous. Auth.*, No. 16–CV–6785, 2017 WL 7793638, at \*14 (E.D.N.Y. July 28, 2017), *report and recommendation adopted*, 2018 WL 1067732 (E.D.N.Y. Feb. 23, 2018) (citing *White v. City of N.Y.*, 206 F. Supp. 3d 920, 937 (S.D.N.Y. 2016) (citation omitted)). The plaintiffs posit the existence of both a formal policy and informal practices at Armor.

For the formal policy, the plaintiffs point to Armor's requirement that an inmate could see a specialist or visit a hospital only after an official in Armor's Florida corporate offices approved the referral, in writing, and within thirty days of the request. According to the plaintiffs, Mr. Gleeson died while those necessary referrals were pending approval. (ECF No. 73, Pls.' Opp. Br. at 11) ("[Dr. Sanchez] made the request on two separate occasions for the decedent's referral to a rheumatologist, both well-before John Gleeson's death. The referral never happened."). Under the plaintiffs' theory,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 112 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

Armor's referral policy prevented Mr. Gleeson from receiving adequate medical care and resulted in his death.

**\*15** It is undisputed that Armor followed a protocol that required clinicians at the NCCC to submit referral requests to Armor directors in Florida. The record also shows that Armor clinicians noted in medical records that Mr. Gleeson should see a rheumatologist for his recurrent swelling. Mr. Gleeson himself believed that he was "on the list to see a different doctor.... a rheumatologist." (ECF No. 57-12, 4:36-5:06.) It is not clear from the medical records whether doctors or PAs made a specific referral for Mr. Gleeson to see a rheumatologist; that is due in large part to the fact that the records are illegible. Certainly, there are multiple references to both hereditary angioedema and rheumatologists in the medical records. Drawing all reasonable inferences in favor of the plaintiffs, I find that there is a triable issue of fact as to whether Armor's referral request policy prevented Mr. Gleeson from seeing a rheumatologist, and caused his death. [22] Furthermore, a reasonable jury could find that Armor's woefully deficient record-keeping and its failure to install an electronic medical records system contributed to Armor's failure to ensure that the rheumatologist referral actually took place. [23]

The plaintiffs also argue that Armor had informal practices and customs that caused Mr. Gleeson's inadequate medical treatment. To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989). The policy must be "so manifest as to imply the constructive acquiescence of senior policy-making officials." *Byvalets*, 2017 WL 7793638, at \*16 (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)). In other words, the relevant practice must be "so widespread as to have the force of law." *Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (citations omitted).

The thrust of the plaintiffs' argument is that the Armor defendants had a widespread and well-settled custom of providing inadequate medical care to prison inmates. Judges have defined "widespread" to mean that the unconstitutional acts in question are "common or prevalent throughout the [entity]" and "well-settled" to mean that the unconstitutional acts "have achieved permanent, or close to permanent, status." *Fowler v. City of New York,* No. 13-CV-2372, 2019 WL 1368994, at \*14 (E.D.N.Y. Mar. 26, 2019) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 346

(S.D.N.Y. 2002)). "There is no 'magic number' of instances of unconstitutional conduct that will suffice to permit the inference of a broader [entity] policy of custom." *Id.* (citations and internal quotations omitted).

The Comptroller report, AAG affirmation, and NYSCOC reports about the treatment of inmates Kevin Brown (ECF No. 71-30), Roy Nordstrom (ECF No. 71-31), and Antonio Marinaccio (ECF No. 71-32) detail Armor's "egregious lapses in medical care" and its "pattern" of inadequate care. Accordingly, the plaintiffs have raised a genuine issue of material fact as to whether the Armor defendants have a widespread and well-settled custom of providing inadequate medical care to prison inmates *See Pipitone v. City of New York*, 57 F. Supp. 3d 173, 191 (E.D.N.Y. 2014) ("[T]he Mollen Report provides powerful evidence that there was a custom and practice within the police department of tolerating corruption to avoid bad publicity. It characterizes this custom as persistent, widespread, and emanating from top commanders, including the police commissioner. The Mollen Report thus provides evidence that is sufficient to allow a jury to conclude that the supervisory and disciplinary failures described therein constituted a municipal policy for *Monell* purposes and that the City's handling of the Eppolito matter was reflective of that policy.") (citations omitted).

**\*16** The cases in which other courts in this Circuit rejected the findings of a government report as evidence of a policy or practice involved events that were too far removed from the plaintiffs' case to be probative of a then-existing policy or practice. *See, e.g. Moses*, 2017 WL 4386362, at \*12 (DOJ report analyzing excessive force incidents from 2006 to 2007 is "too disconnected in time and personnel to plausible allege a policy, practice, or custom extant in 2000 so as to affect [the plaintiff]."); *Rodriguez v. City of Westchester*, No. 15-CV-9626, 2017 WL 118027, at \*7 (S.D.N.Y. Jan. 11, 2017) (DOJ report written more than six years before the events in question occurred, and involving different third-party contractors, was "too stale, and too disconnected in personnel, to plausibly allege a policy, practice, or custom extant in 2014 so as to affect [the plaintiff]."); *Melvin v. County of Westchester*, No. 14-CV-2995, 2016 WL 1254394, at \*15 (S.D.N.Y. Mar. 29, 2016) (DOJ letter was too remote in time because it was written more than four years before the events in question and involved a different third-party contractor).

This case is different. The Comptroller's report and the AAG's affirmation detail the same kinds of inadequate medical care,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 113 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

the same party (Armor), and the same time frame (2011 to 2014), as the events alleged by the plaintiffs. In fact, the AAG affirmation cited Mr. Gleeson's death as emblematic of a subset of Armor's inadequate medical care. Accordingly, the reports are sufficient to create a jury question regarding whether Armor had a custom of providing inadequate medical care that resulted in Mr. Gleeson's death.

### v. Nassau County

The County argues as a threshold matter that it cannot be held liable for any inadequate medical care on the part of the Armor medical staff because the Armor medical team "made all the treatment decisions" as the "exclusive medical provider of the NCCC." (ECF No. 80 at 2.) Municipalities cannot shield themselves from liability by delegating inmate medical care to third-party, private entities. See *Gil v. Vogilano*, 131 F. Supp. 2d 486, 493 (S.D.N.Y. 2001) ("[A] municipality's duty to provide medical care to inmates is non-delegable and is not absolved by contracting with a third party to provide care.") (citations omitted). However, that does not mean that the County is automatically liable for Armor's inadequate medical care. Only a few courts in this district have held that *respondeat superior* is a viable theory of liability in cases involving the failure to provide adequate medical care. *See e.g.* *Covington v. Westchester County Jail*, No. 96-CV-7551, 1998 WL 26190, at *2-3 (S.D.N.Y. Jan. 26,1998); *McNeil v. Correctional Medical Care, Inc.*, No. 18-CV-0894, 2019 WL 4415528, at *10 (N.D.N.Y. Sept. 16, 2019). These courts follow *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700 (11th Cir. 1985), a decision that has not been adopted in this Circuit. I will follow the majority view that there is no *respondeat superior* liability for municipalities under Section 1983—including for inadequate medical care cases involving private vendors—and that the plaintiffs must identify a "policy" or "custom" to impose liability on a municipality.

Accordingly, as with the Armor defendants, the plaintiffs must identify a "policy" or "custom" that caused Mr. Gleeson's injury in order to impose liability on Nassau County. The plaintiffs are entitled to establish a "policy" or "custom" through one of the four methods set forth above. Here, the plaintiffs argue that the County failed to supervise Armor. [24]

**\*17**  A failure to supervise "may constitute an official policy or custom if the failure amounts to 'deliberate indifference' to the rights of those with whom the city employees interact."

*Wray v. City of New York*, 490 F.3d 189, 195-96 (2d Cir. 2007) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). To prevail on this theory, the plaintiffs must demonstrate that "the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2004) (citation omitted). "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence 'may be properly thought of as a city policy or custom that is actionable under § 1983." *Id.* (quoting *City of Canton*, 489 U.S. at 388).

To prove such deliberate indifference, "the plaintiff must show that the need for more or better supervision to protect against constitutional violations was obvious ... An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (internal citation omitted).

The plaintiffs argue that the County's failure to address the "rash of inmate deaths at the NCCC since 2011" evinces deliberate indifference. (ECF No. 70 at 26.) The plaintiffs point to the NYSCOC reports, which were addressed to Sheriff Sposato and the Presiding Officer of the Nassau County Legislature, as evidence of policymakers' notice of recurring constitutional violations. The County responds that they were not on notice of Armor's inadequate treatment because the Comptroller's report and the AAG's affirmation were issued at least two years after Mr. Gleeson's death. This defense is not persuasive. The plaintiffs do not argue that those reports put the County on notice of a pattern of inadequate health care at the NCCC. Rather, they argue that the NYSCOC reports provided the requisite notice, and that the Comptroller's report and the AAG's affirmation confirm the existence of repeated past issues involving Armor that the County knew of and ignored.

The record includes one report issued before Mr. Gleeson's death—*In the Matter of the Death of Roy Nordstrom* (ECF No. 71-31)—that faults Armor for an egregious lapse in medical care. The report is addressed to Sheriff Sposato and copied to Edward P. Mangano, who was then the Nassau County

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 114 of 260

Executive. The Medical Review Board concluded that Armor provided "grossly incompetent" care that contributed to the Mr. Nordstrom's death from acute myocardial infarction. The Board issued the following directive to the Nassau County Executive:

> The Office of the Nassau County Executive shall conduct an inquiry into the fitness of Armor Correctional Health Services, Inc. as a correctional medical care provider in the Nassau County Correctional Center. Specific attention shall be directed to Armor's flagrant disregard of New York State Education Law, of the Rules of the Board of Regents, and of New York State nursing practice regulations, to wit, staffing unsupervised Licensed Practical Nurses at the Correctional Center who engaged in nursing practice beyond the scope of their licensure and in unlawful medical practice, who failed to consult with and refer to a physician in a medical emergency, and who failed to hospitalize a critically ill patient.

(ECF No. 71-31, at 9.)

A reasonable jury could find that the report about Mr. Nordstrom alerted Nassau County, through its policymakers Sheriff Sposato and Nassau County Executive Mangano, to a potentially serious problem of unconstitutional conduct, such that the need for supervision was "obvious."[25] *See also Cash v. County of Erie*, 654 F.3d 324 (2d Cir. 2011) (based on a single prior incident of sexual contact between a prisoner and prison guards, a jury could reasonably conclude that the municipality was on notice that its policies in that area were inadequate); *Carter v. Broome County*, No. 16-CV-422, 2019 WL 3938088, at *9 (N.D.N.Y. Aug. 21, 2019) ("[S]ummary judgment on a plaintiff's *Monell* claim is inappropriate if a fact-finder could find systemic and gross deficiencies in staffing, facilities, equipment, or procedures in a detention center's medical care system *and* that a policy-making official knows about them and fails to correct them.") (citation and quotation marks omitted). Rather than address the obvious need for closer supervision, the County scaled back its

oversight. For example, the County left the Health Contractor Administrator position vacant beginning in August 2013, and assessed no penalties on Armor for contract violations, including Armor's failure to achieve NCCHC accreditation. The Comptroller found that the County "failed to provide adequate oversight to ensure that Armor was in compliance with its contract with the County." (Comptroller Report at ii.) The plaintiffs have raised a genuine issue of material fact as to whether these failures to supervise Armor amount to deliberate indifference to the rights of inmates at the NCCC.

## II. The Plaintiffs' State Law Claims

### a. *Wrongful Death*

**\*18** The Armor defendants' motion for summary judgment on the plaintiffs' wrongful death claim is denied. As discussed above, there are genuine issues of material fact as to whether the Armor medical staff acted with "deliberate indifference," which is a standard akin to objective recklessness. *Grimmet*, 2017 WL 2274485, at *4 (quoting *Darnell*, 849 F.3d at 35). Further, under New York law, "an employer will be vicariously liable for the acts of his employee when these acts are within the general scope of his employment, while engaged in the master's business, and with a view to the furtherance of that business and the master's interest." *Medley v. City of New York*, No. 94-CV-3708, 1998 WL 938731, at *3 (E.D.N.Y. Dec. 3, 1998) (citation omitted). Accordingly, summary judgment cannot be entered in favor of the Armor defendants because there are triable issues of fact as to whether the Armor employees acted negligently, and in the scope of their employment, in causing Mr. Gleeson's death. *See Chong v. N.Y.C. Transit Auth.*, 83 A.D.2d 546, 547 (N.Y. App. Div. 1981) (elements of wrongful death claim include: (1) death of a human being, (2) negligence of a defendant causing death, (3) survival of distributees suffering pecuniary loss because of the death, and (4) appointment of a personal representative of the decedent).

The County defendants' motion for summary judgment on the plaintiffs' wrongful death claim is also denied. Under New York law, an entity or hospital may be vicariously liable for the negligence of independent contractors in certain circumstances based on a theory of "agency or control in fact, or apparent or ostensible agency." *See Garofolo v. State*, 135 A.D.3d 1108, 1109 (N.Y. App. Div. 2016) (citations omitted). The "ostensible agency" theory imposes vicarious liability on an entity defendant for the negligence of an independent

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 115 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

contractor doctor "when an inmate has reasonably relied upon the appearance of the doctor's authority created by the words or conduct of [the entity]." *Id.* The availability of the theory depends on "whether the plaintiff could have reasonably believed, based upon all of the surrounding circumstances, that the treating physician was provided by the defendant or was otherwise acting on the defendant's behalf." *Id.* at 1110 (alteration omitted) (quoting *Soltis v. State of New York*, 172 A.D.2d 919, 920 (N.Y. App. Div. 1991)).

Here, the Armor medical staff treated Mr. Gleeson in the prison facility on multiple occasions. A reasonable jury could find that Mr. Gleeson could have reasonably believed that the County employed the Armor medical staff. *Compare Soltis*, 172 A.D.2d at 920 (the fact that the plaintiff was treated at the state facility, with the assistance of state officials, precluded summary judgment as to the state's vicarious liability for the negligence of the independent contractor), *with Garofolo*, 135 A.D.3d at 1110 (the plaintiff could not reasonably believe that the doctors were employed by the prison because the plaintiff's treatments "took place outside of the prison without the involvement of any prison employees.") Accordingly, summary judgment is denied.

### b. *Intentional Infliction of Emotional Distress*

Intentional infliction of emotional distress has four elements: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress." *Greenaway v. Cty. of Nassau*, 97 F. Supp. 3d 225, 239-40 (E.D.N.Y. 2015) (quoting *Howell v. N.Y. Post Co., Inc.*, 81 N.Y.2d 115 (1993)). The "extreme and outrageous conduct" must "go beyond all possible bounds of decency" and be "atrocious, and utterly intolerable in a civilized community." *Greenaway*, 97 F. Supp. 3d at 239-40 (citations omitted). The tort "may be invoked only as a last resort, to provide relief in those circumstances where traditional theories of recovery do not." *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (internal citation and quotation marks omitted).

Even drawing all inferences in the plaintiffs' favor, the record does not sustain an intentional infliction of emotional distress claim. There is no evidence about the mindset of the defendants or their employees, in part because the plaintiffs did not depose them. Furthermore, no reasonable juror would find that the evidence on this record establishes

conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *See Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46, 56 (2016). As discussed above, there is a triable issue of fact as to whether the defendants acted with deliberate indifference or negligently. These traditional claims may provide relief at trial; accordingly, the plaintiffs' claim for intentional infliction of emotional distress is dismissed. [26]

### III. Damages

**\*19** The Armor defendants make three damages-related arguments in their motion for summary judgment. First, they claim that the plaintiffs cannot sustain a claim for attorneys' fees under 42 U.S.C. § 1988 because the plaintiffs "cannot be a prevailing party on any of the civil rights claims set forth in this litigation." (ECF No. 60-5, at 15.) As discussed above, the plaintiffs' civil rights claims will be tried before a jury. Accordingly, dismissing the plaintiffs' request for attorneys' fees is premature.

Second, the defendants claim that the plaintiffs cannot recover pecuniary losses beyond funeral expenses in connection with their wrongful death claims. Damages in a wrongful death action are limited to compensation for "pecuniary loss," which is defined as "the economic value of the decedent to each distributee at the time decedent died," and includes "loss of income and financial support, loss of household services, loss of parental guidance, as well as funeral expenses and medical expenses incidental to death." *Milczarski v. Walaszek*, 108 A.D.3d 1190 (App. Div. 2013) (internal citations omitted). "To recover on their wrongful death claims, plaintiffs must present an evidentiary basis for a reasonable expectation of pecuniary loss from decedent's death." *Datskow v. Teledyne Continental Motors Aircraft Products*, 807 F. Supp. 941, 945 (W.D.N.Y. 1992) (quoting *Public Administrator of Kings County v. U.S. Fleet Leasing of New York, Inc.*, 159 A.D.2d 331, 332 (N.Y. 1990)). Generally, "because it is difficult to provide direct evidence of wrongful death damages, the calculation of pecuniary loss is a matter resting squarely within the province of the jury." *Milczarski*, 108 A.D.3d at 1190 (quoting *Parilis v. Feinstein*, 49 N.Y.2d 984, 985 (1980)).

The plaintiffs have raised an issue of triable fact as to whether the plaintiffs have a reasonable expectation of pecuniary loss from Mr. Gleeson's death that exceed funeral expenses. First, the plaintiffs established that Mr. Gleeson provided household services to his parents, ex-wife, and children. (*See,*

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 116 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

*e.g.*, M.G. Dep. 21:8-13; ECF No. 61-5, 326:6-12.) Second, the plaintiffs established that Mr. Gleeson provided financial support to his children pursuant to a divorce judgment, although he was in arrears at the time of his death, as well as contributions for vacations, holiday gifts, back to school clothing, sports equipment, and sports team fees. (ECF No. 61-5, 317:3-319:19.) Finally, the plaintiffs established that Mr. Gleeson had a relationship with his children. (M.G. Dep. 298:11-20.) In light of these facts, I will not find as a matter of law that the plaintiffs have suffered no pecuniary losses apart from funeral expenses. *See, e.g. Ryan*, 2016 WL 11500151, at *8 ("Although the record concerning potential pecuniary loss is quite limited, the Court cannot find as a matter of law that Plaintiff suffered no pecuniary injury beyond the recovery of Ryan's funeral expenses.")

Third, the Armor defendants claim that they cannot be sued for punitive damages. Courts have held that entities acting under color of state law "are not afforded the same immunities from liability as are available to the municipality." *Phelan ex rel. Phelan v. Torres*, No. 04-CV-3538, 2005 WL 4655382, at *16 (E.D.N.Y. Sept. 20, 2005)[27] (non-for-profit corporation under contract with a municipality cannot be shielded from punitive damages). Punitive damages may be awarded only when the plaintiff has demonstrated that the defendants' conduct was "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56

(1983). Nevertheless, "[g]enerally, the issue of whether to award punitive damages is an issue for the jury to decide based on an evaluation of plaintiff's proof of 'sufficiently serious misconduct.' " *Phelan*, 2005 WL 4655382, at *15 (citation omitted). Accordingly, the Armor defendants can be sued for punitive damages, and their motion for summary judgment on the issue of punitive damages is dismissed.

### CONCLUSION

**\*20** The Court grants summary judgment for Defendants "John Does 1-10," "John and Jane Does 11-20," the Nassau County Correctional Center, the Nassau County Sheriff's Department, and Michael J. Sposato in his official capacity as Sheriff of Nassau County, and dismisses them from the case. The defendants' motion for summary judgment on the intentional infliction of emotional distress claim is also granted as to all remaining defendants. The Court denies summary judgment to Sheriff Sposato in his individual capacity, Nassau County, and Armor on all remaining claims.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4754326

---

### Footnotes

1    In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the non-moving party, in this case, the plaintiffs. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salomon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).

2    On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Brotherhood of Carpenters and Joiners of America*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I will disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

The parties' 56.1 submissions are not helpful in determining whether there are material disputes of fact. By way of example only, the parties spend far more time disputing the procedural history of this litigation than in

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 117 of 260

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

developing the chronology of Mr. Gleeson's treatment and death at the NCCC. Nevertheless, I have reviewed the entire record, including Mr. Gleeson's medical records, to determine the extent to which there are factual disputes.

3    The Armor defendants are foreign corporations authorized to conduct business in the state of New York. (ECF No. 72), Pls.' Counter-Statement in Response to Armor defendants ("Pls.' 56.1 (Armor)" ¶ 50)

4    The Nassau University Medical Center provided medical care to inmates at the NCCC before Armor. (ECF No. 71-4, Report of Nassau County Comptroller George Maragos ("Comptroller Report"), at i.)

5    The Medical Review Board consists of six members appointed by the governor, with the advice and consent of the senate. N.Y. Correct. Law § 43 (McKinney 2019). Three of the six members must be physicians. *Id.* Among its duties, the Board "investigate[s] and review[s] the cause and circumstances surrounding the death of any inmate of a correctional facility," and submits a report to the Commission of Correction and the administrator of the correctional facility. *Id.* § 47.

6    Mr. Gleeson also disclosed his alcohol and heroin use. (*Id.*)

7    The parties did not include in their 56.1 statements the details of Mr. Gleeson's treatment in the weeks leading up to his death. Accordingly, I have reviewed the handwritten medical records, which are difficult to read, and in some cases, completely illegible. The parties did not depose the medical personnel who authored the records.

8    ECF No. 57-22, ¶ 12.

9    Neither side includes the full details of the conversation, nor mentions Mr. Gleeson's reference to the rheumatologist.

10    The County defendants challenge the declaration of Morgan Smith, another inmate, as inadmissible hearsay. (ECF No. 80-1, § F.) Rule 56(c)(4) of the Federal Rules of Civil Procedure permits the Court to consider a declaration on summary judgment if it is made on personal knowledge and includes facts that would be admissible in evidence. While some of the statements in the Smith declaration may be inadmissible hearsay, the statement that he and other inmates were yelling for help is not offered for the truth of its content, but simply as evidence that the inmates called for help.

11    According to Mr. Smith, Mr. Gleeson's neck was "two times its normal size." (ECF No. 74-39, ¶ 4.)

12    In their reply to the plaintiffs' 56.1 counter-statement, the County defendants make a general challenge to the admissibility of some of the plaintiffs' evidence, but do not make a specific objection to the NYSCOC reports. In any event, the NYSCOC reports are admissible as public records under Federal Rule of Evidence 803(8)(A)(iii) because they contain factual findings from a legally authorized investigation, and the defendants have not suggested that the reports lack trustworthiness. *See Moses v. Westchester County Department of Correction*, No. 10-CV-9468, 2017 WL 4386362, at *10-11 (S.D.N.Y. Sept. 29, 2017).

13    None of the defendants challenge the admissibility of the Comptroller Report. The County defendants argue that I should disregard the Comptroller Report because it was "created in 2016 and has no bearing on the death of the decedent ..." (ECF No. 80-1, § F.) I address this argument in section I.b.iv of this Opinion.

14    In a letter responding to the Comptroller's report, Sheriff Sposato noted that an Interim Health Contract Administrator had been appointed in 2016, and that the Sheriff's Department had published a job announcement for a permanent replacement. (Comptroller Report at 53.) The Comptroller's views were unchanged: "[we] reiterate that this position was vacant from 2011 to 2016 and reemphasize the importance

of having a medical professional on site at the Correctional Center to oversee the medical care provided by the contractor." (*Id.* at 59.)

15 The National Commission on Correction Health Care ("NCCHC") establishes nationally recognized standards and benchmarks. (Comptroller Report at n. 27.)

16 I take judicial notice of the lawsuit filed in state court. *See Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388 (2d Cir. 1992).

17 The County defendants object to the admissibility of the affirmation because the settlement agreement provides that it is "not intended for use by any third party in any other action or proceeding[.]" (ECF No. 80 at 8) (quoting ECF No. 80-3, ¶ 10). The affirmation is admissible as a public record under Federal Rule of Evidence 803(8)(A)(iii) because it contains factual findings from a legally authorized investigation, and the defendants have not suggested that it lacks trustworthiness. *See Bradford Trust Co. v. Merrill Lynch*, 805 F.2d 49, 54-55 (2d Cir. 1986) (FBI reports prepared for related criminal action fall under the public records hearsay objection).

18 Before the Second Circuit's decision in *Darnell*, a pretrial detainee had to prove that the defendant official was subjectively aware of the harms associated with the constitutional deprivation. In *Darnell*, the Second Circuit changed the culpability standard for conditions-of-confinement cases in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), which applied an objective standard for excessive force claims brought by pretrial detainees under the Fourteenth Amendment. *Darnell*, 849 F.3d at 35.

19 *See generally Ramey v. Perez*, No. 13-CV-00017, 2014 WL 407097, at *4 (S.D.N.Y. Jan. 31, 2014) ("There has been considerable division among the district courts of the Second Circuit as to whether *Iqbal* abrogates several factors of the *Colon* test and if so to what extent.... *Colon* remains the standard in this Circuit for deciding whether personal involvement by supervisory officials is sufficiently alleged in the context of the Eighth Amendment.").

20 The AAG affirmation references three other deaths—before Mr. Gleeson's—where the Medical Review Board found that Armor was responsible for egregious lapses in medical care. (AAG Affirmation ¶ 9.) These findings support the conclusion that Sheriff Sposato should have known about the risk of constitutional violations, a question that is ultimately for a jury.

21 The plaintiffs also have sued Sheriff Sposato in his official capacity. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "[T]hus, within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." *Stancati v. County of Nassau*, No. 14-CV-2694, 2015 WL 1529859, at *2 (E.D.N.Y. Mar. 31, 2015) (quotation marks and citation omitted). A suit against Sheriff Sposato in his official capacity will be treated and analyzed as a suit against Nassau County, and the claim against Michael J. Sposato as Sheriff of Nassau County is dismissed as duplicative and redundant.

22 There is substantial evidence in the record that Mr. Gleeson would not have died if he had been seen by a rheumatologist. (ECF No. 71-6 ¶ 22; NYCOC Report ¶ 13 ("Had Gleeson been appropriately referred to a specialist, received a correct diagnosis, and received the proper treatment, his terminal event may have been prevented.")).

23 Armor's proposed electronic medical records system, which it did not implement, could, for example, generate reports of "[p]atients' pending consultations with specialists." (2011 Armor Contract at 231.)

Gleeson v. County of Nassau, Not Reported in Fed. Supp. (2019)

The plaintiffs also argue that the County's approval and renewal of its contract with Armor constitutes an official policy. (ECF No. 70 at 22.) A decision adopted by a municipal body is, of course, an officially promulgated policy for the purposes of *Monell* liability. *Monell*, 436 U.S. at 690. But the County's approval of the Armor contract is too far removed from Mr. Gleeson's treatment to support the requisite causal connection. *Pipitone*, 57 F. Supp. 3d at 194 ("Municipalities can only be liable under § 1983 when they are a 'moving force' behind the constitutional deprivation.") (citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

The AAG affirmation references three other deaths, before Mr. Gleeson's, in which the Medical Review Board found that Armor engaged in egregious lapses in medical care. (AAG Affirmation ¶ 9.) These repeated findings of civil rights violations buttress the conclusion that by the time of Mr. Gleeson's detention, the County had notice of serious problems of unconstitutional conduct requiring better supervision.

Even if the plaintiffs could sustain the intentional infliction of emotional distress claim, it would be dismissed as to the County defendants. *See J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 n.10 (E.D.N.Y. 2017) ("It is well settled that public policy bars claims sounding in intentional infliction of emotional distress against a government entity.") (quoting *Lauer v. City of N.Y.*, 240 A.D.2d 543 (N.Y. 1997)).

The Honorable Edward Korman adopted the report and recommendation in an unpublished order on November 28, 2005.

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2454193
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Philip GLOVER, Plaintiff,

v.

Glenn S. GOORD, et al., Defendant.

No. 9:06-CV-1037 (LEK/DEP).

|

Aug. 22, 2007.

**Attorneys and Law Firms**

PHILIP GLOVER, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State of New York, Office of the Attorney General, Syracuse Regional Office, Maria Moran, Esq., Assistant Attorney General, of Counsel, Syracuse, NY, for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

 **\*1** This matter comes before the Court following a Report-Recommendation filed on July 3, 2007, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 20).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 20) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED** that Defendant Goord's Motion to dismiss (Dkt. No. 16) is **GRANTED;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) be **DISMISSED as against Defendant Goord,** without prejudice to the right to replead; and it is further

**ORDERED** that the Motions of Defendants Canfield and Coniglio to transfer the action to the Western District of New York (Dkt.Nos.8, 16) are **GRANTED;** and it is further

**ORDERED** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

Plaintiff Philip Glover, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action against Glenn S. Goord, the former Commissioner of the New York State Department of Correctional Services ("DOCS"), and two physicians-one a DOCS employee stationed at the Elmira Correctional Facility, and the other an orthopedic surgeon at the Wyoming County Community Hospital-alleging deprivation of his rights under the Eighth Amendment to the United States Constitution. In his complaint, plaintiff asserts that during the course of treatment of his broken arm, extending over a significant period and requiring at least two surgeries, defendants were deliberately indifferent to his serious medical needs, resulting in his experiencing cruel and unusual punishment. Plaintiff's complaint seeks recovery of compensatory and punitive damages.

In response to plaintiff's complaint, the defendants have moved seeking its dismissal, claiming improper venue or, in the alternative, a transfer of the action to the Western District of New York. In that motion, defendant Goord also requests dismissal of plaintiff's claims against him based upon lack of personal involvement. For the reasons set forth below, I recommend that defendant Goord's motion to dismiss for lack of personal involvement be granted, and that the action be transferred to the Western District of New York, where the

remaining defendants are located and the events relevant to plaintiff's claims took place.

I. *BACKGROUND* [1]

 **\*2** Plaintiff is a New York State prison inmate entrusted to the custody of the DOCS. At the times relevant to his claims, plaintiff was confined within the Elmira Correctional Facility ("Elmira"). On or about May 30, 2004, while at Elmira, plaintiff suffered a broken arm. As a result of his examination of the injury Dr. Wesley Canfield, a DOCS physician at Elmira, determined that Glover needed to undergo the surgical insertion of a K-wire and screw in order to repair the break. Arrangements were therefore made for surgery, to be performed by Dr. Gerald Coniglio at the Wyoming County Community Hospital.

Following his operation, which was performed on July 13, 2004, and extending until October 20, 2004, plaintiff experienced severe pain and ongoing leakage of infected puss at the site of his surgery. According to the plaintiff, he was examined by defendants Canfield and Coniglio "on numerous occasions" to address the problems with his arm and ascertain the cause of his pain and infection. After several consultations, a second operation was scheduled to be performed on October 20, 2004, again at the Wyoming County Community Hospital. In that second operation, which plaintiff maintains was performed despite testing revealing that he had a high glucose level, Dr. Coniglio removed the K-wire.

Following his second operation, plaintiff's arm continued to leak infected puss. Plaintiff was again examined by defendants Canfield and Coniglio multiple times between October 20, 2004 and the end of that year. After determining that stronger antibiotics had failed to cure plaintiff's arm, medical officials scheduled a third operation.

Before the third scheduled surgery could take place, plaintiff was examined by a Dr. Angus, at the Arnot Ogden Medical Center, located in Elmira, New York, in connection with an apparently unrelated potential circumcision. Noting plaintiff's high level of glucose, Dr. Angus refused to perform that procedure. When Dr. Angus alerted defendants Canfield and Coniglio of plaintiff's high glucose level, they immediately prescribed metformin and glipizide for level two diabetes. Once those prescription drugs were administered, the wound on plaintiff's arm healed within two weeks.

In November of 2005 Dr. Richard Boch x-rayed plaintiff's arm. Upon reviewing the resulting x-rays, Dr. Boch determined that the screw placed in Grover's arm was too large, and additionally that it was inserted backwards. Dr. Boch subsequently removed the screw and placed it in a medical evidence bag.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on August 28, 2006, alleging that by their actions defendants were deliberately indifferent to his serious medical needs in violation of his constitutional rights under the Eighth Amendment. Dkt. No. 1. In response to plaintiff's complaint, defendants have lodged two separate motions seeking dismissal of the action on the ground that it is improperly venued in this district or, alternatively, requesting a transfer of the action to the Western District of New York. [2] Dkt. Nos. 8, 16. Defendant Goord also seeks dismissal of plaintiff's claims against him based upon the lack of his personal involvement in the constitutional violations alleged. *Id.* Plaintiff has since responded to both motions, arguing that because defendant Goord is alleged to have directly supervised the defendants in the action at the relevant times, and was purportedly required to approve all medical procedures performed, there is an adequate basis for finding personal liability against him. Plaintiff also asserts that the Northern District of New York is an appropriate venue, but requests a transfer of the action to the Western District of New York in the event that the court agrees that venue in this district is inappropriate. Dkt. Nos. 14, 19.

 **\*3** The pending dismissal motions, which are now ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

III. *DISCUSSION*

A. *Dismissal Motion Standard*

Plaintiff's motion to dismiss, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon the court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which is particularly unexacting in its requirements. Rule 8 of the Federal Rules of Civil Procedure requires only that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Absent applicability of a heightened pleading requirement such as

that imposed under Rule 9, a plaintiff is not required to plead specific factual allegations to support the claim; rather, "the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1964 (2007) (other quotations omitted)); *cf. Iqbal v. Hasty,* 490 F.3d 143, 2007 WL 1717803, at *11 (2d Cir. June 14, 2007) (acknowledging that a plaintiff may properly be required to illuminate a claim with some factual allegations in those contexts where amplification is necessary to establish that the claim is "plausible"). Once the claim has been stated adequately, a plaintiff may present any set of facts consistent with the allegations contained in the complaint to support his or her claim. *Twombly,* 127 S.Ct. at 1969 (observing that the Court's prior decision in *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. (1957), "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true, and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1722, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.), *cert. denied,* 540 U.S. 823, 124 S.Ct. 153 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). The burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) is substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (other quotations omitted)). Accordingly, a complaint should be dismissed on a motion brought pursuant to Rule 12(b)(6) only where the plaintiff has failed to provide some basis for the allegations that support the elements of his or her claim. *See Twombly,* 127 S.Ct. at 1969, 1974.

**\*4** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97

S.Ct. 285, 292 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Sufficiency of Plaintiff's Allegations Against Commissioner Goord*

In his motion, defendant Goord argues that plaintiff's complaint is devoid of any allegations of his involvement in, or even awareness of, the constitutional violations alleged. Defendant Goord maintains that because plaintiff's claim appears to be grounded solely on the theory of *respondeat superior*-an assumption largely confirmed by plaintiff's opposition papers-he is entitled to dismissal of plaintiff's complaint based upon lack of personal involvement.

Personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

A supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal,* 2007 WL 1717803, at *6; *see also*

*Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*5** When viewed in isolation, the allegations set forth in plaintiff's complaint are completely devoid of any connection between Commissioner Goord and plaintiff's alleged injuries. Plaintiff simply notes that defendant Goord was the Commissioner during the relevant time period, and was therefore "responsible ultimately for [his] care, custody, and control, and under the respondent superior doctrine is liable for actions of his respondents who act out of the color of state law." Complaint (Dkt. No. 1) ¶ 6. These allegations are facially insufficient to implicate Commissioner Goord in the constitutional violation alleged, since they fail to allege a tangible connection between his actions and plaintiff's alleged injuries. *See, e.g., Gill v. Mooney,* 824 F.2d 192, 196 (2d. Cir.1987) (finding dismissal appropriate where plaintiff did no more than allege that defendant was in charge of prison); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (same).

In his response dated Feb. 2, 2007, in opposition to Commissioner Goord's dismissal motion, plaintiff writes that he is "including Commissioner Goord; under the color of State Law because Defendants Dr. Wesley Canfield; and Defendant Gerald Conglio; Is [sic] under the direct supervision of Commissioner Goord." Plaintiff's Affidavit (Dkt. No. 14) ¶ 1. From this it appears that plaintiff is attempting to justify the inclusion of Commissioner Goord in the action based solely on his supervisory position over defendants Canfield and Coniglio. This allegation alone is insufficient to implicate defendant Goord in the constitutional violation alleged, since it fails to establish a nexus between Commissioner Goord and the alleged injuries. "[M]ere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson,* 347 F.3d at 435 (quoting *Ayers,* 780 F.2d at 210).

In his later response, filed on May 2, 2007, in opposition to defendant Canfield's dismissal motion, plaintiff interjects a new argument, asserting that

> [a]ll medical procedures done in New York State Department Correctional Services; Must first be approved by the Commissioner of Corrections; Who was Glenn S. Goord at the time of both of Plaintiffs operations; So therefore

> Commissioner Goord was Directly involved. And should be kept on as a defendant. [sic]

Plaintiff's Affidavit (Dkt. No. 19) ¶ 2(C). [3] This statement moves well beyond the original assertions set forth in plaintiff's complaint. From this, plaintiff's position now appears to be that because Commissioner Goord would have had to approve any medical procedure before the plaintiff could undergo medical treatment for his arm injury, he was thus personally involved in the treatment decisions at issue.

Plaintiff's assertion regarding Commissioner Goord's authority to approve all medical procedures which, despite the court's skepticism, must be accepted as true for purposes of defendants' motion, gives room for pause. Such an allegation would potentially form the basis for a finding of personal involvement in a situation, for example, where an inmate plaintiff alleges the complete denial of medical treatment. Thus, by way of illustration, had plaintiff alleged that additional surgery was recommended, but denied by the DOCS, then defendant Goord's liability could potentially be implicated under the circumstances now asserted by the plaintiff. In this instance, by contrast, plaintiff's claim is not that he has been denied requested surgery, but rather that the surgeries were performed negligently and that his operating and treating doctors failed to discern the existence of a high glucose level and to prescribe medication to eliminate his infections. It is difficult to imagine how Commissioner Goord's authority to approve medical procedures could expose him to personal liability in this setting. In deference to plaintiff's *pro se* status, however, and to permit clarification of the basis for plaintiff's claims of personal involvement on the part of defendant Goord, as well as to allow defendant Goord to respond to and defend against that claim, I recommend that plaintiff's claims against defendant Goord be dismissed for lack of personal involvement, though without prejudice and with leave to replead.

### C. *Improper Venue* [4]

**\*6** In their motions, defendants assert that venue in this action is improperly laid in the Northern District of New York, and that as such they are entitled to dismissal of plaintiff's complaint pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure. As an alternative to dismissal, defendants request that the matter be transferred to the Western District of New York. Plaintiff opposes defendants' dismissal motion

but, in the event of a finding of improper venue, urges that the action be transferred to the Western District.

Venue in an action such as this is governed by 28 U.S.C. § 1391(b), which provides, in pertinent part, that

> [a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred....

28 U.S.C. § 1391(b). In the event of a finding that venue is improper, a court is empowered to dismiss the action or, alternatively, if the interest of justice dictates, to transfer the case to any district in which it could have been brought. 28 U.S.C. § 1406(a); *see also Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 465-67, 82 S.Ct. 913, 915-16 (1962).

Since I have already determined that Commissioner Goord's motion to dismiss based on lack of personal involvement should be granted, the factors informing the venue examination now focus upon the residence of defendants Canfield and Coniglio, as well as where the relevant events occurred. Plaintiff's complaint lists defendant Canfield's address as Elmira, Chemung County, New York. It further lists defendant Coniglio's address as Warsaw, Wyoming County, New York. At all times relevant to this action, plaintiff was incarcerated at the Elmira Correctional Facility, located in Elmira, Chemung County, New York. The two surgeries and related medical treatment at issue in plaintiff's complaint took place at the Wyoming County Community Hospital in Warsaw, Wyoming County, New York. Both Chemung and Wyoming Counties are located within the Western District. Since it appears that the Western District is the appropriate forum in which this case, as currently configured, should be litigated, and both parties have requested a transfer in the event of such a finding, I recommend that this matter be transferred to that district as the most appropriate forum for litigation of plaintiff's claims.[5]

*See, e.g., Chet Baker Enterprises, L.L.C. v. Fantasy, Inc.,* 257 F.Supp.2d 592, 595-98 (S.D.N.Y.2002).

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint in this action, which alleges that defendants were deliberately indifferent to his serious medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment, fails to demonstrate the requisite personal involvement of former Commissioner Goord in the constitutional violation alleged. Accordingly, I recommend that defendants' motion to dismiss plaintiff's claims against defendant Goord be granted, with leave to replead.

**\*7** Turning to defendants' venue-based motion, because the remaining defendants reside in the Western District of New York, and the relevant events occurred there, I recommend transfer of the action to that district.

Based upon the foregoing it is hereby

RECOMMENDED that defendant Goord's motion to dismiss (Dkt. No. 8) be GRANTED, and that plaintiff's complaint be dismissed as against defendant Goord, without prejudice to the right to replead within an appropriate, specified period of time; and it is further

RECOMMENDED that the motions of defendants Canfield and Coniglio to transfer venue (Dkt.Nos.8, 16) be GRANTED, and that the action be transferred to the Western District of New York.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2454193

Glover v. Goord, Not Reported in F.Supp.2d (2007)

**Footnotes**

1       In light of the procedural posture of the case, the following recitation is drawn principally from plaintiff's complaint, the allegations of which are accepted as true for purposes of defendants' motion. *See Erickson v. Pardus,* --- U.S. ----, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964).

2       The first dismissal motion, filed on January 11, 2007, was interposed on behalf of defendants Goord and Coniglio, the only two defendants who until that point in time had been served. Dkt. No. 8. On February 5, 2007, after being served with the summons and complaint in the action, defendant Canfield moved seeking similar relief. Dkt. No. 16.

3       Although plaintiff raises arguments relating to Commissioner Goord's dismissal motion in his papers in response to defendant Canfield's later motion, I will consider the argument nonetheless. *Cf. Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (holding that a *pro se* complaint, "however inartfully pleaded," must be held to less stringent standards than formal pleadings drafted by lawyers).

4       While as a magistrate judge I lack the authority, absent consent of the parties, to order dismissal of an action, a venue transfer is regarded as a non-dispositive matter which falls within the scope of my non-consensual jurisdiction under 28 U.S.C. § 636(b) (1)(A). *See White Mop Wringer Co. of Canada Ltd. v. BT Capital Partners, Inc.,* No. 95-CV-565, 1997 WL 222380, at *1 (N.D.N.Y. Apr. 29, 1997) (Pooler, J.); *Pemrick v. Stracher,* No. 90-CV-849, 1992 WL 697636, at *1 (N.D.N.Y. Mar. 27, 1992) (McAvoy, C.J.); *see also Advance Relocation & Storage, Inc. v. Wheaton Van Lines, Inc.,* No. CV 99-2491, 2000 WL 33155640, at *1 (E.D.N.Y. Sept. 15, 2000) (decision of magistrate judge ordering a venue transfer under 28 U.S.C. § 1404(a)); *Tenen v. Winter,* 15 F.Supp.2d 270 (W.D.N .Y.1998) (decision by district judge affirming the order of a magistrate judge denying a motion for a change of venue). Because defendants' motion to transfer venue is raised in conjunction with their motion to dismiss, however, I have chosen to format my response to that motion as a recommendation to Judge Kahn.

5       Even if defendant Goord remained in the action, the court would nonetheless retain the authority to transfer the case to the Western District of New York under, *inter alia,* 28 U.S.C. § 1404(a) as the far more convenient forum for litigation. *Viacom Int'l, Inc. v. Melvin Simon Productions, Inc.,* 774 F.Supp. 858, 868 (S.D.N.Y.1991). When considering whether to order a transfer under a provision such as section 1404(a), a court must weigh several relevant factors, including 1) the place where the operative facts occurred; 2) convenience of the parties; 3) convenience of witnesses; 4) the relative ease of access to sources of proof; 5) the availability of process to compel attendance of unwilling witnesses; 6) plaintiff's choice of forum; 7) the forum's familiarity with the governing law; and 8) trial efficiency and the interests of justice. *Id.* (citations omitted); *see Excelsior College v. Frye,* 306 F.Supp.2d 226, 231 (N.D.N.Y.2004) (Hurd, J .). Courts routinely transfer cases when the principal events occurred, and accordingly the key witnesses are located, in another district. *Viacom,* 774 F.Supp. at 868 (citing *Computer Horizons Corp. v. Knauer,* 483 F.Supp. 1272, 1273 (S.D.N.Y.1980)).

**End of Document**                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

1998 WL 382055
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Angel GONZALEZ, Plaintiff,

v.

THE CITY OF NEW YORK; New York
City Department of Correction; Warden, Otis
Bantum Correctional Center; Corrections
Officer Summer, Shield No. 11856, Defendants.

No. 97 CIV. 2246(MGC).
|
July 9, 1998.

MEMORANDUM OPINION AND ORDER

CEDARBAUM, J.

**\*1** Plaintiff *pro se,* Angel Gonzalez, brings this action under 42 U.S.C. § 1983. He alleges that while in the custody of the New York City Department of Correction ("NYC DOC"), he was beaten by Correction Officer Summer. This is a motion to dismiss the complaint as against the City of New York, Warden of Otis Bantum Correctional Center (the "Warden") and NYC DOC pursuant to Fed.R.Civ.P. 12(b)(6).

On April 22, 1998, a letter was sent to Gonzalez directing him to respond to this motion by June 22, 1998. The letter advised Gonzalez that if he did not respond by June 22, the motion would be decided on the basis of the existing record, and the City of New York, New York City Department of Correction and Warden of Otis Bantum Correctional Facility might be dismissed from the action. Gonzalez has not responded. For the reasons that follow, the motion to dismiss is granted.

BACKGROUND

The complaint alleges that plaintiff was assaulted by Correction Officer Summer while he was incarcerated at Otis Bantum Correctional Center on Rikers Island, New York City. According to the complaint, as plaintiff was coming into the facility's recreation area from the "yard," he passed through a metal detector which registered that he had a metal object on his person. Defendant Summer then swore at plaintiff and told him to hurry up. As plaintiff passed through the

metal detector a second time, he said to Summer, "You don't have to act like that!" Summer then struck plaintiff in the face repeatedly until he lost consciousness. According to the complaint, when plaintiff regained consciousness, he found Summer "still abusing" him and swearing at him. Plaintiff left, found his way back to the housing area and felt as if he "had been hit with a bat to the face ." Plaintiff alleges that he suffered a cut under his left eye, serious swelling of his face and head, and lacerations of his scalp. He alleges that black and blue shadows still show under his eyes, and that he suffers from headaches. He seeks damages in the amount of three million dollars.

DISCUSSION

On a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must be accepted as true, *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and all reasonable inferences must be drawn in favor of the plaintiff, *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). A complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

1. NYC DOC and the City of New York

Defendants argue that Gonzalez cannot assert a claim against NYC DOC based on any legal theory because it is not a suable entity. They also contend that the complaint fails to state a claim against the City of New York because it does not allege that the actions complained of were the result of an official policy, custom or practice of the City of New York.

**\*2** In addition to the defect that NYC DOC is an agency of the City of New York that is not a suable entity, [1] the complaint fails to state a claim upon which relief can be granted against either NYC DOC or the City. To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a right, privilege or immunity guaranteed by federal law. To state a claim against a municipality, a plaintiff must also plead that the wrongful action alleged was the result of an official policy, custom or practice of the municipality, and that that policy caused plaintiff's injury. *Monell v. Department of Social Services,* 436 U.S. 658, 690–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The complaint, however, alleges no official policy, custom or practice resulting in injury to Gonzalez. Indeed, the complaint does not even mention the City of New York or NYC DOC, except to the extent that they are listed as parties.

2. Warden of Otis Bantum Correctional Center

Defendants also urge dismissal of the complaint against the Warden, on the ground that there are no allegations in the complaint concerning that defendant. When an individual defendant is sued under § 1983, that defendant's personal involvement in the alleged constitutional deprivation is a prerequisite to an award of damages. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). For a claim under § 1983, a complaint sufficiently alleges personal involvement of a supervisory official if it alleges one of the following: (a) direct participation in the alleged wrong; (b) failure to remedy a violation after receiving notice of it; (c) creation of a policy or custom under which unconstitutional practices occur; or, (d) grossly negligent management of subordinates who cause the constitutional violation. *See Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

A § 1983 claim against a municipal official in his official capacity is treated as a claim against the municipality itself. *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985). As noted above, § 1983 imposes liability on a municipality only when the action that is alleged to be unconstitutional implements or executes an official policy or custom. *See Monell,* 436 U.S. at 690–91.

From the complaint, it is unclear whether the warden is being sued in his personal or official capacity. However, *pro se* complaints, if possible, should be construed as asserting both claims. *Jackson v. Dinkins,* 1995 WL 657075, at *1 (S.D.N.Y. Nov.8, 1995) (citing *Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 604, 126 L.Ed.2d 569 (1993)).

The complaint does not allege the personal involvement of the Warden. The complaint mentions the Warden only in the caption, and fails to allege any act or omission by that party. *See Crown v. Wagenstein,* 1998 WL 118169, at *1 (S.D.N.Y. Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement); *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997) (same).

**\*3** Finally, to the extent that the complaint asserts an official-capacity claim against the Warden, the claim fails for the same reason that the claims against the City of New York and NYC DOC fail. There are no allegations of any municipal policy or custom that the Warden was executing, or that such a policy or custom caused the alleged violation of the plaintiff's constitutional rights, as required by *Monell.* The absence of any such allegation precludes a finding of liability against the Warden in his official capacity.

Accordingly, the complaint fails to the state a claim against the Warden upon which relief can be granted.

CONCLUSION

For the foregoing reasons, the motion to dismiss the complaint as against defendants the City of New York, New York City Department of Correction, and Warden of Otis Bantum Correctional Facility is granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1998 WL 382055

---

**Footnotes**

1    Defendants correctly point out that New York City agencies, such as NYC DOC, are organizational subdivisions of the City of New York lacking independent legal existence and are not themselves subject to suit. *See, e.g., Adams v. Galletta,* 966 F.Supp. 210, 212 (S.D.N.Y.1997) ("where a plaintiff has named the Department of Corrections as a defendant, he has sued a non-suable entity").

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 128 of 260

Gonzalez v. City of New York, Not Reported in F.Supp. (1998)

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1923236
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Milan HALL, Plaintiff,
v.
CLINTON COUNTY, Defendant.

8:18-CV-1405 (GTS/CFH)
|
Signed 04/21/2020

**Attorneys and Law Firms**

MILAN HALL, Plaintiff, Pro Se, 36 Bell Road, Chazy, NY 12921.

OF COUNSEL: THOMAS K. MURPHY, ESQ., MURPHY BURNS LLP, Counsel for Defendant, 407 Albany Shaker Road, Loudonville, NY 12211.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Milan Hall ("Plaintiff") against Clinton County ("Defendant"), is Defendant's motion to dismiss Plaintiff's Amended Complaint for failure to state a claim upon which relief can be granted. (Dkt. No. 13.) For the reasons set forth below, Defendant's motion is granted.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

Plaintiff filed an Amended Complaint in accordance with this Court's Decision and Order of August 26, 2019. (Dkt. No. 11 [Decision and Order filed Aug. 26, 2019].) Generally, in his Amended Complaint, Plaintiff alleges that, "commencing on the 28th day of June 2012," Defendant has violated his rights in five ways by using his marriage license as proof of paternity: (1) Defendant has stripped him of his status as a man and termed him a non-custodial parent and obligor; (2) Defendant has wrongfully denied him the right to raise his child as he pleases and to do so in privacy; (3) Defendant has damaged his reputation in his community; (4) Defendant has denied him the right to a trial by jury before ordering him to pay child support; and (5) Defendant denied him

his right to due process when it failed to disclose to him the legal consequences that would result from the signing of his marriage license. (Dkt. No. 12 [Pl.'s Am. Compl.].) Generally, based on these factual allegations, and construed with special liberality, Plaintiff's Amended Complaint claims that Defendant violated his rights to due process under the Fifth and Fourteenth Amendments, and his right to a jury trial under the Sixth and/or Seventh Amendments to the United States Constitution and 42 U.S.C. § 1983. (*Id.*)

### B. Parties' Briefing on Defendant's Motion to Dismiss

#### 1. Defendant's Memorandum of Law

Generally, in its motion to dismiss Plaintiff's Amended Complaint, Defendant makes two arguments. (Dkt. No. 13, Attach. 2 [Def.'s Mem. of Law].) First, Defendant argues that Plaintiff's Amended Complaint fails to state a claim upon which relief can be granted. (*Id.* at 7-8.) More specifically, Defendant argues that Plaintiff has not pled facts plausibly suggesting the existence of any municipal custom, policy, or practice that caused his alleged constitutional deprivations, but rather has merely alleged that New York's valid paternity laws are not fair. (*Id.*) Defendant also argues that Plaintiff is essentially seeking a nullification of a New York State Family Court Order of Child Support against him, triggering the domestic relations exception to federal court jurisdiction, and thus, even if the Court were to find that Plaintiff has stated a claim, the Court would not possess subject-matter jurisdiction over any such claim. (*Id.*)

Second, Defendant argues that, based on the Amended Complaint's own factual allegations, Plaintiff's claims are untimely as a matter of law. (*Id.* at 8-9.) More specifically, Defendant argues that the statute of limitations for personal injury actions in New York is three years from when the plaintiff knew or had reason to know of the injury, and that the Amended Complaint expressly alleges that the child support proceedings were initiated on June 28, 2012; yet Plaintiff did not file this lawsuit until December 2018. (*Id.*) Defendant argues that any allegations that the injury is ongoing (because Plaintiff is under a continuous obligation to pay child support) would not render his claim timely under the continuing violation doctrine because, based on the factual allegations of the Amended Complaint, he was (or reasonably should have been) aware of that injury as early as June 28, 2012. (*Id.*)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 130 of 260

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

### 2. Plaintiff's Opposition Memorandum of Law

**\*2** Generally, in opposition to Defendant's motion, Plaintiff makes four arguments. (Dkt. No. 15, at 4-5 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that he is not alleging that Defendant failed to inform him of the responsibilities that could possibly result from children born during his marriage at the time he signed the marriage license, but that "Defendants failed to employ Due Process Safeguards to ensure that the rights of the Plaintiff were protected, and as a result the Plaintiff was defaulted into a Title IV-D case from which he now suffers the deprivation of his inherent rights"; however, he concedes that "[t]his deprivation is extrinsically linked to the Defendants failure to employ due process safeguards when presenting the Plaintiff with a marriage certificate, the legal instrument that would later be used to default the Plaintiff into a Title IV-D case." (*Id.* at 4.) Pointing to a federal statute requiring a state to have a civil process for voluntarily acknowledging paternity that includes the provision of due process and an explanation by the state of the individual's rights and responsibilities of acknowledging paternity, he appears to argue that Defendant violated his right to due process by summoning him to a "fact finding" hearing before a "Family Court Support Magistrate" because the Federal Manual of Child Support requires that such a proceeding should not have been presided over by "a judge of the court." (*Id.*)

Second, Plaintiff argues that he is not merely asking the Court to overturn the child support order as Defendant suggests, but is seeking a remedy for the violation of his constitutional rights. (*Id.* at 4-5.)

Third, Plaintiff argues that it is a crime to deprive an individual of his or her constitutional rights. (*Id.* at 5.)

Fourth, Plaintiff argues that his claims should not be found to be untimely because he promptly filed his original Complaint in 2018 as soon as he discovered that his rights had been violated. (*Id.* at 5.)

## II. GOVERNING LEGAL STANDARDS

It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed. R. Civ. P. 8(a)(2); or (2) a challenge to the legal

cognizability of the claim. *Jackson v. Onondaga Cnty.*, 549 F. Supp.2d 204, 211 nn. 15-16 (N.D.N.Y. 2008) (McAvoy, J.) (adopting Report-Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, some elaboration regarding that ground is appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed. R. Civ. P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed. R. Civ. P. 8(a)(2) as "simplified" and "liberal." *Jackson*, 549 F. Supp. 2d at 212 n.20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed. R. Civ. P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson*, 549 F. Supp. 2d at 212 n.17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson*, 549 F. Supp. 2d at 212 n.18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F. Supp. 2d 203, 213 & n.32 (N.D.N.Y. 2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed. 2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp. 2d at 213 n.22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-52 (2009).

**\*3** Most notably, in *Bell Atlantic Corp. v. Twombly*, the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson*, 355 U.S. 41,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 131 of 260

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

45-46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly*, 127 S. Ct. at 560-61, 577. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 555-70. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id.* at 555. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not show[n]–that the pleader is entitled to relief." *Iqbal*, 129 S. Ct. at 1950 (internal quotation marks and citations omitted). However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.*, it "does not impose a probability requirement." *Twombly*, 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal*, 129 S. Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed. R. Civ. P. 12(b)(6) or Fed. R. Civ. P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [1]

## III. ANALYSIS

**\*4** After carefully considering whether Plaintiff's Amended Complaint should be dismissed, the Court answers this question in the affirmative for the reasons stated in Defendant's memorandum of law. (Dkt. No. 13, Attach. 2, at 7-9 [Def.'s Mem. of Law].) To those reasons, the Court adds the following analysis.

As an initial matter, the Court finds that Plaintiff's claims, to the extent that they seek an invalidation of a Family Court child support order, are barred by the *Rooker-Feldman* doctrine. Under the *Rooker-Feldman* doctrine, a federal court lacks subject-matter jurisdiction where the following four elements are met: (1) the plaintiff has lost in state court; (2) the plaintiff complains of injuries caused by the state court judgment; (3) the plaintiff invites the district court to review and reject the state court judgment; and (4) the state court judgment was rendered before the district court proceedings commenced. *Ganiyu v. Lopez*, 19-CV-11605, 2020 WL 1467356, at \*2 (S.D.N.Y. Mar. 25, 2020) (citing *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 [2d Cir. 2005]). It is evident from the Amended Complaint that Plaintiff received a child support order against him, that he now complains that the proceedings that resulted in that order caused his alleged constitutional injuries, and that the child support order was rendered before he commenced this action. Additionally, although Plaintiff frames his argument in terms of constitutional violations and inadequacies in the proceedings underlying the support order, such arguments amount to little more than a request for this Court to assess whether the Family Court's reliance on the marriage license to establish paternity was correct, something which this Court is not permitted to do. *See Kramer v. Dane*, 17-CV-5253, 2018 WL 4489284, at \*3 (E.D.N.Y. Sept. 19, 2018) ("[T]he fact that plaintiffs assert that their constitutional rights were violated during the state court proceedings does not except their claims from the *Rooker-Feldman* doctrine."); *Davis v. Westchester Cnty. Family Court*, 16-CV-9487, 2017 WL 4311039, at \*8

(S.D.N.Y. Sept. 26, 2017) (finding "[t]he fact that Plaintiff is challenging the constitutional adequacy of the proceedings is of no help to him" in precluding application of the *Rooker-Feldman* doctrine to his claims) (collecting cases). [2]

**\*5**  To the extent that Plaintiff seeks entitlement to relief beyond a nullification of the child support order that would be excepted from jurisdiction by the *Rooker-Feldman* doctrine, the Court also finds that Plaintiff's claims pursuant to 42 U.S.C. § 1983 fail under Fed. R. Civ. P. 12(b)(6) as time-barred. Plaintiff attached to the Amended Complaint a copy of the Family Court's summons to a fact-finding hearing to be held on July 30, 2012, before Support Magistrate Michael J. Howley, and a copy of the Petition for Child Support filed against Plaintiff that was the basis for that hearing. (Dkt. No. 12, Attach. 1.) The Amended Complaint alleges that it was the commencement of the proceedings against Plaintiff through this petition in June 2012 that caused the deprivation of his rights. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) The Supreme Court has held that, "[b]ecause § 1983 claims are best characterized as personal injury actions ... a State's personal injury statute of limitations should be applied in all § 1983 claims." *Owens v. Okure*, 488 U.S. 235, 240-41 (1989). The Supreme Court found in particular that New York's general or residual statute related to personal injury actions should be applied, which sets a three-year statute of limitations. *Owens*, 488 U.S. at 249-50; *accord, Phillips v. City of New York*, 304 F. Supp. 3d 305, 311 (E.D.N.Y. 2018). Such statute of limitations begins "when a plaintiff has a complete and present cause of action, that is when the plaintiff can file suit and obtain relief," or, in other words, "when the wrongful act or omission results in damages, ... and once the plaintiff knows or has reason to know of the injury which is the basis of his action." *McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018) rev'd on other grounds *McDonough v. Smith*, 139 S.Ct. 2149 (2019).

In this case, Plaintiff acknowledges in his Amended Complaint that his alleged constitutional harms occurred as a result of the child support proceedings against him in late June 2012. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) It is therefore reasonable to find that Plaintiff knew or should have known of the proceedings against him and the child support order at the time those events occurred in 2012. Of note, Plaintiff does not allege that he was never informed of either the proceedings against him or of the child support order itself until a later time. Nonetheless, Plaintiff did not file his initial Complaint in this action until December 3, 2018, more than six years later. (Dkt. No. 1 [Pl.'s Compl.].) Although

Plaintiff argues in his opposition memorandum of law that he "promptly filed a complaint with the Federal District Court as soon as he discovered his rights had indeed been violated," he offers no explanation in either the Amended Complaint or his opposition memorandum of law as to why he seemingly did not know of the alleged constitutional violations until 2018. (Dkt. No. 15, at 5 [Pl.'s Opp'n Mem. of Law].) Additionally, it does not matter when Plaintiff actually discovered a violation. The relevant consideration is when he knew *or had reason to know* of the alleged injury, and without any factual allegation that Plaintiff was somehow left in the dark for six years about the basis for the child support proceedings and order against him (despite the factual statement in the order that the proceeding against Plaintiff was authorized because he and the child's mother had gotten married on July 24, 2010), the Court cannot find that he has alleged facts plausibly suggesting that he did not have reason to know of the alleged injury as long ago as June of 2012. As a result, the Court finds that Plaintiff's claims are barred by the statute of limitations.

The Court also finds that tolling is not warranted under the circumstances alleged. Although the Second Circuit recognizes the continuing violation doctrine, it has qualified that the doctrine applies only to claims "composed of a series of separate acts that collectively constitute one unlawful practice," or "claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015). Although Plaintiff alleges that the violations of his rights "continue to this day" because he is still subject to the child support order, the fact that he continues to suffer an ongoing injury does not bring his claim under the auspices of the continuing violation doctrine. In other words, each payment Plaintiff is required to make under the child support order is not a new and separate act and injury, but merely a consequence of the initial act, namely, the proceedings and the issuance of the child support order in 2012. Plaintiff had a fully formed claim upon the occurrence of the relevant proceedings and the issuance of the child support order. The Court therefore declines to find that the continuing violation doctrine applies to Plaintiff's claims, and finds instead that there is no other apparent basis for tolling the statute of limitations. Plaintiff's claims pursuant to 42 U.S.C. § 1983 are therefore time-barred and must be dismissed.

**\*6**  In the alternative to the finding that Plaintiff's claims are time-barred and/or covered by the *Rooker-Feldman* doctrine, the Court finds that he has not alleged facts plausibly stating any claim upon which relief can be granted. As an initial

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 133 of 260

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

matter, Defendant is correct that Plaintiff has again failed to allege any facts plausibly suggesting a municipal custom, policy, or practice to merit holding Defendant liable for the alleged constitutional violations. The only apparent policy identified by Plaintiff is the policy of allowing use of a marriage license to create a presumption of paternity. (Dkt. No. 12, at 5 [Pl.'s Am. Compl.].) However, as Defendant argues, this "policy" is in fact a long-standing part of New York common law, not merely a practice or rule put in place by Defendant or the Clinton County Family Court. *See In re Findlay*, 253 N.Y. 1, 6-7 (N.Y. 1930) (discussing the presumption of legitimacy). Notably, Plaintiff has not alleged facts plausibly suggesting that Defendant had a policy of disallowing rebuttal of the presumption of legitimacy or any other action of that nature that would have prevented Plaintiff from providing evidence to rebut that presumption. As a result, Plaintiff has not alleged facts plausibly suggesting that the alleged constitutional violations were a result of any policy imposed by Defendant, and the Court therefore finds that Defendant cannot be held liable for the claims asserted against it.

Even if Plaintiff had alleged facts plausibly suggesting the existence of a municipal custom, policy, or practice, the Court finds that Plaintiff has not stated a claim upon which relief can be granted. Many of the claims asserted by Plaintiff (i.e., that Defendant has stripped him of his status as a man, violated his right to privacy, violated his right to raise his child as he pleases, violated his right to trial by jury, and defamed him) are either not facially viable legal claims under the circumstances or are so vaguely asserted (i.e., without sufficient supporting factual allegations) that they cannot be found to plausibly state a claim upon which relief can be granted. The Court therefore finds little need to discuss these claims in any detail, but finds that they must be dismissed.

With regard to Plaintiff's due process claim, and particularly Plaintiff's argument that Defendant's acceptance of the marriage license as proof of paternity was a violation of his right to due process, as the Court has previously found, Plaintiff has not alleged facts plausibly suggesting that he was denied the opportunity to present counter-evidence to overcome the presumption that a child born in the context of a marriage is the child of the married spouses. Rather, the summons attached to the Amended Complaint notified him of a fact-finding hearing that preceded the issuance of the child support order. Plaintiff has not alleged facts plausibly suggesting that he did not receive sufficient notice of the commencement of the proceedings before the child support

order was enacted against him (or that he even attended the hearing). Moreover, the summons specifically states that "failure to appear will result in the entry of an order on default unless service has been made by mail alone, in which event no default may be entered without proof satisfactory to the court that you have received actual notice of the commencement of this proceeding." (Dkt. No. 12, Attach. 1, at 1.) Without any factual allegation plausibly suggesting that Plaintiff (a) lacked notice of the hearing such that a default was improper, or (b) attended the hearing but was denied the opportunity to provide evidence to counter the presumption created by the marriage license, the Court cannot find that he has alleged facts plausibly suggesting that Defendant violated his due process rights in relying on the marriage license when issuing the child support order.

Plaintiff also argues that his due process rights were violated by the fact that a Support Magistrate of the Family Court granted the petition for child support because the Federal Manual of Child Support requires that "[p]roceedings conducted pursuant to either the expedited judicial or expedited administrative process must be presided over an individual who is not a judge of the court." (Dkt. No. 15, at 4 [Pl.'s Opp'n Mem. of Law].) However, even if Plaintiff has alleged facts plausibly suggesting that Defendant violated this provision of the Federal Manual of Child Support (a finding that the Court does not make), he has made no factual allegation plausibly suggesting how any such violation in turn violated his due process rights under the United States Constitution. [3]

**\*7** Having already afforded Plaintiff an opportunity to amend his Complaint, the Court finds that it need not grant Plaintiff an opportunity to amend the Amended Complaint to attempt to cure any of the above-mentioned deficiencies, In any event, it finds those deficiencies to be substantive in nature, due to the findings that the Court lacks subject-matter jurisdiction to consider any claims that fall under the *Rooker-Feldman* doctrine, and that any other potential claims are untimely (and Plaintiff has not offered any indication that he could allege facts to plausibly suggest that those claims were in fact timely).

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is **GRANTED**; and it is further

Hall v. Clinton County, Not Reported in Fed. Supp. (2020)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 134 of 260

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED**.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 1923236

---

### Footnotes

1    *See* Fed. R. Civ. P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L-7 Designs, Inc. v. Old Navy, LLC*, No. 10-573, 2011 WL 2135734, at *1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary judgment is not necessary under Fed. R. Civ. P. 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

2    The Court notes that, although Defendant argues that subject-matter jurisdiction is lacking over Plaintiff's claims based on the domestic relations exception, the Second Circuit recently held that the domestic relations exception does not apply in federal-question cases. *Deem v. DiMell-Deem*, 941 F.3d 618, 621 (2d Cir. 2019). Although the Second Circuit also found that, notwithstanding the inapplicability of the domestic relations exception, the separate domestic relations abstention doctrine does apply to federal-question cases, the Court need not determine whether abstention would be appropriate in this case based on its finding that the *Rooker-Feldman* doctrine divests the Court of subject-matter jurisdiction over any claims that would be covered by that abstention. Finally, the Court notes that it may *sua sponte* consider the *Rooker-Feldman* doctrine (even though Defendant never invoked it) because pursuant to Fed. R. Civ. P. 12(h)(3), the Court may *sua sponte* consider whether it lacks subject-matter jurisdiction over a claim.

3    Of note, the New York Family Court Act indicates that support magistrates are in fact not "a judge of the court" as Plaintiff appears to assert. *See* N.Y. Fam. Ct. § 439(a) (indicating that, although support magistrates are appointed to have authority over certain matters related to support proceedings, their findings in many cases are limited or overseen by "a judge of the court"). Given that Plaintiff himself acknowledges that the decision-maker on the support petition was a "Family Court Support Magistrate" (an acknowledgment that is

**Hall v. Clinton County, Not Reported in Fed. Supp. (2020)**

confirmed by the attachment to the Amended Complaint), the Court finds that Plaintiff has not alleged facts plausibly suggesting that the use of a support magistrate was in anyway contrary to federal law or policy.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 3280821
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Leor KWELLER and Zoe Liberman, Plaintiffs,
v.
The COUNTY OF BROOME et al., Defendants.

3:25-CV-343 (AJB/ML)
|
Signed November 25, 2025

**Attorneys and Law Firms**

Andrea L. Zellan, Sarafa Zellan PLLC, New York, NY, Karen A. Newirth, Newirth Linehan PLLC, New York, NY, Oscar Michelen, Michelen Law, P.C., Mineola, NY, for Plaintiffs.

James C. Knox, Alishah Elena Bhimani, Hacker Murphy LLP, Troy, NY, for Defendant Alyssa Congdon.

Kavitha Janardhan, Lawrence M. Ordway, Jr., Bousquet Holstein PLLC—Syracuse Office, Syracuse, NY, for Defendant Samantha Herceg.

**DECISION and ORDER**

Anthony J. Brindisi, United States District Judge:

**I. INTRODUCTION**

**\*1** On March 18, 2025, Leor Kweller ("plaintiff") and his wife, Zoe Liberman ("Ms. Liberman") filed this 42 U.S.C. § 1983 action against defendants Hailey Demkovich, Samantha Herceg, the City of Binghamton (the "City"), City Police Chief Joseph Zikuski ("Chief Zikuski"), City Police Captain Cory Minor ("Captain Minor"), City Police Investigator Amanda Miller ("Investigator Miller"), the County of Broome (the "County"), County District Attorney Michael Korchak ("DA Korchak"), County Chief Assistant District Attorney Mark Loughran ("Chief ADA Loughran"), County Assistant District Attorneys Alyssa Congdon ("ADA Congdon") and Amanda Cronin ("ADA Cronin"), Broome County District Attorney's Office Investigator Jeff Wagner ("BCDA Investigator Wagner"), and unidentified Broome County District Attorney's Office and City Police Department employees numbered one through ten (the "Does"). Dkt. No. 1.

In short, plaintiff alleges that Hailey Demkovich and Samantha Herceg falsely accused him of rape, the Binghamton Police Department ("BPD") inadequately investigated those false allegations, and the Broome County District Attorney's Office (the "BCDA") deliberately disregarded exculpatory evidence and chose to prosecute him anyway. *See generally* Dkt. No. 1. The Broome County Court ultimately granted plaintiff's motion to dismiss all criminal charges against him on May 31, 2023, and the BCDA's appeal of that decision was withdrawn on February 20, 2024. *Id.* ¶¶ 191–92.

The twelve-count complaint asserts § 1983 claims for "False Arrest and Malicious Prosecution" (Count I), "Due Process and Denial of the Right to a Fair Trial" (Count II), "Failure to Intervene" (Count III), "Supervisory Liability" (Count IV), "*Monell* Liability" (Counts V & VI), "Civil Rights Conspiracy" (Count VII), as well as related state law claims for "False Arrest and Malicious Prosecution" (Count VIII), "Intentional, Reckless, or Negligent Infliction of Emotional Distress" (Count IX), violations of Article I, sections 6 and 12 of the New York State Constitution (Count X), "*Respondeat Superior*" (Count XI), and "Abuse of Process" (Count XII). Dkt. No. 1, ¶¶ 191–302. [1]

Defendants Hailey Demkovich and Samantha Herceg answered the complaint, Dkt. Nos. 37, 39, but the remaining defendants moved to dismiss the pleading pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. Nos. 19, 27, 29–31, 37

Defendants' motions have been fully briefed, [2] *see* Dkt. Nos. 43–44, 46–47, 53–54, 56, 58, 61, and will be considered on the basis of the submissions without oral argument.

**II. BACKGROUND**

The following facts are taken from the complaint and will be assumed true for the purpose of assessing defendants' motions to dismiss.

On the night of November 26, 2021, plaintiff accompanied his brother, Yaron Kweller ("Yaron"), to downtown Binghamton, New York, to visit "several of the bars and restaurants Yaron ... owns in partnership with others," including Dos Rios Cantina, the Colonial, and the Stone Fox. Dkt. No. 1 ("Compl.") ¶ 28.

**\*2** Around 10:00 p.m., the brothers arrived at Dos Rios Cantina, staying for some time before going to the Colonial

and, eventually, the Stone Fox. Compl. ¶ 30. At the Stone Fox, the brothers met up with Jordan Rindgen ("Rindgen"). *Id.* ¶ 31. Rindgen was the general manager of the Stone Fox, the Colonial, and Dos Rios Cantina. *Id.*

After Rindgen completed his shift at the Stone Fox, he and the brothers went to Dillinger's, a nearby bar not owned by Yaron. Compl. ¶ 31. The three arrived at Dillinger's sometime after midnight. *Id.* ¶ 32. There, an unknown woman, later identified as Samantha Herceg ("Herceg"), approached plaintiff, Yaron, and Rindgen. *Id.* Herceg purchased a round of alcoholic beverages and shots of alcohol for the men. *Id.*

Around 2:00 a.m., plaintiff, Yaron, Rindgen, and Herceg walked to the Stone Fox. Compl. ¶¶ 32–33. The Stone Fox had closed for the night, but Rindgen went inside to retrieve a bottle of wine and canned alcoholic seltzers for the group. *Id.* at 33. The four then traveled to Yaron's business office, which was located nearby. *Id.* ¶ 34. While at Yaron's office, Herceg texted her friends in a group message and invited them to come to the office. *Id.* ¶ 35. Among those invited was Demkovich, who agreed to join, arriving at Yaron's office a short time later. *Id.* ¶¶ 37–38.

Once Demkovich arrived, the group—now consisting of plaintiff, Yaron, Rindgen, Herceg, and Demkovich—returned to the Colonial. Compl. ¶ 41. There, Herceg and Demkovich (the "complainants") ordered shots of alcohol and began to kiss each other. *Id.* ¶ 43. The complainants approached and kissed Rindgen, who was socializing with plaintiff and Yaron. *Id.* ¶ 44. Then, the complainants "danced together in a sexual manner," and "danced sexually with Yaron." *Id.* At some point, Herceg kissed plaintiff. *Id.* ¶ 59. Surveillance cameras inside the Colonial captured footage of these events. *Id.* ¶ 45.

Around 3:00 a.m., the Colonial closed for the night, and the five returned to Yaron's office. Compl. ¶ 46. The complainants went into the bathroom together, emerging partially undressed before disrobing completely and engaging in sexual contact with one another in front of plaintiff, Yaron, and Rindgen. *Id.* ¶¶ 49–50. After that, Rindgen and the complainants used cocaine together. *Id.* ¶ 51.

Then, Rindgen and Demkovich "began kissing and touching each other sexually." Compl. ¶ 53. "Herceg [went] over to the couch where [plaintiff] was sitting and tried to kiss him." *Id.* ¶ 52. Herceg "stated that she wanted [plaintiff] to have sex with her and ejaculate inside her," but plaintiff "took no action towards ... Herceg at that time or at any time during the

encounter." *Id.* Meanwhile, "Demkovich initiated oral sex on Yaron." *Id.* ¶ 53. Rindgen moved away from Demkovich and Yaron and "began having consensual contact with ... Herceg." *Id.* ¶ 54.

"[A]pproximately forty-five minutes after the group had returned to the office for the second time ... Herceg and Demkovich told [p]laintiff, his brother Yaron, and ... Rindgen that they were ready to go home." Compl. ¶ 55. Before leaving, the complainants "appeared to be in a good mood and were joking with [plaintiff], Yaron ..., and [ ] Rindgen." *Id.* ¶ 56. Surveillance footage showed complainants leaving plaintiff's office and walking toward a parking garage at 3:48 a.m. on November 27, 2021. *Id.* ¶ 91.

**\*3** Later that day, the complainants reported to the New York State Police that they had been sexually assaulted and underwent rape examinations. Compl. ¶¶ 76, 175(a). The State Police advised the complainants to contact BPD. *Id.* ¶ 76. That evening, Demkovich's boyfriend called the Colonial to report that the owners had drugged and raped Demkovich the night before. *Id.* ¶ 62. Rindgen, who was also the general manager of the Colonial, informed Yaron that Demkovich's boyfriend had called, and Yaron contacted a friend in BPD, Detective Bob Fimbres, who confirmed that a report had been filed against the men. *Id.* ¶¶ 64–65. Yaron advised plaintiff of the complaint, and both men retained counsel. *Id.* ¶¶ 66–67.

On November 28, 2021, BPD Investigator Miller was assigned to investigate the complainants' allegations. Compl. ¶ 77. Investigator Miller separately interviewed the complainants, who restated their accusations and provided text messages and photographs from the night of the alleged assault. *Id.* ¶¶ 78–79. Demkovich allegedly told Investigator Miller that she was questioning if she was, in fact, raped, or if the physical or sexual contact was consensual, but this statement was never recorded. *Id.* ¶ 82. Two days later, plaintiff's attorney provided Investigator Miller with surveillance footage from inside the Colonial. *Id.* ¶ 88.

One week after the alleged sexual assaults, Investigator Miller and her supervisor, Captain Minor, executed a search warrant at Yaron's office, where the alleged assaults occurred, but they did not recover any physical evidence. Compl. ¶ 90. BPD also obtained surveillance footage from third parties that covered the street area surrounding Yaron's office. *Id.* ¶ 91.

On December 8, 2021, newly hired ADA Congdon attended a meeting with DA Korchak, Chief ADA Loughran, Captain

Minor, and Investigator Miller to discuss the complainants' allegations and the ongoing investigation. Compl. ¶¶ 103–04. Chief ADA Loughran suggested that BPD and the BCDA attempt to obtain the complainants' phones. *Id.* ¶ 105. After the meeting, DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation. *Id.* ¶ 106. ADA Congdon had previously worked as a criminal defense lawyer for nearly a decade, but she had no experience working as a prosecutor. *Id.* ¶ 103(f).

Meanwhile, rumors of the complainants' allegations spread throughout the Binghamton community. Compl. ¶ 96. Public outrage intensified as local news outlets picked up the story. *Id.* On December 10, 2021, BPD issued a press release stating that it was "investigating a[n] ... incident involving the owners of the Colonial," and that it was "aware of additional allegations being made on social media." *Id.* ¶ 98. Likewise, DA Korchak issued a video statement, acknowledging that "his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County," and "encourag[ing] those with knowledge to contact the BCDA[ ] or local police departments." *Id.* ¶ 99. The next day, "more than 500 protestors gathered in front of the Colonial and Dos Rios and marched to the Stone Fox." *Id.* ¶ 100.

On December 14, 2021, Chief ADA Loughran, Investigator Miller, and ADA Congdon met separately with the complainants, seeking consent to access their electronic data, but the complainants refused. Compl. ¶ 109. On December 22, 2021, plaintiff's defense attorney filed an order to show cause in county court requesting preservation of the complainants' cell phone data. *Id.* ¶ 113. The BCDA opposed this motion, but continued its own attempts to obtain the complainants' consent to access this data. *Id.* ¶¶ 114–15. Plaintiff's motion was denied on January 21, 2022, because, at that time, there was no criminal action pending against plaintiff or Yaron. *Id.* ¶ 121.

 **\*4** Sometime during the investigation, the complainants retained attorney Thomas Saitta. Compl. ¶ 114. On January 14, 2022, Saitta informed ADA Congdon that he had a folder containing printouts of the complainants' electronic data (the "Saitta folder"). *Id.* ¶ 115. ADA Congdon directed BCDA Investigator Jeff Wagner to pick up the Saitta folder, but he never did. *Id.* ¶¶ 116–17. Throughout January 2022, members of the BCDA, including ADA Congdon and Chief ADA Loughran, continued to request the complainants' consent to

extract electronic data from their phones. *Id.* ¶ 118. Those attempts were unsuccessful. *Id.*

Though ADA Congdon held "ultimate decision-making authority" over the investigation, she met with DA Korchak and Chief ADA Loughran multiple times between November 2021 and February 2022. Compl. ¶¶ 123–25. ADA Congdon also worked closely with BPD during the investigation. *Id.* ¶ 120. For instance, she worked with Investigator Miller to draft a search warrant for plaintiff's DNA. *Id.* According to the complaint, "[ADA] Congdon did not know that she could apply directly to a court to obtain a suspect's DNA and neither she, ... [Investigator] Miller, or anyone at BCDA[ ] or BPD knew how to draft an appropriate application." *Id.* Consequently, "[n]o search warrant or motion to compel a buccal swab or a DNA sample was ever completed." *Id.* ¶ 121.

Eventually, on February 22, 2022, ADA Congdon met with BPD officers and decided to file criminal charges against plaintiff, Yaron, and Rindgen in local court. Compl. ¶ 131. Members of the press were present at the courthouse when the three were arrested and charged. *Id.* ¶ 133. Plaintiff was charged with "Rape in the Third Degree in violation of New York Penal Law section 130.25(d)," a Class E felony. *Id.* ¶ 134. He entered a plea of not guilty. *Id.* ¶ 131.

At some point, the BCDA hired ADA Cronin to assist ADA Congdon with plaintiff's prosecution. Compl. ¶ 127. By that time, ADA Cronin had worked as a sex crimes prosecutor for several years. *Id.*

Even after his arrest, plaintiff continued to urge members of BPD and the BCDA to obtain the complainants' electronic data. Compl. ¶ 144. On or around March 10, 2022, plaintiff "filed a motion pursuant to C.P.L. § 245.50(3) seeking to compel preservation and disclosure of forensic images of [the complainants'] cell phones." *Id.* ¶ 144(b). But BPD and the BCDA opposed, and plaintiff's motion was denied, "based, in part, on the allegedly speculative nature of [plaintiff]'s arguments that the phones would contain relevant, material, admissible evidence and due in part to the lack of jurisdiction over what was at that time a local court matter." *Id.* Plaintiff also subpoenaed cell phone carriers and social media companies in an attempt to independently obtain the complainants' electronic data. *Id.* ¶ 144(c). Unbeknownst to plaintiff at that time, Herceg had obtained a new phone and iCloud account sometime in March 2022. *Id.* ¶ 185.

At the end of March 2022, ADA Congdon presented the case to the grand jury with assistance from Chief ADA Loughran and ADA Cronin. Compl. ¶¶ 167, 169. According to plaintiff, ADA Congdon inaccurately instructed the grand jury on the law. *Id.* ¶ 169(a). The grand jury returned an indictment as to plaintiff, charging him with: "Rape in the First Degree in violation of New York Penal Law § 130.35(2), a Class 'B' violent felony... and Sexual Abuse in the First Degree, in violation of New York Penal Law § 130.65(2), [a] [C]lass 'D' violent felony." *Id.* ¶ 170. Plaintiff was arraigned in Broome County Court and pleaded not guilty to all charges on March 31, 2022. *Id.* ¶ 171.

**\*5** In June 2022, plaintiff consented to a buccal DNA swab. Compl. ¶ 175. His DNA was compared with the material obtained during Herceg's rape examination. *Id.* ¶ 175(a). A two-male DNA profile mixture was obtained from Herceg's sample, despite her earlier claim that she had not had any other sexual partners for more than a month prior to the alleged assault. *Id.* ¶ 175(b). At some point during the investigation, though, Herceg informed authorities of a possible consensual sexual partner from the relevant period, but investigators excluded that person as a contributor. *Id.* ¶ 175 (d). Plaintiff was also excluded as a contributor to the mixture obtained from Herceg's rape kit. *Id.* ¶ 175(c).

On July 11, 2022, counsel for plaintiff, Yaron, and Rindgen moved to compel production of the complainants' phones. Compl. ¶ *177.* On August 5, 2022, while the motion to compel was still pending, ADA Congdon notified the defense that the complainants agreed to let BPD image their phones. *Id.* ¶ 178. Three months later, the BCDA received a hard drive with the extractions of the complainants' electronic data. *Id.* ¶ 179. The BCDA insisted that plaintiff's counsel review the data at BCDA's office, despite lacking the technology needed to review the materials efficiently. *Id.* ¶ 181. Plaintiff's counsel repeatedly requested access to the hard drive, but the BCDA refused to do so absent a protective order. *Id.* ¶ 182.

In January 2023, plaintiff's counsel sought court intervention, and the presiding judge ordered ADA Congdon and ADA Cronin to turn over the hard drive. Compl. ¶ 183. The parties executed a protective order, and ADA Congdon tendered a report containing the data extracted from Demkovich's phone (the "BCDA report"). *Id.* ¶ 186. Plaintiff never received a copy of the relevant data from Herceg's phone because she had obtained a new phone and iCloud account in March 2022. *Id.* ¶ 185.

On February 14, 2023, plaintiff's attorney and private investigators began reviewing the BCDA report. Compl. ¶ 186. They discovered relevant exculpatory and impeaching text messages. *Id.* They also learned that both complainants turned over their electronic data from the relevant period to their attorney, Saitta, before Herceg obtained a new cell phone. *Id.* ¶ 188. For some reason, though, the BCDA still had not retrieved the Saitta folder. *Id.* ¶ 189.

According to plaintiff, the following messages were exchanged between the complainants and third parties and between the complainants themselves: [3]

a. November 27, 2021 - Defendant Demkovich to a Third Party: "I don't want anyone to know...." "And it was consensual. I knew what was happening. But those guys should be fucking disgusted with themselves."

b. November 27, 2021 - Defendant Demkovich to Defendant Herceg: "And I remember saying to Jordan I was like I better not get denied at any of ur bars."

c. November 27, 2021 - Defendant Herceg to Defendant Demkovich: "Like I can't have this get out..."

d. November 28, 2021 - Exchange between Defendant Herceg and Defendant Demkovich (referencing Defendant Miller): "I am not gonna show her those" Herceg: "I don't think you should" Demkovich: "I am 100% not going to" Herceg: "I am worried about her calling stupid f\*\*king Bianca"

e. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: "I'm settling for nothing Less then a million"

f. November 29, 2021 - Defendant Herceg to Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want the Benz and the Beamer" "And both their houses"

g. November 29, 2021 - Defendant Herceg and Defendant Demkovich and a Third Party: (referring to Plaintiff and Mr. Rindgen) "I want all their bars ..."

h. November 29, 2021 - Defendant Herceg to Defendant Demkovich: "Yup 100% but i do remember being at Alisha's and when she said we were at Jordan's i was like wtf we were w them? And she was like yeah haikey said u guys got raped and obviously I'm still drunk I'm like

whattt no way it doesn't even feel like I've had sex i don't think anything happened and Alisha was like exactly"

**\*6**  i. November 30, 2021 - Defendant Demkovich to Defendant Herceg and Third Parties: "the reason i had to call 911 is because when i told my parents my dad literally got in the car and was headed straight to downtown"

j. December 3, 2021 - Defendant Demkovich instant messages to Defendant Herceg and Third Parties: "if you guys have any photos of us drinking if u could delete them that would be good" "we can't erase everything but minimize it as much as possible" "Danayah maybe archive ur disposals of them on insta" "i might just delete any risky pics" "i need to go on my computer to delete my vsco"

k. December 3, 2021 - Defendant Herceg instant message to Defendant Demkovich: "I've deleted all my posts and changed my user name to no lastnight and trying to delete all my republishes"

l. December 3, 2021 from a Third Party to Defendant Demkovich, Defendant Herceg, and Third Parties: "i already deleted everything w [Herceg] in it and everything hailet sent me to delete"

m. December 7, 2021 from a Third Party ("T.P.") to Defendant Demkovich: T.P.: "it da took me 5 mins of silence to go all the way back up to the messages that night" Demkovich.: "mad far and i don't even have them bc i think i accidentally deleted them that night" T.P.: "yeah i deleted them all out of your phone bc u were going to dylan's [Demkovich's then boyfriend]"

n. December 7, 2021 from a Third Party to Defendant Demkovich: "and then i told her that when [Herceg] came over she told me she didn't have sex but she turned the corner and saw you but thats all she could remember" "bro yeah she [Herceg] was like that whole night i would know if i got fucked i don't feel anything in my vagina but it was prob bc bitch was numb af"

o. December 8, 2021 - Defendant Demkovich. to Defendant Herceg: "okay so i'm"

p. slightly panicking at work because i was just reading my texts from the day after the incident and i said to danayah that it was consensual and that i knew what was happening. but the whole day after the incident i

was questioning if i got raped and i thought it might be classified as consensual because i didn't say no."

q. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "Trust me i was panicking too [about the text messages] Bc i said in the groupchat that night "I'd fuck"

r. December 8, 2021 - Defendant Herceg to Defendant Demkovich: "I don't think you have anything to worry about. Bc if she did get the subpoena [for the phone messages] I'm sure she only got it from the times of like 1-4am"

s. December 8, 2021 - from Defendant Herceg. to Defendant Demkovich and Third Parties: "Yes i deleted everything then made it private and changed everything"

t. December 27, 2021 - Defendant Demkovich to her mother - (after defense counsel served and filed an Order to Show Cause on December 22, 2021, requesting preservation of the Defendants Herceg and Demkovich's cell phones): "i told you i have a message of me saying it was consensual the day after, because i was confused and not in the right head space if the defense sees it, i'm done"

u. December 27, 2021 - Defendant Demkovich. to Defendant Herceg.: "and i have a message of me saying it's consensual" "the day after"

v. December 27, 2021 - Defendant Herceg to Defendant Demkovich: "I have messages w Alisha saying I'd fuck ring ding [Jordan Rindgen]"

**\*7**  w. December 27, 2021 - Defendant Demkovich. to Defendant Herceg: "yeah they will take the message of me saying it's consensual and i'm done" "the lawyer tom [Saitta] needs to make it so they can't get our phones period"

x. December 28, 2021 - Defendant Demkovich to her mother: "I told them [BPD] the next day I was questioning if what happened to me was actually rape ..."

y. December 28, 2021 - Defendant Demkovich to her mother: "i accidentally deleted one text it was in the group text"

z. December 28, 2021 - text message from Defendant Demkovich to Defendant Herceg: "i told him i said it was consensual" "i'm just worried that I said more than

once it was consensual" "i said something about it being consensual"

aa. January 13, 2022 - Defendant Demkovich to her mother: "I just don't want [Herceg's] parents to judge me for saying it was consensual"

bb. January 14, 2022 - Defendant Demkovich to Defendant Herceg: "i really don't see why they'd still want to supoena our phones after i've provided all of That" "so fingers crossed"

cc. June 6, 2022 - Defendant Demkovich to her mother: "and the text messages i sent really fuck me up" "i didn't know because i didn't say no"

dd. June 13, 2022 - Defendant Herceg to Defendant Demkovich: "... Fuck you hailey you're a piece of shit. You think you sit in a high horse bc you 'came looking for me' that night 'only one who cared' no you didn't. If you thought I was in such danger like you say then you would've called the cops you would've brought everyone there w you to get me out. You came for what you thought was gonna be a good time. You're a garbage human who see nothing wrong w their actions."

ee. June 15, 2022 - Defendant Herceg to a Third Party: "She [Demkovich] told Bianca on FaceTime on her walk to 'save me' that she wanted to fuck Jordan [Rindgen], she wanted to go because she wanted to sleep w Jordan. Not to come save me" ... "And she came for what she thought was going to be a good time" ... "I don't remember anything from that night" "Everything I know is from he[r] [Demkovich]"

ff. July 25, 2022 - Defendant Demkovich to her mother: "i wanna drop the charges" Demkovich's mother: "[Herceg] got a new phone..." "No access to her old cloud" Demkovich: "and i texted [Herceg] and she got a new phone so they didn't subpoena hers"

Compl. ¶ 74(a)–(ff) (errors in original).

On February 24, 2023, counsel for plaintiff, Yaron, and Rindgen filed a joint motion seeking dismissal of all charges. Compl. ¶ 191. Plaintiff's motion was granted, and the Broome County Court dismissed all charges against him. *Id.* ¶ 192.

"In June 2023, [DA] Korchak and [ADA] Congdon filed a notice of appeal of the decision dismissing the indictment as to [p]laintiff." Compl. ¶ 196. Plaintiff's attorney "made

repeated attempts to contact [DA] Korchak and [ADA] Congdon ... to try to meet to discuss the case and lack of any evidence against the [p]laintiff and to urge the BCDA[ ]not to perfect the appeal of the criminal case dismissal." *Id.* ¶ 197.

"On October 31, 2023, Yaron ... and ... Rindgen were acquitted of all charges" after a jury trial. Compl. ¶ 200. Thereafter, Yaron's former defense attorney, Paul Battisti, was elected Broome County District Attorney, and a special prosecutor was appointed to handle the BCDA's appeal of plaintiff's case. *Id.* ¶ 202. The special prosecutor withdrew the appeal on or about February 20, 2024. *Id.* ¶ 203.

## III. LEGAL STANDARD

**\*8** The Federal Rules of Civil Procedure permit a party to move to dismiss a pleading for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) ("[T]he '[f]actual allegations must be enough to raise a right to relief above the speculative level.' ") (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

To assess this facial plausibility requirement, the court "must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and draw all reasonable inferences in favor of the plaintiff, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). In doing so, the court generally confines itself to the facts alleged in the pleading, documents attached to the complaint or incorporated into it by reference, and matters of which judicial notice may be taken. *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016).

## IV. DISCUSSION

Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, Chief ADA Loughran, ADA Cronin, ADA Congdon, the City, and the County have moved to dismiss all of plaintiff's claims against them. *See* Dkt. No. 40, 57, 65, 67, 74.

Plaintiff asserts a number of § 1983 claims against the moving defendants, including:

(1) False arrest against Chief Zikuski, Captain Minor, Investigator Miller (collectively, the "individual BPD defendants"), DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, Compl. ¶¶ 220–27;

(2) Malicious prosecution against the individual BPD defendants, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, id.;

(3) Violations of his fair trial and due process rights against Captain Minor, Investigator Miller, DA Korchak, ADA Cronin, ADA Congdon, and BCDA Investigator Wagner, id. ¶¶ 228–36;

(4) Failure to intervene against the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Congdon, ADA Cronin, (collectively, the "prosecutor defendants"), BCDA Investigator Wagner, the City, and the County, id. ¶¶ 237–42;

(5) Supervisory liability against Chief Zikuski, Captain Minor, DA Korchak, and Chief ADA Loughran, id. ¶¶ 243–50;

(6) Municipal liability against Chief Zikuski, Captain Minor, the City, and the County, id. ¶¶ 251–95; and

(7) Civil rights conspiracy claims against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, id. ¶¶ 296–301.

Along with his § 1983 claims, plaintiff brings several related state law claims including:

(1) False arrest against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, Compl. ¶¶ 302–16;

(2) Malicious prosecution against the individual BPD defendants, the prosecutor defendants, BCDA Investigator Wagner, the City, and the County, id.;

(3) Intentional, reckless, or negligent infliction of emotional distress against the individual BPD defendants, the prosecutor defendants, BCDA

Investigator Wagner, the City, and the County, id. ¶¶ 316–21;

(4) Violations of Article I, sections 6 and 12 of the New York State Constitution against the individual BPD defendants, the individual BCDA defendants, the BCDA, the City, and the County, id. ¶¶ 322–26;

**\*9** (5) *Respondeat superior* against the City and the County, id. ¶¶ 327–31; and

(6) Abuse of process against Chief Zikuski, DA Korchak, and the City, id. ¶¶ 332–39.

Plaintiff's wife, Ms. Liberman, is also a plaintiff in this action, and she brings a claim for damages that she allegedly suffered "as a ... result of her husband's wrongful arrest and malicious prosecution." Compl. ¶ 9.

Defendants primarily argue that plaintiff has failed to plausibly allege any of his claims against them, and that Ms. Liberman has similarly failed to state an actionable claim for damages. *See generally,* Dkt. Nos. 19-1 ("Korchak & Loughran Mem."); 27-1 ("County Mem."); 29-1 ("BPD Mem."); 30 ("Cronin Mem."); 31-1 ("Congdon Mem."); 37-1 ("Wagner Mem.").

In addition, the prosecutor defendants contend that, to the extent plaintiff might have plausibly alleged any of his claims against them, they are entitled to absolute or, alternatively, qualified immunity. Korchak & Loughran Mem. at 11–17; Cronin Mem. at 10–14; Congdon Mem. at 7–21.

In opposition, plaintiff contends that he has plausibly alleged his claims against each of the moving defendants, and maintains that neither absolute nor qualified immunity applies. *See* Dkt. No. 44 ("Pl.'s First Opp."); Dkt. No. 47 ("Pl.'s Second Opp.").

**A. Absolute Immunity**

The prosecutor defendants argue that absolute prosecutorial immunity bars plaintiff's federal and state law claims against them. Korchak & Loughran Mem. at 11–16; Cronin Mem. at 10–12; Congdon Mem. at 7–18. In opposition, plaintiff maintains that the prosecutor defendants' alleged conduct falls "outside the scope of absolute immunity." Pl.'s Second Opp. at 41.

As the Second Circuit has repeatedly acknowledged, the principles affording prosecutors absolute prosecutorial immunity from § 1983 claims for damages are the same as those that protect prosecutors from civil liability under state law. *Shmueli v. City of N.Y.*, 424 F.3d 231, 237–38 (2d Cir. 2005) (citing *Rudow v. City of N.Y.,* 822 F.2d 324, 329 (2d Cir. 1987)).

Absolute prosecutorial immunity is broad, applying even in situations where a prosecutor is alleged to have acted maliciously. *Johnson v. Town of Colonie*, 102 A.D.2d 925, 925, 477 N.Y.S.2d 513 (N.Y. App. Div. 3d Dep't 1984) ("Actions performed by the prosecutor which are associated with the prosecutorial phase of the criminal process ... bar civil liability for such action, even if it be assumed that such actions were done maliciously."); *Giraldo v. Kessler*, 694 F.3d 161, 166 (2d Cir. 2012) ("[A]bsolute immunity applies to protect the prosecutor even in the face of a complaint's allegations of malicious or corrupt intent behind the acts.").

"In determining whether absolute prosecutorial immunity attaches, [courts] apply a 'functional approach.' " *Giraldo*, 694 F.3d at 165 (quoting *Hill v. City of N.Y.*, 45 F.3d 654, 660 (2d Cir. 1995)); *see also Rodrigues v. City of N.Y.*, 193 A.D.2d 79, 86, 602 N.Y.S.2d 337 (N.Y. App. Div. 1st Dep't 1993) ("[L]ike federal courts, the courts of [New York] take a functional approach when analyzing claims of immunity.").

### 1. Advocacy Function

**\*10** Consistent with this functional approach, courts routinely find prosecutors are absolutely immune for actions taken in connection with their advocacy function. *Johnson v. Kings Cnty. Dist. Att'y's Off.*, 308 A.D.2d 278, 285, 763 N.Y.S.2d 635 (N.Y. App. Div. 2d Dep't 2003) ("District Attorneys are immune from civil liability for activities 'intimately associated with the judicial phase of the criminal process,' meaning 'initiating a prosecution and in presenting the State's case.' ") (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

For instance, "a prosecutor enjoys absolute immunity when determining which offenses to charge, initiating a prosecution, presenting a case to a grand jury, and preparing for trial." *Anilao v. Spota*, 27 F.4th 855, 864 (2d Cir. 2022); *see also Blake v. City of N.Y.*, 148 A.D.3d 1101, 1104 (N.Y. App. Div. 2d Dep't 2017) (holding prosecutors entitled to absolute immunity for "activities in processing criminal charges after ... arrest ... based upon evidence assembled by police"); *Giraldo*, 694 F.3d at 167 (same, for interviewing putative victim after suspect was arrested); *Flagler v. Trainor*, 663 F.3d 543, 550 (2d Cir. 2011) (same, "for withholding/preserving evidence to be used in connection with a criminal prosecution").

### 2. Investigative Function

However, absolute prosecutorial immunity does not shield a prosecutor's investigative activities from liability. *See Simon v. City of N.Y.,* 727 F.3d 167, 172 (2d Cir. 2013) ("Investigation, arrest, and detention have historically and by precedent been regarded as the work of police, not prosecutors, and 'they do not become prosecutorial functions merely because a prosecutor has chosen to participate.' ") (quoting *Day v. Morgenthau,* 909 F.2d 75, 77–78 (2d Cir.1990)).

"Although all investigative activity could be considered in some sense to be 'preparing for the initiation of judicial proceedings,' ... the Supreme Court has sought to draw a line between ... preparatory steps that a prosecutor takes to be an effective advocate of a case already assembled and ... investigative steps taken to gather evidence." *Smith v. Garretto*, 147 F.3d 91, 94 (2d Cir. 1998) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993)).

In doing so, "[t]he Court has identified 'evaluating evidence and interviewing witnesses' as falling on the absolute immunity side of the line, leaving 'searching for the clues and corroboration' that might lead to a recommendation for an arrest on the qualified immunity side." *Smith v. Garretto*, 147 F.3d at 94 (quoting *Buckley,* 509 U.S. at 273, 113 S.Ct. 2606); *Sculti v. Finley*, 167 A.D.3d 796, 797 (N.Y. App. Div. 2d Dep't 2018) ("Conduct in connection with the application for a search warrant is investigative in nature and, therefore, is governed by qualified immunity."); *Buckley*, 509 U.S. at 275, 113 S.Ct. 2606 (holding prosecutor not absolutely immune for fabricating evidence during preliminary investigation); *Kirchner v. Cnty. of Niagara*, 107 A.D.3d 1620, 1624, 969 N.Y.S.2d 277 (N.Y. App. Div. 4th Dep't 2013) (same, for coaching witness to provide false information to police in effort to reopen closed investigation).

### 3. Functional Analysis

The Court must look to the prosecutor defendants' alleged conduct to determine which acts, if any, are advocative in nature and shielded by absolute prosecutorial immunity.

#### i. DA Korchak & Chief ADA Loughran

DA Korchak and Chief ADA Loughran argue that they are entitled to absolute immunity from plaintiff's claims because "their alleged activities were entirely prosecutorial in nature and were not of an investigatory nature." Korchak & Loughran Mem. at 11. Plaintiff disagrees, arguing that "[DA] Korchak and [Chief ADA] Loughran personally approved and authorized [p]laintiff's arrest." Pl.'s Second Opp. at 45.

**\*11** "The directing of an investigation by police and other law enforcement personnel[,]" is an investigative activity, falling outside the scope of absolute immunity. *Barbera v. Smith*, 836 F.2d 96, 101 (2d Cir. 1987); *Claude H. v. Cnty. of Oneida*, 214 A.D.2d 964, 965, 626 N.Y.S.2d 933, 935 (1995) ("Where a prosecutor goes outside his quasi-judicial role[,] and acts as an investigator or police officer, he is entitled only to qualified immunity."). Here, the complaint contains a number of allegations that detail DA Korchak and Chief ADA Loughran's involvement in the investigation.

First, plaintiff alleges that DA Korchak and Chief ADA Loughran worked together with ADA Congdon and police to plan and execute the investigation, Compl. ¶¶ 103–06, 123, and that Chief ADA Loughran also allegedly met with the complainants in an attempt to gather evidence. *Id.* ¶¶ 109, 118. These actions fall outside the scope of DA Korchak's and Chief ADA Loughran's prosecutorial function and are not shielded by absolute prosecutorial immunity.

Second, plaintiff alleges that DA Korchak issued a video statement "assert[ing] that his office received 'numerous' emails and phone calls regarding 'several incidents that occurred recently' in Broome County ... and encourag[ing] those with knowledge to contact the BCDA[ ] or local police departments." Compl. ¶ 99. Because a prosecutor's "statements to the media are not entitled to absolute immunity[,]" *Buckley*, 509 U.S. at 277, 113 S.Ct. 2606, DA Korchak is not entitled to absolute immunity for his alleged video statement.

Third, plaintiff alleges that DA Korchak and Chief ADA Loughran failed to (1) supervise and train ADA Congdon; (2) advise ADA Congdon of her discovery obligations; and (3) correct her various mistakes of law. Compl. ¶¶ 121–22, 165–66. However, prosecutors are absolutely immune for failing to train or supervise their subordinates as to their prosecutorial duties and obligations. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 344, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) ("[P]rosecutors involved in such supervision or training or

information-system management enjoy absolute immunity from the kind of legal claims at issue here."); *see also Crawford v. N.Y. Cnty. Dist. Att'y*, 99 A.D.3d 600, 601, 953 N.Y.S.2d 23 (N.Y. App. Div. 1st Dep't 2012) (holding district attorney entitled to absolute immunity where he allegedly "discourage[d] ADAs from being respectful of individuals' constitutional rights when prosecuting gun possession cases") (citing *Van de Kamp*, 555 U.S. at 344–46, 129 S.Ct. 855). Accordingly, DA Korchak and Chief ADA Loughran are absolutely immune from liability for their alleged failure to instruct and advise ADA Congdon on her prosecutorial responsibilities.

Absolute prosecutorial immunity also protects the remainder of plaintiff's allegations against DA Korchak and Chief ADA Loughran because they concern activities routinely recognized as "intimately associated with the judicial process." Compl. ¶¶ 169 (presenting case to grand jury), 172 (filing certificate of compliance), 175(d) (failing to disclose evidence), 176 (failing to preserve evidence after plaintiff's indictment), 180 (failing to review evidence); 196 (filing notice of appeal).

In sum, DA Korchak and Chief ADA Loughran are shielded from liability for their involvement in plaintiff's prosecution following his arrest, but not for their earlier investigative conduct.

#### ii. ADA Cronin

Like DA Korchak and Chief ADA Loughran, ADA Cronin argues that she is entitled to absolute prosecutorial immunity because the complaint contains "no allegation that [ADA] Cronin, at any point, worked outside of her prosecutorial function." Cronin Mem. at 11. Plaintiff disagrees, arguing that he has plausibly alleged that ADA Cronin "participated in investigative acts and decision[-]making pertaining to the investigation." Pl.'s Second Opp. at 45.

**\*12** "Among the acts for which a prosecutor is absolutely immune is the initiation of a prosecution." *Schloss v. Bouse*, 876 F.2d 287, 289 (2d Cir. 1989) (citing *Imbler*, 424 U.S. at 430, 96 S.Ct. 984). A prosecutor also "enjoys absolute immunity for failure to disclose exculpatory evidence, because deciding what disclosure to make is part of a prosecutor's role as advocate, and constitutes a core prosecutorial function." *Schnitter v. City of Rochester*, 556 F. App'x 5, 7 (2d Cir. 2014) (summary order) (citing *Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir.2009)).

Consequently, a prosecutor is protected by absolute immunity for withholding exculpatory evidence from a grand jury. [4] *See Hill*, 45 F.3d at 653 (holding absolute immunity protected assistant district attorney's decision to initiate prosecution and withhold alleged *Brady* material); *Drake v. City of Rochester*, 96 Misc.2d 86, 408 N.Y.S.2d 847, 857 (N.Y. Sup. Ct. 1978) ("[A] district attorney alleged to have withheld exculpatory evidence from a Grand Jury, given improper advice to a Grand Jury, suppressed and concealed evidence and conspired with others to obtain a Grand Jury indictment, permitted the presentation of false and misleading testimony to a Grand Jury, and took no action to correct the same was immune from liability."), *aff'd*, 74 A.D.2d 996, 429 N.Y.S.2d 394 (N.Y. App. Div. 4th Dep't 1980).

Plaintiff's allegations against ADA Cronin concern wholly prosecutorial functions for which she enjoys absolute immunity. Specifically, Plaintiff alleges that ADA Cronin failed to identify and disclose exculpatory evidence, Compl. ¶¶ 137, 163, 166, 175(d), 187, withheld exculpatory evidence from the grand jury, *id.* ¶ 168, filed a certificate of compliance, *id.* ¶¶ 172–73, failed to preserve evidence, *id.* ¶ 176, and failed to review evidence, *id.* ¶ 180.

Contrary to plaintiff's assertions, none of these allegations plausibly suggest that ADA Cronin had any involvement in the pre-arrest investigation or the decision to arrest plaintiff. *Id.* ¶¶ 125 ("Beginning in December 2021, [DA] Korchak and [Chief ADA] Loughran ceded ultimate decision-making authority over the investigation to ... *Congdon*."); 131 ("*ADA Congdon* ... decided with BPD to file criminal charges against [p]laintiff.") (emphases added).

In sum, ADA Cronin's alleged conduct is protected by absolute immunity, warranting dismissal of all claims against her.

#### iii. ADA Congdon

Finally, ADA Congdon argues that she is entitled to absolute immunity from plaintiff's claims. Congdon Mem. at 7–18. Plaintiff disagrees, arguing that the complaint plausibly alleges ADA Congdon's extensive role in investigative acts and decision-making. Pl.'s Second Opp. at 45–46.

"[W]here the prosecutor advises the police [*Burns v. Reed*, 500 U.S. 478, 493–95, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)] or performs investigative work in order to decide whether a suspect should be arrested [*Buckley*, 509 U.S.

at 273–75, 113 S.Ct. 2606], the prosecutor is not entitled to absolute immunity." *Kirchner*, 107 A.D.3d at 1623, 969 N.Y.S.2d 277.

**\*13** Plaintiff alleges that, as early as December 8, 2021, ADA Congdon met with members of BPD and the BCDA to discuss the complainants' allegations and the ongoing investigation. Compl. ¶ 104. DA Korchak and Chief ADA Loughran assigned ADA Congdon to the investigation that same day, *id.* ¶ 106, and "ceded ultimate decision-making authority over the investigation" to her. *Id.* ¶ 125. On December 14, 2021, ADA Congdon and others met separately with the complainants and tried, unsuccessfully, to obtain the complainants' consent to extraction of their electronic data. *Id.* ¶ 109. On January 14, 2022, the complainants' attorney informed ADA Congdon "that he had a folder containing printouts of electronic data from the complainants' phones." *Id.* ¶ 115. ADA Congdon allegedly instructed BCDA Investigator Wagner to retrieve the folder, but he never did, and ADA Congdon continued to seek the complainants' consent to an extraction of their data throughout January 2022. *Id.* ¶¶ 116–18. At some point during the investigation, ADA Congdon also allegedly assisted Investigator Miller with trying to draft a search warrant for plaintiff's DNA. *Id.* ¶ 120.

Taken together, the complaint plausibly alleges that ADA Congdon worked alongside police to gather evidence during the pre-arrest investigation. Accordingly, ADA Congdon is not immune for her participation in the investigation in the months preceding plaintiff's arrest.

Relatedly, plaintiff alleges that, at trial, complainant Herceg testified that ADA Congdon allegedly instructed her "to destroy electronic data relating to the night in question," Compl. ¶ 72, and "to delete her social media accounts," *id.* ¶ 110. But, notably, the complaint does not indicate when this instruction allegedly occurred.

ADA Congdon argues that plaintiff has not plausibly alleged that she instructed Herceg to delete electronic data during the investigation. Congdon Mem. at 14. Indeed, ADA Congdon posits that plaintiff "strategically sandwich[ed]" these allegations "between ... paragraphs that do include dates ... to induce the reader to conclude that it occurred between December 14, 2022 [*sic*][,] and December 22, 2021." *Id.* [5]

Taking every reasonable inference in plaintiff's favor, the complaint plausibly alleges that ADA Congdon instructed Herceg to delete exculpatory data prior to plaintiff's indictment. Plaintiff's allegation that Herceg obtained a new phone prior to plaintiff's indictment provides additional support for the inference that ADA Congdon instructed her to delete exculpatory data before proceedings began. Compl. ¶ 185.

In any event, it is ADA Congdon's burden to demonstrate entitlement to absolute immunity, *Burns v. Reed*, 500 U.S. 478, 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991), and:

> Quite plainly, when it may not be gleaned from the complaint whether the conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss.

*Hill*, 45 F.3d at 663. Accordingly, at this early stage, the Court cannot conclude that ADA Congdon is entitled to absolute immunity as a matter of law for allegedly instructing Herceg to delete exculpatory data.

ADA Congdon also argues that absolute prosecutorial immunity protects her decision to arrest plaintiff. Congdon Mem. at 10–14.

Plaintiff alleges that, "[o]n or about February 22, 2022," ADA Congdon "met ... and decided with BPD to file criminal charges against [p]laintiff." Compl. ¶ 131.

As the Supreme Court made clear in *Buckley*:

> a prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as "preparation" for a possible trial; every prosecutor might then shield himself from liability for any constitutional

wrong against innocent citizens by ensuring that they go to trial.

**\*14** 509 U.S. at 276, 113 S.Ct. 2606; *see also Claude H*, 214 A.D.2d at 965, 626 N.Y.S.2d 933 (holding prosecutor acted "in an investigative, law-enforcement role when he directed the police to arrest plaintiff"); *Hill*, 45 F.3d at 661 (holding that assistant district attorney entitled to only qualified immunity for advising police to arrest). Thus, at this stage, ADA Congdon has not demonstrated that she is absolutely immune for advising BPD to arrest plaintiff.

ADA Congdon is entitled to absolute immunity for the remainder of plaintiff's allegations, because they pertain to actions taken in her role as advocate. *See* Compl. ¶¶ 137, 163, 166, 175(d), 187 (failing to identify and disclose exculpatory evidence); 167 (presenting case to grand jury); 168 (withholding exculpatory evidence from grand jury); 172–73 (filing certificate of compliance); 176 (failing to preserve evidence); 180 (failing to review evidence).

The remaining prosecutor defendants (DA Korchak, Chief ADA Loughran, and ADA Congdon) also argue that they are entitled to qualified immunity for any alleged conduct not protected by absolute immunity. Korchak & Loughran Mem. at 16, Congdon Mem. at 18–21. But "the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

### B. Section 1983 Claims

Plaintiff asserts § 1983 claims for false arrest, malicious prosecution, denial of the right to a fair trial, failure to intervene, civil conspiracy, and supervisory liability against the individual BPD defendants, the prosecutor defendants, and BCDA Investigator Wagner. Compl. ¶¶ 220–50, 296–301. He also brings those claims against the City and the County under a theory of municipal liability pursuant to *Monell v. Dept. of Soc. Services of City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Compl. ¶¶ 251–95. All have moved to dismiss the § 1983 claims asserted against them.

### 1. Personal Involvement & Supervisory Liability [6]

Because "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983," *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991), the Court addresses it first.

Investigator Miller, Chief Zikuski, Captain Minor, DA Korchak, Chief ADA Loughran, and BCDA Investigator Wagner argue that plaintiff has not plausibly alleged their personal involvement in any alleged constitutional violations. Korchak & Loughran Mem. at 25; BPD Mem. at 18–24; Wagner Mem. at 11–14. The City also argues that plaintiff has not sufficiently alleged the personal involvement of the unidentified BPD Doe defendants. BPD Mem. at 24 n.3.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia,* the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). The same applies to supervisory officials. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) ("[T]here is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937)).

### i. Investigator Miller

 **\*15**  Investigator Miller argues that plaintiff's § 1983 claims against her must be dismissed, because plaintiff's allegations against her are innocuous and demonstrate only that she "participated in routine investigatory tasks." BPD Mem. at 23. In opposition, plaintiff maintains that "the [c]omplaint clearly specifies Investigator [ ] Miller's personal involvement in investigative misconduct." Pl.'s Second Opp. at 21.

At this stage, plaintiff has sufficiently pleaded Investigator Miller's personal involvement in the allegedly violative conduct. Specifically, plaintiff alleges that Investigator Miller interviewed the complainants, Compl. ¶¶ 78, 109; collected evidence, *id.* ¶¶ 79, 88; executed a search warrant at plaintiff's office, *id.* ¶ 89; discussed the investigation at meetings with members of the BCDA, *id.* ¶¶ 104–05; assisted ADA Congdon in attempting to obtain a DNA sample from plaintiff, *id.* ¶ 120; neglected to retrieve, obtain, or otherwise preserve other evidence, *id.* ¶ 85; and failed to document exculpatory statements, *id.* ¶¶ 82, 74(w). Accordingly, Investigator Miller's motion to dismiss is denied on this ground.

### ii. Wagner

BCDA Investigator Wagner argues that plaintiff's § 1983 claims against him must be dismissed because plaintiff's singular allegation against him cannot plausibly establish his personal involvement in any alleged constitutional violation. Wagner Mem. at 11. Plaintiff maintains that his allegation concerning BCDA Investigator Wagner's "continuing failure to collect the Saitta folder" is sufficient to avoid dismissal on this ground. Pl.'s First Opp. at 10–12.

As defendant points out, plaintiff alleges only that ADA Congdon directed him to retrieve the Saitta folder, but that he failed to do so. Compl. ¶¶ 116–17. Notably, the pleading does not allege that BCDA Investigator Wagner had any other involvement in plaintiff's investigation or prosecution. *See generally id.*

Absent additional non-conclusory allegations that Wagner was aware of the contents of the Saitta folder and intentionally suppressed it, plaintiff has not plausibly alleged BCDA Investigator Wagner's personal involvement in any constitutional violations. Accordingly, plaintiff's § 1983 claims against BCDA Investigator Wagner must be dismissed.

### iii. Supervisory Defendants

As an initial matter, Plaintiff asserts "Supervisory Liability" as an independent cause of action against DA Korchak, Chief ADA Loughran, Chief Zikuski, and Captain Minor. Compl. ¶¶ 243–50. Specifically, plaintiff claims that these defendants "provided grossly inadequate training, supervision, and discipline of the defendant assistant district attorneys and police officers," resulting in the deprivation of his constitutional rights. *Id.* ¶ 246.

Defendants argue that this claim must be dismissed because there is no longer a special rule for supervisory liability in the Second Circuit, and plaintiff has not otherwise alleged that they were personally involved in any alleged constitutional violations. BPD Mem. at 37; Korchak & Loughran Mem. at 25–26. Plaintiff maintains that his supervisory liability claim is proper, and, in any event, he has plausibly alleged that defendants violated his constitutional rights through their own individual actions. Pl.'s Second Opp. at 65–66.

Before the Second Circuit's decision in *Tangreti v. Bachmann,* 983 F.3d 609, 618 (2d Cir. 2020), a plaintiff could impose supervisory liability by alleging one or more of the following:

**\*16** (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). But this is no longer good law. In *Tangreti*, the Second Circuit made clear that "[t]here is no special rule for supervisory liability." 983 F.3d at 618. "Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id.* (quoting *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937).

Plaintiff improperly relies on the pre-*Tangreti* standard in support of his supervisory liability claim. Pl.'s Second Opp. at 65–66. Because such a claim is no longer cognizable, plaintiff's fourth cause of action is dismissed.

Still, plaintiff contends that he has plausibly alleged each supervisory defendant's personal involvement in the underlying constitutional violations. Pl.'s Mem. at 20, 66. Defendants disagree. BPD Mem. at 18–22; Korchak & Loughran Mem. at 25–26.

"[A] defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Instead, "[t]he focus is on what the *supervisor* did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.' " *Tangreti*, 983 F.3d at 618 (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2010) (Gorsuch, J.)) (emphasis in original).

#### a. Chief Zikuski and Captain Minor

Chief Zikuski and Captain Minor argue that plaintiff's § 1983 claims must be dismissed because "the [c]omplaint barely mentions them and contains no allegations that they individually engaged in unconstitutional conduct." BPD Mem. at 22. According to plaintiff, "the [c]omplaint explicitly identifies Defendants Zikuski and Minor as personally involved." Pl.'s Second Opp. at 20.

The complaint contains just two nonconclusory allegations concerning Captain Minor's individual actions: (1) on December 6, 2021, Captain Minor executed a search warrant on Yaron's office with Investigator Miller, Compl. ¶ 90; and (2) on December 8, 2021, Captain Minor met with DA Korchak, Chief ADA Loughran, ADA Congdon, and Investigator Miller, to discuss the complainants' allegations and the ongoing investigations, *id.* ¶ 104. As for Chief Zikuski, plaintiff alleges only that, sometime prior to December 10, 2021, he told someone that he "recommended against filing criminal charges" in plaintiff's case. *Id.* ¶ 98.

The remainder of plaintiff's factual allegations against Chief Zikuski and Captain Minor are speculative, conclusory, or based solely on their supervisory status, rather than their individual actions. *See* Compl. ¶¶ 77, 121–22, 142, 180.

In sum, even taking his nonconclusory factual allegations as true, plaintiff has not plausibly alleged that either Captain Minor or Chief Zikuski were personally involved in any alleged constitutional violations, warranting dismissal of plaintiff's § 1983 claims against them.

#### b. DA Korchak and Chief ADA Loughran [7]

**\*17** Of the remaining prosecutor defendants, only DA Korchak and Chief ADA Loughran argue that plaintiff has failed to plausibly allege their personal involvement in any constitutional violations. Korchak & Loughran Mem. at 25; Dkt. No. 99 ("Korchak & Loughran Reply") at 21. Plaintiff maintains that he has done so with the requisite specificity. Pl.'s Second Opp. at 66–67.

As an initial matter, the Court considers only allegations of investigative conduct, as DA Korchak and Chief ADA Loughran are absolutely immune for any conduct taken as advocates. *See, supra* Point IV.A.3.i. With that limitation in mind, plaintiff's primary allegations against DA Korchak and Chief ADA Loughran stem from their participation in early investigative meetings, prior to "ced[ing] ultimate

decision-making authority over the investigation to ADA Congdon," sometime in December 2021. Compl. ¶¶ 104–06, 109, 125. Beyond that, plaintiff also alleges that Chief ADA Loughran and ADA Congdon agreed to continue seeking the complainants' permission to access their electronic data throughout January 2022. *Id.* ¶ 118.

Absent more, these allegations do not support a reasonable inference that either DA Korchak or Chief ADA Loughran personally violated plaintiff's constitutional rights while acting in an investigatory capacity. [8]

Plaintiff's remaining allegations amount to little more than supervision. For example, he alleges that DA Korchak and Chief ADA Loughran met with ADA Congdon throughout the investigation, but failed to correct her various mistakes of law. Compl. ¶¶ 121–23.

As the Court noted *supra*, to impose liability under § 1983, plaintiff must plausibly allege that DA Korchak and Chief ADA Loughran *individually* violated his constitutional rights. Because he has failed to do so, his § 1983 claims against them must be dismissed.

### iv. Doe Defendants

Plaintiff names ten Doe defendants who are "employees, agents and officers of either the "BCDA[ ] or BPD whose names are presently unknown but who violated Plaintiff's civil rights." Compl. ¶ 25. The BPD defendants argue that plaintiff's claims against any BPD employee Doe defendants should be dismissed, because plaintiff "fails to allege that any specific BPD Defendant arrested or decided to arrest [him], charged or decided to charge him, fabricated evidence that led to his arrest or prosecution, participated in his prosecution, or withheld any specific exculpatory evidence." BPD Mem. at 21, 24 n.3. In opposition, plaintiff maintains that "the John Doe Officers are alleged to have actively participated in investigative misconduct." Pl.'s Second Opp. at 22.

"[W]here, as in this case, [plaintiff] is suing 'John Doe' defendants, the pleading must nevertheless contain plausible allegations of wrongdoing by such defendants, even if their actual names are presently unknown.' " *James v. Monroe Cnty.*, 2022 WL 17155831, at *7 (W.D.N.Y. Nov. 22, 2022) (citing *Antonetti v. City of N.Y.*, 2022 WL 1105172, at *3 (E.D.N.Y. Apr. 13, 2022)). "The absence of allegations against them and lack of personal involvement is fatal to his claims against the John Does." *Azaryev v. City of N.Y.*,

2021 WL 3861722, at *4 (E.D.N.Y. Aug. 27, 2021); *see also Johnson v. N.Y.*, 2019 WL 13563241, at *3 (E.D.N.Y. Nov. 20, 2019) (dismissing § 1983 claims where pleading did not "provide any detail about the officers' particular roles in his arrest").

**\*18** As the BPD defendants correctly point out, *see* BPD Mem. at 19–20, plaintiff fails to attribute many of his allegations regarding BPD officers to any of the named BPD defendants or to any particular Doe defendant, instead referring to "BPD" or "members of BPD," generally. *See* Compl. ¶¶ 71, 91, 94–95, 98, 102–03, 108, 128, 131–32, 178. Plaintiff insists that this "limited use of collective allegations is proper and permissible." Pl.'s Second Opp. at 23.

Plaintiff has certainly alleged that other unknown BPD officers were involved in his investigation and arrest, but he has not plausibly alleged that any particular individual Doe defendant violated his constitutional rights. Even taken as true, allegations that some unnamed BPD officers "obtained footage from security cameras" that was never shown to the complainants, Compl. ¶ 91, failed to take steps to preserve the complainants' cell phone data, *id.* ¶ 108, and "effectuated and processed" plaintiff's arrest, *id.* ¶ 128, are insufficient to state a plausible § 1983 claim against any individual Doe defendant.

Accordingly, plaintiffs' § 1983 claims against the BPD Doe defendants are dismissed.

The BCDA defendants have not explicitly moved for dismissal of plaintiff's claims against the BCDA Doe defendants. This is understandable, as it is unclear how many of the Doe defendants are alleged to be BCDA employees and which claims plaintiff has asserted against them. Compl. ¶ 25.

Of course, courts may *sua sponte* dismiss Doe defendants on the pleadings where a plaintiff has failed to state a plausible claim against them. *See, e.g.*, *Darby v. Greenman*, 14 F.4th 124 (2d Cir. 2021) (affirming district court's dismissal of Doe defendants who had not appeared in the action where claims against them and appearing defendants were based on identical legal theories); *Baker v. Spinner*, 2019 WL 3430918, at *6 n.6 (N.D.N.Y. July 30, 2019) (dismissing unidentified and unserved Doe defendants *sua sponte* where defendants sought dismissal of entire complaint and their failure to appear on behalf of Does was likely "an oversight") *aff'd*, 826 F. App'x 105 (2d Cir. 2020); *see also Hanks v. City of*

*Syracuse*, 2022 WL 4619877 (N.D.N.Y. Sept. 30, 2022), *aff'd*, 2023 WL 8889764 (2d Cir. Dec. 26, 2023).

Such is the case here. If anything, plaintiff's allegations against the BCDA Doe defendants are more tenuous than those asserted against the unidentified BPD officers. Plaintiff repeatedly alleges that "the BCDA[ ]," generally, failed to obtain or review certain evidence, failed to confront the complainants with evidence that undermined their allegations, and lacked fundamental knowledge as to certain investigative procedures regularly employed by prosecutors. Compl. ¶¶ 71, 94–95, 108, 113, 120, 146.

As with the BPD Doe defendants, plaintiff has failed to allege that any individual BCDA Doe defendant was personally involved in any constitutional violation. Accordingly, all Doe defendants that are "employees, agents, [ ] [or] officers" of the BCDA are dismissed.

#### 2. False Arrest

The Court begins its assessment of the merits of plaintiff's § 1983 claims with plaintiff's "First Cause of Action," which he characterizes as a claim for "Fourth and Fourteenth Amendment False Arrest and Malicious Prosecution." Compl. at 51. "Although they often accompany one another, false arrest and malicious prosecution are distinct causes of action." *Spearman v. Dutchess Cnty.*, 2008 WL 2945991, at *3 (N.D.N.Y. July 25, 2008) (citing *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). Accordingly, the Court will address them separately, beginning with false arrest.

**\*19** Of the remaining defendants to plaintiff's § 1983 claims, plaintiff asserts a false arrest claim against Investigator Miller and ADA Congdon. Compl. ¶¶ 220–27. Both moved to dismiss. *See* Dkt. Nos. 29, 31.

As a threshold matter, Investigator Miller argues that plaintiff's false arrest claim is time-barred. BPD Mem. at 26–27. Plaintiff has not addressed this argument. *See generally* Pl.'s Second Opp.

"Statutes of limitations establish the period of time within which a claimant must bring an action." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105, 134 S.Ct. 604, 187 L.Ed.2d 529 (2013). "Section 1983 does not provide a specific statute of limitations. Thus, courts apply the statute of limitations for personal injury actions under state law." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013). "[T]he applicable

statute of limitations for § 1983 actions in New York is three years." *Murphy v. Lynn,* 53 F.3d 547, 548 (2d Cir. 1995).

"[A] statute of limitations begins to run when the cause of action accrues—that is, when the plaintiff can file suit and obtain relief." *Heimeshoff,* 571 U.S. at 105, 134 S.Ct. 604 (internal quotations omitted). "[A]lthough New York law provides the applicable statute of limitations, federal law governs the question of when a false arrest claim accrues." *Covington v. City of N.Y.,* 171 F.3d 117, 121 (2d Cir. 1999).

Under federal law, "it is the standard rule that [accrual occurs] when the plaintiff has a complete and present cause of action," *Wallace v. Kato,* 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). As relevant here, "the statute of limitations upon a § 1983 claim seeking damages for a false arrest in violation of the Fourth Amendment, where the arrest is followed by criminal proceedings, begins to run at the time the claimant becomes detained pursuant to legal process." *Id.* at 397, 127 S.Ct. 1091. Put differently, the statute of limitations begins to run when the claimant is "bound over by a magistrate or arraigned on charges." *Id.* at 389, 127 S.Ct. 1091. [9]

The complaint alleges that, on February 22, 2022, "[d]espite there being no probable cause ... [ADA] Congdon met ... and decided with BPD to file criminal charges against [p]laintiff ... in local court." Compl. ¶ 131. The same day, plaintiff appeared at city court, where he was "arrested, charged, and arraigned." *Id.* ¶ 132.

Therefore, the statute of limitations on plaintiff's false arrest claim began to run once he was arraigned, on February 22, 2022. Plaintiff filed this action more than three years later, on March 18, 2025. Consequently, his § 1983 claim for false arrest is time-barred, and must be dismissed as to the remaining moving defendants. [10]

#### 3. Malicious Prosecution

**\*20** Of the remaining defendants, plaintiff asserts malicious prosecution claims against ADA Congdon and Investigator Miller. Compl. ¶¶ 220–27. Both moved to dismiss, arguing that plaintiff has failed to plausibly allege the elements of his claim. BPD Mem. at 28–32; Congdon Mem. at 23–24. Plaintiff maintains that his allegations state plausible malicious prosecution claims against both. Pl.'s Second Opp. at 19–20, 37–41, 54–56.

"To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must plead both 'a violation of his rights under the Fourth Amendment' and 'the elements of a malicious prosecution claim under state law.' " *Dettelis v. Sharbaugh*, 919 F.3d 161, 163 (2d Cir. 2019) (quoting *Manganiello v. City of N.Y.*, 612 F.3d 149, 160–61 (2d Cir. 2010)). "Under New York law, a malicious-prosecution claim requires a plaintiff to show '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions.' " *Dettelis*, 919 F.3d at 163–64 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997)).

### i. Initiation

"The first element of a malicious prosecution cause of action, under state law or § 1983, is ... 'that the defendant initiated a prosecution against the plaintiff.' " *Rohman v. N.Y. City Trans. Auth. (NYCTA)*, 215 F.3d 208, 217 (2d Cir. 2000) (quoting *Posr v. Ct. Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). Both defendants argue that the complaint fails to establish initiation, but their arguments are premised on different theories.

Investigator Miller argues that plaintiff has not plausibly alleged that she, or any of the BPD defendants, commenced or continued the prosecution against plaintiff. BPD Mem. at 29–30. The Court disagrees.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. [Sh]e must 'play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.' " *Manganiello*, 612 F.3d at 163 (quoting *Rohman, 215 F.3d at 217*). "[P]olice officers can 'initiate' prosecution by filing charges or other accusatory instruments." *Cameron v. City of N.Y.*, 598 F.3d 50, 63 (2d Cir. 2010). "This element might be satisfied by, for example, showing that an officer generated witness statements or was regularly in touch with the prosecutor regarding the case." *Bermudez v. City of N.Y.*, 790 F.3d 368, 377 (2d Cir. 2015) (citing *Manganiello* 612 F.3d at 163).

Collectively and taken as true, plaintiff's allegations satisfy this requirement. According to plaintiff, Investigator Miller was the BPD officer assigned to plaintiff's case. Compl. ¶ 77. In this role, plaintiff alleges that Investigator Miller took witness statements, *id.* ¶¶ 78, 109, gathered evidence, *id.* ¶¶ 79, 88, 90, attended meetings with members of the BCDA,

*id.* ¶¶ 104, 109, and worked directly with ADA Congdon on investigative tasks leading up to plaintiff's arrest and prosecution, *id.* at 120.

Moreover, allegations that a police officer "forwarded statements to a prosecutor without sharing that the statements were suspect," can also satisfy the initiation requirement of a malicious prosecution claim. *Dufort*, 874 F.3d at 353 (citing *Manganiello*, 612 F.3d at 163). Indeed, "New York law has long equated the civil defendant's failure to make a full and complete statement of the facts to the District Attorney or the court ... with that defendant's initiation of a malicious prosecution." *Ramos v. City of N.Y.*, 285 A.D.2d 284, 299–300, 729 N.Y.S.2d 678 (N.Y. App. Div. 1st Dep't 2001) (citing *Hopkinson v. Lehigh Val. R. Co.*, 249 N.Y. 296, 164 N.E. 104 (N.Y. 1928)); *see also Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 449 (E.D.N.Y. 2015) (holding that a police officer's "fail[ing] to make a complete and full statement of facts" to the prosecutor can constitute initiation).

**\*21**  Plaintiff alleges that:

> Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual. This was not recorded by Defendant Miller or anyone else from BPD.

Compl. ¶ 82.

Investigator Miller argues that this allegation does not plausibly indicate that Demkovich told *her* that the sexual contact was consensual. BPD Mem. at 23. Again, the Court disagrees.

According to plaintiff, his encounter with the complainants took place in the early morning hours of November 27, 2021, Compl. ¶¶ 28, 32–55, Investigator Miller interviewed the complainants on November 28, 2021, *id.* ¶ 78, and Demkovich sent a text to her mother on December 28, 2021, stating that she "told them [BPD] the next day I was questioning if what happened to me was actually rape ...," *id.* ¶ 74(w). From these facts, the Court can infer that Demkovich told Investigator Miller, to whom she spoke *the next day*, that she was questioning whether she had sufficiently denied consent.

WESTLAW  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

In sum, because plaintiff plausibly alleged that Investigator Miller was actively involved in the investigation, maintained regular contact with ADA Congdon, and failed to make a full and complete statement of the facts, he has plausibly alleged the initiation element as to Investigator Miller.

ADA Congdon makes a different argument. She contends that, as a prosecutor, she is absolutely immune for the commencement and continuation of a criminal proceeding. Congdon Mem. at 8.

As discussed *supra*, ADA Congdon *is* entitled to absolute immunity for her prosecutorial conduct: that is, any conduct undertaken as an advocate, in preparation for and during the prosecution of the criminal case against plaintiff. *See supra* Point IV.A.3.iii. Accordingly, the Court considers only whether her investigative conduct violated plaintiff's constitutional rights.

Plaintiff alleges that, while acting in an investigative capacity, ADA Congdon (1) participated in meetings, (2) worked closely with BPD, (3) met with the complainants, (4) instructed Herceg to delete electronic data, and (5) directed BPD to arrest plaintiff. Compl. ¶¶ 103–05, 120, 109–10, 131.

Ordinarily, "it would be impossible to satisfy the 'initiation' element of a malicious prosecution claim against the prosecutor." *Harris v. Tioga Cnty.*, 663 F. Supp. 3d 212, 241 (N.D.N.Y. 2023), *appeal dismissed*, 2024 WL 4179651 (2d Cir. Sept. 13, 2024). "After all, 'a prosecutor unquestionably acts as an advocate—and therefore receives absolute immunity—when she initiates and pursues a criminal prosecution.' " *Id.* (quoting *D'Alessandro v. City of N.Y.*, 713 F. App'x 1, 5 (2d Cir. 2017) (summary order)). But this protection ends "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer[.]" *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606.

"[T]he 'initiation' element of a malicious prosecution claim may be satisfied if a defendant fabricates evidence that is material to the probable cause determination." *Harris*, 663 F. Supp. 3d at 241 (citing *McDaniel v. City of N.Y.*, 585 F. Supp. 3d 503, 516–17 (S.D.N.Y. 2022) (collecting cases)). As relevant here, "government officials may be held liable for fabricating evidence through false statements *or omissions*." *Morse v. Fusto*, 804 F.3d 538, 547 (2d Cir. 2015) (emphasis added).

**\*22** Here, plaintiff alleges that ADA Congdon directed Herceg to delete electronic data prior to plaintiff's arrest. Compl. ¶¶ 66, 110, 185. Herceg's text messages from the relevant period undoubtedly undermine the veracity of her and Demkovich's allegations. *Id.* ¶ 74. Taken together, plaintiff has plausibly alleged that suppressing Herceg's text messages affected the probable cause analysis. Accordingly, at this stage, plaintiff's allegations satisfy the initiation element as to ADA Congdon.

### ii. Probable Cause

Investigator Miller and ADA Congdon also argue that plaintiff's malicious prosecution claim must be dismissed, because he has failed to plausibly allege facts that rebut the presumption of probable cause established by his grand jury indictment. BPD Mem. at 27; Congdon Mem. at 23–24.

Because the third element of a malicious prosecution claim requires a plaintiff to allege that they were prosecuted without probable cause, "the existence of probable cause is a complete defense to a claim of malicious prosecution." *Savino*, 331 F.3d at 72 (citing *Colon v. City of N.Y.*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1250 (N.Y. 1983)). " 'Probable cause, in the context of malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty.' " *Kee v. City of N.Y.*, 12 F.4th 150, 166 (2d Cir. 2021) (quoting *Boyd v. City of N.Y.*, 336 F.3d 72, 76 (2d Cir. 2003)).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause." *Savino*, 331 F.3d at 72. "[I]t is the plaintiff who bears the burden of proof in rebutting the presumption of probable cause that arises from the indictment." *Id.* at 73.

Because plaintiff concedes that "[t]he Grand Jury returned an indictment as to [him]," Compl. ¶ 170, the remaining inquiry is whether plaintiff has alleged sufficient facts to overcome the presumption of probable cause.

The presumption of probable cause "may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Savino*, 331 F.3d at 72 (quoting *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1250–51) (emphasis in original). "The rule in New York differs in this respect from that in some jurisdictions which permit the presumption to be overcome by any evidence tending to show the absence

of probable cause." *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1251.

Plaintiff claims that he has rebutted the presumption of probable cause because the complaint "identif[ies] specific individuals, describe[s] the nature of the suppressed or omitted evidence, and explain[s] how the suppression affected the integrity of the grand jury process." Pl.'s Second Opp. at 39.

### a. Investigator Miller

Broadly, plaintiff argues he has overcome the presumption of probable cause with respect to Investigator Miller by plausibly alleging that she failed to (1) show the complainants surveillance footage that contradicted their statements, Compl. ¶¶ 89, 91–94; (2) preserve the complainants' electronic data, *id.* ¶ 85; and (3) document Demkovich's statement that she was questioning whether the alleged sexual assault had actually been consensual, *id.* ¶ 82.

Plaintiff alleges that Investigator Miller obtained security camera footage from the Colonial depicting the complainants "cognizant, in control of their actions, initiating and engaging in consensual sexual contact ... with each other and with [p]laintiff, Yaron ... and ... Rindgen," in the hours preceding the alleged sexual assault. Compl. ¶¶ 88–89. According to plaintiff, Investigator Miller also possessed footage from street cameras showing the complainants "walking on their own and entering [a] car without assistance," following the alleged assault. *Id.* ¶¶ 57, 91. Investigator Miller allegedly failed to confront Herceg with the footage at any point during the investigation. *Id.* ¶ 94.

**\*23** Plaintiff reasons that Investigator Miller's failure to confront the complainants with surveillance footage "showing [them] acting freely and consensually" amounts to bad faith misconduct sufficient to rebut the presumption of probable cause. Pl.'s Second Opp. at 38. There are two problems with this argument.

First, the surveillance footage, as described, does not exculpate plaintiff or otherwise impugn the veracity of the complainants' statements. Indeed, the footage corroborates the complainants' allegations that they were with plaintiff, Yaron, and Rindgen, at Yaron's office on the night in question. Further, footage that depicted the complainants "smiling and appearing in good spirits throughout the evening," and "walking through the basement area of their own free will," Compl. ¶ 81, did not undermine their allegations as to

offenses occurring later in the night and outside the view of surveillance cameras. Likewise, footage of the complainants walking to a parking garage did not invalidate their recitation of events, absent an allegation that the complainants claimed to be unconscious or unable to walk after the alleged assault.

Second, plaintiff does not allege that Investigator Miller intentionally concealed or otherwise suppressed the footage from the prosecution in an effort to paint an incomplete picture of the facts and secure an indictment. He alleges only that Investigator Miller did not confront the complainants with the allegedly contradictory footage. Compl. ¶ 94.

Plaintiff's next allegation, that Investigator Miller failed to take "any steps during the early days of the investigation to obtain or preserve [the complainants'] electronic data," Compl. ¶ 85, similarly fails to rebut the presumption of probable cause.

According to plaintiff, the complainants provided Investigator Miller "with photographs and text messages from the night in question." Compl. ¶ 79. "The messages provided represented selected, non-continuous accounts of the night in question and did not provide a complete record of the relevant period." *Id.* ¶ 80. "The excluded text messages ... included messages stating that the sexual contact between [the complainants] and [p]laintiff ... had been consensual ..." *Id.* ¶ 81.

By plaintiff's own account, any exculpatory text messages were excluded from those provided to Investigator Miller, and plaintiff does not allege any facts suggesting that Investigator Miller knew that the complainants failed to turn over exculpatory text messages. Accordingly, her failure to obtain or otherwise preserve those messages does not amount to a suppression of evidence which could rebut the presumption of probable cause.

Lastly, plaintiff argues that Investigator Miller intentionally failed to document Demkovich's statement that she was questioning whether the alleged assault would be "classified" as consensual, thereby rebutting the presumption of probable cause established by plaintiff's indictment. Compl. ¶¶ 74(o), 82.

Importantly, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists, [*Martinez*, 202 F.3d at 634], unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern,*

268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir. 1995)). "[W]hile vastly inconsistent statements by a victim might undermine the victim's reliability, minor inconsistent statements do not automatically vitiate probable cause based solely on a victim's statements if the totality of the circumstances support probable cause." *Davenport v. City of N.Y.*, 2017 WL 4356883, at *11 (E.D.N.Y. Sept. 28, 2017) (citing *Crawford v. City of N.Y.*, 477 F. App'x. 777, 779 (2d Cir. 2012) (summary order)).

**\*24** Even assuming Demkovich told Investigator Miller that she was questioning whether the alleged assault could be classified as rape, this statement, absent more, is not so "vastly inconsistent" that the remainder of her allegations must be discredited. Plaintiff does not contend, for example, that Demkovich told Investigator Miller that she and plaintiff did not engage in sexual activity, or that she was a willing participant in sexual activity. Compl. ¶ 74(w). Rather, it appears that Demkovich told police that she was questioning whether she had given sufficient indication that she did not want to engage in sexual activity, such that the encounter could be legally classified as "rape." *Id.* ¶ 74(o).

The Second Circuit addressed a similar situation in *Koester v. Lanfranchi*, 288 F. App'x 764, 766 (2d Cir. 2008) (summary order). The plaintiff in that case, who had been falsely accused of sexual abuse, similarly argued that "various circumstances cast doubt as to whether the victim provided a credible account of a forced, rather than consensual, sexual encounter." *Id.* The Second Circuit rejected that argument, holding that plaintiff was "wrong to suggest that defendants had to eliminate these doubts before reasonably relying on the victim's statement to arrest him." *Id.* The same logic applies here.

Investigator Miller had no duty to resolve all doubts as to Demkovich's statement before reasonably relying on it, particularly as she provided text messages and photos that corroborated other aspects of her account. Compl. ¶ 79. And, in any case, "for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996). Demkovich's alleged expression of uncertainty did not render the charges against plaintiff groundless, particularly in light of the other evidence Investigator Miller possessed. Compl. ¶¶ 65, 74(b)(b), 76, 79, 139.

In sum, plaintiff has failed to plausibly allege facts sufficient to rebut the presumption of probable cause as to Investigator Miller, and his § 1983 malicious prosecution claim against her must be dismissed.

### b. ADA Congdon

Plaintiff argues that he has rebutted the presumption of probable cause as to ADA Congdon through his allegations that she (1) suppressed exculpatory DNA evidence from the grand jury, Compl. ¶ 168; (2) failed to obtain and review exculpatory text messages, *id.* ¶¶ 167, 169(b); and (3) instructed Herceg to delete exculpatory data, *id.* ¶ 72.

Plaintiff alleges that the grand jury did not "learn of the exculpatory DNA results that were learned after the Grand Jury returned a voted indictment," because of ADA Congdon's misconduct. Compl. ¶ 168.

This allegation concedes that ADA Congdon did not possess the exculpatory DNA results until after plaintiff's indictment. Accordingly, they could not have been "suppressed." [11]

Next, plaintiff contends that the presumption of probable cause is rebutted by ADA Congdon's failure to timely obtain and review the Saitta folder.

However, a plaintiff cannot "rebut the presumption of probable cause with mere 'conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith." *Savino*, 331 F.3d at 73. In that regard, "[a]ny alleged failure to conduct further investigation or apply all procedures that could have been followed does not amount to fraud, bad faith or the suppression of evidence and is insufficient to overcome the presumption." *Gil v. Cnty. of Suffolk*, 590 F. Supp. 2d 360, 370 (E.D.N.Y. 2008) (citing *Colon*, 468 N.Y.S.2d 453, 455 N.E.2d at 1251).

**\*25** The complaint alleges that the complainants' attorney made ADA Congdon aware of the Saitta folder on January 14, 2022. Compl. ¶ 115. ADA Congdon allegedly directed BCDA Investigator Wagner to retrieve the Saitta folder, but he never did. *Id.* ¶¶ 115–17, 167, 169(b). At the end of March 2022, "[o]verwhelmed by the amount of discovery ... and having still not obtained the Saitta [folder], [ADA] Congdon ... decided to present the case to the grand jury." *Id.* ¶ 167.

Plaintiff admits that ADA Congdon directed BCDA Investigator Wagner to retrieve the Saitta folder once she

became aware of its existence. Her failure to follow up with BCDA Investigator Wagner may constitute negligence, but, without more, cannot support a plausible inference of bad faith sufficient to rebut the presumption of probable cause. [12]

Lastly, plaintiff argues that the presumption of probable cause was rebutted by his allegation that ADA Congdon instructed Herceg to destroy electronic data.

As discussed *supra*, plaintiff plausibly alleged that, during the pre-arrest investigation, ADA Congdon directed Herceg to delete electronic data, and Herceg's electronic data included text messages that substantially undermined the veracity of her and Demkovich's allegations against plaintiff. *See supra* Point IV.A.3.iii. At this stage, these allegations suffice to rebut the presumption of probable cause established by plaintiff's indictment.

### iii. Malice

ADA Congdon also argues that plaintiff failed to allege actual malice, the final element of his malicious prosecution claim. Congdon Mem. at 24. Specifically, ADA Congdon contends that any allegations of malice against her are conclusory. *Id.* In opposition, plaintiff maintains that the complaint "adequately alleges malice, both due to the lack of probable cause as well as the deliberate misconduct." Pl.'s Second Opp. at 55.

Under New York law:

> The "actual malice" element of a malicious prosecution action does not require a plaintiff to prove that the defendant was motivated by spite or hatred ... [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.

*Id.* at 976. "A lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78 (*Ricciuti,* 124 F.3d at 131).

Plaintiff has plausibly alleged facts that rebut the presumption of probable cause as to ADA Congdon, *see supra* Point IV.B.3.ii.b, thereby creating an inference of malice. Accordingly, at this stage, plaintiff has stated a plausible § 1983 malicious prosecution claim against ADA Congdon.

### 4. Due Process and Denial of the Right to a Fair Trial

Plaintiff's "Second Cause of Action," is identified as: "Fourteenth Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation." Compl. at p. 53. Of the moving defendants, this claim remains only as to Investigator Miller and ADA Congdon. Both have moved to dismiss. BPD Mem. at 32–35; Congdon Mem. at 25.

"A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of N.Y.*, 640 F. App'x 115, 118 (2d Cir. 2016) (summary order) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)).

**\*26** Plaintiff's fair trial claim is based, in part, on defendants' alleged failure to "conduct a constitutionally adequate investigation." However, "[a]s Defendants correctly argue, 'there is no constitutional right to an adequate investigation.'" *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 389 (S.D.N.Y. 2021) (quoting *Newton v. City of N.Y.*, 566 F. Supp. 2d 256, 278 (S.D.N.Y. 2008)); *see also Hicks v. Marchman,* 719 F. App'x 61, 64 (2d Cir. 2018) (summary order) (affirming dismissal of fair trial claim where plaintiff "cite[d] no authority for the proposition that there is a stand-alone fair trial claim based on officers' failure to conduct an adequate investigation"). Accordingly, plaintiff's fair trial claim based on defendants' alleged "failure to investigate" must be dismissed.

The remainder of this claim can reasonably be understood as a claim for denial of the right to a fair trial premised on two theories: (1) fabrication of evidence; [13] and (2) withholding of exculpatory and impeachment evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

Defendants argue that plaintiff has failed to state a plausible fair trial claim under either theory. BPD Mem. at 32–35; Congdon Mem. at 25. Plaintiff disagrees. Pl.'s Second Opp. at 56–57.

### i. Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti,* 124 F.3d at 130. To state a fair trial claim premised on the fabrication of evidence, a plaintiff must allege that " 'an (1) investigating official (2) fabricate[d] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.' " *Garnett v. Undercover Officer C0039,* 838 F.3d 265, 279 (2d Cir. 2016) (quoting *Ricciuti,* 124 F.3d at 130).

### a. Investigator Miller

Investigator Miller argues that plaintiff's allegations in support of his fabrication claim are boilerplate and do not state a plausible claim against her. BPD Mem. at 33–34.

Crucially, the Second Circuit has consistently held that "the second element of a fair trial claim based on fabricated evidence requires a plaintiff to prove that a defendant's use of inaccurate information was 'knowing, as opposed to mistaken.' " *Davis-Guider v. City of Troy,* 2024 WL 5199294, at *3 (2d Cir. Dec. 23, 2024) (summary order) (quoting *Barnes v. City of N.Y.,* 68 F.4th 123, 129 (2d Cir. 2023)); *see also Ashley v. City of N.Y.,* 992 F.3d 128, 143 (2d Cir. 2021) ("The fabrication element requires only that the defendant knowingly make a false statement or omission.").

"[T]he requirements that the information be both false and likely to influence a jury's decision constrain the types of information that can serve as the basis for a denial of the right to a fair trial claim." *Garnett,* 838 F.3d at 280. "Information may be 'false' if material omissions render an otherwise true statement false." *Morse,* 804 F.3d at 548.

**\*27** Plaintiff does not allege that Investigator Miller personally testified falsely before any jury or affirmatively fabricated any evidence. Instead, plaintiff alleges that "Demkovich told members of BPD that she was questioning whether she was, in fact, raped, or if the physical or sexual contact was consensual" and, because that statement "was not recorded by Defendant Miller," "the Grand Jury did not learn that ... Demkovich had reported that she was questioning whether a rape had occurred." Compl. ¶¶ 82, 168.

Investigator Miller's omission of that portion of Demkovich's statement did not render the rest of her statement "false." Even

if it did, plaintiff has not plausibly alleged that Miller had reason to know that Demkovich's allegations were false. *See Davis-Guider,* 2024 WL 5199294, at *3 (rejecting argument that "relie[d] on the speculation that because Defendants provided prosecutors with inaccurate information, they must have fabricated evidence," and concluding that "[t]he mere fact that the parties present conflicting evidence does not mean that one side's evidence was fabricated.").

Indeed, at the time Investigator Miller interviewed the complainants, Herceg's allegations, the complainants' text messages and photos, and the surveillance footage all corroborated aspects of Demkovich's allegations. *See supra* Point IV.B.3.b; *see also Brown v. Vill. of Endicott,* 2025 WL 863105, at *30 (N.D.N.Y. Mar. 19, 2025) ("Insofar as the parties agree that [the complainant] provided inconsistent statements... the failure to present this inconsistency to the grand jury does not make the testimony 'false.' This is particularly true when [the complainant] made numerous other, consistent, statements concerning the alleged abuse.").

In sum, plaintiff has failed to state factual allegations that could support a reasonable inference that Investigator Miller knowingly fabricated evidence, either affirmatively or by omission. Therefore, plaintiff's fabrication claim against her must be dismissed.

### b. ADA Congdon

ADA Congdon argues that absolute prosecutorial immunity bars plaintiff's fabrication-of-evidence claim against her, as her allegedly violative conduct falls within the scope of her role as an advocate. Congdon Mem. at 25. Plaintiff disagrees, insisting that his "allegations detail a pattern of exculpatory evidence being deliberately destroyed or withheld by both police and prosecutors, well before any formal prosecution commenced." Pl.'s Second Opp. at 58.

In *Zahrey v. Coffey,* the Second Circuit explicitly recognized a constitutional "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." 221 F.3d 342, 349 (2d Cir. 2000). This includes prosecutors, as "a subsequent immunized act of a single official does not break the chain of causation traceable to his initial misconduct occurring in another capacity." *Id.* at 353 (citing *White v. Frank,* 855 F.2d 956, 961 (2d Cir. 1988)).

Thus, a prosecutor, acting in her investigative capacity, deprives a criminal defendant of the constitutional right to a fair trial where she deliberately omits material information

from evidence that would likely influence a jury's decision. *See Morse*, 804 F.3d at 547–49 (finding prosecutor and investigator, acting in investigative capacities, deprived dentist of fair trial right through deliberate material omissions in billing summaries material to grand jury's decision to indict).

In November 2022, the BCDA allegedly "received a hard drive with the extractions of the cell phones of [the complainants]." Compl. ¶ 179. Three months later, the BCDA turned this information over to plaintiff's attorney in a report, but "none of ... Herceg's communications from November 27, 2021[,] through March 2022 were present" in the BCDA report, because Herceg obtained a new phone and iCloud account in March 2022. *Id.* ¶ 185. Herceg later testified that ADA Congdon instructed her to "destroy electronic data relating to the night in question ... and that she did in fact destroy that evidence." *Id.* ¶ 72. In July 2023, plaintiff obtained the Saitta folder, which contained Herceg's messages from that period, including "numerous exculpatory and impeaching text messages," not included in the BCDA report. *Id.* ¶ 117(e). Saitta also informed plaintiff that ADA Congdon had been aware of the Saitta folder at least two months prior to his indictment (and Herceg's alleged destruction of evidence), but she never retrieved it. *Id.* ¶¶ 115–17.

**\*28** Collectively, plaintiff has plausibly alleged that ADA Congdon (1) instructed Herceg to delete material electronic data prior to plaintiff's arrest and indictment; (2) failed to retrieve existing copies of that material electronic data, despite knowing of its availability before plaintiff's arrest and indictment; and (3) subsequently produced a hard drive of the complainants' electronic data that necessarily omitted the data Herceg destroyed at her request.

Thus, plaintiff has plausibly alleged that ADA Congdon fabricated or otherwise omitted material evidence. Accordingly, plaintiff's fabrication claim survives as to ADA Congdon.

#### ii. Brady Violation

Plaintiff also alleges that defendants deprived him "of his right to due process by directing the destruction of material exculpatory and impeachment evidence in order to hide it from [plaintiff]'s defense counsel and the Court." Compl. ¶ 232. This "theory of liability is essentially a civil claim seeking damages for a *Brady* violation." *Fappiano*, 640 F. App'x at 118 (citing *Bermudez*, 790 F.3d at 376 n.4). "A classic *Brady* violation contains three elements: 'The

evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Fappiano*, 640 F. App'x at 118 (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)).

"To prevail on such a claim, a plaintiff must show the materiality of the nondisclosed evidence." *Bellamy v. City of N.Y.*, 914 F.3d 727, 751 (2d Cir. 2019). To determine materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

Because "*Brady* is rooted in the constitutional right to a fair trial," a plaintiff "fails to allege any violation of his rights under *Brady*," where "the charges ... were dropped before any trial began." *Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014) (summary order) (affirming dismissal of § 1983 *Brady* claim); *see also Malik. v. City of N.Y.*, 2020 WL 2747979 (E.D.N.Y. May 27, 2020) (dismissing § 1983 *Brady* claim where charges were dismissed before trial), *aff'd sub nom. Malik v. City of N.Y.*, 841 F. App'x 281 (2d Cir. 2021) (summary order).

Plaintiff concedes that the charges were dismissed against him without a trial, Compl. ¶ 192, and that the BCDA ultimately withdrew their appeal of this dismissal, *id.* ¶¶ 6–7. Accordingly, plaintiff has failed to allege a *Brady* violation, and his fair trial claim premised on this theory must be dismissed as to the remaining moving defendants.

#### 5. Failure to Intervene

Plaintiff's "Third Cause of Action" is identified as a "failure to intervene" claim. Compl. ¶¶ 237–242. As a threshold matter, failure to intervene is not a standalone cause of action, but rather a form of individual "bystander" liability imposed where a government official could have, but did not, intervene in a constitutional violation committed by another government official in his or her presence. *See Ellis v. City of Elmira*, 2018 WL 6047070, at \*8 n.1 (W.D.N.Y. Nov. 19, 2018) ("[F]ederal courts uniformly have recognized a theory of 'bystander liability' based on a defendant's failure to intervene in § 1983 actions.") (citing *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). In that regard, it may be

asserted even where a defendant did not directly participate in an alleged constitutional violation.

**\*29** Accordingly, this claim remains as to the individual BPD defendants, DA Korchak, Chief ADA Loughran, ADA Congdon, and BCDA Investigator Wagner. Plaintiff also asserts this claim against the City and the County. All have moved to dismiss.

Liability for failure to intervene may attach "if '(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene.' " *Jackson v. City of N.Y.*, 939 F. Supp. 2d 219, 231–32 (E.D.N.Y. 2013) (quoting *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y. 2008)).

As for the municipal defendants, the County argues that plaintiff has failed "fail to allege or articulate how the County, as a municipal entity, was positioned to prevent or remedy ... [alleged] violations in real time." County Mem. at 13. Plaintiff concedes this point in his opposition papers and voluntarily "withdraws the failure to intervene claim against the County only." Pl.'s Opp. at 65. But the City of Binghamton is also a municipal entity. Compl. ¶ 17. To the extent plaintiff attempts to impose individual liability for failure to intervene against the City, that claim must be dismissed for substantially the same reasons.

Turning to the individual defendants, they argue that (1) plaintiff has not plausibly alleged an underlying constitutional violation; or (2) alternatively, plaintiff has not plausibly alleged that defendants had a realistic opportunity to intervene in any constitutional violations. Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Congdon Mem. at 25–26; Wagner Mem. at 22–24. Additionally, ADA Congdon argues that she "could never have had a reasonable opportunity to intervene in her own actions." Congdon Mem. at 26.

A failure to intervene claim "is predicated on there being an underlying violation of [plaintiff]'s constitutional rights that the defendants could have prevented." *McIntosh v. City of N.Y.*, 722 F. App'x. 42, 46 (2d Cir. 2018) (summary order) (citing *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)).

Here, plaintiff has plausibly alleged constitutional violations against ADA Congdon. His surviving § 1983 claims against her are for malicious prosecution and the denial of the right to

a fair trial premised on the fabrication of evidence. *See supra* Points IV.3–4.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson,* 17 F.3d at 557 (citing *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir. 1988)). [14] But, "[o]bviously, a person who is held liable under a theory of direct participation in the constitutional violation cannot also be held liable for a failure to intervene." *Rizk v. City of N.Y.,* 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020) (citing *Jackson,* 939 F. Supp. 2d at 231–32). Because plaintiff has only plausibly stated § 1983 claims against ADA Congdon, she cannot also be liable for failure to intervene in her own conduct.

**\*30** The remaining individual defendants argue that plaintiff has not alleged that they had a realistic opportunity to intervene in any constitutional violations. Korchak & Loughran Mem. at 24–25; BPD Mem. at 36–37; Wagner Mem. at 22–24.

Both of plaintiff's surviving § 1983 claims are premised on plaintiff's allegation that, prior to his arrest and indictment, ADA Congdon instructed Herceg to destroy electronic data related to the night of the alleged assault. Compl. ¶¶ 72, 110. Yet, plaintiff does not allege that any other individual defendant was present for, aware of, or had any realistic opportunity to intervene in or prevent ADA Congdon from instructing or directing Herceg to destroy the allegedly exculpatory electronic data. *See generally* Compl.

Accordingly, he fails to state a plausible § 1983 claim under a failure to intervene theory as to any moving defendant.

### 6. *Monell* Liability

Plaintiff's fifth and sixth causes of action are identified as "*Monell* Claim" and "*Monell* Claim for the Unconstitutional BPD Custom or Policy," respectively. Compl. ¶¶ 251–95. His first *Monell* claim is asserted against the County and his second, against the City, Chief Zikuski, and Captain Minor. All have moved to dismiss plaintiff's *Monell* claims. County Mem. at 8–11; BPD Mem. at 15–17.

As the Second Circuit has explained:

In *Monell v. Department of Social Services,* 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme

Court established that "[l]ocal governing bodies ... can be sued directly under [42 U.S.C.] § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

*Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 124–25 (2d Cir. 2004) (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018).

Plaintiffs proceeding under a *Monell* theory must " 'plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (quoting *Wray v. City of N.Y.*, 490 F.3d 189, 195 (2d Cir. 2007)). "In other words, municipalities may not be held liable 'unless action pursuant to official municipal policy of some nature caused a constitutional tort.' " *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023) (quoting *Monell*, 436 U.S. at 691, 98 S.Ct. 2018).

The Court addresses plaintiff's *Monell* claims in turn.

### i. County

Plaintiff alleges that the BCDA "failed to implement policies and procedures including training and supervision to ensure that criminal defendants ... would not have their constitutional rights violated," and "had unconstitutionally infirm policies and procedures that led to assistant district attorneys not knowing their obligations under *Brady, Giglio,* and discovery." Compl. ¶¶ 267–68.

The County argues that this claim must be dismissed, because plaintiff has not plausibly alleged a custom or policy of the County that caused any alleged violations. County Mem. at 9–10. Plaintiff disagrees. Pl.'s Second Opp. at 70–75.

" 'Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law.' " *Friend*, 61 F.4th at 93 (quoting *Connick v. Thompson*, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)).

 **\*31** A plaintiff can satisfy the official policy element by alleging, *inter alia*, that (1) "a municipal policy or ordinance is itself unconstitutional," *Amnesty Am.*, 361 F.3d at 125;

(2) a municipality's persistent and widespread "practice, as opposed to its formal policy, is to engage in the constitutional violation at issue," *Green v. City of N.Y.*, 465 F.3d 65, 80 (2d Cir. 2006); (3) an official with final policymaking authority makes a "a deliberate choice to follow a course of action ... from among various alternatives," *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); or (4) "the municipality is aware that its policy for handling a given situation, although not unconstitutional in itself, may be applied unconstitutionally, but nevertheless consciously chooses not to train its employees in proper application of the policy," *Green*, 465 F.3d at 80.

First, plaintiff argues that the County is liable under *Monell* for the acts of the prosecutor defendants, because they are all alleged to be "final policymakers." Pl.'s Second Opp. at 70–75 (citing Compl. ¶¶ 252, 274).

"Where a plaintiff seeks to hold a municipality liable for a 'single decision by [a] municipal policymaker[ ],'... the plaintiff must show that the official had final policymaking power." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (quoting *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe v. City of Waterbury*, 542 F.3d at 37. "[T]he critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.*

As an initial matter, plaintiff has not plausibly alleged any facts in support of his legal conclusion that DA Korchak, Chief ADA Loughran, ADA Congdon, or ADA Cronin are final policymakers. *See generally* Compl.

Setting that aside, the Second Circuit has held that a district attorney acts as a final policymaker when the "district attorney acts as the manager of the district attorney's office." *Walker v. City of New York*, 974 F.2d 293, 301 (2d Cir. 1992). Here, the complaint plausibly alleges that DA Korchak acted as a manager of the BCDA at various times. Compl. ¶¶ 103, 125.

Next, to prove the causation element, a plaintiff must plausibly allege "either that the official who is a final policymaker in the area directly committed or commanded the violation of the plaintiff's federal rights ... or that ... he

indirectly caused the misconduct of a subordinate municipal employee." *Jeffes v. Barnes,* 208 F.3d 49, 61 (2d Cir. 2000).

Plaintiff alleges that DA Korchak assigned plaintiff's case to ADA Congdon, "whom [he] knew lacked the necessary prosecutorial experience, knowledge, and training to handle a serious felony investigation, and who repeatedly expressed concern to [him] ... that she was being given more responsibility than she could handle." Compl. ¶ 125.

This is not enough. "The fact that inadequate scrutiny of an applicant's background would make a violation of rights more *likely* cannot alone give rise to an inference that a policymaker's failure to scrutinize the record of a particular applicant produced a specific constitutional violation." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown,* 520 U.S. 397, 410–11, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (emphasis in original). Instead, "[a] plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision." *Id.* at 411, 117 S.Ct. 1382.

Plaintiff also points out that the BCDA hired ADA Congdon, who had no prosecutorial experience, less than a month before assigning her to his case. Compl. ¶ 103(a). According to plaintiff, ADA Congdon was quickly promoted to Bureau Chief of the Special Victims Bureau, even though she had expressed "that she believed she lacked sufficient prosecutorial experience for the role." *Id.* ¶ 103(c). Plaintiff further contends that, "[d]espite having been a member of the Bar of the State of New York from 2012, and despite having practiced criminal defense for nearly a decade, Congdon did not understand her legal obligations as a prosecutor." *Id.* ¶ 103(f).

**\*32** Still, taken as true, these allegations could not plausibly amount to an inference that defendants were deliberately indifferent in hiring and assigning ADA Congdon to plaintiff's case. An official's failure to adequately scrutinize an applicant's background amounts to deliberate indifference "[o]nly where adequate scrutiny of [the] applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire ... would be the deprivation of a third party's federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 411, 117 S.Ct. 1382. Here, that is not the case.

Plaintiff admits that ADA Congdon had nearly ten years of experience as a criminal defense attorney. Compl. ¶ 103(f). The fact that she had never been a prosecutor and had expressed some reluctance about taking on a leadership role, without more, could not plausibly lead a policymaker "to conclude that the plainly obvious consequence of the decision to hire [ADA Congdon] ... would be the deprivation of [plaintiff]'s federally protected right." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl.,* 520 U.S. at 411, 117 S.Ct. 1382.

Next, plaintiff argues that the County should be held liable under *Monell* because the BCDA employed inadequate training procedures. Compl. ¶¶ 193, 268.

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick,* 563 U.S. at 61, 131 S.Ct. 1350. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by the municipality can the failure be properly thought of as an actionable city 'policy.' " *City of Canton, Ohio v. Harris,* 489 U.S. 378, 379, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Moreover, the identified deficiency in the training program must be closely related to the ultimate injury." *Id.*

First, Plaintiff alleges ADA Congdon failed to recognize and disclose exculpatory evidence because the BCDA failed to train its assistant district attorneys regarding their disclosure obligations under *Brady.* Compl. ¶ 268. This allegation cannot support a plausible *Monell* claim.

To establish *Monell* liability, there must be "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton,* 489 U.S. at 385, 109 S.Ct. 1197. Because plaintiff has not plausibly alleged a *Brady* violation, *see supra* Point IV.B.4.ii, he cannot impose *Monell* liability on the County based on a custom or policy that allegedly caused such a violation.

Plaintiff's allegation that ADA Congdon erroneously instructed the grand jury because of the BCDA's "improper practices and procedures," Compl. ¶ 193, fails for largely the same reasons. Plaintiff has plausibly alleged that his constitutional rights were violated only when ADA Congdon instructed Herceg to delete electronic data during the investigation. *See supra* Point IV.B.3. There is no direct causal link between this constitutional violation and the BCDA's allegedly deficient training procedures with respect to grand jury instructions.

In sum, plaintiff has not plausibly alleged that an official policy or practice of the BCDA caused any alleged constitutional deprivation. Accordingly, plaintiff's *Monell* claim against the County must be dismissed.

### ii. City

Plaintiff's second *Monell* claim is asserted against "Defendants City of Binghamton, Zikuski, and Minor." Compl. p. 61.

In *Monell*, the Supreme Court noted that:

> Since official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent ... local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name.

**\*33** 436 U.S. at 691 n.55, 98 S.Ct. 2018.

Conversely, "a suit against a government official in his or her personal capacity cannot lead to ... liability upon the governmental entity," because "a municipality cannot be made liable under 42 U.S.C. § 1983 on a *respondeat superior* basis." *Graham*, 473 U.S. at 167–68, 105 S.Ct. 3099. In other words, a municipal official, sued only in their personal or individual capacity, is not a proper defendant to a claim premised on *Monell* liability.

Plaintiff appears to be suing the individual BPD defendants in only their personal capacities, *see* Compl. at 1 (naming Chief Zikuski and Captain Minor "in their individual capacities"), warranting dismissal of his "*Monell* claim[s]" against them.

To the extent his claims are brought against either Chief Zikuski or Captain Minor in their official capacities, "they are redundant to the claims against the [City]," and are therefore dismissed. *Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist.*, 238 F. Supp. 2d 469, 475 (N.D.N.Y. 2002).

As to the City's liability, the Second Circuit has held that:

> Where the plaintiff does proceed against both the municipal actors alleged to have inflicted the tort and the municipality that promulgated the offensive policy, the plaintiff's failure to secure a judgment against the individual actors would, indeed, preclude a judgment against the municipality if the ruling in favor of the individual defendants resulted from the plaintiff's failure to show that they committed the alleged tort.

*Askins v. Doe No. 1*, 727 F.3d 248, 253–54 (2d Cir. 2013).

Plaintiff's *Monell* claim against the City necessarily depends on his allegations against the individual BPD defendants. Compl. ¶¶ 276–95. Fatally, plaintiff has not plausibly alleged that any BPD defendant violated his constitutional rights. *See supra* Points IV.B.1–5. Thus, plaintiff's *Monell* claim against the City must be dismissed.

### 7. Civil Rights Conspiracy

Plaintiff's seventh cause of action is identified as a "Civil Rights Conspiracy" claim against all defendants. Compl. ¶¶ 296–301. Broadly, he alleges that defendants, "acting within the scope of their employment and under color of state law ... agreed among themselves and with other individuals to act in concert in order to deprive [p]laintiff of his clearly established" constitutional rights. Compl. ¶ 297.

Defendants argue that these claims must be dismissed because (1) plaintiff has not plausibly alleged the existence of an agreement between defendants; and (2) to the extent plaintiff's claims are premised on conspiracies between actors wholly within BPD or wholly within the BCDA, they are barred by the intra-corporate conspiracy doctrine. Korchak & Loughran Mem. at 28–30; County Mem. at 14–16; BPD Mem. at 37–39; Congdon Mem. at 26–28; Wagner Mem. at 24–26. In opposition, plaintiff maintains that (1) he has plausibly alleged all elements of his conspiracy claims; and (2) the intra-corporate conspiracy doctrine is inapplicable, because "[t]he Complaint sufficiently alleges that BPD defendants conspired with BCDA[ ]defendants, and both conspired with Herceg and Demkovich." Pl.'s Second Opp. at 76–80.

**\*34** "To survive a motion to dismiss, a conspiracy claim under 42 U.S.C. § 1983 must allege facts plausibly suggesting that (1) an agreement existed between two or more state actors to act in concert to inflict an unconstitutional injury on plaintiff, and (2) an overt act was committed in furtherance of that goal." *Vega v. Artus*, 610 F. Supp. 2d 185, 202 (N.D.N.Y. 2009) (citing *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)). "A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon*, 709 F.2d 173, 175 (2d Cir. 1983).

Plaintiff alleges that either or both the BPD defendants and the BCDA defendants conspired with the complainants to fabricate the complainants' allegations against plaintiff. The Second Circuit addressed similar allegations in *Betts v. Shearman*, 751 F.3d 78 (2d Cir. 2014). There, the § 1983 plaintiff alleged that two police officers conspired with a private actor to arrest him based on a false allegation that plaintiff assaulted the private actor. *Id.* at 86. The Second Circuit affirmed a pre-answer dismissal of a conspiracy claim, finding plaintiff's "allegation that [the private actor] was coached by the Officers into making false accusations is not plausible given that [the private actor] first called the police and reported that she was assaulted *prior to* her interaction with the officers." *Betts*, 751 F.3d at 86 (emphasis added).

The logic of *Betts* applies with equal force to these facts. To the extent plaintiff's conspiracy claim depends on the alleged fabrication of the complainants' allegations, it, too, must fail. Plaintiff alleges that the complainants initially reported the alleged sexual assault to the New York State Police, who directed them to contact BPD. Compl. ¶ 76. Accordingly, he has not plausibly alleged that the complainants conspired with either BPD or the BCDA to generate their false allegations.

Plaintiff also argues that defendants conspired with one another and the complainants to disregard and suppress exculpatory evidence in order to arrest and prosecute him without probable cause and deny him the right to a fair trial. Compl. ¶¶ 297, 298(c).

As with failure to intervene, a plaintiff bringing "a § 1983 conspiracy claim must [plead and] prove an actual violation of constitutional rights." *Singer*, 63 F.3d at 119. Plaintiff has plausibly alleged that ADA Congdon violated his rights by instructing Herceg to delete electronic data relating to the night of the alleged assault. *See supra* Point IV.B.3–4. But he does not allege that any other defendants were aware of or involved in this violative conduct.

While plaintiff does allege that ADA Congdon worked closely with BPD officers and other BCDA employees during the investigation, Compl. ¶ 120, this allegation, without more, does not permit an inference that defendants entered an agreement with ADA Congdon to violate plaintiff's rights.

Because plaintiff has alleged that just ADA Congdon and Herceg were present at the time of the alleged violations, plaintiff has only plausibly alleged his civil conspiracy claims against them. Accordingly, plaintiff's civil conspiracy claims are dismissed as to all other moving defendants.

### 8. Qualified Immunity

ADA Congdon argues that she is entitled to qualified immunity for any alleged actions not protected by absolute immunity. Congdon Mem. 18–21. In opposition, plaintiff argues that courts generally deny qualified immunity where prosecutors allegedly fabricated evidence while acting in an investigative capacity. Pl.'s Second Opp. 50–53.

**\*35** "Qualified immunity is available to officials so long as their actions do not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Chamberlain Est. of Chamberlain v. City of White Plains*, 960 F.3d 100, 110 (2d Cir. 2020) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

"[A]s a general rule, 'the defense of qualified immunity cannot support the grant of a [Rule] 12(b)(6) motion.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *Green v. Maraio*, 722 F.2d 1013, 1018 (2d Cir. 1983)). "Not only must the facts supporting the defense appear on the face of the complaint, but, as with all Rule 12(b)(6) motions, the motion may be granted only where it appears [that the alleged facts, if true, plausibly state a claim] that would entitle him to relief.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 110 (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

"Thus, a qualified immunity defense presented on a Rule 12(b)(6) motion 'faces a formidable hurdle ... and is usually not successful.' " *Chamberlain Est. of Chamberlain*, 960 F.3d at 111 (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)).

As noted *supra*, plaintiff's surviving § 1983 claims against ADA Congdon for malicious prosecution, fabrication of evidence, and civil rights conspiracy are all premised on his allegation that ADA Congdon instructed complainant Herceg to delete exculpatory electronic data.

"Government officials may be held liable for fabricating evidence through false statements *or omissions*," *Morse*, 804 F.3d at 547 (emphasis added), and the Second Circuit has explicitly held that the "right not to be deprived of liberty as a result of *any government officer's* fabrication of evidence ... was clearly established in 1996." *Zahrey*, 221 F.3d at 357 (emphasis in original).

According to plaintiff, ADA Congdon allegedly violated this clearly established right sometime during or after December 2021. Compl. ¶¶ 72, 110. Therefore, at this stage, ADA Congdon is not entitled to qualified immunity.

**C. State Law Claims**

Plaintiff identifies his state law causes of action as: (1) false arrest and malicious prosecution; (2) intentional, reckless, or negligent infliction of emotional distress; (3) violation of sections 6 and 12 of Article I of the New York State Constitution; (4) *respondeat superior*; and (5) abuse of process. Compl. ¶¶ 302–339. The moving defendants seek dismissal of all state law causes of action asserted against them. Korchak & Loughran Mem. 17–21, 30–31; County Mem. at 17–26; BPD Mem. at 24–32, 35–36, 39–43; Congdon Mem. at 21–25, 28–29; Wagner Mem. at 16–21, 26–31.

As an initial matter, "[i]t is well-established ... that *respondeat superior* 'is not a cause of action at all, but a theory of liability that must attach to a separate claim.' " *Lederman v. Benepe*, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (quoting *Alexander v. Westbury Union Free Sch. Dist.*, 829 F. Supp. 2d 89, 110 n.6 (E.D.N.Y. 2011)). Accordingly, the Court addresses *respondeat superior* liability in tandem with the underlying cause(s) of action for which it is asserted.

**1. False Arrest**

Plaintiff's eighth cause of action is identified as "false arrest and malicious prosecution" and is asserted against "All Defendants." Compl. ¶¶ 302–16.

**\*36** False arrest and malicious prosecution are distinct causes of action under state law. *See Broughton*, 373 N.Y.S.2d 87, 335 N.E.2d at 313 ("Although [false imprisonment and malicious prosecution] are kindred actions, each protects a different personal interest and is composed of different elements."). Accordingly, the Court addresses them separately.

Beginning with false arrest, the City and the individual BPD defendants argue that plaintiff's state law false arrest claim must be dismissed because it is time-barred. BPD Mem. at 26–28. In response, plaintiff has "withdraw[n] his cause[ ] of action for ... false arrest." Pl.'s Second Opp. at 80 n. 20.

Accordingly, plaintiff's state law false arrest claims are dismissed as to all moving defendants.

**2. Malicious Prosecution**

Defendants have moved to dismiss plaintiff's state law malicious prosecution claims, arguing that they are time-barred, BPD Mem. at 25–26, 28–29, and insufficiently pleaded. Korchak & Loughran Mem. at 19–21; County Mem. at 18–21; BPD Mem. at 28–32; Congdon Mem. at 23–24; Wagner Mem. at 18–21. The City also contends that plaintiff has failed to plead compliance with New York's notice of claim requirements. BPD Mem. at 24–26.

The City argues that plaintiff's state law malicious prosecution claims are time-barred because they accrued when Broome County Court dismissed the criminal charges against him, on May 20, 2023, and he filed this action more than one year and ninety days later. BPD Mem. at 25, 28–29.

Although, under New York law, "causes of action to recover damages for intentional torts ... are generally subject to a one-year period of limitations ... intentional tort causes of action asserted against municipal defendants must be commenced within the one–year–and–90–day statute of limitations contained in General Municipal Law § 50–i." *Williams v. City of N.Y.*, 153 A.D.3d 1301, 1305 (N.Y. App. Div. 2d Dep't 2017).

"Under New York law, the cause of action for malicious prosecution accrues 'when plaintiff first becomes entitled to maintain the action, (namely, when there is a determination favorable to plaintiff).' " *Riverhead Park Corp. v. Cardinale*, 881 F. Supp. 2d 376, 381 (E.D.N.Y. 2012) (quoting *10 Ellicott Square Court Corp. v. Violet Realty, Inc.,* 81 A.D.3d 1366, 1369 (N.Y. App. Div. 4th Dep't 2011)).

For example, a trial court's dismissal of criminal charges against a criminal defendant constitutes a "a determination favorable to plaintiff," notwithstanding the possibility or pendency of an appeal. *Marks v. Townsend*, 97 N.Y. 590, 595 (N.Y. 1885) (holding party may sue for malicious prosecution upon final judgment in trial court); *Ciferri v. State*, 118 A.D.2d 676, 676, 500 N.Y.S.2d 28 (1986) (holding statute of limitations on malicious prosecution action "begins to run upon dismissal of the charges by the trial court"); *Lombardo v. Cnty. of Nassau*, 6 Misc.3d 836, 791 N.Y.S.2d 292, 296 (N.Y. Sup. Ct. 2004) ("New York courts have held that the cause of action accrues when plaintiff first becomes entitled to maintain the action (*i.e.*, when there is a determination favorable to plaintiff), notwithstanding the pendency of an appeal"); *Karen v. State*, 111 Misc.2d 396, 444 N.Y.S.2d 381 (N.Y. Ct. Cl. 1981) ("[W]e believe consonance with the Court of Appeals' *Marks* decision calls for a finding of accrual on trial court dismissal.").

Plaintiff alleges that Broome County Court dismissed all charges against him on May 31, 2023. Compl. ¶¶ 192, 196. Accordingly, the one-year-and-90-day limitations period began to run from that day. Plaintiff filed this action over nearly two years later, on March 18, 2025. Consequently, his state law malicious prosecution claims are time-barred and must be dismissed as to all moving defendants. [15]

### 3. Intentional, Reckless, or Negligent Infliction of Emotional Distress

**\*37** Plaintiff's ninth cause of action, for "Intentional, Reckless, or Negligent Infliction of Emotional Distress," is asserted against "All Defendants." Compl. ¶¶ 317–21. Defendants argue that New York law does not permit this claim under the facts alleged, and regardless, plaintiff has failed to state a plausible claim for relief under this theory. Korchak & Loughran Mem. at 30–31; County Mem. at 21–24; BPD Mem. at 39–40; Congdon Mem. at 28–29; Wagner Mem. at 26–29. In response, plaintiff has voluntarily withdrawn this cause of action. Pl.'s Second Opp. at 80 n.20. Accordingly, plaintiff's intentional, reckless, or negligent infliction of emotional distress claims are dismissed as to all defendants.

### 4. New York Constitutional Violations

Plaintiff's "Tenth Cause of Action," asserted against all defendants, alleges violations of Article I, sections 6 and 12 of the New York State Constitution. Compl. ¶¶ 322–26. Defendants have moved to dismiss this cause of action,

because (1) it is precluded by the availability of traditional tort remedies and adequate alternative remedies under federal law; and (2) regardless, it is not plausibly alleged. Korchak & Loughran Mem. at 17–21; County Mem. at 24–25; BPD Mem. at 35–36; Congdon Mem. at 25; Wagner Mem. at 31. Plaintiff argues that the Court should deny defendants' motions as to this claim, because defendants "do not explain how these other remedies could reach them under a theory of [*respondeat superior*]." Pl.'s Second Opp. at 84.

The Court of Appeals has "recognized a private right of action to recover damages against the State for violations of the Equal Protection and Search and Seizure Clauses ... Finding neither injunctive, declaratory, nor exclusionary relief adequate to protect against the invasion of personal liberty interests suffered by the claimants." *Martinez v. City of Schenectady*, 276 A.D.2d 993, 996, 714 N.Y.S.2d 572 (N.Y. App. Div. 3d Dep't 2000) (citing *Brown v. State*, 89 N.Y.2d 172, 652 N.Y.S.2d 223, 674 N.E.2d 1129, 1140–41 (N.Y. 1996)), *aff'd*s 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560 (N.Y. 2001). "[H]owever, the Court of Appeals made it clear that th[is] 'narrow remedy'... was not 'boundless.' " *Lyles v. State*, 2 A.D.3d 694, 695, 770 N.Y.S.2d 81 (N.Y. App. Div. 2d Dep't 2003) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 735 N.Y.S.2d 868, 761 N.E.2d 560, 563 (N.Y. 2001)), *aff'd*, 3 N.Y.3d 396, 787 N.Y.S.2d 216, 820 N.E.2d 860 (N.Y. 2004).

In *Lyles*, the Appellate Division for the Second Department held that:

> recognition of the claimant's State constitutional claims was neither necessary nor appropriate to ensure the full realization of his rights, because the alleged wrongs could have been redressed by an alternative remedy, namely, timely interposed common-law tort claims for assault and battery, false imprisonment, and the intentional and negligent injury to his property.

2 A.D.3d at 695, 770 N.Y.S.2d 81.

Similarly, here, plaintiff alleges that his rights under the New York State Constitution were violated by defendants when he was arrested, charged, and forced to spend "nearly

two years fighting patently false allegations and criminal charges." Compl. ¶ 325. This is the same conduct that underlies his state law tort claims. *See id.* ¶ 323 ("The conduct of Defendants, described above, also violated Mr. Kweller's rights under the New York State Constitution, Article I, §§ 6 and 12."). Accordingly, it is not necessary to recognize a state constitutional claim, because plaintiff's alleged wrongs could have been redressed by timely interposed common-law tort claims, which permit a damages remedy. *See id.* ¶¶ 220–27.

### 5. Abuse of Process

Plaintiff's twelfth cause of action, for "abuse of process," is asserted against the City, DA Korchak, and Chief Zikuski. Compl. ¶¶ 332–39. Defendants argue that this claim must be dismissed, because plaintiff has failed to plausibly allege that they distorted regularly issued process to accomplish a collateral objective, or that they had an intent to do harm. Korchak & Loughran Mem. at 31–32; BPD Mem. at 41. In opposition, plaintiff argues that the "extraordinary level of public outcry" alleged in the complaint created a reasonable inference that defendants had an improper motive for continuing the prosecution. Pl.'s Second Opp. at 85.

 **\*38** "Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of the process in a perverted manner to obtain a collateral objective." *Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 469 N.E.2d 1324, 1326 (N.Y. 1984). "The mere commencement of an action, even with malicious intent, does not give rise to a cause of action for abuse of process." *Dixon v. City of Rochester*, 234 A.D.3d 1301, 1302 (N.Y. App. Div. 4th Dept. 2025).

Plaintiff alleges no facts that could support an inference that either DA Korchak or Chief Zikuski perverted the process brought against him. *See supra* Point IV.B.1. Instead, he alleges only that DA Korchak "was facing a re-election in the upcoming year," and there was "public outcry for the arrest and prosecution of [p]laintiff." Compl. ¶¶ 338–39.

However, "[i]t is not enough that the actor ha[s] an ulterior motive in using the process of the court. It must further appear that he did something in the use of the process outside of the purpose for which it was intended ... [t]here must be a further act done outside the use of the process—a perversion of the process." *Hauser v. Bartow*, 273 N.Y. 370, 7 N.E.2d 268, 269 (N.Y. 1937).

As discussed above, plaintiff has not plausibly alleged that either DA Korchak or Chief Zikuski were personally involved in any of the challenged conduct. *See supra* Point IV.B.1. The fact that DA Korchak or Chief Zikuski had reason to benefit from the perversion of the process against plaintiff cannot permit the inference, absent any other allegations, that they committed any acts to distort the process.

Accordingly, plaintiff's abuse of process claims against DA Korchak and Chief Zikuski must be dismissed. Plaintiff's abuse of process claim against the City must also be dismissed, because it is necessarily premised on *respondeat superior* liability, and plaintiff has failed to state a claim against Chief Zikuski.

### 6. Qualified Immunity

Because all of plaintiff's state law claims have been dismissed, the court need not reach the issue of qualified immunity under state law.

### D. Loss of Consortium

Plaintiff's wife, Ms. Liberman, does not assert any substantive causes of action against defendants. *See generally* Compl. Instead, she seeks damages for injuries she allegedly suffered as a result of defendants' arrest and prosecution of plaintiff. *Id.* ¶¶ 213–19. Defendants argue that this claim must be dismissed. BPD Mem. at 43–44; Congdon Mem. at 30–31; Wagner Mem. at 31–32. The Court agrees.

All of plaintiff's state law claims have been dismissed, *see supra* Point IV.C, and district courts have routinely held that § 1983 does not support derivative claims for damages, because a party seeking only derivative damages has not alleged a deprivation of their constitutional rights. *See Harrison v. Harlem Hosp.*, 2007 WL 2822231 (S.D.N.Y. Sept. 28, 2007) ("While the Second Circuit has not addressed whether a plaintiff may bring a loss of consortium claim pursuant to federal civil rights statutes, the weight of authority holds they may not."), *aff'd,* 364 Fed. Appx. 686 (2d Cir. 2010) (summary order); *Rakchi v. City of New York*, 800 F.Supp.3d 494, 502 (E.D.N.Y. 2025) (dismissing loss of services claim brought pursuant to § 1983); *Fleming v. Sharma*, 605 F. Supp. 2d 399, 409 (N.D.N.Y. 2009); *Chambers v. N. Rockland C. Sch. Dist.*, 815 F. Supp. 2d 753, 772 n.16 (S.D.N.Y. 2011) (collecting cases); *Dilworth v. Goldberg*, 914 F. Supp. 2d 433 (S.D.N.Y. 2012); *Reed v. Medford Fire Dept., Inc.*, 806 F. Supp. 2d 594, 606 (E.D.N.Y. 2011).

**\*39**  Accordingly, Ms. Liberman's sole claim for loss of consortium claim must be dismissed.

### E. Leave to Amend

Finally, the Court must address plaintiff's request for leave to amend his complaint. Plaintiff argues that he should be granted leave to amend his complaint (1) to remedy his failure to plead compliance with New York notice of claim requirements, Dkt. Nos. 43, 46; and (2) "to address any [other] deficiency the Court identifies," Pl.'s Second Opp. at 12. Defendants oppose plaintiff's request because he has not complied with this District's Local Rules, and, regardless, any proposed amendment would be futile. Dkt. No. 53 at 25; Dkt. No. 56 at 5–6; Dkt. No. 61 at 11.

Under this District's Local Rules of Practice, "[a] party moving to amend a pleading ... must attach an unsigned copy of the proposed amended pleading to its motion papers." L.R. 15.1(a). "[T]he proposed amended pleading must be a complete pleading, which will supersede the pleading sought to be amended in all respects." *Id.* A motion to amend "must set forth specifically the proposed insertions and deletions of language and identify the amendments in the proposed pleading." *Id.*

Plaintiff has not complied with this Local Rule. His failure to attach a proposed amended pleading "precludes the Court from 'examin[ing] the exact amendment that it is being asked to permit[;] ... ensur[ing] that all of the allegations asserted ... are contained in a single document[;] ... [and] eliminat[ing] the confusing nature of piecemeal amended pleadings.' " *Wynn v. Lee*, 2019 WL 13546213, at \*1 (N.D.N.Y. May 1, 2019) (quoting *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 508 (N.D.N.Y. 2009)).

Plaintiff's non-compliance with the Local Rules is a sufficient basis on which to deny his motion to amend. *Reynolds-Sitzer v. EISAI, Inc.*, 586 F. Supp. 3d 123 (N.D.N.Y. 2022) (denying motion for leave to amend where plaintiffs requested leave in a brief paragraph of their opposition papers and failed to comply with the Local Rules); *Webb v. Mentor Worldwide LLC*, 453 F. Supp. 3d 550 (N.D.N.Y. 2020) (denying plaintiff's motion for leave to amend, in part, for noncompliance with the Local Rules); *Braxton v. Bell*, 2020 WL 13908846, at \*1 (N.D.N.Y. July 7, 2020) (denying "motion to amend for failure to comply with the Local Rules for the Northern District of New York and Federal Rules of Civil Procedure.").

While plaintiff is correct that leave to amend should be freely given when justice so requires, Pl.'s Second Opp. at 87 (citing Fed. R. Civ. P. 15(a)(2)), "a court need not always allow a party to replead simply because it asked. In particular, denial of leave to amend is proper where the request gives no clue as to how the complaint's defects would be cured." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (internal quotation omitted); *Murphy Med. Assocs., LLC v. Yale Univ.*, 120 F.4th 1107, 1114 (2d Cir. 2024) (affirming denial of leave to amend where plaintiff failed to make formal motion to amend or offer proposed amended complaint).

The only discernable amendment plaintiff has proposed is an amendment to plead compliance with New York's notice of claim requirements. *See* Dkt. Nos. 43, 46. Defendants maintain that this amendment would be futile. Dkt. No. 61 at 11. The Court agrees.

**\*40**  "Leave to amend may be denied on grounds of futility if the proposed amendment fails to state a legally cognizable claim." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010). For instance, "[c]laims barred by an applicable statute of limitations are futile." *Jones v. City of N.Y.*, 571 F. Supp. 3d 118, 126 (S.D.N.Y. 2021) (citing *Grace v. Rosenstock*, 228 F.3d 40, 53 (2d Cir. 2000)).

Plaintiff's proposed amendment would not save any of his state law claims. His state law malicious prosecution claims were filed after the statute of limitations had run, *see supra* Point IV.C.2, and he has not plausibly alleged any of his other state law claims, *see supra* Point IV.C.4–5. Accordingly, plaintiff's request for leave to amend must be denied.

### V. CONCLUSION

Therefore, it is

ORDERED that

1. Chief Zikuski, Captain Minor, Investigator Miller, DA Korchak, BCDA Investigator Wagner, Chief ADA Loughran, and ADA Cronin, are dismissed;

2. Does 1–10 are dismissed;

3. The City and the County are dismissed; and

4. Plaintiff's Third, Eighth, Ninth, Tenth, and Twelfth Causes of Action are dismissed against ADA Congdon.

5. Plaintiff's surviving claims against ADA Congdon are:

-Section 1983 Malicious Prosecution;

-Section 1983 Denial of the Right to a Fair Trial based on Fabrication of Evidence; and

-Section 1983 Civil Rights Conspiracy.

The Clerk of the Court is directed to:

a. Terminate the dismissed defendants from the docket report; and

b. Terminate the moving defendants' pending motions (Dkt. Nos.19, 27, 29, 30, 31, 37).

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 3280821

---

## Footnotes

1       The complaint is sequentially numbered by line. Accordingly, citations to the pleading correspond with that document's internal pagination.

2       Pagination corresponds to the electronically generated CM/ECF headers.

3       Plaintiff does not indicate whether these messages were obtained from the BCDA report or the subsequently obtained Saitta folder. Compl. ¶ 74.

4       A prosecutor has no duty to present exculpatory evidence to a grand jury, either. *See United States v. Williams*, 504 U.S. 36, 37, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("Because it has always been thought sufficient for the grand jury to hear only the prosecutor's side, and, consequently that the suspect has no right to present, and the grand jury no obligation to consider, exculpatory evidence, it would be incompatible with the traditional system to impose upon the prosecutor a legal obligation to present such evidence.").

5       ADA Congdon also insists that "[a] plain reading of the complaint ... makes clear that, prior to [ADA Congdon]'s assignment to the case ... the complainants themselves had already conspired to delete their social media accounts." Congdon Mem. at 15. But, the complainants' alleged conduct is irrelevant to whether ADA Congdon's alleged conduct occurred while acting in an investigative capacity.

6       For reasons that will be explained *infra,* the Court will address plaintiff's Fourth Cause of Action for "supervisory liability" in conjunction with personal involvement.

7       Plaintiff only asserts § 1983 claims for failure to intervene, supervisory liability, and civil rights conspiracy against Chief ADA Loughran. Compl. ¶¶ 206–10, 211–17, 263–66.

8       Plaintiff's allegations that (1) DA Korchak issued a public statement encouraging those with knowledge about recent "incidents" in Broome County to contact the BCDA or BPD, Compl. ¶ 99, and (2) DA Korchak and Chief ADA Loughran failed to correct false information circulating in the media, *id.* ¶ 124, fare no better. Taken as true, neither of these allegations amount to a violation of plaintiff's constitutional rights.

9       In *Heck v. Humphrey*, the Supreme Court held that the accrual of a civil tort claim arising from an allegedly unlawful imprisonment or conviction should be deferred where that claim, if proven, would impugn the validity of an existing conviction. 512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). Under those circumstances, the statute of limitations would toll until "until the setting aside *of an extant conviction.*"

*Wallace*, 549 U.S. at 393, 127 S.Ct. 1091 (emphasis in original). But because plaintiff was never convicted, the deferred accrual rule established in *Heck* is inapplicable. *Id.* at 394–95.

The Second Circuit "recognizes an equitable tolling doctrine in the context of § 1983 actions, and when a 'defendant fraudulently conceals the wrong, the time [limit of the statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.' " *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey,* 706 F.2d 377, 382 (2d Cir. 1983)).

However, equitable tolling applies "only in rare and exceptional circumstances, where ... extraordinary circumstances prevented a party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he [sought] to toll." *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation omitted). No such circumstances exist here.

Regardless, ADA Congdon "had the discretion and authority to decide what evidence to present to the grand jury—[and] was under no duty to present every item of arguably exculpatory evidence in seeking an indictment." *Savino*, 331 F.3d at 75.

The same is true with respect to plaintiff's other allegations that ADA Congdon was generally inexperienced. *See* Compl. ¶¶ 106-07, 125, 165-67, 169.

In his opposition papers, plaintiff seemingly rejects fabrication as a basis for this claim, stating that "[a] fair trial claim does not have to involve fabricated evidence," and "the Second Circuit has explicitly recognized that suppression of exculpatory evidence—whether intentional or reckless—also gives rise to a cognizable fair trial claim." Pl.'s Second Opp. at 62. But, because the complaint alleges that defendants "deprived [plaintiff] of his right to due process by fabricating inculpatory evidence," Compl. ¶ 231, the Court addresses both theories.

While the Second Circuit has not addressed whether law enforcement officials or prosecutors have a duty to intercede in a *prosecutor's* alleged misconduct, plaintiff's surviving claims against ADA Congdon concern actions taken in her investigatory capacity, for which she, like a law enforcement officer, is entitled to qualified immunity at most. *See Buckley*, 509 U.S. at 273, 113 S.Ct. 2606 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton,* 484 F.2d at 608)). Thus, for purposes of assessing defendants' failure to intervene in ADA Congdon's alleged constitutional violations, she will be treated as a law enforcement officer.

The limitations period set forth in N.Y. Gen. Mun. Law § 50-i also applies to an action against an employee of a municipality where the municipality is deemed "the real party in interest," *i.e.*, where the employee's alleged conduct occurred within the scope of their employment, such that the municipality would be required to indemnify them. *See Ruggiero v. Phillips*, 292 A.D.2d 41, 44, 739 N.Y.S.2d 797, 800 (2002); *Ripka v. Cnty. of Madison*, 162 A.D.3d 1371, 1373 (N.Y. App. Div. 3d Dep't 2018); *Clark v. City of Ithaca*, 235 A.D.2d 746, 746, 652 N.Y.S.2d 819 (N.Y. App. Div. 3d Dep't 1997).

Although plaintiff has alleged that the individual defendants were acting within the scope of their employment, Compl. ¶¶ 18–24, some courts have held that the limitations period set forth in N.Y. Gen. Mun. Law § 50-i does not apply to claims against municipal employees for intentional torts, like malicious prosecution, because municipalities do not have a duty to indemnify employees for their intentional wrongdoing or reckless. *Coker v. City of Schenectady*, 200 A.D.2d 250, 253–54, 613 N.Y.S.2d 746 (N.Y. App. Div. 3d Dep't 1994). Under those circumstances, courts apply the one-year statute of limitations provided by N.Y. C.P.L.R. § 215(3).

Regardless of which limitations period applies to plaintiff's malicious prosecution claims against the individual defendants, they are time-barred.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Lettieri v. Matson, Not Reported in Fed. Supp. (2024)

2024 WL 4689006
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

David C. LETTIERI, Plaintiff,
v.
Karen MATSON, Exec. Director, Humane Society; the Broome County Humane Society; David Gaska; Joel L. Daniels; Michael Hockwater; Law Enforcement Hockwater Agent, Western District of NY; Eric Schmict, Western District of NY; Law Enforcement Agent Schmict, Western District of NY; Broome County District Attorney Office; Broome County Ada Doe; Broome County Sheriff; Broome County Sheriff Does #1-3; Federal Agent Does #1-6; Town of Colesville; Paul Powell; Department of Justice; Paul E. Bonanno; Megan A. Tokiash; Federal Bureau of Investigation; Randall E. Garver; Jenelle Brigueal; Leon Brown; Benjamin Hurting; State Trooper New York; New York Trooper Doe; and Diana W., Defendants.

3:24-CV-0434 (GTS/ML)
|
Signed November 6, 2024

**Attorneys and Law Firms**

DAVID C. LETTIERI, 16091-509, Plaintiff, Pro Se, Lewisburg U.S. Penitentiary, Inmate Mail/Parcels, P.O. Box 1000, Lewisburg, Pennsylvania 17837.

## **DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by David C. Lettieri ("Plaintiff") against the above-captioned agencies, entities and individuals ("Defendants"), are (1) United States Magistrate Judge Miroslav Lovric's Report-Recommendation recommending that Plaintiff be required to pay the Court's filing and administrative fee of $405.00 within thirty days or that his Complaint be dismissed, without prejudice and without further Order of the Court, for failure to do so, and (2) Plaintiff's Objection to the Report-Recommendation. (Dkt. Nos. 12, 13.)

After carefully reviewing the relevant papers herein, including Magistrate Judge Lovric's thorough Report-Recommendation, the Court can find no error in the Report-Recommendation, clear or otherwise: Magistrate Judge Lovric employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (*See generally* Dkt. No. 12.) As a result, the Report-Recommendation is accepted and adopted in its entirety for the reasons set forth therein. (*Id.*) To those reasons, the Court adds only one brief point.

Even when construed liberally, Plaintiff's Objection fails to contain a *specific* challenge to a finding or conclusion contained in the Report-Recommendation. (Dkt. No. 13.) [1] As a result, the "challenged" portions of the Report-Recommendation are entitled to only a clear-error review, [2] which they easily survive. In the alternative, the Court finds that any challenged portion of the Report-Recommendation survives a *de novo* review: Magistrate Judge Lovric committed no error in either calculating Plaintiff's accrued "strikes" or assessing whether Plaintiff has alleged facts plausibly suggesting that he was "under imminent danger of serious physical injury" when he signed his Complaint.

**\*2** **ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 12) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) **will be DISMISSED, without prejudice** and without further order of the Court, **UNLESS** he pays the Court's filing and administrative fee of **FOUR HUNDRED AND FIVE DOLLARS AND ZERO CENTS ($405.00)** within **THIRTY (30) DAYS** of the entry of this Decision and Order; and it is further

**ORDERED** that, should Plaintiff timely remit the above-referenced $405.00 fee, Plaintiff's Complaint will be returned to Magistrate Judge Lovric for initial review pursuant to 28 U.S.C. § 1915A.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4689006

Lettieri v. Matson, Not Reported in Fed. Supp. (2024)

---

## Footnotes

1       When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c). *See also Mario v. P&C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

2       When no specific challenge is made to a magistrate judge's report-recommendation, the Court subjects that report-recommendation to only a "clear error" review. Fed. R. Civ. P. 72(b)(2),(3); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *2-3 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion*, 175 F.3d 1007 (2d Cir. 1999). When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

762 F.Supp.3d 290
United States District Court, S.D. New York.

Robert LEWIS, Plaintiff,
v.
The CITY OF NEW YORK, Defendant.

24 Civ. 2336 (AT) (RWL)
|
Signed January 8, 2025

**Synopsis**
**Background:** After city department of buildings issued an emergency declaration recommending that building facade be entirely demolished, city department of housing and preservation did so, and city billed building owner for expenses incurred, owner brought § 1983 action against city, claiming a taking without compensation in violation of the Fifth Amendment, deprivation of due process in violation of the Fourteenth Amendment, and imposition of excessive fines in violation of the Eighth Amendment. City moved to dismiss for lack of subject-matter jurisdiction and for failure to state a claim.

**Holdings:** The District Court, Analisa Torres, J., adopted report and recommendation of Robert W. Lehrburger, United States Magistrate Judge, which held that:

[1] it had no federal subject-matter jurisdiction for which supplemental jurisdiction could or should be exercised;

[2] owner did not state a claim for a physical taking;

[3] owner failed to plausibly allege a regulatory taking claim;

[4] owner failed to state a non-categorical taking;

[5] owner had no claim for deprivation of procedural due process;

[6] owner failed to state a claim for violation of substantive due process; and

[7] owner failed to assert a constitutional claim for imposition of excessive fines.

Claims dismissed without prejudice.

**Procedural Posture(s):** Motion to Dismiss for Lack of Subject Matter Jurisdiction; Motion to Dismiss for Failure to State a Claim.

West Headnotes (45)

**[1]** **Evidence** ⚷ Public records and documents in general
**Federal Civil Procedure** ⚷ Matters considered in general

District court may take judicial notice of public records in deciding a motion to dismiss.

**[2]** **Federal Courts** ⚷ Dismissal or other disposition

A court must dismiss a claim if it lacks statutory or constitutional power to adjudicate it.

**[3]** **Federal Courts** ⚷ Weight and sufficiency

Plaintiff bears burden of proving subject-matter jurisdiction by a preponderance of evidence.

**[4]** **Federal Courts** ⚷ Presumptions and burden of proof

In deciding a motion to dismiss for lack of subject-matter jurisdiction, court must take all facts alleged in complaint as true and draw all reasonable inferences in favor of plaintiff. Fed. R. Civ. P. 12(b)(1).

**[5]** **Federal Courts** ⚷ Evidence; Affidavits

In deciding a motion to dismiss for lack of subject-matter jurisdiction, court may consider affidavits and other materials beyond pleadings to resolve jurisdictional issue. Fed. R. Civ. P. 12(b)(1).

**[6]** **Federal Civil Procedure** ⚷ Insufficiency in general

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 173 of 260

Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of line between possibility and plausibility of entitlement to relief, as required to survive a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

**[7]** **Federal Civil Procedure** 🔑 Insufficiency in general

To survive a motion to dismiss for failure to state a claim, complaint's factual allegations must be enough to raise a right to relief above speculative level, i.e., enough to make claim plausible. Fed. R. Civ. P. 12(b)(6).

**[8]** **Federal Civil Procedure** 🔑 Clear or certain nature of insufficiency

A complaint is properly dismissed for failure to state a claim where, as a matter of law, allegations in complaint, however true, could not raise a claim of entitlement to relief. Fed. R. Civ. P. 12(b)(6).

**[9]** **Evidence** 🔑 Public records and documents in general

**Evidence** 🔑 Matters referred to or incorporated by pleadings

**Federal Civil Procedure** 🔑 Matters considered in general

For the purposes of considering a motion to dismiss for failure to state a claim, a court generally is confined to facts alleged in complaint, but may also consider additional materials, including documents attached to complaint, documents incorporated into complaint by reference, public records, and documents that plaintiff either possessed or knew about, and relied upon, in bringing suit. Fed. R. Civ. P. 12(b)(6).

**[10]** **Federal Civil Procedure** 🔑 Construction of pleadings

**Federal Civil Procedure** 🔑 Matters deemed admitted; acceptance as true of allegations in complaint

If a document relied on in complaint contradicts allegations in complaint, the document, not allegations in complaint, controls, for purposes of a motion to dismiss for failure to state a claim, and court need not accept allegations in complaint as true. Fed. R. Civ. P. 12(b)(6).

**[11]** **Civil Rights** 🔑 Nature and elements of civil actions

To state a cause of action under § 1983, a plaintiff must allege that some person acting under color of state law deprived him of a federal right. 42 U.S.C.A. § 1983.

**[12]** **Civil Rights** 🔑 Rights Protected

Because § 1983 does not provide its own substantive right, plaintiffs must identify federally-protected right that was allegedly violated. 42 U.S.C.A. § 1983.

**[13]** **Civil Rights** 🔑 Nature and elements of civil actions

In a § 1983 case, a plaintiff must show that (1) defendant acted under color of state law and that (2) as a result of defendant's actions, plaintiff suffered a denial of federal statutory rights or constitutional rights or privileges. 42 U.S.C.A. § 1983.

**[14]** **Civil Rights** 🔑 Acts or Conduct Causing Deprivation

In all § 1983 cases, plaintiff must prove that defendant's action was a proximate cause of plaintiff's injury. 42 U.S.C.A. § 1983.

**[15]** **Federal Civil Procedure** 🔑 Pro Se or Lay Pleadings

Pro se complaints must be construed liberally and interpreted to raise the strongest arguments that they suggest.

**[16]      Attorneys and Legal Services** 🔑 Role of court in general

**Attorneys and Legal Services** 🔑 Procedural matters in general

The Second Circuit, as a general matter, is solicitous of pro se litigants, enforcing standards of procedural leniency rather than holding them to rigidities of federal practice.

**[17]      Federal Civil Procedure** 🔑 Pro Se or Lay Pleadings

Even pro se plaintiffs cannot withstand a motion to dismiss for failure to state a claim unless their pleadings contain factual allegations sufficient to raise a right to relief above speculative level, and must allege enough facts to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

**[18]      Federal Courts** 🔑 Limited jurisdiction; jurisdiction as dependent on constitution or statutes

Notwithstanding the liberal pleading standards afforded pro se litigants, federal courts are courts of limited jurisdiction and may not preside over cases if they lack subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

1 Case that cites this headnote

**[19]      Federal Civil Procedure** 🔑 Failure to Prosecute

A potential basis for dismissal of building owner's § 1983 action against city, resulting from city demolishing building's facade and billing owner for expenses incurred, was failure to prosecute; other than consenting to city's request for an extension of time to respond to complaint, owner had not participated in litigation for several months, he neither met and

conferred to formulate a case management plan and scheduling order nor submitted his own, he failed to appear for initial pretrial conference as ordered, he did not file any response to city's motions to dismiss despite being afforded multiple sua sponte extensions and despite being warned that failure to file any opposition could result in dismissal for failure to prosecute, and no lesser sanction was likely to be effective. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 41(b).

More cases on this issue

**[20]      Federal Civil Procedure** 🔑 Failure to Prosecute

A failure to prosecute can evidence itself either in an action lying dormant with no significant activity to move it or in a pattern of dilatory tactics. Fed. R. Civ. P. 41(b).

2 Cases that cite this headnote

**[21]      Federal Civil Procedure** 🔑 Violation of a court order or rule in general

**Federal Civil Procedure** 🔑 Failure to Prosecute

Primary rationale for dismissal for failure to prosecute, or for failure to comply with rules or court orders, is failure of plaintiff in his duty to process his case diligently. Fed. R. Civ. P. 41(b).

**[22]      Administrative Law and Procedure** 🔑 Proceedings in General

**Administrative Law and Procedure** 🔑 Hearing; rehearing

A petitioner in an Article 78 proceeding is permitted to submit affidavits and other written proof of their claim, and where a triable issue of fact is raised, petitioner may obtain a trial. N.Y. CPLR § 7801 et seq.

**[23]      Administrative Law and Procedure** 🔑 Jurisdiction

**Constitutional Law** 🔑 Proceedings in which question is raised

Courts hearing Article 78 proceedings are courts of limited jurisdiction and may not hear a general constitutional challenge to a law or regulation, but may entertain claims that application of a rule is unconstitutional. N.Y. CPLR § 7801 et seq.

**[24]    Federal Courts** 🔑 Effect of dismissal or other elimination of federal claims

District court had no federal subject-matter jurisdiction for which supplemental jurisdiction could or should be exercised, in building owner's § 1983 action against city resulting from city demolishing building's facade and billing owner for expenses incurred; owner asserted a claim pursuant to § 1983 for violation of federal constitutional rights, if such a claim was plausibly stated, district could would have federal question jurisdiction, and district court could consider whether it should exercise supplemental jurisdiction over owner's Article 78 claims, but owner had not plausibly stated a claim for a constitutional violation. 28 U.S.C.A. §§ 1331, 1367; 42 U.S.C.A. § 1983; N.Y. CPLR § 7801 et seq.; Fed. R. Civ. P. 12(b)(1).

More cases on this issue

**[25]    Administrative Law and Procedure** 🔑 Nature and Form of Remedy

To determine whether Article 78 applies to a given dispute, a reviewing court must examine substance of action to identify relationship out of which claim arises and relief sought. N.Y. CPLR § 7801 et seq.

**[26]    Eminent Domain** 🔑 Necessity of just or full compensation or indemnity

The Fifth Amendment, made applicable to states under the Fourteenth Amendment, prohibits government from taking private property for public use without just compensation. U.S. Const. Amends. 5, 14.

1 Case that cites this headnote

**[27]    Eminent Domain** 🔑 Nuisance and demolition

Building owner did not state a claim for a physical taking, in owner's § 1983 action against city resulting from city demolishing building's facade and billing owner for expenses incurred, where owner did not allege that city had physically taken building for a public purpose. U.S. Const. Amend. 5; 42 U.S.C.A. § 1983.

More cases on this issue

**[28]    Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

A "physical taking" occurs when government physically takes possession of an interest in property for some public purpose. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[29]    Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

Government action that does not entail a physical occupation, but merely affects use and value of private property, is considered under framework of regulatory takings, which can be categorical or non-categorical. U.S. Const. Amend. 5.

3 Cases that cite this headnote

**[30]    Eminent Domain** 🔑 Zoning, Planning, or Land Use; Building Codes

A "categorical regulatory taking" occurs in extraordinary circumstance when no productive or economically beneficial use of land is permitted. U.S. Const. Amend. 5.

1 Case that cites this headnote

**[31]    Eminent Domain** 🔑 What Constitutes a Taking; Police and Other Powers Distinguished

Anything less than a complete elimination of value, or a total loss, is a "non-categorical taking," which is analyzed under framework established in *Penn Central*. U.S. Const. Amend. 5.

1 Case that cites this headnote

[32]    **Eminent Domain** 🔑 What Constitutes a
Taking;  Police and Other Powers Distinguished

Courts weigh three factors to determine
whether interference with property rises to
level of a non-categorical regulatory taking: (1)
economic impact of regulation on claimant, (2)
extent to which regulation has interfered with
distinct investment-backed expectations, and (3)
character of governmental action; consideration
of these factors aims to identify regulatory
actions that are functionally equivalent to
classic taking in which government directly
appropriates private property or ousts owner
from his domain. U.S. Const. Amend. 5.

2 Cases that cite this headnote

[33]    **Eminent Domain** 🔑 Nuisance and
demolition

Building owner failed to plausibly allege a
regulatory taking claim, in owner's § 1983 action
against city resulting from city demolishing
building's facade and billing owner for expenses
incurred; owner did not allege that demolition
of facade, fines imposed, or repair charge
liens had completely deprived owner of all
economically beneficial use of his building,
complaint speculated that city's actions were
intended to work a forfeiture of owner's equity
in building, but that assertion was purely
speculative and, in any event, did not allege that
owner had in fact forfeited all of his equity in
building or that he could not make use of building
despite demolition of its front facade. U.S. Const.
Amend. 5; 42 U.S.C.A. § 1983.

More cases on this issue

[34]    **Eminent Domain** 🔑 Nuisance and
demolition

Building owner failed to state a non-categorical
taking, under *Penn Central* factors, in owner's
§ 1983 action against city resulting from city
demolishing building's facade and billing owner
for expenses incurred; owner did not quantify

or characterize with any specificity overall
economic impact that any of city's administrative
actions at building had on him, owner did not
allege that city's actions had interfered with any
distinct investment-backed expectations, city's
actions, taken to remediate conditions posing
an immediate danger to the public, did not
constitute a taking, owner conceded that facade
was deteriorating and had already partly fallen,
and mere imposition of an obligation to pay
money did not constitute an unconstitutional
taking of property under the Fifth Amendment.
U.S. Const. Amend. 5; 42 U.S.C.A. § 1983.

1 Case that cites this headnote
More cases on this issue

[35]    **Eminent Domain** 🔑 What Constitutes a
Taking;  Police and Other Powers Distinguished

Purpose of investment-backed expectation
requirement, as a *Penn Central* factor for a non-
categorical taking claim, is to limit recovery to
owners who could demonstrate that they bought
their property in reliance on a state of affairs that
did not include challenged regulatory regime.
U.S. Const. Amend. 5.

2 Cases that cite this headnote

[36]    **Eminent Domain** 🔑 Nuisance and
demolition

A municipal demolition of an imminently
dangerous structure in order to protect the public
is an exercise of police power and does not
constitute a "taking." U.S. Const. Amend. 5.

[37]    **Constitutional Law** 🔑 Destruction of
property

**Health** 🔑 Buildings, structures, and building
components

Building owner had no claim for deprivation of
procedural due process, in owner's § 1983 action
against city resulting from city demolishing
building's facade and billing owner for expenses
incurred; under exigent circumstances, where
part of building was literally falling to the ground
and endangering the public, due process did not

require a pre-deprivation opportunity to be heard so long as there was sufficient post-deprivation process, and an Article 78 proceeding was just such a post-deprivation remedy, as owner could have brought an Article 78 proceeding to challenge all of city agencies' actions about which he complained. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983; N.Y. CPLR § 7801 et seq.

More cases on this issue

**[38]** **Constitutional Law** 🔑 Duration and timing of deprivation;  pre- or post-deprivation remedies

Essential principle of constitutional right to procedural due process is that a deprivation of life, liberty, or property be preceded by notice and an opportunity to be heard. U.S. Const. Amend. 14.

**[39]** **Constitutional Law** 🔑 Duration and timing of deprivation;  pre- or post-deprivation remedies

In certain circumstances, due process does not require a pre-deprivation opportunity to be heard so long as there is sufficient post-deprivation process. U.S. Const. Amend. 14.

**[40]** **Constitutional Law** 🔑 Egregiousness;  "shock the conscience" test

To establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. U.S. Const. Amend. 14.

**[41]** **Constitutional Law** 🔑 Egregiousness;  "shock the conscience" test

In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and

offensive to human dignity. U.S. Const. Amend. 14.

**[42]** **Constitutional Law** 🔑 Particular claims
**Constitutional Law** 🔑 Destruction of property
**Health** 🔑 Buildings, structures, and building components

Building owner failed to state a claim for violation of substantive due process, in owner's § 1983 action against city resulting from city demolishing building's facade and billing owner for expenses incurred; complaint did not allege facts to plausibly claim that city actions to demolish building facade in an emergency situation and to bill owner charges incurred were in any way egregious or outrageous, owner admitted that building had deteriorated to such an extent that a portion of facade fell to the ground, descriptors owner invoked, including "unjustified," "irrational," "excessive," "foolish and nonsensical," and "bad faith," fell well short, and although owner raised a specter of racial discrimination, such allegations were purely speculative and not supported by any alleged facts. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[43]** **Civil Rights** 🔑 Property and housing

Building owner failed to assert a constitutional claim for imposition of excessive fines, in owner's § 1983 action against city resulting from city demolishing building's facade and billing owner for expenses incurred; complaint did not allege that amount charged by city was not actual cost, plus interest, incurred by city to remediate deteriorating facade, since city repair charge liens were intended not to punish owner but to compensate city for a loss, they fell outside scope of Excessive Fines Clause, complaint failed to plausibly allege that any fine imposed based on conditions at building was grossly disproportionate, and complaint did not assert facts but alleged merely that violations and summonses issued at building were "foolish and

nonsensical" and "excessive and irrational." U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

More cases on this issue

**[44]    Fines  👈 Excessive fines**

The Second Circuit has adopted a two-step inquiry to decide whether a financial penalty is excessive under the Eighth Amendment: first, court must consider whether payment or forfeiture at issue constitutes a "fine," meaning that it is punitive in nature and not purely remedial, and second, court must determine whether fine is grossly disproportional to underlying offense. U.S. Const. Amend. 8.

1 Case that cites this headnote

**[45]    Fines  👈 Excessive fines**

To determine whether a civil penalty is grossly disproportionate under Eighth Amendment's Excessive Fines Clause, court considers four factors: (1) essence of crime of defendant and its relation to other criminal activity, (2) whether defendant fits into class of persons for whom statute was principally designed, (3) maximum sentence and fine that could have been imposed, and (4) nature of harm caused by defendant's conduct. U.S. Const. Amend. 8.

**Attorneys and Law Firms**

**\*296**  Robert Lewis, New York, NY, Pro Se.

Isabella Jacqueline Kendrick, New York City Law Department, New York, NY, for Defendant.

### ORDER ADOPTING REPORT AND RECOMMENDATION

ANALISA TORRES, District Judge:

On March 27, 2024, Plaintiff *pro se*, Robert Lewis, filed this action again Defendant, the City of New York (the "City"), alleging that the City violated his constitutional rights by charging him excessive fines and effecting a taking

of his property without due process or just compensation. *See generally* Compl, ECF No. 1. The City moved to dismiss Lewis's complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6). ECF Nos. 17–19. The Court referred the motion to the Honorable Robert W. Lehrburger. ECF No. 20. Despite being afforded the opportunity to respond, Lewis filed no opposition papers. *See* ECF Nos. 16, 22–23.

After careful consideration, Judge Lehrburger issued a report (the "R&R") recommending that the City's motion be granted and Lewis's claims be dismissed without prejudice to his (1) amending the complaint to plausibly assert a constitutional claim under 42 U.S.C. § 1983 or (2) bringing a proceeding in New York state court. ECF No. 24 at 25; *see* N.Y. C.P.L.R. § 7801 *et seq.* Although he was notified of his light to object to the R&R, Lewis did not file any objections, and the time to do so has now passed. *See* R&R at 25; Fed. R. Civ. P. 72(b)(2): Dkt. Entry 12/9/24. The Court, therefore, reviews the R&R for clear error. *See Whitley v. Bowden*, No. 17 Civ. 3564, 2019 WL 1953941, at \*1 (S.D.N.Y. May 1, 2019) (collecting cases). The Court finds no clear error in Judge Lehrburger's well-reasoned R&R.

Accordingly, the Court ADOPTS Judge Lehrburger's R&R in its entirety. Lewis's claims are DISMISSED WITHOUT PREJUDICE. By **February 7, 2025**, Lewis may file an amended complaint.

SO ORDERED.

### REPORT AND RECOMMENDATION TO HON. ANALISA TORRES: MOTION TO DISMISS

ROBERT W. LEHRBURGER, United States Magistrate Judge.

Plaintiff Robert Lewis ("Lewis" or "Plaintiff"), proceeding pro se, brings this lawsuit challenging assessments and fines charged in connection with remediating the unsafe condition posed by the deteriorating façade of a building owned by Lewis. Lewis claims that demolition of the façade was unnecessary and that the Department of Buildings ("DOB") and the Department of Housing and Preservation ("HPD") of New York City (the "City" or "Defendant") acted irrationally and in bad faith. He claims the City is liable as a state actor under 28 U.S.C. § 1983 for unconstitutional taking in violation of the Fifth Amendment, deprivation of due

process under the Fourteenth Amendment, and imposition of excessive fines.

**\*297** The City has moved to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for, respectively, lack of subject matter jurisdiction, and failure to state a claim. Lewis did not file any opposition to Defendants' motion. For the reasons discussed below, I recommend that the City's motion be GRANTED and the case dismissed without prejudice.

## FACTUAL BACKGROUND

**[1]** The facts are drawn from the Complaint and the public records attached to the Declaration of Isabella J. Kendrick (Dkt. 18 ("Kendrick Decl.")). [1] As required on a motion to dismiss, the Court accepts as true all well-pled allegations of the complaint and draws all reasonable inferences in favor of Lewis, the non-moving party. Applying a liberal reading afforded to pro se plaintiffs, Lewis's allegations and claims can be distilled to the following.

Lewis owns buildings at 724 and 726 St. Nicholas Avenue in New York City. (Complaint ("Compl."), Dkt. 1 ¶ 1.) At the time the buildings originally were purchased by his parents about 35 years ago, the building at 726 St. Nicholas Avenue (the "Property") was in disrepair. (Compl. ¶¶ 5-8.) At some unspecified time, "the façade on [the Property] deteriorated and a piece fell to the ground." (Compl. ¶ 13.) On February 28, 2022, DOB issued an Immediate Emergency Declaration recommending partial demolition of the Property's façade because it had partially collapsed and posed a danger to the public and adjacent properties. (Kendrick Decl. Ex. 1 at ECF 2.) On March 9, 2022, DOB issued an Amended Emergency Declaration recommending that the façade be entirely demolished. (*Id.* at ECF 3.) HPD issued work orders consistent with the Emergency Declarations as reflected in charge reports identifying fees for work that may be billed to the Property. (*See id.* Ex. 2 at ECF 2-3.) As directed, HPD's contractor demolished the front façade of the Property. (Compl. ¶¶ 20, 24.) Lewis alleges that the demolition proceeded without notice, an engineering report, or allowing Lewis to have the Property inspected. (Compl. ¶¶ 20-22, 46.)

Lewis alleges that removing the entire front façade was unnecessary and that doing so damaged and diminished the value of the Property. (Compl. ¶ 29; *see also id.* ¶ 32.)

He further alleges that HPD and DOB worked together to block Lewis from making repairs and imposed "unjustified," "irrational," and "excessive" fines and fees in order "to work a forfeiture of Lewis' equity" in the Property. (Compl. ¶¶ 31, 44; *see also id.* ¶ 29.) Lewis alleges that HPD and DOB have acted inconsistently, such as by demanding that a sidewalk shed be erected, yet refusing to give the permits required to do so (Compl. ¶¶ 14-16), and irrationally, as exemplified by their taking the position that a certificate of no harassment should issue, even though there are no persons other than the Lewis family in the buildings, and at the same time claiming they do not have "the proper paper stock" on which to print the certificate. (Compl. ¶¶ 33-34.) DOB has written "foolish and nonsensical" notices of violation that were dismissed by the Environmental Control Board for lack of evidence. (Compl. ¶¶ 40-43.) DOB and HPD allegedly violated rules of the New York City Landmark Commission by failing to obtain a permit for demolition of the Property's façade. (Compl. ¶¶ 23, 35.) Lewis also asserts **\*298** that HPD has not provided copies of contracts or other documents respecting the Property. (Compl. ¶ 30.)

Following completion of the contracted demolition work and payment by HPD to its contractors, the City billed Lewis for the expenses incurred by HPD in performing the emergency work. (*See* Kendrick Decl. Ex. 3 (NYC Department of Finance Quarterly Tax Statements).) The amounts billed to Lewis approximate or exceed $450,000. (*See id.* at ECF 15 (identifying amount due as $448,726.28); Compl. ¶¶ 24 (alleging $485,500), 36 (alleging $485,000), 55 (alleging $463,000).) Lewis characterizes the amounts invoiced as "unreasonable, unjustified and in bad faith" and effectively a taking without due process. (Compl. ¶ 36.) However, Lewis does not allege that he filed a protest challenging the charges with the HPD or any other City entity. (*See generally* Compl.) Pursuant to law, the charges arising out of the demolition work became a lien on the Property and began to accrue interest when past due. NYC Admin. Code §§ 27-2144, 28-215.1.1.

The City has exacerbated the impairment of Lewis's property rights by requiring him to restore the front façade to the pre-demolition appearance yet dumping the stones in the Property's yard "helter skelter" and "with no numbers or plans for restoration." (Compl. ¶ 38.) Lewis believes that the actions of HPD and DOB are systematic and "racially motivated" with the purpose of depriving Blacks, such as Lewis, of the opportunity for home ownership. (Compl. ¶¶ 1, 17, 48.) Lewis claims the City has taken his property without due process and just compensation and has imposed excessive fines. He

seeks payment of $1,000,000 to cover the costs of restoring the Property's façade and for damages. (Compl. ¶ 56.)

## PROCEDURAL BACKGROUND

Lewis filed the Complaint on March 27, 2024. (Dkt. 1.) Since then, he has not participated in the action other than consenting on or about April 16, 2024, to the City's request for an extension of time to respond to the Complaint. (*See* Dkt. 8.) On April 12, 2024, the Court issued an order scheduling an initial pretrial conference to take place by telephone on June 11, 2024. (Dkt. 7.) Lewis did not appear. (*See* minute entry dated June 11, 2024.) The City filed the instant motion to dismiss on June 17, 2024 (Dkt. 17), accompanied by the Kendrick Declaration and a memorandum of law (Dkts. 18, 19). The Court stayed discovery pending determination of the motion. (Dkt. 16.)

The Court's scheduling order for the motion to dismiss required that Plaintiff file any opposition by July 29, 2024. (Dkt. 16.) Plaintiff did not do so. On September 3, 2024, the Court issued an order sua sponte extending Plaintiff's time to oppose the motion until September 30, 2024. (Dkt. 22.) The order warned Plaintiff of the consequences of failing to file any opposition by that date. (*Id.*) Again, Plaintiff filed no opposition. On October 28, 2024, the Court sua sponte gave Plaintiff a final opportunity to file an opposition no later than November 18, 2024, and warned that "[i]f Plaintiff does not file any opposition by November 18, 2024, the Court will deem the motion fully submitted and resolve the motion based on the record as it stands. Additionally, Plaintiff's failure to submit any opposition may be grounds alone for granting the motion and dismissing Plaintiff's case due to Plaintiff's failure to prosecute." (Dkt. 23.) Again, Plaintiff did not file any opposition.

The docket shows that Plaintiff was served with all orders at the address he provided and which remains his address of record. The motion to dismiss has been **\*299** referred to me for a report and recommendation. (Dkt. 20.)

## LEGAL STANDARDS

### A. Motion To Dismiss For Lack Of Subject Matter Jurisdiction

[2]    [3]    [4]    [5]    A court must dismiss a claim if it "lacks the statutory or constitutional power to adjudicate

it." *Morrison v. National Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks omitted), *aff'd*, 561 U.S. 247, 130 S. Ct. 2869, 177 L.Ed.2d 535 (2010). "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transportation System, Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). In deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the Court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Morrison*, 547 F.3d at 170 (internal quotation marks omitted) (quoting *Natural Resources Defense Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006)). The Court, however, "may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue." *J.S. ex rel. N.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004); *see also Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court ... may refer to evidence outside the pleadings").

### B. Motion To Dismiss For Failure To State A Claim

Under Federal Rule of Civil Procedure 12(b)(6), a pleading may be dismissed for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)"). To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

[6]    [7]    [8]    "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " *Id.* (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). In considering a motion to dismiss, a district court "accept[s] all factual claims in the complaint as true, and draw[s] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Industry Co.*, 753 F.3d 395, 403 (2d Cir. 2014). However, this tenet is "inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. "[R]ather, the complaint's factual allegations must be enough to raise a right to relief above the speculative level ... *i.e.*, enough to make the claim plausible." *Arista Records, LLC v. Doe 3,*

604 F.3d 110, 120 (2d Cir. 2010) (internal quotation marks, emphasis, and brackets omitted) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). A complaint is properly dismissed where, as a matter of law, "the allegations in [the] complaint, however true, could not raise a claim of entitlement to relief." *Twombly*, 550 U.S. at 558, 127 S.Ct. 1955.

 **[9]**    **[10]**    For the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6), a court generally is confined to the facts alleged in the complaint. *See* **\*300** *Cortec Industries v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991). A court may, however, consider additional materials, including documents attached to the complaint, documents incorporated into the complaint by reference, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013) (citing *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). In that regard, if "a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Group Inc.*, No. 11-CV-559, 2012 WL 1027639, at \*2 (S.D.N.Y. March 27, 2012) (citing *Barnum v. Millbrook Care Ltd. Partnership*, 850 F. Supp. 1227, 1232-33 (S.D.N.Y. 1994)).

### C. Legal Standards For Section 1983 Claims

 **[11]**    **[12]**    **[13]**    **[14]**    To state a cause of action under § 1983, "a plaintiff must allege that some person acting under color of state law deprived him of a federal right." *Ahlers v. Rabinowitz*, 684 F.3d 53, 60-61 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Washington v. James*, 782 F.2d 1134, 1138 (2d Cir. 1986)). Because § 1983 does not provide its own substantive right, plaintiffs must identify the federally protected right that was allegedly violated. *See Gonzaga University v. Doe*, 536 U.S. 273, 285, 122 S. Ct. 2268, 2276, 153 L.Ed.2d 309 (2002) (plaintiffs cannot simply claim a violation of § 1983, because § 1983 "by itself does not protect anyone against anything") (internal quotation marks omitted) (quoting *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617, 99 S. Ct. 1905, 1916, 60 L.Ed.2d 508 (1979)). Accordingly, a plaintiff must show that (1) the defendant acted under color of state law and that (2) as a result of the defendant's actions, the plaintiff suffered a denial of federal statutory rights or constitutional rights or privileges. *Annis v. County of Westchester*, 136 F.3d 239, 245 (2d Cir. 1998). Additionally, "in all § 1983 cases, the plaintiff must prove that the defendant's action was a proximate cause

of the plaintiff's injury." *Gierlinger v. Gleason*, 160 F.3d 858, 872 (2d Cir. 1998); *see also White v. City of New York*, No. 16-CV-6183, 2017 WL 3575700, at \*5 (S.D.N.Y. Aug. 17, 2017).

### D. Review Of Pro Se Pleadings

 **[15]**    **[16]**    "*Pro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). "[T]he Second Circuit, as a general matter, is solicitous of *pro se* litigants, enforcing standards of procedural leniency rather than holding them to the rigidities of federal practice." *Massie v. Metropolitan Museum of Art*, 651 F. Supp.2d 88, 93 (S.D.N.Y. 2009); *see also Weixel v. Board of Education*, 287 F.3d 138, 147-48 (2d Cir. 2002) (reversing dismissal where district court failed to construe pro se plaintiff's complaint liberally); *Ortiz v. Cornetta*, 867 F.2d 146, 148 (2d Cir. 1989) ("Once a pro se litigant has done everything possible to bring his action, he should not be penalized by strict rules which might otherwise apply if he were represented by counsel").

 **[17]**    **[18]**    That said, "even pro se plaintiffs cannot withstand a motion to dismiss unless their pleadings contain factual allegations sufficient to raise a 'right to relief above the speculative level,' " **\*301** *Martinez v. Ravikumar*, 536 F. Supp.2d 369, 370 (S.D.N.Y. 2008) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955), and must allege "enough facts to state a claim to relief that is plausible on its face." *Perry v. Mary Ann Liebert, Inc.*, 765 F. App'x 470, 473 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). And, "[n]otwithstanding the liberal pleading standards afforded *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if they lack subject matter jurisdiction." *Torres v. Blackstone Group*, No. 18-CV-6434, 2019 WL 4194496, at \*2 (S.D.N.Y. Sept. 3, 2019) (internal quotation marks omitted), *aff'd*, 836 F. App'x 49 (2d Cir. 2020).

### DISCUSSION

 **[19]**    **[20]**    **[21]**    The City argues that the Complaint should be dismissed for two principal reasons. First, the City asserts that the Court lacks subject matter jurisdiction because Lewis's claims boil down to an administrative challenge to the allegedly irrational actions of the DOB and HPD and therefore may be pursued only by an "Article 78 proceeding"

pursuant to New York State law. Second, the City contends that Lewis fails to state a claim for an unconstitutional taking, deprivation of due process, or excessive fines. The Court agrees. [2]

## I. Lack Of Subject Matter Jurisdiction

Lewis's claims are grounded in the allegation that DOB and HPD acted irrationally and intentionally to demolish the front façade of the Property and impose unnecessary and excessive fines and charges. The Complaint does not challenge any particular rule or regulation as unconstitutional. Instead, Lewis alleges the administrative agencies' actions, as applied to Lewis, **\*302** were arbitrary and unauthorized. Those "as applied" claims are properly brought in an Article 78 proceeding pursuant to New York's Civil Practice Law and Rules. In such circumstances, the Court may, and in this instance should, dismiss the claims for lack of subject matter jurisdiction.

[22]  [23]  Article 78 has been described as "an amalgam of the common law writs of certiorari to review, mandamus, and prohibition," which "provides both a hearing and a means of redress for petitioners ... who seek to challenge municipal decisions." *Reyes v. Erickson*, 238 F. Supp.2d 632, 635-36 (S.D.N.Y. 2003); *accord Hellenic American Neighborhood Action Committee v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996). "A petitioner in an Article 78 proceeding is permitted to submit affidavits and other written proof of their claim, and where a triable issue of fact is raised, the petitioner may obtain a trial." *Hellenic American*, 101 F.3d at 881 (ellipses and brackets omitted) (quoting *Moccio v. New York State Office of Court Administration*, 95 F.3d 195, 202 (2d Cir. 1996)). Courts hearing Article 78 proceedings "are courts of limited jurisdiction and may not hear a general constitutional challenge to a law or regulation." *Jones-Bey v. Stanislov*, No. 23-CV-5599, 2024 WL 3520636, at \*4 (S.D.N.Y. July 23, 2024). They may, however, "entertain claims [like Plaintiff's] that the application of a rule is unconstitutional." *Id.* (brackets in original); *see also Building Industry Electrical Contractors Association v. City of New York*, No. 10-CV-8002, 2011 WL 3427138, at \*14 (S.D.N.Y. Aug. 5, 2011), *aff'd*, 678 F.3d 184 (2d Cir. 2012). Courts thus "have repeatedly held that claims 'fundamentally premised' on the contention that an administrative determination was 'wrongful' must be brought under Article 78." *Jones-Bey*, 2024 WL 3520636, at \*3 (citation omitted).

[24]  [25]  That is the scenario presented here. "To determine whether Article 78 applies to a given dispute, a reviewing court must 'examine the substance of the action to identify the relationship out of which the claim arises and the relief sought.' " *Id.* (quoting *Building Industry Electrical Contractors*, 2011 WL 3427138, at \*14). As set forth above, Lewis challenges the actions of two New York City administrative departments – DOB and HPD. Lewis claims the actions taken and fines and charges imposed were "unjustified," "irrational," "excessive," "foolish and nonsensical," and in "bad faith." (Compl. ¶¶ 29, 31, 36, 40, 44.) Those are precisely some of the grounds for which an Article 78 proceeding is provided. *See, e.g.*, NY CPLR 7803(3) (stating that Article 78 proceedings address claims "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed").

Whether federal courts can exercise jurisdiction over a claim that may be properly brought as an Article 78 petition is a question that the Second Circuit has not answered. *See Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150, 155 (2d Cir. 2013) ("We need not decide, however, whether Article 78 can, on its own, deprive a federal court of jurisdiction over claims brought under that provision, as some district court cases have held"). "District courts in this circuit are split on the issue of whether they can (or should) exercise jurisdiction over Article 78 claims. Some district courts have concluded that they have no jurisdiction over Article 78 petitions. Others have not gone so far but have declined to exercise supplemental jurisdiction over Article 78 claims as a matter of discretion. On the other hand, some district courts have exercised supplemental **\*303** jurisdiction over Article 78 claims where the court otherwise had federal jurisdiction over other claims raised." *Garofalo v. City of New York*, No. 22-CV-7620, 2023 WL 3792514, at \*5 (E.D.N.Y. June 2, 2023) (citations omitted) (collecting cases); *see Jones-Bey*, 2024 WL 3520636, at \*4 (dismissing plaintiff's claims for denial of press pass by New York City's Mayor's Office and "join[ing] a number of other district courts that have dismissed cases brought in federal court that should have been brought to State Supreme Court as an Article 78 proceeding") (internal quotation marks, citation, and brackets omitted).

Here, Lewis has asserted a claim pursuant to 42 U.S.C. § 1983 for violation of federal constitutional rights. If such a claim is plausibly stated, the Court would have federal

subject matter jurisdiction pursuant to 28 U.S.C. § 1331. *See Garofalo*, 2023 WL 3792514, at *2 (finding that plaintiff "established federal question jurisdiction in an obvious way" by asserting violation of Second and Fourteenth Amendments under 42 U.S.C. § 1983). The Court then could consider whether it should exercise supplemental jurisdiction over Lewis's Article 78 claims pursuant to 28 U.S.C. § 1367. As discussed next, however, Lewis has not plausibly stated a claim for a constitutional violation under 42 U.S.C. § 1983. The Court thus has no federal subject matter jurisdiction for which supplemental jurisdiction could or should be exercised.

### II. Failure To State A Claim

Lewis advances three constitutional claims under 42 U.S.C. § 1983:[3] (1) a taking without compensation in violation of the Fifth Amendment; (2) deprivation of due process in violation of the Fourteenth Amendment; and (3) imposition of excessive fines in violation of the Eighth Amendment (although the Complaint does not expressly invoke the Eighth Amendment). The well-pled allegations of the Complaint, however, do not plausibly state a claim under any of those theories.

### A. No Takings Claim

 [26]   The Fifth Amendment, made applicable to the States under the Fourteenth Amendment, prohibits the government from taking "private property for public use without just compensation." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 2457, 150 L.Ed.2d 592 (2001). Lewis claims that the City violated the takings clause, stating that "DOB and HPD ... have engaged in a taking without due process of law by demolishing the front façade of [the Property]," and that "unjustified fines" and the cost of demolition charged to Lewis also constitute a taking.[4] (Compl. ¶¶ 49, 50.) The Complaint's allegations do not plausibly state a takings claim.

 [27]    [28]   The Supreme Court has recognized two types of takings – physical and regulatory. *See* **\*304** *Buffalo Teachers Federation v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (collecting cases). A physical taking "occur[s] when the government physically takes possession of an interest in property for some public purpose." *Id.* (citation omitted). Plaintiff here does not allege that the City has physically taken the Property for a public purpose, and therefore does not state a claim for a physical taking.

 [29]    [30]    [31]    [32]   By contrast, "[g]overnment action that does not entail a physical occupation, but merely affects the use and value of private property" is considered under the framework of regulatory takings, which can be categorical or non-categorical. *Elmsford Apartment Associates, LLC v. Cuomo*, 469 F. Supp.3d 148, 162-63 (S.D.N.Y. 2020). "A categorical regulatory taking occurs in 'the extraordinary circumstance when ***no*** productive or economically beneficial use of land is permitted.' " *Id.* at 164 (*quoting Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 330, 122 S. Ct. 1465, 1483, 152 L.Ed.2d 517 (2002)). "Anything less than a complete elimination of value, or a total loss, is a non-categorical taking, which is analyzed under the framework established in *Penn Central Transportation Co. v. New York City*." *Id.* at 165 (referring to the Supreme Court's decision in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 98 S. Ct. 2646, 57 L.Ed.2d 631 (1978)). Courts "weigh three factors to determine whether the interference with property rises to the level of a [non-categorical regulatory] taking: '(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.' " *Buffalo Teachers Federation*, 464 F.3d at 375 (*quoting Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225, 106 S. Ct. 1018, 1026, 89 L.Ed.2d 166 (1986)). The consideration of these factors aims to "identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539, 125 S. Ct. 2074, 2082, 161 L.Ed.2d 876 (2005).

 [33]   The Complaint fails to plausibly allege a regulatory taking claim. Lewis does not allege that the demolition of the façade, the fines imposed for violations, or the repair charge liens have "completely deprive[d]" Lewis "of ***all*** economically beneficial use of [his] property." *Lingle*, 544 U.S. at 538, 125 S.Ct. 2074 (internal quotation marks and citation omitted). (*See, e.g.*, Compl. ¶¶ 52, 53.) The Complaint speculates that HPD and DOB's actions were "intended to work a forfeiture of Lewis' equity in [the] Property." (Compl. ¶ 31.) That assertion is purely speculative and, in any event, does not allege that Lewis has in fact forfeited all of his equity in the Property or that he cannot make use of the Property despite demolition of the front façade.

 [34]    [35]   Similarly, Lewis fails to state a non-categorical taking under the *Penn Central* factors. Lewis does not

quantify or characterize with any specificity the overall economic impact that any of the City's administrative actions at the Property have had on him. Nor does he allege that the City's actions have interfered with any distinct investment-backed expectations – indeed, Lewis "does not allege that he invested time or money in the Property," *Vanderveer v. Zoning Board of Appeals*, No. 19-CV-3833, 2020 WL 7042669, at *4 (E.D.N.Y. Dec. 1, 2020), *aff'd*, 2021 WL 3745741 (2d Cir. Aug. 25, 2021), although he does allege generally that his parents **\*305** purchased the Property "in a wrecked state" many years ago. [5] (Compl. ¶ 7.)

 **[36]**   As for the third factor, the Supreme Court has stated that a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646 (citation omitted). Demolition of the front façade of the Property is a physical invasion of sorts. However, "a municipal demolition of an imminently dangerous structure in order to protect the public is an exercise of the police power and does not constitute a 'taking.' " *Wantanabe Realty Corp. v. City of New York*, 315 F. Supp.2d 375, 401 (S.D.N.Y. 2003) (citation omitted). As noted by Plaintiff, "[t]here came a time that the façade [at the subject property] deteriorated and a piece fell to the ground." (Compl. ¶ 13.) Emergency declarations followed. (Kendrick Decl. Ex. 1.) The City's actions, taken to remediate conditions posing an immediate danger to the public, do not constitute a taking. [6] *Wantanabe Realty*, 315 F. Supp.2d at 401.

While Lewis also alleges that "excessive fining" constituted an unconstitutional taking, "the mere imposition of an obligation to pay money does not constitute an unconstitutional taking of property" under the Fifth Amendment. *Dubin v. County of Nassau*, No. 16-CV-4209, 2024 U.S. Dist. LEXIS 34707 at *31 (E.D.N.Y. Feb. 28, 2024) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1339-40 (Fed. Cir. 2001)); *see also Moorer v. U.S. Bank N.A.*, No. 3:17-CV-56, 2018 WL 587319, at *7 (D. Conn. Jan. 29, 2018) ("The Supreme Court, however, has never held that the Takings Clause applies to the creation of an ordinary liability to pay money") (internal quotation marks omitted). As noted in *Moorer*, while "the Second Circuit has yet to confront the issue, other Circuit Courts consistently have followed the conclusion reached by the majority of the Justices in *Eastern* [*Enterprises*] – 'that an obligation to pay [undifferentiated, fungible] money cannot constitute

a taking.' " *Moorer*, 2018 WL 587319, at *7 (brackets in original) (*quoting West Virginia CWP Fund v. Stacy*, 671 F.3d 378, 386-87 (4th Cir. 2011)).

Therefore, the Complaint fails to state a takings claim related to any of the challenged  **\*306**  City actions with respect to the Property.

### B. No Due Process Claim

 **[37]**    **[38]**    **[39]**   Lewis alleges that the City denied him "substantive and procedural due process" when it demolished the façade of the Property, and then charged Lewis for the demolition work. (*See* Compl. ¶¶ 29, 30, 36, 46, 49, 50, 52.) The essential principle of the constitutional right to procedural due process is that a deprivation of life, liberty, or property be preceded by notice and an opportunity to be heard. *See Parratt v. Taylor*, 451 U.S. 527, 538, 101 S. Ct. 1908, 1914, 68 L.Ed.2d 420 (1981). But in certain circumstances – such as the exigent circumstances here, where part of a building was literally falling to the ground and endangering the public – due process does not require a pre-deprivation opportunity to be heard so long as there is sufficient post-deprivation process. *See Catanzaro v. Weiden*, 188 F.3d 56, 63-64 (2d Cir. 1999) (holding that a pre-deprivation hearing was unnecessary before demolition of damaged building that public official reasonably believed to be an immediate danger to the public); *see also Kshel Realty Corp. v. City of New York*, No. 01-CV-9039, 2006 WL 2506389, at *1, *8 (S.D.N.Y. Aug. 30, 2006) (recognizing emergency exception to requirement for pre-deprivation process where the City demolished entire building due to falling façade), *aff'd*, 293 F. App'x 13 (2d Cir. 2008); *Rohde v. City of New York*, No. 99-CV-8714, 2000 WL 1372835, at *3 (S.D.N.Y. Sept. 25, 2000) (dismissing complaint alleging violation of due process by City for demolishing building whose façade collapsed, and stating, "[t]he Second Circuit has held that demolition of a building, without a prior hearing, for the purpose of dealing with an emergency does not give rise to a [due process] claim as long as there is a 'post deprivation remedy' ") (quoting *Catanzaro*, 188 F.3d at 62).

An Article 78 proceeding is just such a post-deprivation remedy. As explained above, Lewis could have brought an Article 78 proceeding to challenge all of DOB and HPD's actions about which he complains. Indeed, the Second Circuit has "held on numerous occasions that an Article 78 proceeding is a perfectly adequate postdeprivation remedy" in instances where, as here, the plaintiff claims wrongful application of rules and regulations by City agencies rather

than facial invalidity of the rules and regulations. *Hellenic American Neighborhood Action Committee,* 101 F.3d at 881 (collecting cases). Lewis thus has no claim for deprivation of procedural due process. [7]

**\*307** **[40]** **[41]** Lewis's claim for violation of substantive due process also fails. "[T]o establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Pena v. DePrisco,* 432 F.3d 98, 112 (2d Cir. 2005) (*quoting County of Sacramento v. Lewis,* 523 U.S. 833, 847, 118 S. Ct. 1708, 1717 n.8, 140 L.Ed.2d 1043 (1998)). The Second Circuit has repeatedly stated that "in order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly 'brutal and offensive to human dignity.' " *Lombardi v. Whitman,* 485 F.3d 73, 81 (2d Cir. 2007) (*quoting Smith v. Half Hollow Hills Central School District,* 298 F.3d 168, 173 (2d Cir. 2002)).

**[42]** The Complaint does not allege facts to plausibly claim that the actions of the City to demolish the façade of the Property in an emergency situation and to bill Lewis the charges incurred were in any way egregious or outrageous. As admitted by Lewis, the subject property had deteriorated to such an extent that a portion of the façade fell to the ground. (Compl. ¶ 13.) Even the descriptors Lewis invokes – "unjustified," "irrational," "excessive," "foolish and nonsensical," and "bad faith" – fall well short. And, although he raises the specter of racial discrimination, his allegations in that respect are purely speculative and not supported by any actual alleged facts. Thus, Lewis fails to state a claim for violation of substantive due process.

**C. No Excessive Fine Claim**

**[43]** The Eighth Amendment prohibits the government from imposing "excessive fines." [8] U.S. Const. amend. VIII. Although the Complaint does not mention the Eighth Amendment, it repeatedly alludes broadly to "excessive fines" imposed by the City. (*See* Compl. ¶¶ 29, 31, 44, 51, 54.) The Complaint, however, fails to advance a plausible Eighth Amendment claim.

**[44]** The Second Circuit has adopted a two-step inquiry to decide "whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski,* 814 F.3d 104,

108 (2d Cir. 2016). First, a court must consider whether the payment or forfeiture at issue constitutes a "fine," meaning that it is punitive in nature and not "purely 'remedial.' " *Id.* at 109 (quoting *United States v. Bajakajian,* 524 U.S. 321, 331, 118 S. Ct. 2028, 2035, 141 L.Ed.2d 314 (1998)). Second, a court must determine whether the fine is "grossly disproportional" to the underlying offense. **\*308** *Id.* at 110 (quoting *Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028). The Complaint does not plausibly allege both required elements for any of the charges it references.

First, the HPD repair charge liens cannot constitute excessive fines as they are a method to recover emergency demolition expenses incurred by the City. *See* NYC Admin. Code §§ 28-215.1.1 (addressing liens for emergency work), 27-2144 (addressing liens on premises). The approximate $485,000 to which the Complaint refers constitutes the sum expended by the City in contracting for demolition of the front façade of the Property, along with associated fees and taxes. (*See* Compl. ¶ 36; Kendrick Decl. Ex. 3.) The Complaint does not allege that the amount charged by the City was not the actual cost (plus interest) incurred by the City to remediate the deteriorating façade. Because the HPD repair charge liens are "intended not to punish the [property owner] but to compensate the Government for a loss ... [they] fall outside the scope of the Excessive Fines Clause." *Viloski,* 814 F.3d at 109 (citing *Bajakajian,* 524 U.S. at 329, 118 S.Ct. 2028).

**[45]** Second, the Complaint fails to plausibly allege that any actual civil penalty or fine imposed based on conditions at the Property were grossly disproportional. To determine whether a civil penalty is grossly disproportionate, the Court considers four factors: (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct. *Id. at* 108.

Here, the Complaint does not address the amount of any specific fine or penalty or why any such amount is disproportionate. Instead, the Complaint alleges merely that the violations and summonses issued at the Property are "foolish and nonsensical" and "excessive and irrational." (Compl. ¶¶ 40, 43.) These "bare allegations are inadequate to state a plausible claim that the ... penalties are disproportionate to the gravity of the offenses they are designed to punish, much less 'grossly' disproportionate." *New York State Professional Process Servers Association v.*

*City of New York*, No. 14-CV-1266, 2014 WL 4160127, at *12 (S.D.N.Y. Aug. 18, 2014); *see also Farina v. Metropolitan Transportation Authority*, 409 F. Supp.3d 173, 200 (S.D.N.Y. 2019) ("With no allegation as to the amount of fines actually paid by [plaintiff], it is not possible to undertake the four-factor analysis of whether his fines were 'grossly disproportional' to the underlying offense and therefore a plausible violation of the Eighth Amendment"). Further, the Complaint alleges that "many of the bad faith violations were dismissed by the Environmental Control Board for lack of evidence." (Compl. ¶ 43.) To the extent any of those violations relate to the fines about which Lewis complains, there can be no constitutionally excessive fine since "no fine has been imposed." *Infinity Outdoor Inc. v. City of New York*, 165 F. Supp.2d 403, 431 (E.D.N.Y. 2001). The Complaint does not assert facts demonstrating that any cited "fines" are grossly disproportional to the alleged conduct.

Accordingly, the Complaint fails to assert a constitutional claim for imposition of excessive fines.

## CONCLUSION

For the reasons discussed above, I recommend that the motion to dismiss be GRANTED and the complaint DISMISSED without prejudice to Plaintiff's bringing an Article 78 proceeding in state court. Additionally, because Plaintiff is pro **\*309** se and he has not yet had an opportunity to amend, he should be granted leave to amend to plausibly assert a claim for a constitutional violation pursuant to 28 U.S.C. § 1983. To the extent not addressed above, the Court has considered the parties' arguments and determined them to be either moot or without merit.

## DEADLINE TO OBJECT AND PRESERVE APPEAL

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Any party shall have fourteen (14) days to file a written response to the other party's objections. Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Analisa Torres, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Any request for an extension of time for filing objections must be addressed to Judge Torres. **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

Dated: December 5, 2024

**All Citations**

762 F.Supp.3d 290

---

### Footnotes

1    "The Court may take judicial notice of public records in deciding a motion to dismiss." *Manley v. Utzinger*, No. 10-CV-2210, 2011 WL 2947008, at *1 n.1 (S.D.N.Y. July 21, 2011) (citing *Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Scherer v. Equitable Life Assurance Society*, 347 F.3d 394, 402 (2d Cir. 2003)).

2    There is a potential additional basis for dismissal, although the Court does not rely on it in making its recommendation. Specifically, Federal Rule of Civil Procedure 41(b) gives district courts the power to dismiss a case if "the plaintiff fails to prosecute" the case, "to comply with [the Federal Rules of Civil Procedure]," or to comply with court orders. Fed. R. Civ. P. 41(b). Rule 41(b) does not define "failure to prosecute," but "[i]t can evidence itself either in an action lying dormant with no significant activity to move it or in a pattern of dilatory tactics." *Lyell Theatre Corp. v. Loews Corp.*, 682 F.2d 37, 42 (2d Cir. 1982). The "primary rationale" for dismissal pursuant to Rule 41(b) is "the failure of plaintiff in his duty to process his case diligently." *Id.* at 43. Here, other than consenting in April 2024 to the City's request for an extension of time to respond

to the Complaint, Lewis has not participated in the litigation for the last several months. He neither met and conferred to formulate a case management plan and scheduling order nor submitted his own; he failed to appear for the initial pretrial conference as ordered; and he did not file any response to the motion to dismiss despite being afforded multiple sua sponte extensions and despite being warned that failure to file any opposition could result in dismissal for failure to prosecute. The City has extensive litigation in both federal and state courts and is prejudiced to some extent when cases languish. Similarly, this District is one of the nation's busiest, and both it and litigants are burdened when the docket is clogged by cases that plaintiffs have neglected. In contrast, Lewis will not be prejudiced to the extent his claims can be dismissed without prejudice to refiling. And, no lesser sanction is likely to be effective given that Lewis has gone entirely silent. *See generally Spencer v. Doe*, 139 F.3d 107, 112-13 (2d Cir. 1998) (articulating five factors to consider in determining whether to dismiss for failure to prosecute: "[(i)] the duration of the plaintiff's failure to comply ...; [(ii)] whether the plaintiff was on notice that failure to comply would result in dismissal; [(iii)] whether the defendants are likely to be prejudiced by further delay in the proceedings; [(iv)] a balancing of the court's interest in managing its docket with the plaintiff's interest in receiving a fair chance to be heard; and [(v)] whether the judge has adequately considered a sanction less drastic than dismissal"); *accord Ampudia v. Lloyd*, 531 F. App'x 32, 34 (2d Cir. 2013).

3      Lewis has plausibly alleged that the persons responsible for the actions about which he complains are state actors to whom 42 U.S.C. § 1983 applies.

4      Lewis also suggests that the City intends to demolish the Property in its entirety, but his allegations in that regard are speculative, conclusory, and not well pled. (*See* Compl. ¶¶ 24 (alleging that HPD has a contract with an "unknown party" but alluding to the contract price charged for the partial demolition); 46 (generally referencing "the proposed demolition of [the] Property" without notice); 54 (again generally alleging a "propos[al] to demolish" the Property without notice or engineering reports).) Lewis has not alleged that he has been charged for demolition of the entire Property rather than only for the emergency demolition of the front façade. Moreover, the Complaint does not request injunctive relief to prevent any future demolition.

5      Moreover, "[t]he purpose of the investment-backed expectation requirement is to limit recovery to owners who could demonstrate that they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime." *Allen v. Cuomo*, 100 F.3d 253, 262 (2d Cir. 1996) (internal quotation marks and citation omitted). The Complaint does not include any allegations that Lewis – or his parents – purchased the Property with the expectation that they could never be required to remediate a deteriorating façade. To the contrary, Lewis concedes that his parents purchased the Property when it was already in a state of disrepair. (Compl. ¶ 7.)

6      The Complaint does challenges whether there was in fact an emergency posing imminent danger to the public. In particular, the Complaint alleges that the "public was protected from any danger" by a sidewalk shed erected by the City. (Compl. ¶ 20.) *Cf. Libbey v. Village of Atlantic Beach*, 982 F. Supp.2d 185, 196, 211 (E.D.N.Y. 2013) (denying motion to dismiss takings claim where building was in disrepair but not necessarily imminently dangerous because another court had issued an order requiring installation of fence to secure the area and found that the defendant village had violated that order). But a shed would only be a temporary measure preceding actual remediation of the façade. Put another way, the erection of a sidewalk shed would not obviate the need to remediate a façade that Lewis concedes was deteriorating and had already partly fallen.

7      The City also notes that DOB and HPD did provide notice of the actions complained of, as well as pre-deprivation administrative remedies, obviating the need to even consider post-deprivation remedies. For instance, notice of proposed HPD repair charges prior to demolition work beginning was provided through HPD's publicly-viewable Building Charge Report database. (Kendrick Decl. Exs. 1, 2.) *See Trump Presidential, Inc. v. New York City Department of Housing Preservation & Development*, 170 A.D.3d 866,

868, 96 N.Y.S.3d 248 (2d Dep't 2019) ("since HPD records its expenses in its building charge report that is publicly available online ... the petitioner was on notice of the violations and charges on the property"). After the demolition work, Lewis was notified of the finalized HPD repair charges on his quarterly property tax statements, which are public records on the City's Department of Finance's website. (*See* Kendrick Decl. Ex. 3.)

Pursuant to Sections 27-2129 and 27-2146 of the New York City Administrative Code and Section 17-03(g) of Chapter 17 of Title 28 of the Rules of the City of New York, an owner can challenge the imposition of repair charges to HPD by the due and payable date of those charges. *See Shahid v. City of New York*, 144 A.D.3d 1163, 1164, 43 N.Y.S.3d 393 (2d Dep't 2016) (noting the administrative remedy to challenge emergency repair liens provided by Sections 27-2129 and 27-2146 of the New York City Administrative Code). The quarterly tax statements listing HPD repair charges included a statement notifying Lewis of this procedure. (*See* Kendrick Decl. Ex. 3 at ECF 4, 7, 13.) Once a property owner receives a final determination from HPD on their written objection, if aggrieved, they may then bring an Article 78 proceeding to challenge that determination as discussed above. Similar multi-step opportunities to contest the actions of City agencies have been deemed sufficient due process. *See, e.g.*, *Nestle Waters North America, Inc. v. City of New York*, No. 15-CV-5189, 2016 WL 3080722, at *8-11 (S.D.N.Y. May 25, 2016) (dismissing claim and finding that multiple levels of administrative agency and state court process, including Article 78 proceeding, to challenge agency determinations was sufficient due process), *aff'd*, 689 F. App'x 87 (2d Cir. 2017).

8    The Supreme Court has held that the Fourteenth Amendment incorporates the Eighth Amendment's prohibition against excessive fines and that it therefore applies to the states. *See Timbs v. Indiana*, 586 U.S. 146, 150, 139 S. Ct. 682, 687, 203 L.Ed.2d 11 (2019).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 16558154
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Colin B. MONTAGUE, Plaintiff-Appellant,

v.

CITY OF ROCHESTER, John Does, Unknown Officers of the Town of Greece Police Department, John Does, Unknown Officers of the Drug Enforcement Agency, John Does, Unknown Officers of the City of Rochester Police Department, Leon, City of Rochester Police Department, Officer Padgham, City of Rochester Police Department, Investigator Sindoni, City of Rochester Police Department, Deputy Lockwood, City of Rochester Police Department, John Does, Unknown Officers of the Monroe County Sherrif's Department, Defendants-Appellees, Town of Greece, Rochester Police Department, Greece Police Department, Monroe County Sheriff's Department, Officer Shaun Moore, Town of Greece Police Department, Agent Andrew Woeppel, Drug Enforcement Agency, Investigator David Simpson, City of Rochester Police Department, Sergeant Brinkerhoff, City of Rochester Police Department, Other Officers From Granet Known and Unknown, Lieutenant John Henderson, Town of Greece Police Department, Lieutenant Mark Sundquist, Town of Greece Police Department, Sergeant Patrick Welch, Town of Greece Police Department, Sergeant James Carris, Town of Greece Police Department, Sergeant David Mancuso, Town of Greece Police Department, Sergeant Brandon White, Town of Greece Police Department, Officer Keith Baer, Town of Greece Police Department, Officer Edward Caton, Town of Greece Police Department, Officer David D'aurelio, Town of Greece Police Department, Investigator Pearce, City of Rochester Police Department, the Drug Enforcement Agency, Defendants.

21-1598-pr
|
November 1, 2022

Appeal from a judgment of the United States District Court for the Western District of New York (John L. Sinatra, Jr., *Judge*), entered on May 14, 2021.

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Aaron M. Goldsmith, Law Office of Aaron M. Goldsmith, P.C., New York, NY.

For Defendants-Appellees: No appearances.

Present: Barrington D. Parker, Susan L. Carney, William J. Nardini, Circuit Judges.

**SUMMARY ORDER**

 **\*1** Plaintiff-Appellant Colin B. Montague appeals from the district court's dismissal of his suit under 28 U.S.C. § 1915A. Montague, *pro se,* sued the City of Rochester, the Town of Greece, the police departments of Rochester and Greece, the Monroe County Sheriff's Department, the Drug Enforcement Administration, and several individual officers, named and unnamed, of the police and sheriff's departments and the DEA. [1] He sought relief under 42 U.S.C. § 1983 and *Bivens* v. *Six Unknown Named Agents*, 403 U.S. 388, 398 (1971), alleging Fourth, Fifth, and Fourteenth Amendment violations arising from alleged police harassment and false arrest. On November 10, 2020, the district court dismissed Montague's claims as barred by the applicable statutes of limitations and sovereign immunity. On February 22, 2021, Montague filed an amended complaint, which the district court dismissed on May 4, 2021. Montague moved for reconsideration under Federal Rules of Civil Procedure 59(e) or 60, which the court denied on May 14, 2021. Montague, no longer *pro se*, now appeals the district court's May 14, 2021, order. We assume the parties' familiarity with the case.

We review a district court's denial of a motion to alter or amend judgement under Rule 59(e) or for relief from judgment under Rule 60 for abuse of discretion. *Empresa Cubana del Tabaco* v. *Culbro Corp.*, 541 F.3d 476, 478 (2d Cir. 2008). Because Montague's motion for reconsideration merely reprised arguments already considered and rejected by the district court, he failed to identify "controlling decisions or data that the court overlooked" and the district court properly denied his motion. *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

For completeness' sake, we also consider the underlying decision of the district court dismissing Montague's claims as untimely. We review a district court's *sua sponte* dismissal of a complaint under § 1915A or § 1915(e)(2) *de novo*. *Zaleski v. Burns*, 606 F.3d 51, 52 (2d Cir. 2010); *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004). As Montague concedes, his claims fell outside the statutes of limitations. "The statute of limitations for *Bivens* claims is governed by the statute of limitations for New York state law personal injury claims not sounding in intentional tort," which is three years. *Gonzalez* v. *Hasty*, 802 F.3d 212, 219–20 (2d Cir. 2015) (internal quotation marks omitted); New York Civil Practice Law and Rules § 214(5). A *Bivens* claim accrues under federal law when a plaintiff "has knowledge of his or her claim or has enough information that a reasonable person would investigate and discover the existence of a claim." *Gonzalez*, 802 F.3d at 220. Section 1983 actions filed in New York are also subject to a three-year statute of limitations. *Hogan* v. *Fischer*, 738 F.3d 509, 517 (2d Cir. 2013). The events Montague describes in his complaint—the allegedly unlawful stops and searches and his arrest and indictment—occurred in 2012, and the grand jury dismissed his original state indictment on May 20, 2013, more than seven years before he filed his first complaint, on June 11, 2020.

**\*2** Montague argues that his claims should be subject to equitable tolling, which allows a court to extend a statute of limitations to avoid injustice in "rare and exceptional circumstances in which a party is prevented in some extraordinary way from exercising his rights." *Zerilli–Edelglass* v. *N.Y. City Transit Auth.*, 333 F.3d 74, 80 (2d Cir. 2003) (cleaned up). The relevant question is "whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." *Veltri* v. *Bldg. Serv. 32B–J Pension Fund*, 393 F.3d 318, 323 (2d Cir. 2004).

Montague argues that a confluence of events meant he could not reasonably have discovered he was harmed until 2018. First, he states that he was never notified by his attorney that the grand jury had dismissed the charges against him; he became aware of this fact only in 2018 when, during his (unrelated) federal criminal trial, he asked his attorney to

determine the status of the earlier state charges. Second, he emphasizes that he has been in federal prison since 2014. Third, he notes that he was told, in May 2013, by the attorney representing him in connection with the state charges that the DEA was holding his possessions "pending further investigation." App'x 36.

None of these facts amounts to "extraordinary" circumstances, *Zerilli–Edelglass*, 333 F.3d at 80, or demonstrates that Montague exercised "all due diligence" in pursuing his claims. *Valdez ex rel. Donely* v. *United States*, 518 F.3d 173, 182 (2d Cir. 2008) (internal quotation marks omitted). The lack of a notification that the charges had been dismissed would not have prevented Montague from inquiring about them before 2018. Montague was aware of his allegedly false arrest as soon as it happened, and he provides no reason why he could not have challenged it at the time. *See Zerilli–Edelglass*, 333 F.3d at 80. Nor is Montague's status as a prisoner a "rare and exceptional circumstance[ ]" that prevented him from filing a petition either before or after his incarceration. *Zerilli–Edelglass*, 333 F.3d at 80; *see also Walker* v. *Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (prisoner not entitled to equitable tolling of statute of limitations for § 1983 claim); *Hizbullahankhamon* v. *Walker*, 255 F.3d 65, 75 (2d Cir. 2001) (solitary confinement insufficient to toll statute of limitations where prisoner had other opportunities to file). Montague also points to cases tolling the statute of limitations where law enforcement officers intentionally prevented a complainant from filing his claim but provides no evidence that any of the defendants did so in his case. Montague is thus not entitled to equitable tolling, and the district court properly dismissed his complaint as untimely.

* * *

The judgment of the district court is **AFFIRMED**.

**All Citations**

Not Reported in Fed. Rptr., 2022 WL 16558154

---

**Footnotes**

1      Montague does not appeal the dismissal of his claim against the DEA.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by   Villalobos v. Smith,   S.D.N.Y.,   July 12, 2022

2015 WL 1321685
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Michael MORAN, Plaintiff,

v.

COUNTY OF SUFFOLK and John
Doe, the person intended to be the police
officer who shot plaintiff, Defendants.

No. 11 Civ. 3704(PKC)(GRB).
|
Signed March 24, 2015.

**Attorneys and Law Firms**

Michael Caliguiri, Ralph G. Bell, Bauman & Kunkis, New York, NY, for Plaintiff.

Arlene S. Zwilling, Hauppauge, NY, for Defendants.

### *MEMORANDUM AND ORDER*

PAMELA K. CHEN, District Judge.

**\*1**  Plaintiff Michael Moran ("Plaintiff") initiated this proceeding against defendants County of Suffolk (the "County") and a John Doe police officer under 42 U.S.C. § 1983 alleging that the use of unreasonable deadly force against him violated his rights under, *inter alia,* the Fourth Amendment of the United States Constitution. (Dkt. 1 ("Complaint" or "Compl.").) Plaintiff also asserts claims under state law and common law, including claims for assault and battery and negligence. Presently before the Court is the County's motion for summary judgment. For the reasons set forth below, the County's motion is granted and the case is dismissed.

### *BACKGROUND*

#### I. *Factual Background*

Unless otherwise stated, the following facts are taken from Plaintiff's Rule 56.1 Statement (Dkt. 23 ("Pl.St.")), and all reasonable inferences are drawn in Plaintiff's favor as the non-moving party. [1] *See Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

On August 4, 2010, at around 4:00 p.m., Plaintiff was waiting for his girlfriend outside a Dunkin Donuts located in West Babylon, New York. (Pl.St.¶ 3.) Plaintiff was sitting on a bench and had with him a black fabric backpack containing his laundry. (*Id.* ¶ 5.) Plaintiff observed two police cars enter the Dunkin Donuts parking lot. (*Id.*¶ 4.) After a few moments, Plaintiff picked up his backpack and walked to the entrance of the Dunkin Donuts. (*Id.* ¶ 5.) From outside, Plaintiff saw his girlfriend in handcuffs and struggling with police officers. (*Id.* ¶ 6; Dkt. 21 (Declaration of Ralph G. Bell, dated Mar. 17, 2014 ("Bell Decl.")) Ex. A at 150–51, 154.)

Suffolk County Police Officers Robert Bodenmiller ("Bodenmiller"), Jennifer Price ("Price"), and Charles Erdmann ("Erdmann") had gone to the Dunkin Donuts in response to a call about an emotionally disturbed woman in the vicinity. (Pl. St. ¶¶ 8, 11, 24; *see, e.g.,* Bell Decl. Ex. B at 15–18.) Officers Bodenmiller and Price identified Plaintiff's girlfriend as someone who matched the description they were provided, and were in the process of detaining and questioning her. (Bell Decl. Ex. B at 24–38.) At the time, Bodenmiller and Price each had a baton, mace, a taser, and a Glock semiautomatic handgun. (Pl.St.¶ 23.)

Plaintiff ran inside and stopped just inside the entrance and dropped his backpack to the ground next to his left foot. (*Id.* ¶¶ 7, 35–36; Bell Decl. Ex. A at 158–60.) [2] Plaintiff testified that Price, who was closest to him, approached him and instructed him to "calm down." (Pl. St. ¶ 38; Bell Decl. Ex. A at 161.) Bodenmiller "observed a dark colored object" in Plaintiff's right hand. (Pl.St.¶ 8.) Bodenmiller did not see Plaintiff point the object. (*Id.*¶ 9.) Nor did Plaintiff raise his hands toward the officers or verbally threaten them. (*Id.* ¶¶ 10, 12–14.) Bodenmiller saw Price turn towards Plaintiff, but did not hear her say anything or see her raise her hands. (*Id.* ¶ 15.) Bodenmiller further stated that Plaintiff did not lunge or jump at Price. Price never requested Bodenmiller's assistance or indicate to him that she felt threatened. (*Id.* ¶¶ 17–18.)

**\*2**  Without saying anything to Plaintiff, Bodenmiller fired two shots, aiming for Plaintiff's "center mass." (*Id.* ¶¶ 19–20, 41.) Bodenmiller testified that he had been trained to fire twice at the center mass of a subject when in close proximity, and, "[i]f the threat does not stop" to take a third shot to the head. (Bell Decl. Ex. B at 57–58.) Plaintiff was struck with

two bullets, one in the right index finger and one at the "rib line." (Pl.St.¶ 21.) Plaintiff heard "three pops" and felt pain in his stomach before falling to his knees and landing on his right side. (*Id.* ¶ 42.) No weapon or black object was ever found or recovered on or near Plaintiff's person following the shooting. (*Id.* ¶ 22.) Neither Price nor the third officer, Erdmann, drew their weapons during the incident. (*Id.* ¶¶ 17, 25.)

Two months after the shooting, Price issued Plaintiff a ticket for "obstructing governmental administration" at the instruction of one of her supervisors. (*Id.* ¶ 26.)

About a year after the shooting, on September 27, 2011, the Suffolk County Police Department issued a Department Directive regarding the "Use of Force–Use of Firearms and Deadly Physical Force" (hereinafter "Use of Force Directive" or "Directive"). (Bell Decl. Ex. H at 24–1.) The purpose of the Directive was to "establish[ ] the limits within which the use of deadly force, particularly the use of firearms, by members of the Suffolk County Police Department is permitted, and outlines certain situations in which the use of firearms, or other means of deadly force, is not permitted." (Pl. St. ¶¶ 28, 29; Bell Decl. Ex. H at 24–1.) Under the "Rules and Regulations" section of the Directive, "[a]n officer may discharge a firearm *only* in" specified situations, including "Confrontational Situations" defined as "[w]hen reasonable and necessary to defend an officer or another from what the officer reasonably believes to be the use, or imminent use, of deadly force." (Pl. St. ¶ 30; Bell Decl. Ex. H at 24–2 (emphasis in original).) The Use of Force Directive further provides that "[s]ince all possible combinations of circumstances cannot be envisioned ... a police officer may use deadly force as an emergency measure to avoid the imminent unlawful use of deadly force which is about to occur by reason of a situation occasioned or developed through no fault of the officer; and, which is of such gravity that, according to ordinary standards of intelligence and morality, the desirability of avoiding such injury clearly outweighs the desirability of avoiding the conduct sought to be prevented by [the Directive's] Rules and Procedures." (Bell Decl. Ex. H at 24–4.)

Plaintiff alleges that Bodenmiller is the subject of another excessive force suit claiming that Bodenmiller wrongfully "utilized a shield to restrain" a prisoner, who subsequently died in police custody on May 6, 2011. (Bell Decl. Ex. B at 10–11; Pl. St. ¶ 27.)

**II. *Procedural History***

**\*3** Plaintiff commenced this action on August 1, 2011, naming as defendants the County and a John Doe as "the person intended to be the police officer who shot plaintiff." (Compl. at 1.) The County answered on August 16, 2011. (Dkt.3.) On September 6, 2011, Plaintiff submitted a letter to Magistrate Judge William. D. Wall requesting discovery regarding the identity of the police officer "in order that said individual may be correctly named and served in the lawsuit." (Dkt.4.) Following a pretrial conference, Judge Wall issued an order dated October 6, 2011 requiring that "[m]otions to join new parties or amend the pleadings" be filed by March 22, 2012 and that discovery be completed by June 14, 2012. (Dkt. 7–1 at 1.) On or around November 8, 2011, Plaintiff served a summons for John Doe "n/k/a Robert Bodenmiller" [3] via substitute service at the Suffolk County Police Department. (Dkt 8 at 2 (Proof of Service for John Doe).) Plaintiff did not, however, amend the Complaint to name Bodenmiller. Indeed, to this day, Plaintiff has not sought to amend the Complaint to name Bodenmiller as a defendant.

Thereafter, on June 20, 2012, Defendants furnished Plaintiffs with the Police Department's Internal Affairs file regarding the shooting, which indicated that Bodenmiller was the officer who shot Plaintiff. (*See* Dkt. 11; Bell Decl. Ex. H.) Plaintiff then deposed Bodenmiller on July 10, 2013. (Bell Decl. Ex. B.) On October 15, 2013, discovery concluded and the parties filed a joint proposed pretrial order that still indicated a "John Doe" on the caption. (Dkt. 16 at 1). At a conference held on October 22, 2013, the Court granted the County leave to file its summary judgment motion.

### *LEGAL STANDARD*

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Redd v. N.Y. Div. of Parole,* 678 F.3d 166, 173 (2d Cir.2012). A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* Because Plaintiff, as the non-moving party, has the "burden of proof at trial" on his claim, the County's ability to satisfy this standard as to any "essential element" of a claim "necessarily renders all other facts immaterial," *Celotex Corp. v. Catrett,* 477 U.S. 317,

322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), and entitles the County to summary judgment.

In determining whether there are genuine disputes of material fact, the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Terry,* 336 F.3d at 137 (citation and quotation omitted). The nonmoving party cannot avoid summary judgment simply by relying "on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir.2005) (quotations and citations omitted). That party must offer "some hard evidence showing that its version of the events is not wholly fanciful." *Miner v. Clinton Cnty., New York,* 541 F.3d 464, 471 (2d Cir.2008) (quotations and citation omitted).

### DISCUSSION

**I. *Plaintiff's Claims against the John Doe Police Officer***

**\*4** The Court initially addresses the parties' dispute regarding which defendants are involved in this action. Plaintiff alleges that the John Doe police officer named in the Complaint, now known to be Bodenmiller, used excessive force in violation of Plaintiff's constitutional rights. (Compl.¶¶ 8, 14.) In response to the County's summary judgment motion, Plaintiff asserts that the case must proceed against the John Doe officer because no summary judgment motion was filed on behalf of the John Doe officer, "now known to be Bodenmiller." (Dkt. 22 ("Pl.Mem.") at 11). The County disputes Plaintiff's contention on the basis that Bodenmiller has not been and cannot now be made a party to this case. (Dkt. 24–8 ("Reply") at 3.) The Court agrees.

Although Bodenmiller indisputably is the officer who shot Plaintiff, Plaintiff did not amend the Complaint to substitute Bodenmiller as the John Doe Defendant prior to the expiration of the applicable statute of limitations, nor, for that matter, has he done so at any point in this litigation. Plaintiff's failure to timely amend the Complaint is fatal to his claims against the John Doe Defendant.

Section 1983 claims arising in New York have a statute of limitations of three years. *Patterson v. Cnty. of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004). Here, Plaintiff's claim accrued on August 4, 2010, and the limitations period expired on August 4, 2013. Plaintiff filed his Complaint on August 1, 2011, naming as defendants the County and "John Doe, the person intended to be the police officer who

shot plaintiff." (Compl. at 1.) Plaintiff's claim against the County is timely. As to the individual officer Defendant, the general rule is that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued." *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir.2013) (quoting *Aslanidis v. United States Lines, Inc.,* 7 F.3d 1067, 1075 (2d Cir.1993)). Substitutions of a party's name for John Doe, therefore, "may only be accomplished" if the amended pleading relates back to the date of the complaint under Federal Rule of Civil Procedure 15(c). *Aslanidis,* 7 F.3d at 1075. Since Plaintiff did not amend his Complaint to substitute Bodenmiller for the John Doe Defendant, Plaintiff's claims against Bodenmiller are timely only if he is permitted to file an amendment that "relates back" to the Complaint, filed on August 1, 2011. *See Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 541, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010) ("Rule 15(c) of the Federal Rules of Civil Procedure governs when an amended pleading 'relates back' to the date of a timely filed original pleading and is thus itself timely even though it was filed outside an applicable statute of limitations."); *Laureano v. Goord,* No. 06 Civ. 7845(SHS) (RLE), 2007 WL 2826649, at \*5 (S.D.N.Y. Aug. 31, 2007) ("When the statute of limitations would otherwise bar an amendment, Rule 15(c) allows the claim if it 'relates back' to the original complaint." (citing Fed.R.Civ.P. 15(c)(3)).

**\*5** Plaintiff's counsel has not attempted to substitute Bodenmiller either by moving to amend the Complaint, or by addressing the amendment issue in his opposition to the County's motion for summary judgment. Though it appears that Plaintiff would prefer the Court ignore the amendment issue, the Court considers *sua sponte* whether Plaintiff should be granted leave to file an amended complaint. The Court finds that he should not.

**A. Relation Back Under Rule 15(c)(1)(C)**

Rule 15(a) instructs courts that "leave to amend [a complaint] 'shall be freely given when justice so requires.' " *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citation omitted). Nevertheless, a motion to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies ..., or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery,* Inc., 551 F.3d 122, 126 (2d Cir.2006); *see Monahan v. N.Y.C. Dep't of Corr.* 214 F.3d 275, 283 (2d Cir.2000) (Leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or

futility."). An amendment is futile if the claim to be added would be barred by the applicable statute of limitations. *Grace v. Rosenstock,* 228 F.3d 40, 53 (2d Cir.2000).

"Rule 15(c) (1)(C) provides the federal standards for relation back." *Hogan,* 738 F.3d at 517. Under Rule 15(c)(1)(C), an amendment to change the party against whom a claim is asserted will relate back only if all of the following specifications are met:

> (1) the claim must have arisen out of conduct set out in the original pleading; (2) the party to be brought in must have received such notice that it will not be prejudiced in maintaining its defense; (3) that party should have known that, *but for a mistake of identity,* the original action would have been brought against it; and ... [4] the second and third criteria are fulfilled within 120 days of the filing of the original complaint, and ... the original complaint [was] filed within the limitations period.

*Hogan,* 738 F.3d at 517 (quoting *Barrow v. Wethersfield Police Dep't.,* 66 F.3d 466, 468–69 (2d Cir.1995) (emphasis in Hogan); see Fed.R.Civ.P. 15(c)(1)(C)(i)-(ii).

With respect to what constitutes "mistaken identity" for purposes of permitting relation back under Rule 15(c), the Second Circuit in *Barrow* held that:

> Rule 15(c) does not allow an amended complaint adding new defendants to relate back if the newly added defendants *were not named originally because the plaintiff did not know their identities* . Rule 15(c) explicitly allows the relation back of an amendment due to a 'mistake' concerning he identity of the parties (under certain circumstances), but not the failure to identify individual defendants when the plaintiff knows that such

defendants must be named cannot be characterized as a mistake.

**\*6** 66 F.3d at 470 (emphasis added). [4]

In other words, where a plaintiff is mistaken about the identity of the *proper party* to be sued, an amendment to name that party may relate back under Rule 15(c). *Id.* at 469. [5] However, where the plaintiff knows who the proper party is, just not by name, there is no mistake about identity that will permit relation back under Rule 15(c). *See Hogan,* 738 F.3d at 518 ("This Court's interpretation of Rule 15(c)(1)(C) makes clear that the lack of knowledge of a John Doe defendant's name does not constitute a 'mistaken identity.' ") In that situation, any amendment to add the proper party's name, once determined, must be made within the statute of limitations. *See id.* at 517 (reiterating that " 'John Doe' pleadings cannot be used to circumvent statutes of limitations because replacing a 'John Doe' with a named party in effect constitutes a change in the party sued").

Here, Plaintiff was not mistaken about the identity of the proper John Doe officer to sue; rather, he simply did not did know the officer's name when he filed suit. In initiating this action, Plaintiff intended to sue the "police officer who shot plaintiff" on August 4, 2010. (Compl. at 1.) Plaintiff identified that officer as "John Doe" in the Complaint because he did not know Bodenmiller's name at the time, not because of any mistake regarding Bodenmiller's role in, or liability for, the shooting. Though Plaintiff was unaware of Bodenmiller's identity, he was not mistaken about the need to name Bodenmiller as a defendant. (*See* Dkt. 4 (Plaintiff's letter requesting discovery from the County regarding the John Doe's officer's identity, and indicating that the officer had to be "correctly named ... in the lawsuit")); *Barrow,* 66 F.3d at 470 (Rule 15(c) does not permit relation back where the "plaintiff knows that [the] defendant[ ] must be named"). Thus, Plaintiff's failure to name Bodenmiller in this suit does not constitute a mistake under Rule 15(c)(1)(C)(ii). *See Bender v. City of New York,* No. 14 Civ. 4386(LTS)(GWG), 2015 WL 524283, at \*3–4 (S.D.N.Y. Feb. 10, 2015) (under *Barrow,* "[plaintiff] cannot satisfy Rule 15(c)(1)(C)(ii), as the John Doe defendants were unnamed because [plaintiff] did not know their names at the time she filed the complaint; rather, she first learned this information only when the named defendants made their initial disclosures"); *Ceara v. Deacon,* No. 13 Civ. 6023(KMK), 2014 WL 6674559, at \*4 (S.D.N.Y. Nov.25, 2014) (plaintiff's reason for not serving officer within

the three year period—that he did not know the identity of the defendant-was insufficient to satisfy the mistake element of Rule 15(c)(1)(C)); *Vasconcellos v. City of New York,* No. 12 Civ. 8445(CM), 2014 WL 4961441, at *5–6 (S.D.N.Y. Oct.2, 2014) ("[u]nder a straightforward application of *Barrow,*" plaintiff's failure "to identify the Officer Defendants by name in her original suit because she did not know their identities" "cannot be characterized as a mistake" for purposes of Rule 15(c)); *Strada v. City of New York,* No. 11 Civ. 5735(MKB), 2014 WL 3490306, at *9 (E.D.N.Y. July 11, 2014) (*"Barrow* precludes this Court from finding that [p]laintiff's failure to amend the Complaint to name the individual officers was a mistake contemplated by Rule 15(c)."); *Ulloa v. City of New York,* No. 13 Civ. 5795(AKH), 2014 WL 1100226, at *2 (S.D.N.Y.Jan.6, 2014) ("a plaintiff's lack of knowledge as to the identity of John Doe defendants cannot be considered a 'mistake" (citation omitted)). Accordingly, Rule 15(c)(1)(C) does not provide a basis to allow Plaintiff to amend the Complaint to name Bodenmiller and relate the claims against him back to the date of the original Complaint.

**B. Relation Back Under Rule(c)(1)(A)**

**\*7** In addition to relation back under Rule 15(c), the Courts must examine the "controlling body of limitations law," and apply state law if it provides "a more forgiving principle of relation back than the one provided" by Rule 15(c). *Hogan,* 738 F.3d at 518 (quoting Fed.R.Civ.P. 15, Advisory Comm. Notes 1991); *see* Fed.R.Civ.P. 15(c)(1) (an amended pleading also relates back to an earlier pleading if "the law that provides the applicable statute of limitations allows relation back"). The Court will thus examine whether a claim against Bodenmiller would be timely under the relevant provisions of the New York Civil Practice Law and Rules ("CPLR").

1. *Section 203 of the CPLR*

A party may seek relation back for a previously unknown defendant under CPLR § 203(c), New York's general relation back statute. *Strada,* 2014 WL 3490306, at *6 (citing *Bumpus v. New York City Transit Auth.,* 66 A.D.3d 26, 883 N.Y.S.2d 99, 106 (App.Div.2009)). Under § 203, courts allow claims against a new defendant to "relate back to timely filed pleadings when (1) the new claim arose out of the same conduct, transaction or occurrence as the original allegations; (2) the new party is united in interest with the original defendant, and by reason of that relationship can be charged with such notice of the institution of the action that he will not be prejudiced in maintaining his defense on the merits; and (3) the new party knew or should have known that, but

for a mistake as to the identity of the proper parties, the action would have been brought against him as well." *JCG v. Ercole,* No. 11 Civ. 6844(CM)(JLC), 2014 WL 1630815, at *15 (S.D.N.Y. Apr. 24, 2014) (quoting *Fisher v. Cnty. of Nassau,* No. 10 Civ. 0677(JS)(ETB), 2011 WL 4899920, at *5 (E.D .N.Y. Oct. 13, 2011)), *report and recommendation adopted,* 2014 WL 2769120 (S.D.N.Y. June 18, 2014).

Here, Plaintiff cannot avail himself of § 203 for the same reasons that Rule 15(c) does not apply. Plaintiff cannot establish the third prong of the test under § 203, which, like Rule 15(c), requires a mistake as to the identity of the proper party to be sued. As discussed above in the Rule 15(c) context, the failure to name a defendant whom the plaintiff knows must be named does not constitute a "mistake." "The third prong of § 203(c) 'employs the same standard as the federal rule.' " *Bender,* 2015 WL 524283, at *6 (quoting *Sloane v. Town of Greenburgh,* No. 01 Civ. 11551(MBM), 2005 WL 1837441, at *3 (S.D.N.Y. July 27, 2005)). Since Plaintiff cannot satisfy Rule 15(c)'s mistake element, he also cannot satisfy the third prong of § 203(c). Any claim against Bodenmiller therefore would not relate back to the date of the Complaint under CPLR § 203. *See, e.g., Strada,* 2014 WL 3490306, at *9.

2. *Section 1024 of the CPLR*

CPLR § 1024 allows "[a] party who is ignorant, ... of the name or identity of a person who may properly be made a party[ ][to] proceed against such person as an unknown party by designating so much of his name and identity as is known. If the name or remainder of the name becomes known[,] all subsequent proceedings shall be taken under the true name and all prior proceedings shall be deemed amended accordingly." Under CPLR § 306–b, once a John Doe complaint is filed, a plaintiff must serve it on the correct defendant within 120 days after the commencement of the action.

**\*8** The Second Circuit recently held that CPLR § 1024 is more forgiving in relating back complaints compared to the federal standard under Rule 15(c). *See Hogan,* 738 F.3d at 518; *accord Ceara,* 2014 WL 6674559, at *5; *Strada,* 2014 WL 3490306, at *5. To invoke § 1024, a plaintiff must show that: (1) the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name;" and (2) the plaintiff "describe[d] the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan,* 738 F.3d at 519 (alteration, citations and internal quotation marks omitted). "Due diligence in this context requires that a plaintiff 'show

that he or she made timely efforts to identify the correct party before the statute of limitations expired .' " *Strada,* 2014 WL 3490306, at *5 (quoting *Justin v. Orshan,* 14 A.D.3d 492, 788 N.Y.S.2d 407, 408 (N.Y.App.Div.2005)).

Plaintiff's inexplicable failure to amend the complaint—despite learning Bodenmiller's identity shortly after filing the Complaint—cannot satisfy the due diligence requirement of § 1024. Early in this litigation, Plaintiff sought discovery of the identity of the John Doe police officer so "that said individual may be correctly named and served[.]" (Dkt.4.) Plaintiff then served a summons for John Doe, "n/k/a Robert Bodenmiller[,]" at the Suffolk County Police Department on or about November 8, 2011 (*see* Dkt. 8 at 2)—several months before the March 22, 2012 court-imposed deadline for joining new parties or amending the Complaint, and almost two years before the expiration of the statute of limitations on August 4, 2013. Yet Plaintiff did not seek to amend the Complaint in the time between November 8, 2011 and August 4, 2013. Plaintiff still did not act to amend the Complaint after the County furnished an Internal Affairs report on June 20, 2012 that named Bodenmiller as the officer who shot Plaintiff. Nor did Plaintiff seek to amend the Complaint after conducting a deposition of Bodenmiller on July 10, 2013. Even after the County raised this issue in its summary judgment motion papers, Plaintiff did not seek to amend. Moreover, Plaintiff offers no explanation for his failure to amend the Complaint or seek an extension of the time in which to do so. Because Plaintiff learned the true identity of the John Doe Defendant prior to the expiration of the statute of limitations, he cannot invoke § 1024 to now add Bodenmiller as a defendant to this action. *See Strada,* 2014 WL 3490306, at *6 (plaintiff did not exercise due diligence where, *inter alia,* defendant provided plaintiff with the names of the officers involved prior to the expiration of the statute of limitations, and plaintiff did not attempt to amend the Complaint). *Cf. Ceara,* 2014 WL 6674559, at *5 (plaintiff acted with due diligence because plaintiff made efforts to ascertain defendant's full identity, apprised the court of his efforts, and promptly filed an amended complaint within thirty days of learning defendant's name).

**\*9** Accordingly, an amendment to substitute Bodenmiller for the John Doe Defendant would not relate back to the filing date of Plaintiff's Complaint under federal or state law. Given that the statute of limitations has run, amending the Complaint to add Bodenmiller would be futile. Regrettably, Plaintiff has buried his head in the sand, to his peril, with respect to this fatal flaw in his Complaint. The Court is thus constrained from granting Plaintiff leave to file an amended complaint, and Plaintiff's claim against the John Doe Defendant must be dismissed.

## II. *Plaintiff's Claims Against the County*

### A. Section 1983 Claim

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must show the deprivation of any rights, privileges, or immunities secured by the Constitution and laws by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993). In this action, Plaintiff's claims arise under the Fourth Amendment's prohibition against unreasonable seizures. [6]

Because municipalities may not be held vicariously liable for the actions of their employees, a § 1983 claim against a municipality must be premised on the theory that the municipality maintained a policy, practice, or custom that caused the plaintiff's constitutional injury. *Monell v. Dep't of Social Servs. of City of N.Y.,* 436 U.S. 658, 694–95, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983."). Courts in this Circuit apply a two-prong test to § 1983 claims brought against a municipality. *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985). A "plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer." *Id.* (citation omitted). Next, a plaintiff must establish a " 'direct causal link between [the] municipal policy or custom and the alleged constitutional deprivation.' " *Hayes v. Cnty. of Sullivan,* 853 F.Supp.2d 400, 439 (S.D.N.Y.2012) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412(1989)); *accord Abreu v. City of New York,* 657 F.Supp.2d 357, 360 (E.D.N.Y.2009) (quoting *Canton,* 489 U.S. at 385).

A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or

(4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. *See Parker v. City of Long Beach,* 563 F. App'x 39 (2d Cir.2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.,* 757 F.3d 31, 62 (2d Cir.2014) (widespread and persistent practice); *Hines v. Albany Police Dep't,* 520 F. App'x 5, 7 (2d Cir.2013) (actions of policymakers); *Schnitter v. City of Rochester,* 556 F. App'x 5, 8 (2d Cir.2014) (failure to train or supervise); *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545 (2d Cir.2009) (formal policy and act of a person with policymaking authority for the municipality).

**\*10** Plaintiff alleges, in sum and substance, that the County was deliberately indifferent to his rights due to its failure to properly train or supervise its officers, including Bodenmiller. (Compl.¶¶ 10–11.) Plaintiff points to two alleged policies in support of his claims: (1) the Use of Force Directive, which Plaintiff contends is "so vaguely worded" that it provides no meaningful guidance on when officers may exercise deadly force, and (2) Bodenmiller's deposition statement that he was trained to fire two shots aimed at a subject's center mass. (Pl. Mem. at 12–13.) Plaintiff asserts that the combination of these two policies created "a situation where Bodenmiller was shooting to kill" with only a vague directive on when he should use deadly force, thereby causing a deprivation of Plaintiff's constitutional rights. (*Id.* at 13–14.)

Deliberate indifference with respect to the failure to train or supervise municipal employees exists where the plaintiff establishes that (1) "a policymaker knows 'to a moral certainty' that [municipal] employees will confront a particular situation"; (2) "the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult,' or 'there is a history of employees mishandling the situation' "; and (3) " 'the wrong choice by the [municipal] employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Wray v. City of New York,* 490 F.3d 189, 195–96 (2d Cir.2007) (quoting *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992)). The plaintiff must show the "policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Cash v. Cnty. of Erie,* 654 F.3d 324, 334 (2d Cir.2011) (quoting *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 128 (2d Cir.2004)); *see Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 396 (S.D.N.Y.2009) ("To sustain a *Monell* claim based on a failure to supervise or discipline, the plaintiff must demonstrate that the decision-maker was on notice of a potentially serious problem of unconstitutional

conduct, that the need for corrective action was obvious, and that the decision-maker failed to investigate or take action in circumstances suggesting deliberate indifference to the rights of those being harmed.")

"A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson,* —— U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626, (1997)). Without actual or constructive "notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* Nevertheless, "in a narrow range of circumstances," a municipality can be found to be deliberately indifferent based on a single incident where "the unconstitutional consequences of failing to train [are] so patently obvious that a city should be liable under § 1983 without proof of a pre-existing pattern of violations." *Connick,* 131 S.Ct. at 1360–61; *see Canton,* 489 U.S. at 390 n. 10. The violation of constitutional rights must be a "highly predictable consequence" of the failure to train or supervise. *Connick,* 131 S.Ct. at 1361 (internal quotation marks omitted).

**\*11** Even construing the evidence in the record most favorably to Plaintiff, no rational jury could conclude that the standard for municipal liability, under a failure to train theory or any other theory, has been met. Plaintiff fails to proffer evidence sufficient to permit a trier of fact to find that the County has acted with deliberate indifference in designing its training program or that the deficiencies he cites led to the violation of his rights by Bodenmiller. Most significantly, Plaintiff points to no evidence of similar violations by purportedly untrained officers that may have notified the County of any deficiencies with the County's training of its officers with respect to the use of deadly force and civilian encounters. The record is devoid of evidence that before the events of August 4, 2010, the County knew of a pattern or even one incident involving use of excessive force or improper deadly force by Suffolk County police officers. *See Connick,* 131 S.Ct. at 1360 ("pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference" on a failure to train theory). Although Bodenmiller testified that he is a named defendant in another suit involving allegation of excessive force, there is no indication that that

event occurred before August 4, 2010. (Bell Decl. Ex. B at 10–11.) Plaintiff's submissions suggest that, to the contrary, the incident occurred afterwards on May 6, 2011. (Pl.St.¶ 27.) Nor is there any evidence indicating that the other alleged incident involved a use of force comparable or similar to the August 4, 2010 shooting. Thus, nothing suggests that the County condoned or ignored repeated constitutional violations.

To the extent Plaintiff relies on a single-incident theory of liability (*see* Pl. Mem. at 13), that claim also fails because Plaintiffs cannot show that the use of force training provided by the County to its police officers is tantamount to a lack of training. To make this showing, Plaintiffs must prove that the County's police officers have an "utter lack of an ability to cope with constitutional situations," *Connick,* 131 S.Ct. at 1363, and that "the need for more or different training is so obvious and the inadequacy so likely to result in the violation of constitutional rights," *Canton,* 489 U.S. at 390. *Accord Breitkopf v. Gentile,* No. 12 Civ.1084 (JFB)(AKT), 2014 WL 4258994, at *23 (E.D.N.Y. Aug. 29, 2014). Here, it is uncontroverted that the County provided some use of force training to Bodenmiller and his fellow officers. (*See, e.g.,* Pl. St. ¶ 19; Bell Decl. Ex. B at 57–58.) Bodenmiller testified that he was trained at the police academy, and annual training thereafter at the precinct, on the use of deadly physical force. (Bell Decl. Ex. B at 88–89.) Bodenmiller also testified to his understanding that he was "allowed to use deadly force when [he] reasonably believe[d] that deadly force is being used against [him] or a third person." (*Id* . at 89.) Where, as here, a plaintiff challenges the adequacy of training rather than the failure to train at all, courts repeatedly have held that a plaintiff cannot rely on the single-incident theory of municipal liability. *See, e.g., O'Brien v. Barrows,* 556 Fed. App'x. 2, 5 (2d Cir.2014) ("failing to provide an armed police officer with *any* training about the constitutional limitations on the use of deadly force could constitute deliberate indifference" (emphasis in original)); *Breitkopf,* 2014 WL 4258994, at *23 ("Since *Connick,* some courts have concluded that a plaintiff cannot rely on the single-incident theory where she challenges the adequacy and not the lack of the existence of training."); *Chamberlain v. City of White Plains,* 986 F.Supp.2d 363, 391–93 (S.D.N.Y.2013) (collecting cases denying summary judgment based on lack of any training, and dismissing claims challenging adequacy of training).

**\*12** Plaintiff's contention that the Use of Force Directive evidences the County's deliberate indifference by failing to

provide sufficiently specific guidance on the use of deadly force also fails for the reasons already stated. *See Yang Feng Zhao,* 656 F.Supp.2d at 394 (no triable issue of fact based on assertion that training was deficient in not providing guidance about when to believe a suspect's denial of guilt and when to avoid questioning). Furthermore, the Directive was issued in September 2011—over a year after Plaintiff was shot in August 2010—a fact seemingly overlooked by both parties. (Bell Decl. Ex. H at 24–1; *see* Reply at 4–7). It is difficult to see how any purported deficiency in the as-yet-unadopted Directive caused Bodenmiller to improperly implement deadly force against Plaintiff.

Lastly, even assuming *arguendo* that some iteration of the Use of Force Directive was in effect at the time of the shooting, such a policy, coupled with the training that Bodenmiller received about shooting twice at a subject's center mass, is still insufficient to establish the County's deliberate indifference. As previously discussed, Plaintiff has not presented any evidence tending to show that the improper use of force was a common problem in the County's police force. Nor has Plaintiff offered any evidence about deficiencies in the County's Use of Force Directive or training and how any additional or other training might have altered Bodenmiller's actions. Thus, Plaintiff cannot show that the shooting was caused by a County policy, as opposed to Bodenmiller's failure to follow the training he received. *See Amnesty Am.,* 361 F.3d at 129–30 ("The elements of an identified training deficiency and a close causal relationship, which together require the plaintiffs to prove that the deprivation occurred as the result of a municipal policy rather than as a result of isolated misconduct by a single actor, ensure that a failure to train theory does not collapse into *respondeat superior* liability."). [7] Accordingly, the County is entitled to summary judgment on Plaintiff's § 1983 claim.

### B. Plaintiff's State Law Claims

Plaintiff asserts various state law claims against the County and John Doe Defendant that appear to allege excessive force, assault and battery, and negligent hiring, training, and supervision of police officers. (Compl.¶¶ 17–31.) To the extent these claims allege negligent training or supervision by the County based on the same facts upon which the Plaintiff's Section 1983 claim against the County is based, the Court dismisses them, with prejudice, for the same reasons discussed above. *See Henry–Lee v. City of New York,* 746 F.Supp.2d 546, 566 (S.D.N.Y.2010) ("To prevail on a [state law] claim for negligent hiring, training, supervision, or

retention, a plaintiff must prove that a municipality's failure to properly train, hire, retain, or supervise 'its police officers in a relevant respect evidences a *deliberate indifference* to the rights of its inhabitants.' " (quoting *Jackson v. City of New York,* 192 A.D.2d 641, 596 N.Y.S.2d 457, 458 (1993)) (emphasis added)). As for the remaining state law claims against both Defendants, the Court declines to exercise supplemental jurisdiction over them under 28 U.S.C. § 1367, and dismisses them without prejudice.

### CONCLUSION

**\*13** The Court accordingly grants the County's motion for summary judgment in its entirety, and dismisses Plaintiff's Complaint. All of Plaintiff's claims, except his state law claims that do not allege negligent training and supervision by the County and his state law claims against the John Doe Defendant, are dismissed with prejudice. The Clerk of Court is respectfully requested to close this case.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1321685

---

### Footnotes

1      The Court declines Plaintiff's invitation to deny the County's motion based on the County's failure to comply with Local Rule 56.1. (*See* Pl. Mem. at 10.) Although the County's 56.1 Statement does not set forth undisputed material facts supported by citations to competent evidence (*see* Dkt. 24–1), as required by the Rule, the Court exercises its "broad discretion to ... to overlook a party's failure to comply with local court rules[,]" and conducts its own review of the record. *See Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001). Accordingly, where relevant, the Court cites to supporting evidence in the record.

2      Plaintiff's account differs from the officers' in this regard; Price and Erdmann testified that Moran approached the officers "aggressively" or in a "slow run." (*See* Bell Decl. Exs. C. at 72 & D at 44, 58.) Bodemiller testified that Moran "was charging towards Officer Price." (*Id.* Ex. B at 44.) Plaintiff also denies having any object in his right hand. (Pl.St.¶ 39).

3      The acronym "n/k/a" refers to the phrase "now known as."

4      While there has been some debate over the continuing vitality of *Barrow* after the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010), the Court finds that *Barrow* remains good law, and that, unlike *Krupski, Barrow* is directly relevant to the facts presented here. *See, e.g., Morales v. Cnty. of Suffolk,* 952 F.Supp.2d 433, 437 (E.D.N.Y.2013) (finding that *Krupski* did not address the key issue in *Barrow, i.e.,* "whether a plaintiff's lack of knowledge as to the identity of 'John Doe' Defendants can be considered a 'mistake' or 'error' " and citing decisions concluding that "*Barrow* remains good law after *Krupski."* ).

5      In *Barrow,* the Second Circuit cited the example of this type of mistake contained in the Advisory Committee Notes for Rule 15(c): "when a defendant mistakenly sues an agency of the government without knowing that the cause of action requires the defendant to sue an agency head." 66 F.3d at 469.

6      Although Plaintiff also asserts claims under the due process clause and the Eighth Amendment, "[a]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *see Taylor v. Nassau Cnty.,* 11 Civ. 0934(SJF), 2012 WL 5472554, at \*1 n. 2 (E.D.N.Y. Nov. 5, 2012) (addressing excessive force claim brought under Fourth and

Fourteenth Amendment under Fourth Amendment only). The Eighth Amendment, which applies to claims of excessive force brought by convicted prisoners, is also unavailable to Plaintiff. *See Graham,* 490 U.S. at 394; *Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986).

7      Indeed, as discussed, Bodenmiller testified that he received use of force training when he first became a County police officer and annually thereafter and that his understanding of the County's use of force policy was that he was "allowed to use deadly force when [he] reasonably believe [d] that deadly force is being used against [him] or a third person." (Bell Decl. Ex. B at 89.)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 202 of 260

Myers v. Wollowitz, Not Reported in F.Supp. (1995)

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,
v.
Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*

**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action

stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, *3, 1994 U.S.Dist. LEXIS 17698, *8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914, *1, 1992 U.S.Dist. LEXIS 18864, *2–3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 203 of 260

**Myers v. Wollowitz, Not Reported in F.Supp. (1995)**

his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 204 of 260

Rech v. Siragusa, Not Reported in Fed. Supp. (2023)

2023 WL 2559409
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Michael RECH, Plaintiff,
v.
Charles J. SIRAGUSA, et al., Defendants.

6:23-CV-6039 EAW
|
Signed March 3, 2023

**Attorneys and Law Firms**

Michael Rech, Youngstown, OH, Pro Se.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, Chief Judge

## INTRODUCTIONS

**\*1** *Pro se* plaintiff Michael Rech ("Plaintiff") is incarcerated at the Northeast Ohio Correctional Center and he has filed this action seeking relief pursuant to 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). (Dkt. 1). He asserts several claims stemming from two searches and seizures in his underlying criminal case, *United States of America v. Rech*, Case No. 6:21-CR-6080-CJS-MWP (the "criminal case"), which is currently pending sentencing after conviction at trial in this District. Plaintiff seeks various forms of relief, including the return of all seized items and funds, vacatur of his conviction and any orders issued by United States District Judge Charles Siragusa and United States Magistrate Judge Marian Payson in the criminal case, Judge Siragusa's recusal in the criminal case, and immediate release. (Dkt. 1 at 14).

Plaintiff has filed a motion for leave to proceed *in forma pauperis*, in which he also requests the appointment of counsel. (Dkt. 2). Plaintiff has also filed a request for disqualification of the undersigned and that the matter be assigned to a judge from outside this District. (Dkt. 5). For the reasons discussed below, Plaintiff is granted leave to proceed *in forma pauperis*, Plaintiff's request that the undersigned recuse herself and that the matter be assigned to a judge from outside this District is denied, the complaint is dismissed

without leave to replead, and the request for the appointment of counsel is denied.

## DISCUSSION

### I. Request for Disqualification

Plaintiff requests that this case "not be assigned to any judge in the W.D.N.Y. District Court," asserting that assignment to a judge from outside this District is "imperative to protect [Plaintiff's] rights and to assure due process and impartial hearings/trial." (Dkt. 5 at 1).

Pursuant to 28 U.S.C. § 455(a), a judge must disqualify herself "in any proceeding in which [her] impartiality might reasonably be questioned." 28 U.S.C. § 455(a). "This provision governs circumstances that constitute an appearance of partiality, even though actual partiality has not been shown." *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 127 (2d Cir. 2003) (citing *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)). "The bias and/or prejudice asserted under [§ 455(a)] must stem from extrajudicial sources, *i.e.*, outside the judicial proceeding at hand." *Hoffenberg v. Hoffman & Pollok*, No. 00 Civ. 3151(RWS), 2002 WL 31444994, at \*2 (S.D.N.Y. Oct. 31, 2002) (citations omitted). "Since the judge is presumed to be impartial, the movant has a stringent burden of proof." *Id.* (citations omitted).

Plaintiff has offered no specific factual reasons why the undersigned (or any other judge in this District) could not be impartial in this case. It thus appears that Plaintiff's request is based solely on the fact that he has named Judges Siragusa and Payson as defendants in this action. However, "recusal cases are very fact-specific" and "[j]udges need not always recuse when a fellow judge is somehow involved in case." *King v. Deputy Atty. Gen. Del.*, 616 F. App'x 491, 495 (3d Cir. 2015) (citations omitted); *see also Whitnum v. Town of Woodbridge*, No. 3:17-CV-1362 (JCH), 2019 WL 3024865, at \*3 (D. Conn. July 11, 2019) ("[That the plaintiff] complains of rulings, actions, or inactions of one or more of the undersigned's colleagues, cannot be a basis for recusal. No reasonable person would conclude, in this case, that because a colleague of the undersigned has been criticized by a litigant, that the undersigned could not fairly preside over her case."); *Meyer v. Foti*, 720 F. Supp. 1234, 1238 n.5 (E.D. La. 1989) ("The court disagrees with plaintiff's argument that a reasonable man would question this court's impartiality merely because

it would be required to pass on upon the conduct of fellow district judges."). Instead, the Court must make a fact-specific inquiry as to whether "a reasonable person with knowledge of the facts and circumstances might question a judge's impartiality." *McGraw v. Moody*, No. 4:10CV01846-WRW, 2010 WL 5089761, at *1 (E.D. Ark. Dec. 7, 2010) (finding recusal not warranted where plaintiff sued fellow district judge for having allegedly improperly dismissed a prior lawsuit).

**\*2** Plaintiff has pointed to no facts that would cause a reasonable person familiar with this case to question the undersigned's impartiality. Moreover, as set forth in detail below, Plaintiff's claims against Judges Siragusa and Payson are barred by absolute judicial immunity and cannot be maintained in this or any court. Resolution of the instant action is thus a straightforward matter of law and does not require inquiry by the Court into the propriety of any actions taken by Judges Siragusa or Payson. Under these circumstances, no reasonable observer could conclude that partiality towards Judges Siragusa and Payson would influence the undersigned's assessment of the matter. [1] *See McMurray v. Smith*, No. CIV 08-0805 JB/KBM, 2008 WL 8836074, at *1 n.1 (D.N.M. Sept. 29, 2008) ("[T]he Court notes that it need not recuse itself, even though the Defendants in this case are fellow judges from the District.... The Compendium of Selected Ethics Opinions states that a judge need not recuse from a case involving a party that filed suit against the judge, where the judicial immunity will be a complete defense to the action against the judge." (citation and quotation omitted)); *see also Jones v. City of Buffalo*, 867 F. Supp. 1155, 1163 (W.D.N.Y. 1994) (finding that district judges are not required to "automatically recuse themselves simply because they or their fellow judges on the court are named defendants in a truly meritless lawsuit" (citation omitted)).

For all these reasons, the Court denies Plaintiff's request for disqualification and reassignment of the matter.

## II. **Plaintiff's Claims**

Because Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a), he is granted permission to proceed *in forma pauperis*. Therefore, under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, the Court must review the claims set forth in the complaint.

### A. **Legal Standard**

Sections 1915 and 1915A "provide an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The Court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the Court determines that the action (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See* 28 U.S.C. § 1915A(b)(1)-(2); 28 U.S.C. § 1915(e)(2)(B). The Federal Rules of Civil Procedure require a complaint to include enough facts to state a claim for relief "that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). While the Court will generally afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal, *Abbas*, 480 F.3d at 639 (internal quotation marks omitted), leave to amend pleadings may be denied when any amendment would be futile, *see Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and *Bivens*. "To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)).

*Bivens* "is the federal analog to suits brought against state officials" under section 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted); *see also Tavarez v. Reno*, 54 F.3d 109, 109-10 (2d Cir. 1995) ("[F]ederal courts have typically incorporated § 1983 law into *Bivens* actions."). Thus, "[a] plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006) (citing *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999). "The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities." *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007). The Supreme Court has

recognized implied causes of action under *Biven*s in only three contexts: (1) unreasonable search and seizure under the Fourth Amendment, *Bivens*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); (2) employment discrimination under the Due Process Clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); and (3) inadequate medical treatment of a convicted prisoner under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). [2]

**\*3** To establish liability against an official under § 1983 or *Bivens*, a plaintiff must allege that individual's personal involvement in the alleged constitutional or federal law violation. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*"); *Thomas*, 470 F.3d at 496 ("the doctrine of *respondeat superior* does not apply in *Bivens* actions"). Because "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution," the personal involvement of each defendant must be plausibly alleged in the complaint. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and citation omitted).

### B. Plaintiff's Allegations

In evaluating the complaint, the Court must accept all factual allegations as true and must draw all inferences in Plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003),

In Plaintiff's criminal case, he was charged by superseding indictment dated September 2, 2021, with forty counts of bank fraud, wire fraud, and money laundering in connection with a scheme to fraudulently obtain three Paycheck Protection Program loans under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Indictment, *United States of America v. Rech*, No. 6:21-CR-6080-CJS-MWP, Dkt. 22 (W.D.N.Y. Sept. 2, 2021). On November 22, 2022, Plaintiff was convicted by jury verdict on all remaining counts. [3] Jury Verdict, *United States of America v. Rech*, No. 6:21-CR-6080-CJS-MWP, Dkt. 117 (W.D.N.Y. Nov. 22, 2022).

In the instant civil action, Plaintiff sues Judges Siragusa and Payson, as well as Monroe County Court Judge Michael L. Dollinger ("Judge Dollinger"), the United States of America, defense attorney Peter Pullano, Esq. ("Pullano"), Pullano's

law firm Tully Rinckey PLLC ("Tully Rinckey"), Monroe County, the Monroe County Sheriff's Department, the State of New York, and an "Unknown Named and Quantity of Monroe County Sheriffs." (Dkt. 1 at 15). He asserts that his rights were violated on March 26, 2021, when federal agents executed a search warrant signed by Judge Payson, during another search in October of 2021, and during the course of his criminal case. *Id.* at 11-13. [4]

During the execution of the search warrant, federal agents seized "legal guns and antiques," [5] which were outside the scope of the search warrant and not in plain sight. *Id.* at 11. The federal agents gave the firearms to the Monroe County Sheriff's Department for "safe keeping" against Plaintiff's will. *Id.* Judges Payson and Siragusa "ignored" the fact that Plaintiff's Second and Fourth Amendment rights were violated during the search and seizure. *Id.* A few weeks after this search, Judge Dollinger issued a state court order suspending Plaintiff's pistol permit and requiring him to surrender all handguns, long guns, and antique guns to the Monroe County Sheriff's Department. *Id.* at 13. Plaintiff asserts that Judge Dollinger can order a pistol permit suspension hearing, but he did not have jurisdiction to "rule on long guns or antiques." *Id.*

**\*4** Plaintiff further alleges that federal agents and the Court "seized funds in access [sic] of the allegations" against him and "failed to place protective orders on such funds," which prevented them from being used to retain criminal defense counsel. *Id.* at 11. The government and the court also failed to pay interest on those funds. *Id.* During court appearances on June 2 and July 15, 2022, Judge Siragusa denied Plaintiff's request to use his seized funds to retain defense counsel. *Id.* at 11-12. Judge Siragusa "deemed [Plaintiff] an 'indigent defendant' " and stated, "Mr. Rech, you are going to prison." *Id.* at 12. Plaintiff argues that those denials violated his Fifth and Sixth Amendment rights and his right to a fair trial. *Id.*

"On multiple occasions," Judge Siragusa denied Plaintiff's request that status conferences be held by video, which exposed Plaintiff to cruel and inhumane conditions during his travel to court. *Id.* Plaintiff further alleges that Judges Payson and Siragusa transferred him multiple times among four jails in an effort to punish and retaliate against him. *Id*. On December 20, 2022, Judge Siragusa "agreed" that Plaintiff's case had "zero loss and no victims" and that Plaintiff might receive "0-6 months" at sentencing, but he refused to issue a written order concerning the violations of Plaintiff's constitutional rights. *Id.*

Pullano was appointed to represent Plaintiff during the criminal trial. *Id.* at 13. On November 3, 2022, Judge Siragusa directed Pullano to provide Plaintiff with documents on jump drives, but Pullano failed to comply with that order. *Id.* The complaint further alleges that Pullano refused to address the violations of Plaintiff's constitutional rights, committed legal malpractice, and provided ineffective assistance of counsel. *Id.*

### C. Sufficiency of Claims

#### 1. Pullano and Tully Rinckey

Plaintiff sues Pullano, his former defense attorney who represented him in the criminal case, and Pullano's law firm, Tully Rinckey. (Dkt. 1 at 15). As stated above, "[a] plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas*, 470 F.3d at 496 (collecting cases). However, Pullano and Tully Rinckey are "private parties who cannot, for purposes of *Bivens* claims seeking money damages, be deemed government actors when acting as [Plaintiff's] defense counsel." *Andrews v. Johnson*, No. 21-CV-8310 (LTS), 2022 WL 158538, at *4 (S.D.N.Y. Jan. 18, 2022) (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 324-25, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981)); *see also Harrison v. New York*, 95 F. Supp. 3d 293, 328 (E.D.N.Y. 2015) (neither privately-retained defense attorneys nor public defenders and court-appointed counsel are government actors by virtue of their positions) (collecting cases).

To pursue a § 1983 or *Bivens* claim against a private party in this context, the complaint must plausibly allege (1) "an agreement" between defense counsel and federal or state officials (2) "to act in concert" to deprive the plaintiff of a constitutional right and (3) "an overt act done in furtherance of that goal causing damages." *Udechukwu v. City of New York*, 333 F. Supp. 3d 161, 169 (E.D.N.Y. 2018) (quoting *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999)); *see also McCloud v. Jackson*, 4 F. App'x. 7, 9 (2d Cir. 2001) ("a court-appointed attorney is subject to § 1983 liability where he conspires with state officials to deprive his client of federal rights"). There is no such allegation of an agreement here; Pullano is sued only for ineffective assistance of counsel in his representation of Plaintiff. There are no allegations asserted against Tully Rinckey. Therefore, Plaintiff has not alleged that Pullano and Tully Rinckey acted under the color of federal

or state law, and the claims against them are dismissed with prejudice.

**\*5** The Court further notes that, while as previously explained it need not and is not reaching the viability of Plaintiff's *Bivens* claims on the merits, *see* note 2, *supra*, it is apparent that any claim against Pullano or Tully Rinckey—even if actions under the color of federal law had been alleged—could not be sustained on a *Bivens* theory.

#### 2. Judicial Defendants, the United States, and New York State

##### a. Sovereign Immunity

Plaintiff sues Judges Siragusa and Payson in their official and individual capacities, as well as the United States. Plaintiff's claims for monetary damages against the United States and the federal judges in their official capacities are barred by sovereign immunity. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Id.* at 475, 486, 114 S.Ct. 996; *see also Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("Because an action against ... federal officers in their official capacities is essentially a suit against the United States, such suits are also barred under the doctrine of sovereign immunity, unless such immunity is waived."). Therefore, Plaintiff's claims against the United States and his official capacity claims against Judges Siragusa and Payson are dismissed without prejudice for lack of jurisdiction. *See F.D.I.C.*, 510 U.S. at 475, 114 S.Ct. 996 ("Sovereign immunity is jurisdictional in nature. Indeed, the terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit." (quotation and alteration omitted)).

Plaintiff also names the State of New York as a Defendant in this matter. The Eleventh Amendment bars federal court claims against the State absent its consent to such suit or an express statutory waiver of immunity. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). "This bar exists whether the relief sought is legal or equitable." *Papasan v. Allain*, 478 U.S. 265, 276, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). New York has not waived its sovereign immunity in federal court from suits for damages, *see Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39-40 (2d Cir. 1977), nor has its sovereign immunity

been abrogated by Congress for claims brought under § 1983, *see Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990). For these reasons, Plaintiff's claims against the State of New York, as well as any official capacity claims against Judge Dollinger, are dismissed without prejudice for lack of jurisdiction. *See Will*, 491 U.S. at 71 ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office."); *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (collecting cases and citing *Kampfer v. County of Fulton*, Nos. 94-9110, 94-9201, 107 F.3d 3, 1997 WL 48990, at *1 (2d Cir. Jan. 15, 1997) for the observation that County Court "is an arm of the State of New York").

### b. Absolute Judicial Immunity

With respect to Plaintiff's individual capacity claims against Judges Siragusa, Payson, and Dollinger, it is well settled that judges generally have absolute immunity from suit for their judicial actions, *see Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009); *Mireles v. Waco*, 502 U.S. 9, 11, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991), unless the "complaint alleges an ongoing violation of federal law" and seeks prospective declaratory relief, *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002). Absolute judicial immunity ensures "that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Bradley v. Fisher*, 80 U.S. 13 Wall. 335, 347, 20 L.Ed. 646 (1871). Consequently, judicial immunity is not defeated by claims of malice or bad faith. *Mireles*, 502 U.S. at 11, 112 S.Ct. 286.

**\*6** Judicial "immunity is overcome in only two sets of circumstances." *Id.* "First, a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity." *Id.* "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 12, 112 S.Ct. 286. As to the first circumstance, in determining whether a judge's actions are "judicial," the Second Circuit applies a "functional approach." *Bliven*, 579 F.3d at 209. The relevant factors include the nature of the judge's action, whether the action typically is performed by a judge, whether the parties expect the judge to take such action, and whether the parties dealt with the judge in his judicial capacity. *See Stump v. Sparkman*, 435 U.S. 349, 362, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). "[A]cts arising out of, or related to, individual cases

before the judge are considered judicial in nature." *Bliven*, 579 F.2d at 210.

Considering the factors outlined in *Stump*, 435 U.S. at 362, 98 S.Ct. 1099, Plaintiff does not assert that Judges Siragusa, Payson, or Dollinger took actions not ordinarily performed by a judge. Signing a search warrant, scheduling status conferences, appointing counsel, presiding over hearings and trials, and ruling on the requests of parties are all judicial activities. *See Bliven*, 579 F.3d at 210. Moreover, the parties would expect these Defendants to take such actions as judges, and the complaint does not suggest that Plaintiff dealt with Judges Siragusa, Payson, or Dollinger outside of their judicial capacities.

As to the second circumstance, Plaintiff does not plausibly allege that Judges Siragusa, Payson, or Dollinger took judicial action in the absence of jurisdiction. Although Plaintiff states that Judge Dollinger did not have jurisdiction to order the surrender of certain guns during his pistol permit proceeding, "the scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of the judge." *Stump*, 435 U.S. at 356, 98 S.Ct. 1099. An allegation of an action taken simply "in excess" of authority does not defeat judicial immunity. *Id.* In any event, there is no indication that Judge Dollinger exceeded his jurisdiction. While New York does not maintain a "similar licensing scheme for long-barrel rifles and shotguns ('long guns' or 'longarms')" as it does for the possession of "firearms" ("pistols, revolvers, and certain other handguns"), "the [New York] Penal Law speaks to continued long gun possession by a person whose pistol license has been revoked...." *Juzumas v. Nassau County, New York*, 33 F.4th 681, 684 (2d Cir. 2022); *see also Fusco v. County of Nassau*, 492 F. Supp. 3d 71, 78-79 (E.D.N.Y. 2020) ("[U]nlike other firearms there is no license requirement for the purchase or possession of longarms[;] [n]onetheless, the possession of longarms is regulated in New York." (internal citation and quotation marks omitted)).

New York Penal Law § 400.00 provides New York's "firearm licensing scheme," with § 400.00(11)(c) addressing long guns:

> In any instance in which a person's license is suspended or revoked under paragraph (a) or (b) of this subdivision, such person shall surrender such license to the appropriate licensing

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 209 of 260

Rech v. Siragusa, Not Reported in Fed. Supp. (2023)

official and *any and all firearms, rifles, or shotguns owned or possessed by such person shall be surrendered to an appropriate law enforcement agency* .... In the event such license, firearm, shotgun, or rifle is not surrendered, such items shall be removed and declared a nuisance and any police officer or peace officer acting pursuant to his or her special duties is authorized to remove any and all such weapons.

*Fusco*, 492 F. Supp. 3d at 79 (emphasis added) (quoting N.Y. Penal Law § 400.00(11)(c)) ("Longarms are referenced in the section governing the consequences of license suspension and revocation....").

Based on the foregoing, the Court finds that the complaint has not overcome the judicial immunity afforded to Judges Siragusa and Payson for their actions during Plaintiff's criminal case or to Judge Dollinger for his actions during Plaintiff's pistol permit proceedings in state court, *see Aron v. Becker*, 48 F. Supp. 3d 347, 365 (N.D.N.Y. 2014) ("[I]nsofar as Plaintiff seeks money damages from Judge Becker arising from or related to the pistol permit application matter, all such claims are barred by absolute judicial immunity."). The claims against these Defendants are dismissed with prejudice.

### 3. Monroe County and County Employees

**\*7** Plaintiff names as Defendants Monroe County, the Monroe County Sheriff's Department, and "Unknown Named and Quantity of Monroe County Sheriffs." He alleges that these Defendants violated his rights under the Second and Fourteenth Amendments.

First, although Monroe County is a municipality that can be sued under § 1983, *see Monell v. New York City Dep't Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Monroe County Sheriff's Department is merely an administrative arm of Monroe County and cannot be sued as a separate legal entity, *see Fusco*, 492 F. Supp. 3d at 77 ("The Nassau County Police Department is not a suable entity because it is an administrative arm of Nassau County."). The claims against the Monroe County Sheriff's Department are therefore dismissed with prejudice.

Second, it is well settled that "a suit against a municipal officer in his or her official capacity is functionally equivalent to a suit against the entity of which the officer is an agent." *Baines v. Masiello*, 288 F. Supp. 2d 376, 384 (W.D.N.Y. 2003). Therefore, any official capacity claims against the unidentified Monroe County Sheriffs are redundant of Plaintiff's claims against Monroe County and must be dismissed with prejudice. *See Alger v. County of Albany*, 489 F. Supp. 2d 155, 165 (N.D.N.Y. 2006) (dismissing a "claim against an individual in her official capacity [as] nothing more than a claim against the municipality itself").

Third, Monroe County may not be held liable under § 1983 unless the challenged action was performed pursuant to a county policy or custom. *See Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Municipalities are not subject to § 1983 liability solely on the doctrine of *respondeat superior. See Collins v. City of Harker Heights*, 503 U.S. 115, 121, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. To hold a municipality liable in a § 1983 action, "a plaintiff is required to plead and prove three elements: (1) an official custom or policy that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotation marks omitted).

Plaintiff fails to articulate how the County's receipt of the evidence seized in his criminal case constitutes (1) the denial of a constitutional right (2) that occurred pursuant to an official custom or policy. To the extent that the allegations can be construed to assert a claim against Monroe County based on Judge Dollinger's order that Plaintiff surrender certain guns upon his pistol permit suspension, he fails to state a claim on this basis. As stated above, § 400.00(11) of the New York Penal Law provides for the revocation and suspension of firearms licenses and surrender of long guns to an appropriate law enforcement agency. N.Y.P.L. § 400.00(11)(c)). Consequently, Plaintiff does not allege a county policy on this ground. *See Juzumas,* 33 F.4th at 688 ("In requiring [plaintiff] to surrender his longarms after his conviction, [the] County was reasonably applying state law, not crafting its own independent firearm surrender policy untethered to the Penal Law."). Plaintiff's claims against Monroe County are dismissed with prejudice.

Plaintiff's related claims against "Unknown Named and Quantity of Monroe County Sheriffs" must also be dismissed as wholly conclusory and for lack of personal involvement. The Complaint is devoid of factual allegations against

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 210 of 260

Rech v. Siragusa, Not Reported in Fed. Supp. (2023)

these individuals, and Plaintiff merely refers to them as "officers of the court" in connection to his pistol permit proceeding. Liability exists only where the "defendant, through the official's own individual actions, has violated the Constitution." *Tangreti*, 983 F.3d at 618; *Ashcroft*, 556 U.S. at 676, 129 S.Ct. 1937. Plaintiff's bare pleading does not satisfy those requirements.

### III. Denial of Leave to Amend

**\*8** In general, district courts should give *pro se* litigants leave to amend their claims before facing dismissal. *Cuoco*, 222 F.3d at 112 ("[T]he court should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."). However, leave to amend is properly denied where amendment would be futile. *Id.*

Here, the Court dismisses Plaintiff's claims against: Judges Siragusa, Payson, and Dollinger under the doctrine of absolute judicial immunity; Pullano and Tully Rinckey for lack of federal or state action and/or lack of personal involvement; the Monroe County Sheriff's Department as an arm of the County; the State of New York and the United States pursuant to sovereign immunity; Monroe County for lack of *Monell* liability; and "Unknown Named and Quantity of Monroe County Sheriffs" for lack of personal involvement in any unconstitutional conduct.

Here, "[t]he problem with [Plaintiff's] causes of action is substantive; better pleading will not cure it." *Cuoco*, 222 F.3d at 112. All of Plaintiff's claims are barred by immunity and/or are based on a meritless legal theory, which cannot be remedied in a second pleading. Denial of leave to amend is not an abuse of discretion "[w]here it appears that granting leave to amend is unlikely to be productive." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).

Moreover, it is clear to the Court that this is Plaintiff's second attempt to challenge his pending criminal prosecution in a § 1983 or *Bivens* action. In *Heck v. Humphrey*, the Supreme Court held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence

invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

512 U.S. 477, 484, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). "Subsequently, the Supreme Court and the Second Circuit extended *Heck*'s reach to section 1983 lawsuits brought during pending criminal prosecutions." *Dawson v. Lippiccolo*, 590 F. Supp. 3d 514, 517 (E.D.N.Y. 2022) (finding plaintiff's challenge to his ongoing criminal prosecution based on his claim of an "illegal search" to be barred by *Heck* and denying leave to amend). Thus, any claims that would render invalid Plaintiff's conviction and confinement would also be barred by *Heck*. For all these reasons, leave to replead is denied.

### CONCLUSION

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a), and his request to proceed *in forma pauperis* (Dkt. 2) is therefore granted. For the reasons discussed above, Plaintiff's request for disqualification of the undersigned (Dkt. 5) is denied and the complaint is dismissed without leave to amend. Plaintiff's request for the appointment of counsel is denied as moot.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*9** SO ORDERED.

Rech v. Siragusa, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 211 of 260

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2559409

---

## Footnotes

1    To be clear, this is not to suggest that if the merits did need to be reached that the undersigned would be required to recuse herself.

2    The Court notes that Plaintiff's *Bivens* claims for alleged violations during his criminal proceedings do not fall into one of the three recognized contexts and would therefore constitute an expansion of *Bivens*. It is clear from recent Supreme Court decisions, *see Egbert v. Boule*, ––– U.S. ––––, 142 S. Ct. 1793, 1803, 213 L.Ed.2d 54 (2022), that expanding the *Bivens* doctrine is "disfavored," *Ziglar v. Abbasi*, 582 U.S. 120, 137 S. Ct. 1843, 1857, 198 L.Ed.2d 290 (2017). However, because this action is being dismissed on other grounds, the Court need not address the availability of a remedy under *Bivens*.

3    Three counts were dismissed prior to trial on the government's motion. *United States v. Rech*, No. 6:21-CR-6080-CJS-MWP, Dkt. 106 (W.D.N.Y. Nov. 9, 2022).

4    The Court notes that Plaintiff has already attempted to sue Judge Payson for alleged violations during his criminal case that stem from the same allegations asserted here—that she signed a search warrant resulting in the illegal search and seizure. *See* Complaint, *Rech v. Roth*, No. 6:22-CV-6299-CJS, Dkt. 1 at 13 (W.D.N.Y. Jul. 8, 2022). In *Rech v. Roth*, Plaintiff also asserts that federal and county officials illegally seized items on March 21, 2021, that they "used" to "obtain another search and seizure warrant illegally from Chili Town Court" on October 28, 2021 and "took legal items ... left behind from the previous search warrant." *Id.* at 5, 13-14. The claims against Judge Payson were dismissed with prejudice on initial screening and Plaintiff was granted leave to amend his other claims. *Rech v. Roth*, No. 6:22-CV-6299-CJS, Dkt. 3 (W.D.N.Y. Aug. 1, 2022).

5    "Antiques" presumably refers to antique guns.

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3352758
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheila ROBINSON, Plaintiff,
v.
Mark WILLIAMS, et al., Defendants.

6:22-CV-0982 (GTS/ML)
|
Signed January 12, 2023

**Attorneys and Law Firms**

SHEILA ROBINSON, Plaintiff, Pro Se, 939 Ontario Avenue, Niagara Falls, New York 14301.

**ORDER and REPORT-RECOMMENDATION**

MIROSLAV LOVRIC, United States Magistrate Judge

**\*1** The Clerk has sent a *pro se* complaint in the above captioned action together with (1) an application to proceed *in forma pauperis*, and (2) an application to appoint counsel, filed by Sheila Robinson ("Plaintiff") to the Court for review. (Dkt. Nos. 1, 2, 5.) For the reasons discussed below, I (1) grant Plaintiff's *in forma pauperis* application, (2) deny Plaintiff's motion for appointment of counsel, and (3) recommend that Plaintiff's Complaint be dismissed in its entirety (a) in part with leave to amend, and (b) in part without leave to amend. (Dkt. Nos. 1, 2, 5.)

**I. BACKGROUND**

Construed as liberally [1] as possible, Plaintiff's Complaint alleges that she formed clothing brands and has since been targeted and harassed by defendants Mark Williams, Kyle Piersall, John De Traglia, Joseph Aiello, Brian Baye, Marissa Vomer, K. Phillips, Benny Grullon, Derek Schultz, Reginald Sanders, Brian French, Hiram Rios, Louis L. Stanton, John Does, Letitia James, Chuck Schumer, Amazon.com, Jeff Bezos, Facebook.com, Mark Zuckerberg, Google.com, Sergin Brin, Larry Page, Sundar Pichai, Zazzle.com, Robert Beaver, Cafepress.com, Bob Marino, Fred Durham, Redbubble.com, Barry Newstead, Martin Hopskin, Utica New York Police Department, and City of Utica in New York State (collectively "Defendants"). (*See generally* Dkt. No. 1.)

More specifically, Plaintiff alleges that she frequented Miller Park in Utica, New York. (Dkt. No. 1 at 5.) Plaintiff alleges that when she would go to Miller Park, Utica police officers would also be present in the park and that the police officers' presence in the park at the same time as Plaintiff put her in "fear of [her] safety and well being" such that she "stopped going to [the] park in fear of being shot by the [U]tica police." (*Id.*)

Plaintiff alleges that, at some point in time, she called the police regarding issues she was having with third-party, Biory Chavez Tinco. (*Id.*) Plaintiff alleges that she sought to pursue charges against Mr. Tinco and to obtain a restraining order that would protect her from Mr. Tinco, but that the Utica police officers refused to arrest Mr. Tinco or assist Plaintiff in obtaining an order of protection. (*Id.* at 5-6.)

Plaintiff alleges that, at some point in time, she went to get her mail and an unnamed maintenance person "came out and provoked [P]laintiff into accidentally macing," [2] the maintenance person then called the police, Plaintiff was arrested, and paid a $300 fine. (*Id.* at 6.)

Plaintiff alleges that a building located next to her residence is a nuisance because it is a gathering place for drug users and dealers. (*Id.* at 6.) Plaintiff alleges that she sought police assistance "multiple times" to address individuals from the property next door who trespassed on to her property. (*Id.*) However, Plaintiff alleges that the Utica police refused to arrest individuals that criminally trespassed and did not conduct warrant checks on the trespassers. (*Id.* at 6-7.)

**\*2** Plaintiff alleges that Defendant Derek Schultz filed a false statement that Plaintiff was suffering from mental illness. (*Id.* at 7.) Plaintiff alleges that Defendant Marissa Vomer filed a false statement stating that Plaintiff was rambling. (*Id.*) Plaintiff alleges that Defendant Reginald Sanders retaliated against Plaintiff by refusing to arrest third-party T. Jones and stating to Plaintiff "you wanted Utica police fired[.] [W]hy should we help you[?]" (*Id.*)

Plaintiff alleges that Defendant Louis Stanton was the assigned judge to another one of her civil cases and that he conspired to violate Plaintiff's right to a jury trial. (*Id.* at 8.) More specifically, Plaintiff alleges that Defendant Stanton dismissed Plaintiff's civil case against "tech-giants" via electronic notice so that Plaintiff would not receive the notice in time to appeal the decision. (*Id.*)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 213 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

Plaintiff alleges that she contacted the New York State Attorney General's office multiple times regarding the harassment she experienced by "one or more of the tech-giants" and the stalking that she experienced at Miller Park by the Utica police officers but that the New York State Attorney General's office informed her that it does not investigate those matters and directed Plaintiff to obtain her own attorney. (*Id.* at 9-10.)

Plaintiff alleges that unnamed "New York State Officials" deprived her of "Erap arrears" by incorrectly and "intentionally posting online that [P]laintiff had not uploaded [the] required documents." (*Id.* at 10-11.)

Plaintiff alleges that she contacted Defendant Chuck Schumer to help her "stop and collect the unauthorized apparel from [A]mazon warehouses" after Plaintiff saw that her clothing line brand was being improperly sold by Defendant Amazon.com. (*Id.* at 11.) Plaintiff alleges that Defendant Schumer failed to assist her because his family members are employed by Defendant Amazon.com. (*Id.*)

Plaintiff alleges that third-party Yahoo.com and Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg, conspired to target, cyberstalk, and stalk Plaintiff to interfere with her civil right to make online profits. (*Id.* at 11.) Plaintiff also alleges that Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg racially targeted her because she is a Black American and they are white or of Asian descent. (*Id.* at 12.)

Based on these factual allegations, Plaintiff appears to assert the following ten claims: (1) a claim against Defendant Utica Police Department for its conduct at Miller Park in violation of the Fourth Amendment and 42 U.S.C. § 1983; (2) a claim against Defendant Utica Police Department for its refusal to arrest Mr. Tinco and obtain an order of protection in favor of Plaintiff against Mr. Tinco in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (3) a claim against Defendant Utica Police Department for its refusal to arrest individuals who trespassed on Plaintiff's residence in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (4) a claim against Defendant Stanton for violating Plaintiff's due process right to a jury trial pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (5) a claim against Defendant Stanton for sending a dismissal notice electronically in violation of the First Amendment

and 42 U.S.C. § 1983; (6) a claim against the New York State Attorney General's Office for failure to investigate and enforce the laws in violation of the Fourteenth Amendment and 42 U.S.C § 1983; (7) a claim against unnamed New York State officials for interfering with Plaintiff's right to equal housing in violation of the Fourteenth Amendment and 42 U.S.C. § 1983; (8) a claim against Defendant Schumer for violating Plaintiff's right to equal protection under the law pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (9) a claim against Yahoo.com and Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Jeff Bezos, and Mark Zuckerberg for conspiracy to deprive Plaintiff equal protection under the law pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; and (10) a claim against "the Tech-Giant gang" for stalking, cyberstalking, and harming Plaintiff. (*See generally* Dkt. No. 1.)

**\*3** As relief, Plaintiff seeks, *inter alia*, $100,000,000,000 in compensatory damages, punitive damages in the amount of $300,000,000,000, and costs and attorney's fees. (*Id.*)

## II. PLAINTIFF'S APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $402, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). [3] After reviewing Plaintiff's *in forma pauperis* application (Dkt. No. 2), the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's application to proceed *in forma pauperis* is granted. [4]

## III. LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT

Having found that Plaintiff meets the financial criteria for commencing this action *in forma pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e). Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [5]

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 214 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of Civil Procedure. Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

**\*4** A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

### IV. ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that all causes of action be dismissed.

### A. Claims Against the Utica Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see* *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality

in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at \*3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at \*2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by* 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

As a result, I recommend that all claims against Defendant Utica Police Department be dismissed for failure to state a claim upon which relief may be granted.

Moreover, to the extent that the Court is inclined—for the sake of judicial efficiency—to review Plaintiff's claims against Defendant Utica Police Department, as against Defendant City of Utica, I still recommend dismissal of Plaintiff's claims for failure to state a claim upon which relief may be granted.

A municipality may only be named as a defendant in certain circumstances. Pursuant to the standard for establishing municipal liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell*, 436 U.S. 658); *see also* *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer."). A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See* *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). A plaintiff must also establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights. *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion). Indeed,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 215 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right; it "may not be held liable on a theory of *respondeat superior.*" *Jeffes v. Barnes*, 208 F.3d 49, 56 (2d Cir. 2000).

**\*5**  Critically, "a prerequisite to municipal liability under *Monell* is an underlying constitutional violation by a state actor." *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 567 (S.D.N.Y. 2010). As the Second Circuit has noted, "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also id.* (noting that once a "district court properly [finds] no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* [is] entirely correct").

### 1. Miller Park

I recommend that Plaintiff's claims with respect to Miller Park be dismissed for failure to state a claim upon which relief may be granted. The allegation that police officers are merely present in a public space, such as a park, at the same time as Plaintiff fails to allege that Plaintiff's rights were violated in any way. *See Hickombottom v. City of Chicago,* 739 F. Supp. 1173, 1179 (N.D. Ill. 1990) (police surveillance of plaintiff's apartment did not violate the Fourth Amendment in that plaintiff had no reasonable expectation of privacy as to his comings and goings); *Phillips v. City of San Jose*, C-94-20468, 1994 WL 706213, at \*4 (N.D. Cal. Dec. 13, 1994) (allegations that the police officers followed and observed plaintiff in public areas were not sufficiently egregious to constitute a due process violation under the Fourteenth Amendment).

Moreover, courts in this Circuit have routinely dismissed similar claims as factually frivolous. *See McNaughton v. de Blasio*, 20-CV-6991, 2020 WL 5983100, at \*4-5 (S.D.N.Y. Oct. 8, 2020) (dismissing as frivolous the plaintiff's allegations including, *inter alia*, that the N.Y.P.D. was enlisting parents and their children in an elaborate scheme to lure the plaintiff into committing pedophilic acts); *Gamez v. U.S. Dist. Court Eastern and Southern Dist. of Tyranny, New York*, 11-CV-4068, 2011 WL 3949807, at \*2 (E.D.N.Y. Sept. 6, 2011) (dismissing as factually frivolous, the plaintiff's

claims that the police were stalking, ambushing, and illegally surveilling him). "[A finding of] factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible, whether or not there are judicially noticeable facts available to contradict them." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). The term "frivolous" embraces "not only the inarguable legal conclusion, but also the fanciful factual allegation." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Plaintiff's allegations, even under a liberal reading that the courts give *pro se* pleadings, easily qualify as frivolous under the standard asserted above. *See Denton,* 504 U.S. at 33.

As a result, I recommend that Plaintiff's claims regarding Miller Park be dismissed for failure to state a claim upon which relief may be granted and, in the alternative, for frivolity.

### 2. Failure to Arrest Mr. Tinco

To the extent that Plaintiff's Complaint asserts a claim based on an alleged failure to file charges against Mr. Tinco or help Plaintiff obtain an order of protection against Mr. Tinco, I recommend that it be dismissed. Plaintiff does not have standing to compel any law enforcement agency to prosecute suspected criminal acts because there is no private right of action to enforce state or federal criminal statutes. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."); *see also Walker v. CIBC Ltd.*, 20-CV-1337, 2021 WL 3518439, at \*5 (N.D.N.Y. Apr. 13, 2021) (Hummel, M.J.) ("It appears plaintiff is either seeking the criminal prosecution of an individual or individuals or a law enforcement investigation, which is beyond this Court's jurisdiction."), *report-recommendation adopted by* 2021 WL 3204860 (N.D.N.Y. July 29, 2021) (McAvoy, J.); *McFadden v. Ortiz*, 12-CV-1244, 2013 WL 1789593, at \*3 (N.D.N.Y. Apr. 26, 2013) (D'Agostino, J.) (holding that "there is no private right of action to enforce either state or federal criminal statutes.").

**\*6**  As a result, I recommend that Plaintiff's claims regarding the failure to arrest Mr. Tinco be dismissed.

### 3. Failure to Arrest Trespassers

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 216 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

For the reasons set forth above in Part IV.A.2. of this Order and Report-Recommendation, I recommend that Plaintiff's claims regarding the failure to arrest alleged trespassers be dismissed for lack of standing.

### B. Claims Against Defendant Stanton

Plaintiff's Complaint appears to assert claims against Defendant Stanton in his individual and official capacity, for actions he allegedly took in his position as Senior United States District Judge of the Southern District of New York. (Dkt. No. 1 at 8-9.)

It is well settled that "officials acting in a judicial capacity are entitled to absolute immunity against § 1983 actions, and this immunity acts as a complete shield to claims for money damages." *Montero v. Travis*, 171 F.3d 757, 760 (2d Cir. 1999); *see also Mireles v. Waco*, 502 U.S. 9, 9-10 (1991) (citations omitted) ("A long line of this Court's precedents acknowledges that, generally, a judge is immune from a suit for money damages. Although unfairness and injustice to a litigant may result on occasion, 'it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself."); *Mahapatra v. Comstock*, 97-CV-7129, 1998 WL 88054, at *1 (2d Cir. Feb. 26, 1998) ("[T]he district court properly dismissed the claims for damages based on absolute immunity. Judges are shielded from liability for civil damages for judicial acts performed in their judicial capacities."); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 523 (E.D.N.Y. 2010) ("It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."). "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." *Stump v. Sparkman*, 435 U.S. 349, 357 (1978).

Plaintiff's allegations regarding Defendant Stanton appear to relate to actions he took as judge, while presiding over another civil proceeding initiated by Plaintiff. (*See generally* Dkt. No. 1.) The Complaint is devoid of facts plausibly suggesting that Defendant Stanton took any action as an individual, and therefore also fails to allege that he acted in the clear absence of all jurisdiction. As a result, I recommend that the claims against Defendant Stanton be dismissed in their entirety based on the doctrine of absolute judicial immunity.

### C. Claims Against New York State Attorney General's Office

As set forth above in Part IV.A.2. of this Order and Report-Recommendation, this Court does not have authority to commence its own investigation, commence criminal prosecution, compel a law enforcement agency to investigate suspected criminal activity, or compel a prosecutor to prosecute. Prosecutors possess discretionary authority to bring criminal actions, and they are "immune from control or interference by citizen or court." *Conn. Action Now, Inc. v. Roberts Plating Co.*, 457 F.2d 81, 87 (2d Cir. 1972).

**\*7** As a result, I recommend that Plaintiff's claims against the New York State Attorney General's Office be dismissed.

### D. Claims Against Unnamed New York State Officials

I recommend that Plaintiff's claims against unnamed New York State officials regarding the denial of her Emergency Rental Assistance Program ("ERAP") housing application, be dismissed.

First, to the extent that those claims are asserted against employees of New York State in their official capacity, they are barred by the Eleventh Amendment. "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity...." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009).

New York[6] has not waived its Eleventh Amendment immunity to suit in federal court, and Congress did not abrogate the states' immunity in enacting 42 U.S.C. § 1983. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 40 (2d Cir. 1977). The Eleventh Amendment therefore bars Plaintiff's § 1983 claims against New York State officials in their official capacity as employees of New York State from proceeding in federal court.

Second, Courts have held that there is no private cause of action for the denial of an application for federally funded emergency rental assistance program funds.[7] *See Wexler v. Dep't of Children and Families*, 22-CV-1111, 2022 WL 5250140, at *2 (M.D. Fla. Sept. 19, 2022) (recommending dismissal of the plaintiffs' claims alleging that their federal Emergency Rental Assistance Program applications were

mishandled and misappropriated and holding that "there is no express or implied cause of action under the CAA and the undersigned is aware of no Court ... that has found otherwise"); *Turner v. Hamilton Cnty. Trustee Assn.*, 22-CV-0275, 2022 WL 1606289, at \*4 (S.D. Ind. May 20, 2022) (dismissing the plaintiff's claim that his application for federally funded Emergency Rental Assistance Program was improperly denied as fraudulent and holding that "there is no private right of action created, expressly or impliedly, by Congress in the CAA or the CARES Act.").

As a result, I recommend that Plaintiff's claims against unnamed New York State officials for denial of her ERAP application, be dismissed based on the doctrine of immunity pursuant to the Eleventh Amendment and because it fails to state a claim upon which relief may be granted.

### E. Claims Against Defendant Schumer

The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Chaney v. Koupash*, 04-CV-0126, 2008 WL 5423419, at \*20 (N.D.N.Y. Dec. 30, 2008) (Homer, M.J.) (citing *Myers v. Barrett*, 95-CV-1534, 1997 WL 151770, at \*3 (N.D.N.Y. Mar. 28, 1997) (Pooler, J.)). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005).

**\*8** Plaintiff fails to allege any facts plausibly suggesting that she was treated differently from similarly situated individuals or any other individuals. Vague and conclusory allegations, are insufficient to plausibly suggest an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.*, 87 F.3d 65, 70 (2d Cir. 1996); *see Byng v. Delta Recovery Servs.*, LLC., 13-CV-0733, 2013 WL 3897485, at \*15, n. 5 (N.D.N.Y. July 29, 2013) (D'Agostino, J.) (finding that Attica inmate alleged no facts in the complaint to indicate he was similarly situated to anyone or that someone else was treated differently than he was). The

Complaint is devoid of allegations plausibly suggesting that Plaintiff was similarly situated to anyone or that she was treated differently. Accordingly, I recommend that Plaintiff's Fourteenth Amendment Equal Protection claims against Defendant Schumer be dismissed for failure to state a claim upon which relief may be granted. [8]

Further, to the extent that Plaintiff attempts to state conspiracy claims pursuant to 42 U.S.C. §§ 1985, 1986, I recommend that they be dismissed for failure to state a claim upon which relief may be granted.

"[T]o make out a violation of § 1985(3) ..., the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners of Am., Loc. 610, AFL-CIO v. Scott*, 103 S. Ct. 3352, 3356 (1983). A "conspiracy" requires, for purposes of Section 1985, "a plurality of actors committed to a common goal." *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 456 (S.D.N.Y. 1998), *aff'd*, 182 F.3d 899 (2d Cir. 1999).

In addition, a claim pursuant to Section 1985 requires that a plaintiff allege "some racial or [ ] otherwise class-based animus behind the conspirators' action." *Palmieri v. Lynch*, 392 F.3d 73, 86 (2d Cir. 2004). The Complaint fails to allege any racial or class-based animus other than one conclusory assertion that the "Tech-giants" racially targeted Plaintiff because she is a Black American "and all the tech-giant defendants are of white or Asian" descent. (*See generally* Dkt. No. 1.) "[C]onclusory allegations are inadequate to make out a claim under Section 1985." *Jones v. Nat'l Commc'n and Surveillance Networks*, 409 F. Supp. 2d 456, 472 (S.D.N.Y. 2006) (citing *Salgado v. City of N.Y.*, 00-CV-3667, 2001 WL 290051, at \*8 (S.D.N.Y. Mar. 26, 2001); *Sadler v. Brown*, 793 F. Supp. 87, 90 (S.D.N.Y. 1992)). Thus, Plaintiff does not sufficiently allege a conspiracy between Defendant Schumer and/or others to deprive Plaintiff of any federally protected rights.

Likewise, Plaintiff does not allege a claim under Section 1986, which proscribes knowingly failing to prevent a Section 1985 conspiracy "which such person by reasonable diligence could have prevented," and explicitly requires an underlying

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 218 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

conspiracy under Section 1985. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 341 (2d Cir. 2000) ("[A] § 1986 claim must be predicated on a valid § 1985 claim.").

**\*9** As a result, I recommend that Plaintiff's claims against Defendant Schumer be dismissed.

### F. Claims Against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg

A claim for relief under 42 U.S.C. § 1983 must allege facts showing that the defendant acted under color of state "statute, ordinance, regulation, custom or usage." 42 U.S.C. § 1983. Thus, to state a claim under § 1983, a plaintiff must allege both that: (1) a right secured by the Constitution or laws of the United States was violated, and (2) the right was violated by a person acting under the color of state law, or a "state actor." *West v. Atkins*, 487 U.S. 42, 48-49 (1988). Generally, private parties are not state actors, and are not liable under § 1983. *Sykes v. Bank of Am.*, 723 F.3d 399, 406 (2d Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001)); *see also Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002) ("[T]he United States Constitution regulates only the Government, not private parties....") (internal quotation marks and citations omitted). "Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish that the challenged conduct constitutes 'state action.' " *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 941 F.2d 1292, 1295-96 (2d Cir. 1991) (citing *Blum v. Yartsky*, 457 U.S. 991, 1002 (1982)). A private defendant may be held liable only as "a willing participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)). Claims under § 1983 can be brought against private entities by "showing that a person acting under color of state law ... collaborated with a private person ... to deprive the plaintiff of a constitutional right." *Fries v. Barns*, 618 F.2d 988, 990 (2d Cir. 1980) (citing *Adickes*, 398 U.S. at 144).

Here, the Complaint fails to allege facts plausibly suggesting that Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg were "state actors" or were "collaborating" with state actors. Plaintiff's inclusion of citations to the statute—42 U.S.C. § 1983—in her Complaint, does not change that the

Complaint is devoid of factual allegations alleging any state involvement by Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg. (*See generally* Dkt. No. 1.)

Moreover, to the extent that Plaintiff sought to allege a claim against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg for stalking, cyberstalking, and harming Plaintiff, there is no private cause of action for stalking or general "harm." *Sonnick v. Budlong*, 20-CV-0410, 2020 WL 2999109, at \*5, 9 n.8, 11 (N.D.N.Y. June 4, 2020) (Lovic, M.J.) (citations omitted) ("[F]ederal stalking is a crime pursuant to 18 U.S.C. § 2261A, and does not provide for a private cause of action.... New York does not recognize private causes of action for stalking, harassment, or trespass."), *report and recommendation adopted by* 2020 WL 4345004 (N.D.N.Y. July 29, 2020) (McAvoy, J.).

**\*10** As a result, I recommend that Plaintiff's claims against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg be dismissed for failure to state a claim upon which relief may be granted.

### G. Conspiracy

As set forth above in Part IV. E. of this Order and Report-Recommendation, the Complaint fails to allege facts plausibly suggesting racial or class-based animus—other than Plaintiff's legally insufficient, conclusory assertion that unnamed "Tech-giants" racially targeted Plaintiff because she is a Black American "and all the tech-giant defendants are of white or Asian" descent. (Dkt. No. 1 at 12.) Thus, Plaintiff does not sufficiently allege a conspiracy between Defendants and/or others to deprive her of any federally protected rights pursuant to 42 U.S.C. § 1985. Moreover, because Plaintiff fails to allege an underlying conspiracy pursuant to 42 U.S.C. § 1985, she likewise fails to allege a claim pursuant to 42 U.S.C. § 1986, which proscribes knowingly failing to prevent a Section 1985 conspiracy.

As a result, to the extent that Plaintiff alleges conspiracy claims pursuant to 42 U.S.C. §§ 1985, 1986 against any Defendant, I recommend that they be dismissed.

### H. Claims Against Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 219 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

**John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin**

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

The caption of the Complaint lists Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin but the body of the Complaint does not contain any factual allegations regarding them. Thus, I recommend that Plaintiff's claims against Defendants Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin be dismissed. *See Johnson v. Gonzalez*, 14-CV-0745, 2015 WL 1179384, at *6 (N.D.N.Y. Mar. 13, 2015) (Kahn, J.) (dismissing the claims against a defendant where the complaint lists the defendant's "name in the caption, but fails to again name or assert allegations against him."); *Serrano v. New York State Dep't of Envtl. Conservation*, 12-CV-1592, 2013 WL 6816787, at *15 (N.D.N.Y. Dec. 20, 2013) (D'Agostino, J.) (citing *Jaffer v. Chemical Bank*, 93-CV-8459, 1994 WL 392260, at *3 (S.D.N.Y. July 26, 1994) (holding that "[w]hen a complaint's caption names a defendant but the complaint does not indicate that the named party injured the plaintiff or violated the law, the motion to dismiss must be granted")) (dismissing the plaintiff's claims against two defendants who were listed as parties in the complaint and in the caption, but not elsewhere in the complaint).

**I. Statements of Defendants Schultz, Vomer, and Sanders**

**\*11** Having found that all of Plaintiff's federal claims are subject to dismissal, I recommend that, to the extent Plaintiff has asserted any state law claims—such as defamation

claims against Defendants Schultz, Vomer, and Sanders [9]— the Court decline to exercise jurisdiction over those claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court "may decline to exercise supplemental jurisdiction over [pendent state law claims] if ... the district court has dismissed all claims over which it has original jurisdiction"); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims."); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 53 (2d Cir. 1986) (citing *Kavit v. A.L. Stamm & Co.*, 491 F.2d 1176, 1180 (1974)) (holding that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

**V. OPPORTUNITY TO AMEND**

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.). [10]

 **\*12** I recommend that Plaintiff's claims against Defendant Utica Police Department be dismissed without leave to amend because it is not an entity that is amenable to suit. Moreover, to the extent that Plaintiff's claims against Defendant Utica Police Department are construed as against Defendant City of Utica, I recommend that they be dismissed without leave to amend because (1) Plaintiff's claims regarding Miller Park

are factually frivolous, and (2) a better pleading will not cure the issue with Plaintiff's claims alleging that the Utica Police Department failed to arrest Mr. Tinco and the criminal trespassers.

I recommend that Plaintiff's claims against Defendant Stanton be dismissed without leave to amend because he is entitled to absolute judicial immunity.

In addition, a better pleading will not cure the issue with Plaintiff's claim against the New York Attorney General's Office alleging that it failed to investigate and prosecute alleged criminal and improper conduct. As a result, to the extent that the Complaint is construed as asserting any claim against the New York Attorney General's Office, I recommend that it be dismissed without leave to amend.

To the extent that Plaintiff's Complaint is construed as asserting any claims against unnamed New York State officials for denying her ERAP application, I recommend that they be dismissed without leave to amend because (1) the officials in their official capacity are immune from suit pursuant to the Eleventh Amendment, and (2) there is no private cause of action to pursue Plaintiff's allegations.

Further, to the extent that Plaintiff asserted claims against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg for stalking, cyber stalking, and harassment, I recommend that they be dismissed without leave to amend because there is no private cause of action for stalking, cyber stalking, and harassment.

This Court has serious doubts about whether Plaintiff can amend to assert actionable claims pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin, Schultz, Vomer, and Sanders. However, out of an abundance of caution, I recommend that Plaintiff be permitted to amend those claims against those Defendants. In addition, to the extent that Plaintiff sought to allege any defamation claim against Defendants Schultz, Vomer, and Sanders, I recommend that she be permitted to amend that claim too.

If Plaintiff chooses to file an amended complaint, she should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987)); *accord Pourzancvakil v. Humphry*, 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

## VI. PLAINTIFF'S MOTION TO APPOINT COUNSEL

**\*13** Plaintiff has also submitted a request for appointment of counsel. (Dkt. No. 5.)

As an initial matter, "[a] party has no constitutionally guaranteed right to the assistance of counsel in a civil case." *Leftridge v. Connecticut State Trooper Officer No. 1283*, 640 F.3d 62, 68 (2d Cir. 2011) (citations omitted). Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion. As a threshold matter, the court should ascertain whether the indigent's claims seem likely to be of substance. A motion for appointment of counsel may be properly denied if the court concludes that the plaintiff's "chances of success are highly dubious." *Leftridge*, 640 F.3d at 69. If the court finds that the claims have substance, the court should then consider:

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 221 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in th[e] case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp.*, 28 F.3d at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)). This is not to say that all, or indeed any, of these factors are controlling in a particular case. Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

In the present matter, the Court has recommended dismissal of the action. As such, the Court cannot find that Plaintiff's claims are likely to be of substance. Plaintiff's motion (Dkt. No. 5) is therefore denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's application to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED only for purposes of filing and any appeal unless the trial court certifies in writing that the appeal is not taken in good faith**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 5) is **DENIED without prejudice to refiling**; and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITH LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts (1) claims

pursuant to 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, De Traglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, and Hopskin, Schultz, Vomer, and Sanders, and (2) a defamation claim against Defendants Schultz, Vomer, and Sanders, because it fails to state a claim upon which relief may be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further respectfully

**RECOMMENDED** that the Court **DISMISS WITHOUT LEAVE TO REPLEAD** Plaintiff's Complaint (Dkt. No. 1) to the extent that it asserts (1) claims against Defendants Utica Police Department, City of Utica, and Stanton; (2) claims against the New York Attorney General's Office and unnamed New York State officials; and (3) claims of stalking, cyber stalking, and harassment against Defendants Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, pursuant to 28 U.S.C. § 1915(e)(2)(B); and it is further

**\*14 ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules. [11]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [12] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 3352758

---

**Footnotes**

1 The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

2 It is unclear if Plaintiff intended to state that she "accidentally menaced" the maintenance person or that she "accidentally" used mace or some form of pepper spray.

3 The language of that section is ambiguous because it suggests an intent to limit availability of *in forma pauperis* status to prison inmates. *See* 28 U.S.C. § 1915(a)(1) (authorizing the commencement of an action without prepayment of fees "by a person who submits an affidavit that includes a statement of all assets such prisoner possesses"). The courts have construed that section, however, as making *in forma pauperis* status available to any litigant who can meet the governing financial criteria. *Hayes v. United States*, 71 Fed. Cl. 366, 367 (Fed. Cl. 2006); *Fridman v. City of N.Y.*, 195 F. Supp. 2d 534, 536 n.1 (S.D.N.Y. 2002).

4 Plaintiff is reminded that, although her application to proceed *in forma pauperis* has been granted, she is still required to pay fees that she may incur in this action, including copying and/or witness fees.

5 To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis in either law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

6 "An official capacity suit against a municipal employee is a suit against the municipality itself." *Pittman v. Billings*, 20-CV-0422, 2020 WL 2079440, at *9 (N.D.N.Y. Apr. 30, 2020) (Baxter, M.J.), *report and recommendation adopted by* 2020 WL 2574631 (N.D.N.Y. May 21, 2020) (Sharpe, J.).

7 The "Coronavirus Aid Relief and Economic Security Act ("CARES Act"), which was continued by the [Consolidated Appropriations Act of 2021] CAA and the America Rescue Plan Act, allocated funds for rental assistance." *Turner*, 2022 WL 1606289, at *2.

8 The Court notes that, should this action proceed against Defendant Schumer and the United States Attorney make the requisite certification such that the United States be substituted as defendant, Plaintiff has failed to allege compliance with the administrative exhaustion requirements set forth in the Federal Tort Claims Act (FTCA). *See De Masi v. Schumer*, 608 F. Supp. 2d 516, 518-526 (S.D.N.Y. 2009) (replacing the United States as the allegedly liable party and proceeding as a FTCA suit where the plaintiff alleged that Senator Charles Schumer failed to respond to the plaintiff's repeated requests for assistance as one of Senator Schumer's constituents).

9 To the extent that Plaintiff attempts to allege a retaliation claim against Defendant Sanders pursuant to 42 U.S.C. § 1983 and the First Amendment, I recommend that it also be dismissed because Plaintiff fails to allege that she engaged in any protected speech. (*See generally* Dkt. No. 1.) Instead, Plaintiff alleges only that Defendant Sanders accused Plaintiff of "want[ing] [U]tica police fired" and asked "why should we help you[?]" after refusing to make an arrest. (Dkt. No. 1 at 7.) However, with additional factual allegations, Plaintiff may have a viable claim against Defendant Sanders. *See generally Rudd v. City of Norton Shores, Michigan*, 977 F.3d 503, 513-516 (6th Cir. 2020) (citing *Briner v. City of Ontario*, 370 F. App'x 682, 700 (6th Cir. 2010); *Apple v. Glenn*, 183 F.3d 477, 479 (6th Cir. 1999)) (holding that (1) "[t]he freedom of speech ... protects the right of an ordinary citizen to criticize public officials ... without fear of criminal or civil repercussions," and thus, formal petitions including citizen complaints and informal requests for police assistance qualify as protected petitioning of the government, and (2) although " 'the right to petition the government does not guarantee a response to the petition or the right to compel government officials to act on or adopt a citizen's views[,]' [a]nd individuals have no constitutional entitlement to police protection[,].... the 'unconstitutional conditions' places limits on the government's ability to deny an otherwise discretionary benefit in retaliation for a person's protected speech.... [thus the Sixth Circuit has previously held that a plaintiff] stated a plausible claim by

**Robinson v. Williams, Not Reported in Fed. Supp. (2023)**

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 223 of 260

suggesting that the police 'refused to investigate the theft of [his] GMC truck in retaliation for complaints regarding the [police's] alleged failure to properly investigate [an earlier] burglary[.]' ").

10     *See also Carris v. First Student, Inc.,* 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 796 (2d Cir. 1999)— that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)), *rev'd on other grounds,* 682 F. App'x 30.

11     The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

12     If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 224 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

2023 WL 2986825
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Sheila ROBINSON, Plaintiff,

v.

Mark WILLIAMS, Utica NY, Police Officers 1-12; Kyle Piersall, Utica NY, Police Officers 1-12; John DeTraglia, Utica NY, Police Officers 1-12; Joseph Aiello, Utica NY, Police Officers 1-12; Brian Baye, Utica NY, Police Officers 1-12; Marissa Vomer, Utica NY, Police Officers 1-12; K. Phillips, Utica NY, Police Officers 1-12; Benny Grullon, Utica NY, Police Officers 1-12; Derek Shultz, Utica NY, Police Officers 1-12; Reginald Sanders, Utica NY, Police Officers 1-12; Brian French, Utica NY, Police Officers 1-12; Hiram Rios, Utica NY, Police Officers 1-12; Louis L. Stanton, New York State Judge; John Does, Unknown New York State Erap Officials; Letitia James, New York State Attorney General; Chuck Schumer, U.S. Senator for New York; Amazon.com; Jeff Bezos, CEO of Amazon.com; Facebook.com; Mark Zuckerberg, CEO of Facebook.com; Google.com; Sergin Brin, of Google; Larry Page, of Google; Sundar Pichai, CEO of Google; Zazzle.com; Robert Beaver, CEO of Zazzle.com; Cafepress.com; Bob Marino, CEO of Cafepress.com; Fred Durham, of Cafepress.com; Redbubble.com; Barry Newstead, of Redbubble.com; Martin Hopskin, of Redbubble.com; Utica New York Police Dept., and City of Utica, New York, Defendants.

6:22-CV-0982 (GTS/ML)
|
Signed April 18, 2023

**Attorneys and Law Firms**

SHEILA ROBINSON, Plaintiff, Pro Se, 939 Ontario Avenue, Niagara Falls, New York 14301.

## **DECISION and ORDER**

GLENN T. SUDDABY, United States District Judge

**\*1** Currently before the Court, in this *pro se* civil rights action filed by Sheila Robinson ("Plaintiff") against the above-captioned individuals and entities ("Defendants"), are

(1) United States Magistrate Judge Miroslav Lovric's Report-Recommendation recommending that some of the claims in Plaintiff's Complaint be *sua sponte* dismissed without leave to amend, and that the remaining claims in that Complaint be *sua sponte* dismissed with leave to amend, and (2) Plaintiff's Objections to the Report-Recommendation. (Dkt. Nos. 6, 9.)

After carefully reviewing the relevant filings in this action, the Court finds no error in the Report-Recommendation, clear or otherwise: [1] Magistrate Judge Lovric employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. As a result, the Court accepts and adopts the Report-Recommendation for the reasons stated therein. To those reasons, the Court adds only two points.

First, even when construed with the utmost of special liberality, Plaintiff's "Objections" fail to assert a *specific* challenge to the Report-Recommendation. (*Compare* Dkt. No. 9 *with* Dkt. No. 6.) [2] As a result, the "challenged portions" of the Report-Recommendation are entitled to only a clear-error review. In any event, even if the Court were to subject those portions of the Report-Recommendation to a de novo review, the Court would find that they survive that review.

**\*2** Second, rather than wait for the undersigned's ruling on Magistrate Judge Lovric's Report-Recommendation, Plaintiff has attempted to file an Amended Complaint. (Dkt. No. 10.) This litigation practice has complicated matters because, even assuming that Plaintiff had an absolute right to file such an Amended Complaint under Fed. R. Civ. P. 15(a)(1) despite the fact that she had not yet served her Complaint, [3] an amended complaint supersedes an original complaint in all respects. [4] This means that, arguably, Plaintiff's Amended Complaint has partially mooted Magistrate Judge Lovric's Report-Recommendation, which analyzed Plaintiff's *original* Complaint.

Out of a desire for judicial efficiency, the Court is tempted to apply the recommendations in the Report-Recommendation to Plaintiff's Amended Complaint. However, the Court is mindful of the Second Circuit's admonition that a *pro se* plaintiff's request to amend her complaint when a motion to dismiss is pending should be denied only without prejudice, or perhaps stayed, until she has had the benefit of the district court's ruling on the motion to dismiss. [5]

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 225 of 260

Robinson v. Williams, Not Reported in Fed. Supp. (2023)

For all of these reasons, the Court has chosen to apply Magistrate Judge Lovric's Report-Recommendation to Plaintiff's original Complaint while deeming Plaintiff's Amended Complaint as a *proposed* Amended Complaint (out of special solicitude to Plaintiff as a *pro se* civil rights litigant), and holding that proposed Amended Complaint in abeyance pending confirmation from Plaintiff that it is indeed the Amended Complaint on which she wishes to proceed.

**\*3  ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Lovric's Report-Recommendation (Dkt. No. 6) is **ACCEPTED** and **ADOPTED**; and it is further

**ORDERED** that the following claims in Plaintiff's Complaint (Dkt. No. 1) are **DISMISSED**: (1) Plaintiff's claims against Utica Police Department, the City of Utica, and Judge Stanton; (2) Plaintiff's claims against the New York State Attorney General and unnamed New York State officials; and (3) Plaintiff's stalking claims, cyberstalking claims, and harassment claims against Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, and Zuckerberg; and it is further

**ORDERED** that the remaining claims in Plaintiff's Complaint (Dkt. No. 1) **shall be DISMISSED** without further Order of this Court **UNLESS**, within **THIRTY (30) DAYS** of this Report-Recommendation, Plaintiff files an **AMENDED COMPLAINT** that corrects the pleading defects identified

in those claims, which are specified as follows: (1) Plaintiff's claims under 42 U.S.C. §§ 1983, 1985, and 1986 against Defendants Schumer, Amazon.com, Facebook.com, Google.com, Zazzle.com, Cafepress.com, Redbubble.com, Bezos, Zuckerberg, Williams, Piersall, DeTraglia, Aiello, Baye, Phillips, Grullon, French, Rios, John Does, James, Brin, Page, Pichai, Beaver, Marino, Durham, Newstead, Hopskin, Schultz, Vomer, and Sanders; and (2) Plaintiff's defamation claims against Defendants Schultz, Vomer, and Sanders; and it is further

**ORDERED** that, more specifically, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiff shall do one of the following two things: (1) notify the Court in writing that her proposed Amended Complaint (Dkt. No. 10) is indeed the Amended Complaint on which she wishes to proceed, or (2) file a revised Amended Complaint; and it is further

**ORDERED** that, upon Plaintiff's fulfillment of one of the conditions set forth in the preceding paragraph (or, in the absence of his fulfillment of either condition, after the passage of thirty days), Plaintiff's operative Amended Complaint shall be referred to Magistrate Judge Lovric for review of its pleading sufficiency pursuant to 28 U.S.C. § 1915(e) (as well as his management of pretrial matters).

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2986825

---

**Footnotes**

1      When no objection is made to a report-recommendation (or when only a *general* objection is made to a report-recommendation), the Court subjects that report-recommendation to only a clear-error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a clear-error review, "the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks omitted).

2      When a *specific* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c); *see also Mario v. P&C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir. 2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII

claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

3     Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure provides that "[a] party may amend its pleading once as a matter of course *within* ... 21 days after serving it...." Fed. R. Civ. P. 15(a)(1)(A) (emphasis added). Here, Plaintiff never served her Complaint; thus, she is arguably not yet *within* the 21-day window in which she may filed an Amended Complaint as a matter of course. *Compare Morris v. New York State Gaming Comm'n*, 18-CV-0384, 2019 WL 2423716, at *4 (W.D.N.Y. March 14, 2019) ("Because Plaintiff never served the original Complaint, the 21-day time limit to file an amended complaint under Rule 15(a)(1)(A) never *commenced*.") (emphasis added) *with Henderson v. Wells Fargo Bank, NA*, 13-CV-0378, 2015 WL 630438, at *2 (D. Conn. Feb. 13, 2015) ("Fed. R. Civ. P. 15(a) provides that a 'party may amend its pleading once as a matter of course within ... 21 days after serving it.' Because Plaintiff has not yet served Defendant with the complaint, her motion is granted although unnecessary because leave of the Court is not required.").

4     *See Int'lControls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect."); 6 C. Wright & A. Miller, *Federal Practice & Procedure* § 1476, at 556-57 (2d ed. 1990) ("A pleading that has been amended under Rule 15(a) supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified."); *cf.* N.D.N.Y. L.R. 7.1(a)(4) ("[T]he proposed amended pleading ... will supersede the pleading sought to be amended in all respects.").

5     *See Cresci v. Mohawk Valley Community College*, 693 F. App'x 21, 25 (2d Cir. June 2, 2017) ("The court's criticism of Cresci for failure to submit a proposed amended complaint before learning whether, and in what respects, the court would find deficiencies was unjustified, and the court's denial of leave to replead, simultaneously with its decision that the complaint was defective, effectively deprived Cresci of a reasonable opportunity to seek leave to amend.").

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 227 of 260

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

2021 WL 4392422
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John SAGARIA, Plaintiff,
v.
ORANGE COUNTY JAIL, et al., Defendants.

No. 20-CV-2287 (KMK)
|
Signed 09/24/2021

**Attorneys and Law Firms**

Michael David Meth, Esq., Meth Law Offices, PC, Chester, NY, Counsel for Plaintiff.

Anthony Francisco Cardoso, Esq., Orange County Attorney's Office, Goshen, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Plaintiff John Sagaria ("Plaintiff") brings this Action pursuant to 42 U.S.C. § 1983 against the Orange County Jail (the "Jail"), the Orange County Sheriff's Department (the "Sheriff's Department"), and the County of Orange (the "County"; collectively "Defendants") for wrongful incarceration in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article 1 Section 6 of the New York State Constitution. (Compl. (Dkt. No. 1).) Before the Court is Defendants' Motion to Dismiss (the "Motion"). (Not. of Mot. (Dkt. No. 25).) For the following reasons, the Motion is granted.

I. Background

A. Factual Background
The following facts, drawn from Plaintiff's Complaint, are taken as true for the purpose of resolving the instant Motion.

Plaintiff is a businessman who has lived in Orange County, New York for over 25 years. (Compl. ¶ 12.) His primary source of income is the two businesses he owns, both of which he must be present to operate. (*Id*.) Plaintiff also

is the plaintiff in a contentious divorce proceeding in the Supreme Court of Orange County, New York (the "state court"). (*Id*. ¶ 13.) On December 14, 2018, during a custody hearing related to this divorce proceeding, Plaintiff's ex-wife's counsel, Barbara Strauss, Esq. ("Strauss"), raised the issue of Plaintiff's unpaid spousal support. (*Id*. ¶ 14.) The state court denied Plaintiff's request for a hearing and offer of proof on the non-payment issue. (*Id*. ¶ 15.) Plaintiff was held in summary contempt of court for non-payment of spousal support, and the state court ordered his immediate detention. (*Id*.) The state court remanded Plaintiff to the Jail pursuant to an order of commitment. (*Id*. ¶ 17.) Plaintiff alleges that the state court set $25,000 as the payment required for Plaintiff to purge his contempt. (*Id*. ¶ 16.) The Court takes judicial notice of the order of commitment, which states that Plaintiff could purge his contempt by "paying the partial sum of $25,889.64 to C[ynthia] S[agaria]," and orders Plaintiff to be imprisoned for 30 days, "or until the purge sum of $25,889.64 is paid." (*See* Decl. of Anthony F. Cardoso in Supp. ("Cardoso Decl.") Ex. B ("Order of Commitment") (Dkt. No. 26-2).) *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts, ... not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings."). [1]

On December 17, 2018, Plaintiff paid $25,000 to Strauss by credit card. (Compl. ¶ 19.) Strauss subsequently issued a Letter of Release to the state court and brought the letter and payment confirmation to the Sheriff's Department. (*Id*.) The Sheriff's Department refused to release Plaintiff because the release letter did not come from the state court. (*Id*. ¶¶ 19, 20.) The state court refused to sign the release order. (*Id*. ¶ 21.)

**\*2** On December 19, 2018, Plaintiff paid an additional $28,090.26 by credit card to the Sheriff's Department GOVPAY EXP Payment Service to satisfy the purge amount. (*Id*. ¶ 22.) This sum included $3,090.26 in fees. (*Id*. ¶ 23.) The Sheriff's Department charged Plaintiff's credit card. (*Id.*) Subsequently, the Sheriff's Department stated that it could accept only $10,000 via credit card. (*Id*. ¶ 24.) The Sheriff's Department stated that Plaintiff had to pay $25,000 in cash at the window of the Jail to be released. (*Id*. ¶ 26.) While Plaintiff's family and friends were gathering cash, he was advised by the state court that an additional $1,639.644 paid directly to Strauss would be required for release. (*Id*. ¶¶ 28, 30.) Plaintiff paid Strauss $1,639.44 in cash and was released on December 19, 2018 at 8:30 P.M. (*Id*. ¶¶ 30–31.) The

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 228 of 260

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

following day, GOVPAY EXP credited Plaintiff's credit card the $28,090.26 previously paid. (*Id*. ¶¶ 22, 33.)

Plaintiff seeks compensatory and special damages— including for emotional injury and loss of liberty, punitive damages, pre- and post-judgment interest, and attorneys' fees and costs. (*Id*. ¶ 34 & 10–11.) [2]

### B. Procedural Background

Plaintiff filed his Complaint on March 13, 2020. (Compl.) On September 28, 2020, Defendants submitted a letter requesting a pre-motion conference in anticipation of filing a motion to dismiss pursuant to Rule 12(b)(6). (Dkt. No. 21.) On October 8, 2020, the Court ordered Plaintiff to respond to Defendant's pre-motion letter by October 13, 2020, (Dkt. No. 22), which Plaintiff did, (Dkt. No. 23). On October 20, 2020, the Court adopted a briefing schedule. (Dkt. No. 24.) On November 20, 2020, Defendants filed their Motion To Dismiss. (Not. of Mot.; Cardoso Decl. (Dkt. No. 26); Not. of Mot. on Behalf of Defs. ("Defs.' Mem.") (Dkt. No. 27).) Plaintiff filed a memorandum of law in opposition to the Motion To Dismiss on December 18, 2020. (Mem. of Law in Opp'n ("Pl.'s Mem.") (Dkt. No. 28).) Defendants filed their Reply on January 5, 2021. (Reply Mem. of Law in Further Supp. of Mot. To Dismiss on Behalf of the Defs. ("Defs.' Reply") (Dkt. No. 29).)

## II. Discussion

### A. Standard of Review

When ruling on a Rule 12(b)(6) motion to dismiss, the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). The Court, however, is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 678 (citation and quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the [C]ourt to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Specifically, the plaintiff must allege facts sufficient to show "more than a sheer possibility that a defendant has acted unlawfully," *id*., and if the plaintiff

has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed," *Twombly*, 550 U.S. at 570.

On a Rule 12(b)(6) motion to dismiss, the question "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012). Accordingly, the "purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (citation and quotation marks omitted). To decide the motion, the Court "may consider the facts as asserted within the four corners of the complaint together with the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010) (citation and quotation marks omitted).

### B. Analysis

#### 1. Claims Against the Jail and the Sheriff's Department

**\*3** The Jail and the Sheriff's Department argue that they are administrative arms of the County and cannot be sued independently under New York law. (Defs.' Mem. 12.) The Court agrees.

The Orange County Sheriff's Department is a municipal department of the County of Orange, State of New York. Sheriff's Office, *Sheriff's Office: Orange County, New York*, https://www.orangecountygov.com/1650/Sheriffs-Office (last visited September 24, 2021). The Sheriff's Department is subdivided into multiple divisions. *Id.* The Orange County Jail is a subdivision of the Sheriff's Department. Orange County, *Corrections (Jail)*, https://www.orangecountygov.com/511/Corrections-Jail (last visited September 24, 2021). The Jail is responsible for operating and maintaining the County's correctional system. *Id.* [3]

Pursuant to Federal Rule of Civil Procedure 17, federal courts must look to state law when deciding whether a government entity may be sued. Fed. R. Civ. P. 17(b)(3) (providing that capacity to be sued is determined "for all ... parties [except individuals or corporations] by the law of the state where

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 229 of 260

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

the court is located"); *see also Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999) ("New York law governs the capacity of a police department to sue or be sued."); *Orraca v. City of New York*, 897 F. Supp. 148, 152 (S.D.N.Y. 1995) ("[T]he capacity of a governmental entity to sue or be sued is a question of state law."). "Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *McCloud v. Dzurenda*, No. 20-CV-6393, 2021 WL 1924181, at *3 (E.D.N.Y. May 13, 2021) (quoting *Rose v. County of Nassau*, 904 F. Supp. 2d 244, 247 (E.D.N.Y. 2012)); *see also Carr v. County of Sullivan*, No. 16-CV-06850, 2018 WL 3733952, at *2 n.6 (S.D.N.Y. Aug. 3, 2018) (noting that departments are "merely administrative arms of a municipality [that] do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Polite v. Town of Clarkstown*, 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) (holding that "municipal departments in this State ... are not amenable to suit, and no claims can lie directly against them"); *Hoisington v. County of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) (finding that "municipal departments like the Department of Social Services are not amenable to suit"). Neither the Sheriff's Department nor the Jail exist separate and apart from the County and, as a result, neither can be sued. *See Gleeson v. County of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (finding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Carr*, 2018 WL 3733952, at *2 n.6 (holding that the Fallsburg Police Department cannot be sued because "[i]t is well-settled that departments that are merely administrative arms of a municipality do not have legal identity separate and apart from the municipality and, therefore, cannot sue or be sued"); *Campbell v. Sposato*, No. 15-CV-1958, 2015 WL 9267222, at *4 (E.D.N.Y. Nov. 17, 2015) (finding Nassau County Correctional Center was not a proper party because it was an arm of the Department of Sheriff, which was a Nassau County department), *report and recommendation adopted*, 2015 WL 9273951 (E.D.N.Y. Dec. 16, 2015); *Joseph v. Nassau Cnty. Corr. Ctr.*, No. 12-CV-4414, 2013 WL 1702162, at *3 (E.D.N.Y. Apr. 19, 2013) (same); *Polite*, 60 F. Supp. 2d at 216–17 (dismissing claims against the Clarkstown Police Department); *see also* N.Y. GEN. MUN. LAW § 2 (noting that counties are defined as "municipal corporations").

**\*4** Thus, Plaintiff's claims against the Sheriff's Department and the Jail are dismissed with prejudice. This outcome

does not "subject ... Plaintiff to indefinite arbitrary detention." (Pl.'s Mem. 22.) Plaintiff may seek recourse against the County, which "has already been named as a defendant." *Umhey v. County of Orange*, 957 F. Supp. 525, 532 (S.D.N.Y. 1997).

### 2. Due Process

Plaintiff claims that the delay in his release violated his due process rights. (Compl. ¶¶ 49–51.) The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Plaintiff brings both substantive and procedural due process claims under the Fourteenth Amendment. To state a procedural due process claim, a plaintiff "must first establish that he enjoyed a protected liberty interest." *Arce v. Walker*, 139 F.3d 329, 333 (2d Cir. 1998). If a plaintiff establishes such a protected interest, the next question is whether "the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011). The Fourteenth Amendment guarantees " 'more than fair process'; it 'cover[s] a substantive sphere as well, barring certain government actions regardless of the fairness of the procedures used to implement them.' " *Hurd v. Fredenburgh*, 984 F.3d 1075, 1087 (2d Cir. 2021) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)). To state a substantive due process claim, Plaintiff must allege: (1) a valid liberty or property interest, (2) which Defendants infringed in an arbitrary or irrational manner. *See Harlen Assocs. v. Incorporated Village of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001). "The interference with the plaintiff's protected right must be so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection." *Southerland v. City of New York*, 680 F.3d 127, 152 (2d Cir. 2012) (quotation marks omitted).

Plaintiff alleges a valid liberty interest for both a procedural and substantive due process claim. Because "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action[,] ... commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) (citation and quotation marks omitted). Here, Plaintiff alleges that he was wrongfully detained for 30 additional hours. (Compl. ¶¶ 51–53.) The Court assumes

without deciding that improper detention for this amount of time can violate substantive due process. *See Lynch v. City of New York*, 335 F. Supp. 3d 645, 655 (S.D.N.Y. 2018) (holding unconstitutional the Department of Correction's practice of forcing detainees who had already paid bail to remain detained until a critical mass awaiting release formed). Thus, the key questions are (1) whether Plaintiff plausibly alleges that Defendants failed to use constitutionally sufficient procedures, and (2) whether Plaintiff's confinement was arbitrary or irrational. The Court concludes on both questions that Plaintiff has failed to state a claim.

### a. Procedural Due Process

Given that Plaintiff had a liberty interest in freedom from bodily restraint, the question is "whether the government deprived the plaintiff of that interest without due process," which examines "what process was due to the plaintiff, and inquires whether that constitutional minimum was provided in the case under review." *Narumanchi v. Bd. of Trs. of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988) (citing *Mathews v. Eldridge*, 424 U.S. 319 (1976)).

### i. First Payment Attempt

**\*5** Plaintiff claims that Defendants failed to use constitutionally sufficient procedures in delaying his release after the Jail received a letter from Strauss consenting to Plaintiff's release. (Pl.'s Mem. 10–11.) The Court disagrees.

The Complaint acknowledges that Plaintiff was detained pursuant to a commitment order after a finding of contempt. (*See* Compl. ¶¶ 15, 17.) Plaintiff does not challenge the facial validity of this commitment order. (*See generally id.*) [4] Nor does he allege that he challenged the commitment order while he was detained. (*See generally id.*; *see also* Pl.'s Mem. 13 (stating that Plaintiff "never challenged the order").) Of course, Plaintiff was "free to raise ... legal challenges ... by seeking to have the commitment order vacated." *Ngemi v. County of Nassau*, 87 F. Supp. 3d 413, 419 (E.D.N.Y. 2015). [5] Absent such a challenge, Defendants were "bound to execute the valid order as it [was] written." *Id.* (citing *Tornheim v. Eason*, 363 F. Supp. 2d 674, 677 (S.D.N.Y. 2005) ("A sheriff is not empowered to review a facially valid court order; it is not within his scope of authority to question the legality of the provision in the [j]udgment."), *aff'd*, 175 F. App'x 427 (2d Cir.

2006)). As a result, to the extent they acted consistent with the commitment order, Defendants are entitled to quasi-judicial immunity. (*See* Defs.' Mem. 13.) *See Fludd v. Fischer*, No. 10-CV-6603, 2012 WL 3749652, at \*5 (W.D.N.Y. Aug. 28, 2012) ("Government officials carrying out a facially valid court order are entitled to immunity to suits for damages under § 1983."), *aff'd in part, vacated in part on other grounds, remanded*, 568 F. App'x 70 (2d Cir. 2014); *Tornheim*, 363 F. Supp. 2d at 677 (finding that a municipal official sued in his official capacity for executing a court order was "entitled to an absolute quasi-judicial immunity because his actions —undertaken in performance of his official duties—ha[d] an integral relationship with the judicial process"); *Respass v. N.Y.C. Police Dep't*, 852 F. Supp. 173, 177 (E.D.N.Y. 1994) (finding it "highly unlikely that the mere averment that the warden failed to look behind the facial validity of [the] plaintiff's commitment order would state a claim against the Department of Corrections"). [6]

**\*6** Plaintiff's claim thus turns on whether Plaintiff has plausibly alleged that Defendants acted beyond the scope of the commitment order. He has not. The commitment order allowed Plaintiff to purge his contempt by paying Cynthia Sagaria $25,889.64. (*See* Order of Commitment.) *See N.Y.C. Transit Auth. v. Transp. Workers Union of Am.*, 822 N.Y.S.2d 579, 589 (App. Div. 2006) (noting that a civil contemnor may end his or her incarceration by satisfying the purge conditions). Plaintiff's payment of $25,000 on December 17, 2019 was less than the required $25,889.64. (*See* Compl. ¶ 19; Order of Commitment.) Strauss's letter consenting to Plaintiff's release likewise did not require Plaintiff's release, because the commitment order did not specify that Plaintiff would be released upon consent by his ex-wife. (*See* Order of Commitment.) Because Plaintiff does not claim that Defendants violated the commitment order, he has not alleged that Defendants violated his due process rights by delaying his release after his first attempted payment. *See Ngemi*, 87 F. Supp. 3d at 419 (finding that where the sheriff was executing a facially valid commitment order by placing the plaintiff in custody, the plaintiff's complaint did not allege a valid procedural due process against any employee of the Sheriff's Office); *Pack v. Hynes*, Nos. 04-CV-574, 04-CV-2907, 2004 WL 3090592, at \*2 (E.D.N.Y. Aug. 18, 2004) ("The superintendents of various New York State correctional institutions had custody of [the] plaintiff under a sentence and judgment of convictions [that were] valid on their face. No valid claim is stated against them individually or together.").

Plaintiff cites *Town of Wilmurt v. Wright*, 171 N.Y.S. 230 (App. Div. 1918), to argue that Defendants would have been "entirely justified" in releasing Plaintiff due to his ex-wife's consent, (Pl.'s Mem. 10–11). However, *Wright* is consistent with the Court's reasoning. There, the parties were able "to agree upon [a] settlement, which would release the defendant from imprisonment." *Wright*, 171 N.Y.S. at 232. However, the defendant was released only because "an order was made discharging the defendant." *Id.* In other words, the defendant in *Wright* received a court order reversing a prior detention order. *See also First Mariner Bank v. Resol. L. Grp., P.C.*, No. 12-CV-1133, 2014 WL 1681986, at *3 (D. Md. Apr. 28, 2014) (ordering that the defendants had purged civil contempt). Defendants are not liable merely because Plaintiff failed to seek the same.

### ii. Second Payment Attempt

Plaintiff argues that the County violated his due process rights by refusing to release him after he attempted to pay the full purge amount via credit card. (Pl.'s Mem. 11–12.) The Court disagrees. [7]

Numerous courts have held that there is no "constitutional right to a certain type of bond." *Walden v. Carmack*, 156 F.3d 861, 874 (8th Cir. 1998); *see also Guam v. Tuncap*, 2011 Guam 24 ¶ 12 (noting that "other courts have held that there is no established right to a certain type of bond"); *Campbell v. Johnson*, No. 06-CV-365, 2006 WL 3408177, at *2 (N.D. Fla. Nov. 27, 2006) (holding that "there is no established constitutional right to a certain type of bond"); *cf. Holland v. Rosen*, 895 F.3d 272, 292 (3d Cir. 2018) (finding it unlikely "that the Excessive Bail Clause guarantees a right to monetary bail"). The history of New York's bail law is consistent with this principle. New York's law was "intended to reform the restrictive bail scheme" and "improve the availability of pretrial release." *People ex rel. McManus v. Horn*, 967 N.E.2d 671, 674 (N.Y. 2012). This law allows a court to require that "bail be posted in any one of three or more ... forms." N.Y. CRIM. PROC. LAW § 520.10(2)(b). The statute lists nine possible bail forms, and "[c]redit card or similar device" is only one of the options. *Id.* § 520.10(1). Thus, even in a bail regime designed to improve the availability of pretrial release, a criminal defendant is not entitled to pay bail by credit card. *See, e.g.*, *People v. Disimile*, 142 N.Y.S.3d 319, 322 (County Ct. 2021) (setting bail as "$30,000 cash, $60,000 insurance company bond or $200,000 partially secured appearance bond with a 10% cash component"). In light of this history, it is

unsurprising that courts have rejected claims that refusing to accept credit card payment for bail is unconstitutional. *See, e.g.*, *Wells v. Ward*, 470 F.2d 1185, 1185 (10th Cir. 1972) (affirming summary judgment against a plaintiff who alleged that "the jailer refused to accept his bail bond credit card"); *see also Kinsey v. Ohio*, No. 20-3315, 2021 WL 1100494, at *1 (6th Cir. Jan. 11, 2021) (summary order) (affirming summary judgment against a plaintiff who claimed that he was "was not permitted to pay the bail with a credit card because cash was the only acceptable method of payment"); *cf. Keele v. City of St. John*, No. 10-CV-811, 2011 WL 453254, at *3, *4 (E.D. Mo. Feb. 4, 2011) (dismissing on statute of limitations grounds the plaintiff's constitutional claim that the defendants "refused to take checks or credit cards as payment for bail").

**\*7** Finally, the Sheriff's Department did not violate Plaintiff's constitutional rights by incorrectly advising him that he could pay the full purge amount via credit card. Simply put, such miscommunications do not qualify as constitutional fouls. *See Blackburn v. Wash. Dep't of Soc. & Health Servs.*, No. 11-CV-5385, 2011 WL 3563741, at *2 (W.D. Wash. Aug. 12, 2011) (finding that, where "a miscommunication occurred over the course of one weekend," this "regrettable mistake" did not "amount[ ] to a violation under ... the Constitution because it was unintentional and brief"), *aff'd*, 472 F. App'x 569 (9th Cir. 2012); *cf. Brown v. Strickland*, No. 09-CV-3248, 2009 WL 3414344, at *1 (S.D. Tex. Oct. 20, 2009) ("Neither simple negligence nor gross negligence is enough for constitutional liability. A simple mistake does not violate the Constitution." (citation omitted)).

Because Defendants' refusal to allow Plaintiff to pay more than $10,000 via credit card towards purging his contempt does not rise to the level of a constitutional violation, Plaintiff's procedural due process claim must be dismissed. [8]

### b. Substantive Due Process [9]

The Court considers whether Plaintiff's prolonged detention was arbitrary. *See Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "Substantive due process protects against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill advised." *Cunney v. Bd. of Trs.*, 660 F.3d 612, 626 (2d Cir. 2011) (citation omitted). "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human

dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (citation and quotation marks omitted).

**\*8** "[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). An individual who has not been adjudged guilty of a crime, like Plaintiff, may therefore only be subjected to the restrictions of a detention facility so long as they "do not amount to punishment." *Fusco v. County of Putnam*, No. 15-CV-08132, 2018 WL 1889070, at \*7 (S.D.N.Y. Apr. 18, 2018) (citing *Bell,* 441 U.S. at 536). The Second Circuit has recognized that in assessing whether prison restrictions imposed on individuals without criminal convictions comport with substantive due process, "a court must decide whether the restriction is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Almighty Supreme Born Allah v. Milling*, 876 F.3d 48, 61 (2d Cir. 2017) (alterations omitted) (quoting *Bell,* 441 U.S. at 538). [10]

When executive action "infringes a protected right, a plaintiff must show not just that the action was literally arbitrary, but that it was 'arbitrary in the constitutional sense.' " *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citation omitted). In other words, only conduct that "shocks the conscience" will form the basis for a substantive due process violation for executive action. *Id*. In the Second Circuit, "whether executive action shocks the conscience depends on the state of mind of the government actor and the context in which the action was taken." *Id.*

Plaintiff claims that his release was delayed 30 hours. (Compl. ¶ 53.) This detention period is distinguishable from *Lynch*, which Plaintiff cites to argue that prolonged detention may violate due process. (Pl.'s Mem. 16–17.) In *Lynch*, the court found that a city violated the plaintiff's substantive due process rights with its practice of forcing detainees who had already paid bail to remain detained until a critical mass formed, with no justification other than convenience. 335 F. Supp. 3d at 655. Here, unlike in *Lynch*, Plaintiff has not alleged that Defendants have a formal policy of prolonging the release of incarcerated individuals by transferring them elsewhere. (*See generally* Compl.) Nor has Plaintiff alleged that Defendants deprived him of the ability to purge contempt. *See supra* (discussing the absence of a constitutional right to make bail payments via credit card). Therefore, the Sheriff Department's decision to delay Plaintiff's release after it mistakenly accepted his payment

does not rise to a level that is "arbitrary in the constitutional sense.' " *O'Connor*, 426 F.3d at 203. Nor does a credit card cap "shock[ ] the conscience." *Id.*; *see also Davidson v. City of Bridgeport*, 487 F. App'x 590, 592 (2d Cir. 2012) (summary order) (holding that to establish "egregious and conscience-shocking" behavior, the plaintiff must show that the municipality "engaged in deliberate malfeasance"). Thus, Plaintiff's Fourteenth Amendment substantive due process claim is dismissed.

### 3. Eighth Amendment

Next Plaintiff claims that the delay in release time violated his Eighth Amendment rights. (Compl. ¶¶ 49–51.) Because Plaintiff was incarcerated due to an official order of commitment for failure to pay spousal support and not a criminal conviction, his delayed release claim falls under the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). While a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *id.* (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)), as discussed, Plaintiff has failed to allege a Due Process claim. Further, because Plaintiff was not a criminal defendant, it is unclear that he is protected by the Eighth Amendment Excessive Bail Clause. *See Kehl*, 456 F.2d at 868–69. Even if he were, Plaintiff alleges that the state court set his purge amount, (*see* Compl. ¶ 16; *see also* Order of Commitment), and Plaintiff does not name the state court as a defendant, *see supra* Footnote 5. Plaintiff's Eighth Amendment claim is therefore dismissed. [11]

### III. Conclusion

**\*9** For the foregoing reasons, Moving Defendants' Motion To Dismiss is granted. Because this is the first adjudication of Plaintiff's claims, the dismissal is without prejudice. Plaintiff may file an amended complaint within 30 days of the date of this Opinion & Order. Failure to file an amended complaint could result in dismissal of this case with prejudice. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 25).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2021 WL 4392422

---

## Footnotes

1      Plaintiff does not appear to contest this payment figure. (*See generally* Pl.'s Mem.) Indeed, he incorporates it into his brief. (*See id.* at 3, 12.)

2      Because the Complaint is not paginated, the Court refers where there are no paragraph numbers to the ECF-generated page numbers in the upper right-hand corner.

3      The Court may take judicial notice of the structure of the Orange County government because it is "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019) (citing *Kramer*, 937 F.2d at 774), *reconsideration denied in part*, No. 17-CV-9178, 2019 WL 2866113 (S.D.N.Y. July 2, 2019); *cf. Gjolaj v. Bureau of Citizenship & Immigr. Servs.*, 468 F.3d 140, 143 n.2 (2d Cir. 2006) (holding that a court may take judicial notice of "a fundamental change in the political structure and government of Albania").

4      The Court notes that the order of commitment provided "how much [Plaintiff] should pay ... in order to purge himself from contempt," which is one requirement for facial validity under New York law. *See Garenani v. County of Clinton*, 552 F. Supp. 2d 328, 333 (N.D.N.Y. 2008) (citing *Loeber v. Teresi*, 681 N.Y.S.2d 416, 419 (App. Div. 1998)); *see also* N.Y. JUD. LAW § 774(1) (requiring that a commitment order "specify the amount of the fine, and the duration of the imprisonment").

5      Plaintiff alleges that the state court refused to sign the release order, (*see* Compl. ¶ 21; Pl.'s Mem. 11), and arbitrarily changed the purge conditions, (*see* Compl. ¶ 30; Pl.'s Mem. 2, 4, 10, 14). The Court does not consider these claims because the state court is neither a defendant in this Action nor a County employee. *See* N.Y. JUD. LAW § 39(6) ("[A]ll justices, judges, and nonjudicial officers and employees of the courts and court-related agencies of the unified court system ... shall be employees of the state of New York ...."). For the same reason, the Court rejects Plaintiff's argument that the state court failed to allow the required ten-day notice before considering Plaintiff's ex-wife's contempt application. (*See* Pl.'s Mem. 9.)

6      Plaintiff briefs only the issue of qualified immunity, which is not relevant to the issue of quasi-judicial immunity. As such, the Court does not address it. (*See* Pl.'s Mem. 22–23.)

7      The Court assumes without deciding that Plaintiff enjoys due process protections equivalent to those provided by the Eighth Amendment Excessive Bail Clause, even though he was detained for civil contempt. *Cf. U. S. ex rel. Goodman v. Kehl*, 456 F.2d 863, 868–69 (2d Cir. 1972) ("How far, in light of the rather obvious thrust of the Eighth Amendment toward criminal prosecutions, these principles apply to orders for civil contempt whose purpose is not to punish but to secure obedience to a court's processes may be a different question.").

8      Plaintiff's false imprisonment claim, (*see* Compl. ¶ 52), is dismissed for the same reason. Federal courts look to New York law to determine the elements of a cause of action for false imprisonment. *See Tobias v. County of Putnam*, 191 F. Supp. 2d 364, 375 (S.D.N.Y. 2002). Under New York law, "where a facially valid order issued by a court with proper jurisdiction directs confinement, that confinement is privileged and everyone connected with the matter is protected from liability for false imprisonment." *Aponte v. Fischer*, No.

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 234 of 260

Sagaria v. Orange County Jail, Not Reported in Fed. Supp. (2021)

14-CV-3989, 2020 WL 1911190, at *10 (S.D.N.Y. Aug. 20, 2020) (citing *Holmberg v. County of Albany*, 738 N.Y.S.2d 701, 703 (App. Div. 2002)).

9      While a plaintiff may simultaneously assert liberty interests based on procedural and substantive due process protection, if the Court finds that "the claim for substantive due process is subsumed by" the procedural due process claim, "it must be dismissed." *Rother v. NYS Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013); *see also Cherry v. N.Y.C. Hous. Auth.*, 15-CV-6949, 2017 WL 4357344, at *29 (E.D.N.Y. Sept. 29, 2017) ("Plaintiff fails to state a claim for a violation of substantive due process because [that] claim is based on the same facts as his procedural due process claim."); *Ratajack v. Brewster Fire Dep't, Inc.*, 178 F. Supp. 3d 118, 147 (S.D.N.Y. 2016) (holding that "the overwhelming majority of [the plaintiff's] claims fall into ambit of other provisions of the Constitution," including the Due Process Clause, "thereby closing off [the plaintiff's] ability to seek relief by invoking the concept of substantive due process"); *Monko v. Cusack*, No. 11-CV-1218, 2013 WL 5441724, at *3 (N.D.N.Y. Sept. 27, 2013) (dismissing substantive due process claim where it "overlaps both his procedural due process claim and his retaliation claim" (citing *Rother*, 2013 WL 4774484, at *14)). Here, as Plaintiff relies on the same facts in both claims, Plaintiff's substantive due process claim is subsumed by his procedural due process claim, and is dismissed on this independent basis.

10     Although the Second Circuit was specifically addressing the substantive due process rights of pre-trial detainees in *Milling*, the reasoning appears to apply with equal force to Plaintiff. *See Fusco*, 2018 WL 1889070, at *5 n.3 (analogizing the due process analysis for pre-trial detainees to the due process analysis for incarcerated civil contemnors).

11     Because Plaintiff fails to allege a violation of his constitutional rights, he cannot maintain a *Monell* claim. *See Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008) (listing as a requirement of a *Monell* claim that the plaintiff establish "deprivation of a constitutional or statutory right"); *see also Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) ("If [no individual defendant] inflicted a constitutional injury on [the plaintiff], 'it is inconceivable that the [municipality] could be liable to [the plaintiff].' " (alterations omitted) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))).

Even if he had pleaded a violation of his constitutional rights, Plaintiff could not establish a *Monell* claim because he has not alleged "that an official policy of the municipality caused [his] constitutional injury." *Roe*, 542 F.3d at 36. (*See generally* Compl.) This requirement for *Monell* liability reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997); *see also Newton v. City of New York*, 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). In other words, a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (italics omitted); *see also Vassallo v. Lando*, 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights."). "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton*, 566 F. Supp. 2d at 271; *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation."). Here, the only valid defendant is the County. Absent an alleged policy or custom

that caused constitutional harm, Plaintiff cannot maintain a *Monell* claim against the County. *See Kinsey v. Ohio*, No. 17-CV-982, 2020 WL 1066633, at *1, *4 (S.D. Ohio Mar. 5, 2020), *aff'd*, No. 20-3315, 2021 WL 1100494 (6th Cir. Jan. 11, 2021) (dismissing the plaintiff's claim because his "amended complaint fail[ed] to allege that any ... [c]ounty custom or official policy led to a violation of his constitutional rights" where the plaintiff "offered to pay the ... bail amount by credit card, but ... [the] [c]ounty refused to accept any form of payment other than cash").

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

**2023 WL 6318280**
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

George TARANTO, et al., Plaintiffs,
v.
PUTNAM COUNTY, et al., Defendants.

No. 21-CV-2455 (KMK)
|
Signed September 28, 2023

**Attorneys and Law Firms**

Thomas Martin Gambino, Esq., Law Office of Thomas M. Gambino & Associates PC, Poughkeepsie, NY, Counsel for Plaintiffs.

James A. Randazzo, Esq., Portale Randazzo LLP, White Plains, NY, Counsel for Defendants.

Drew William Sumner, Esq., Sumner Law LLP, White Plains, NY, Counsel for Defendants.

OPINION & ORDER

KENNETH M. KARAS, District Judge:

**\*1** Plaintiffs George Taranto ("Taranto"), Karen Taranto, and Christopher P. Taranto and Kerrianne Taranto-Garabo as Executors for the Estate of Taranto (altogether, "Plaintiffs") bring this Action, pursuant to 42 U.S.C. § 1983, against Putnam County ("County"), the Putnam County Sheriff's Office, Sheriff Robert L. Langley, Jr. ("Langley"), Deputy Sheriff Ronald C. Yeager ("Yeager"), Investigator Daniel Hunsberger ("Hunsberger"), Deputy Sheriff Ryan Diskin ("Diskin"), Deputy Sheriff Vincent Dalo ("Dalo"), Sergeant William Quick ("Quick"), and Officers John Does 1–10 (collectively, "Defendants"), in their individual and official capacities, alleging several constitutional violations and state claims. (*See generally* Second Am. Compl. (Dkt. No. 31).) Before the Court is Defendants' Motion to Dismiss (the "Motion") the claims in the Second Amended Complaint ("SAC") except for the Fourth Amendment excessive force claim, failure to intervene claims against the on-scene officers, state law claims for assault, battery, and wrongful death, and Karen Taranto's claims for loss of consortium, (*see* Notice of Defs.' Mot. To Dismiss (Dkt. No. 32)). [1] For the

following reasons, Defendants' Motion To Dismiss is granted in part and denied in part.

## I. Background

### A. Allegations and Materials Appropriately Considered
As a threshold matter, the Court must determine whether it may consider the (1) Notice of 50-h Hearing attached to Defendants' Motion, (*see* Dkt. No. 34) or the (2) Langley Video Interview, New York Attorney General Complaint, Putnam County Daily Voice News Article, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler attached to Plaintiffs' Opposition (*see* Dkt No. 38) at this stage of the litigation. [2]

#### 1. Applicable Law

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002) (citation omitted). However, "the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.* (citations omitted); *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety ..., documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.' " (alteration omitted) (quoting *Samuels v. Air Transp. Loc. 504*, 992 F.2d 12, 15 (2d Cir. 1993))). Under the Federal Rules of Evidence, a court may take judicial notice of a fact outside of the pleadings provided that the fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 237 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

### 2. Application

**\*2** "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases); *see also Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *5 (S.D.N.Y. Sept. 30, 2015) ("To be incorporated by reference, the complaint must make a clear, definite, and substantial reference to the documents, and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." (alterations omitted) (quoting *Bill Diodato Photography LLC v. Avon Prods., Inc.*, No. 12-CV-847, 2012 WL 4335164, at *3 (S.D.N.Y. Sept. 21, 2012))).

Even if not incorporated by reference, a document on which the complaint "solely relies and which is integral to the complaint," *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citation, emphasis, and quotation marks omitted), or a document on which "the complaint relies heavily on upon its terms and effect," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (quotation marks omitted), may also be considered by the Court on a motion to dismiss. Documents are "integral" where the plaintiff had to rely on their content "in order to explain what the actual unlawful course of conduct was on which the [d]efendants embarked." *Thomas*, 232 F. Supp. 2d at 276; *see also Gantt v. Ferrara*, No. 15-CV-7661, 2017 WL 1192889, at *14 (S.D.N.Y. Mar. 29, 2017) (holding documents were integral to the complaint where the plaintiff "relied heavily upon [them] in framing the [c]omplaint" (alterations in original) (citation omitted)). Additionally, "no serious question as to [the documents'] authenticity can exist," *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991), and it must be "clear on the record that no dispute exists regarding the authenticity or accuracy of the document," *DiFolco*, 622 F.3d at 111 (citation and quotation marks omitted).

Plaintiffs' Second Amended Complaint states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) That is Plaintiffs' sole reference to the 50-h Hearing. (*See generally id.*) No Party has attempted to explain how the Notice of 50-h Hearing, 50-h Adjournment Letters, and Letter from Dr. Frank Kessler regarding Taranto's ability to testify were clearly referenced in or integral to the Second Amended Complaint. Indeed, the Second Amended Complaint makes no reference to these documents and Plaintiffs have not relied on these documents in framing the Second Amended Complaint. Accordingly, these documents are not considered by the Court at this stage. For the same reason, the New York Attorney General Complaint against the Putnam County Sheriff's Department, the Putnam County Daily Voice News Article regarding the DiPippo settlement, and the Langley Video Interview, which are not mentioned anywhere in the Second Amended Complaint, cannot be considered.

### B. Factual Background

The following facts are drawn from the SAC and materials attached thereto and are assumed to be true for the purpose of deciding the instant Motion.

### 1. Parties

The Putnam County Sheriff's Office was and remains an agency of Putnam County. (SAC ¶ 5.) Langley, Yeager, Hunsberger, Diskin, Dalo, Quick, and Officers John Does 1-10 were employed "by Putnam County, by and through the Putnam County Sheriff's Office and/or Fire Department personnel and/or Emergency Medical Technicians" and "were acting within the scope of their employment." (*Id.* ¶¶ 6–7.) Langley "at all relevant times herein was and still is employed by Putnam County and/or Putnam County Sheriff's Office as Sheriff of Putnam County" and "supervised the actions of all subordinate officers of the Putnam County Sheriff's Office complained of herein." (*Id.* ¶¶ 10, 13.) "John Doe 1 was a Fire Department supervisor present at the time [ ] Taranto encountered the remaining Defendants" and "John Doe 2-3 are Emergency Medical Technicians present at the time [ ] Taranto encountered the remaining Defendants." (*Id.* ¶¶ 14–15.)

**\*3** "Taranto was born on December 25, 1943 and died on August 25, 2021. His estate was duly formed on November 4, 2021 in Connecticut where he resided with his wife at the time of his death. Christopher P. Taranto and Kerrianne Taranto-Garabo, the decedent's children, were appointed by the Connecticut Probate Court as co-executors for the Estate of [ ] Taranto and have been substituted herein in his place and stead." (*Id.* ¶ 17.)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 238 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2. Factual Allegations Giving Rise to the Current Action

On July 8, 2019 at approximately 2:00 AM while lawfully at his residence located at 202 Apple Tree Lane, Brewster, New York, Taranto heard noise outside his residence and saw flashlights by his window. (*Id.* ¶¶ 24–25.) Taranto exited his home and stood on his driveway with his lawfully possessed firearm at his side pointing downward towards the ground. (*Id.* ¶¶ 26–27.) Taranto heard multiple Defendants screaming at him to drop his firearm and raise his hands. (*Id.* ¶ 28.) Taranto complied with the orders and placed his firearm on the pavement and raised his hands. (*Id.* ¶ 29.) Taranto further complied with Defendants' orders to walk towards them. (*Id.* ¶ 30.)

Dalo then approached Taranto from behind and "violently threw him to the ground, banging his head on the ground, repeatedly striking him and smashing his face upon the pavement." (*Id.* ¶ 31.) "Thereafter, all Defendants continued to use force upon a prone and helpless [ ] Taranto as he lie face-down on the pavement experiencing difficulty breathing and chest pains." (*Id.* ¶ 32.) "Defendants, [ ] Yeager, [ ] Diskin, [ ] Dalo, [ ] Quick and/or John Does 1–10 proceeded to throw him to the ground, beat him about the face, head[,] and body with at least closed fists, grind his head and face on the ground and severely brutalize him." (*Id.* ¶ 40.)

During Taranto's arrest, Defendants believed Taranto to be emotionally disturbed and believed he was "verbally non-compliant." (*Id.* ¶¶ 33, 37.) Taranto was a 75-year-old, "frail man suffering from early dementia," and had recently had open heart surgery at the time of the incident. (*Id.* ¶¶ 33, 39.) Plaintiffs allege Defendants were aware of these facts at the time of the incident. (*Id.* ¶ 39.) Plaintiffs further allege that "[d]espite believing [ ] Taranto to be an emotionally disturbed person, Defendants failed to utilize a process or procedure to [e]nsure his safety." (*Id.* ¶ 34.) Plaintiffs additionally allege that "[d]uring the course of [ ] Taranto's arrest, the Defendants did not believe [ ] Taranto to have used deadly physical force against them." (*Id.* ¶ 35.) Defendants "eventually placed handcuffs" on Taranto while under the supervision of Quick. (*Id.* ¶ 41.) "As the supervisor in charge, [ ] Quick was responsible for the overall actions of the subordinate officers on scene, including the treatment of [ ] Taranto and the force used upon him." (*Id.* ¶ 42.)

"Taranto was detained in handcuffs in the rear seat of a police vehicle while pleading for help from law enforcement personnel on scene due to the excruciating pain caused by handcuffs placed on him that were fastened too tight." (*Id.* ¶ 44.) Taranto was removed from the scene while informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body." (*Id.* ¶ 45.) "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance." (*Id.* ¶ 46.) "Any first aid provided at the scene by Fire Department personnel or Emergency Medical Technicians present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶ 48.) Plaintiffs also allege that "[a]ny Fire Department personnel or Emergency Medical Technicians present on scene conspired with the remaining Defendants to conceal and/or cover up Defendants' excessive use of force utilized upon [ ] Taranto and the injuries caused to him." (*Id.* ¶ 49.) Taranto was eventually moved to Putnam County Hospital while in Defendants' custody unbeknownst to his family. (*Id.* ¶ 50.)

**\*4** Defendants entered Taranto's home without his or Karen Taranto's consent. (*Id.* ¶ 51.) Once inside the home, Defendants demanded Karen Taranto show them Taranto's pistol permit and stated "they almost killed her husband and would only tell her that he had been arrested." (*Id.* ¶¶ 52–53.) Defendants did not advise her that her husband was going to a hospital or that he was injured. (*Id.* ¶ 54.) Defendants left Taranto at the hospital after placing a criminal court summons in his pocket charging him with Menacing in the Second Degree "unattended and without notifying his family who several hours later received a phone call from a nurse at the hospital." (*Id.* ¶¶ 55–56.) Plaintiffs attach an appearance ticket for Taranto with the charge of Menacing in the Second Degree to the Second Amended Complaint. (SAC Ex. 4.) A nurse from Putnam Hospital called Karen Taranto to inform her that her husband was placed on life support after suffering cardiac and respiratory failure and pulmonary edema. (SAC ¶ 57.) Because Taranto was unable to breathe on his own, he was placed on a respirator—he remained unconscious for several days and was in critical condition. (*Id.* ¶¶ 58–59.) Taranto was removed to Danbury Hospital via ambulance given the critical nature of his injuries. (*Id.* ¶ 60.) After recovering consciousness and regaining the ability to breathe on his own, Taranto was released from the hospital. (*Id.* ¶ 61.)

On September 1, 2019, Taranto woke up and realized he was unable to walk. (*Id.* ¶ 62.) Taranto was taken to Danbury

Case 3:24-cv-00102-GTS-ML     Document 102     Filed 04/07/26     Page 239 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Hospital where a scan revealed that he had "brain bleeds as a direct result of the brutal attack." (*Id.* ¶ 63.) The following day, Taranto underwent surgery to relieve the bleeding and pressure on his brain. (*Id.* ¶ 64.) Taranto lost control of his bladder as a result of the surgery and had permanent reduced motor skills and cognitive ability. (*Id.* ¶¶ 66–67.) Taranto remained in the hospital for another seven days and then began physical rehabilitation treatment. (*Id.* ¶ 65.)

Plaintiffs allege that the "Defendants herein have covered-up Defendants' collective misconduct and violent tendencies of the Defendants, including but not limited to Defendant Quick." (*Id.* ¶ 72.) "After knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct" and "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce[d] them to falsely testify against [ ] Taranto in criminal court." (*Id.* ¶¶ 76–77.) "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions." (*Id.* ¶ 87.)

Plaintiffs additionally allege that "Defendants failed to disclose criminal discovery in a timely fashion and/or at all" and that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all." (*Id.* ¶¶ 82–83.) Defendants provided the Putnam County District Attorney's Office documents which have been provided to Taranto's criminal defense attorney which "came after various filings as part of this present litigation apparently in response to those filings." (*Id.* ¶¶ 88–89.) "Criminal Discovery was initially provided to defense counsel by the Putnam County District Attorney's Office on September 10, 2020, with Supplemental Disclosure being provided on November 16, 2020, April 6, 2021 and May 27, 2021"—the "May 27, 2021 Supplemental Discovery was made seven days after Plaintiffs' counsel filed his response to Defendants' pre-motion letter." (*Id.* ¶¶ 90–91.) "Other than document number 28, the disclosure presented as part of the May 27, 2021 Supplemental Discovery existed before the initial discovery response was made on September 10, 2020 but were not provided at that time." (*Id.* ¶ 92.) "One such document ... purports to be an internal investigation allegedly performed by Defendants pursuant to the arrest of George Taranto," which "is alleged to have started on July 8, 2019 and ended one-year later on July 9, 2020 resulting in

Defendant Langley condoning the actions of the Defendants herein." (*Id.* ¶¶ 93–94.) "This document, along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (*Id.* ¶ 95.) "[T]his report was not disclosed as part of the original criminal disclosure on September 10, 2020 or either Supplement disclosure on November 16, 2020 or April 6, 2021." (*Id.* ¶ 96.) Plaintiffs attach a list of materials disclosed to defense counsel on different dates, beginning in September 2020 and ending in May 2021. (SAC Ex. 9.)

**\*5** Plaintiffs point to "misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery." (SAC ¶ 84.) "In the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶ 85.) [3]

The complaint arrest report attached to Plaintiffs' Second Amended Complaint July 8, 2019, reported by Yeager and reviewed by Quick, states:

ON 07/08/2019 AT APPROXIMATELY 0310 HOURS, MEMBERS WERE INVESTIGATING A STOLEN VEHICLE INCIDENT AT 201 APPLE TREE LN IN THE TOWN OF SOUTHEAST. WHILE STANDING IN THE PARKING LOT OUTSIDE OF SAID RESIDENCE, AN OLD WHITE MALE, GEORGE C TARANTO DOB ... 1943, EXITED HIS RESIDENCE AT 202 APPLE TREE LANE AND WALKED UP TO INVESTIGATOR HUNSBERGER. INV HUNSBERGER TURNED TO ASK THE MAN TO GO BACK INTO HIS RESIDENCE WHEN MEMBER OBSERVED INV HUNSBERGER RUN TO COVER AND HEARD INV HUNSBERGER YELL "HES GOT A GUN".

DEPUTY DALO, DEPUTY DISKIN, SERGEANT QUICK AND MYSELF ALL DREW OUR SERVICE WEAPONS AND ORDERED MR. TARANTO NUMEROUS TIMES TO PUT DOWN HIS WEAPON AND PUT HIS HANDS IN THE AIR. MR. TARANTO DID NOT INITALLY COMPLY WITH ORDERS AND TOOK COVER BEHIND A VEHICLE. ALL MEMBERS CLEARLY STATED MULTIPLE TIMES THAT WE WERE POLICE FROM THE SHERIFF'S OFFICE. AFTER MULTIPLE ORDERS TO PUT DOWN HIS WEAPON, MR. TARANTO COMPLIED, PUT HIS WEAPON DOWN ON THE PAVEMENT,

AND LISTENED TO ORDERS TO WALK TOWARD DEPUTIES. AT THIS TIME DEPUTY DALO WAS ABLE TO SNEAK UP BEHIND MR. TARANTO AND BRING HIM TO THE GROUND. ALL MEMBERS THEN ASSISTED TRYING TO GET MR. TARANTO IN HANDCUFFS. MR. TARANTO WAS ORDERED NUMEROUS TIME TO PUT HIS HANDS BEHIND HIS BACK BUT CONTINUED TO KEEP THEM LOCKED UNDER HIS BODY. MEMBERS WERE ABLE TO FREE MR. TARANTO'S ARMS AND GET THEM BEHIND HIS BACK SO THAT HE COULD BE PLACED IN HANDCUFFS.

EMS WAS CALLED TO THE SCENE TO EVALUATE MR. TARANTO FOR ANY INJURIES. HE WAS TRANSPORTED BY AMBULANCE TO PUTNAM HOSPITAL CENTER FOR FURTHER EVALUATION. MEMBER FOLLOWED THE AMBULANCE TO PHC AND ISSUED MR. TARANTO AN APPEARANCE TICKET FOR THE TOWN OF SOUTHEAST COURT FOR THE CHARGE OF MENACING IN THE 2ND DEGREE (PL 120.14(1)) FOR 08/01/2019 AT 1800 HOURS AT WHICH TIME HE WILL BE ARRAIGNED. MEMBER ALSO CHARGED MR. TARANTO WITH CRIMINAL POSSESSION OF A WEAPON IN THE 4TH DEGREE (VTL 265.01(2)), RESISTING ARREST (PL 205.30) AND OBSTRUCTING GOVERNMENTAL ADMINISTRATION IN THE 2ND DEGREE (PL 195.05).

THE COLT MUSTANG .380 PISTOL WITH A FULL MAGAZINE OF AMMUNITION

(SAC Ex. 3.) Additionally attached to the Second Amended Complaint is a use of force form prepared by Quick indicating that Taranto was emotionally disturbed, that he resisted through "Verbal Non Compliance," "Verbal Threats/ Gestures" and "Physically Uncooperative (Resisting)," that "verbal command," "physical direction," "impact weapon," and "hands" were used to control Taranto, and that "suspect was tackled then physically restrained" and sustained "laceration to head/shoulder pain." (SAC Ex. 5.)

Plaintiffs additionally attach a Putnam County Sheriff's Department Personnel Investigation conducted by Kevin McManus which lists personnel involved as Quick, Diskin, Dalo, Yeager, Hunsberger, and Investigator Ryan McMahon and states that:

**\*6** On 07/08/2019, the afore mentioned Sheriff's Office members were investigating a stolen vehicle complaint on Apple Tree Lane within Reed Farm, located in the T/O Southeast. During the investigation, the defendant exited his residence of 202 Apple Tree Lane holding a unholstered handgun. The defendant was ordered to drop his weapon multiple times over the course of 3 minutes. Upon the defendant finally placing his weapon on the ground, he was taken to the ground by Deputy Dalo and assisted by other members. The defendant continued to struggle while members attempted to handcuff him. As a result of being taken to the ground, the defendant sustained a small cut or rash to his head.

(SAC Ex. 8.) The Recommendation of Investigating Officer stated that:

All Sheriff's Office members on scene acted within the scope of their duties in assisting with effecting a lawful arrest of the defendant. Furthermore, all Sheriff's Office members acted within the scope of the New York State Penal Law as it pertains to Article 35 as well as within the rules and regulations of the Putnam County Sheriff's Department in effecting said arrest using the minimum force necessary. Since Sgt, Quick was directly involved in the incident, member believes any investigation should be conducted by his direct supervisor. Sheriff's Office Rules and Regulations Article 8.lA, in effect at the time of this incident states Any injury to a prisoner whether the injury occurred while the subject was being taken into custody or while the person was in custody of the Putnam

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 241 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

County Sheriff's Department shall be the subject of an internal investigation, Member observed video and spoke with Sgt, Quick and several of the Deputies involved after the incident and investigation determined that the there was no improper conduct on the part of any Sheriff's Office member on scene. Member used my discretion in determining there was no need for a detailed written report.

(*Id.*) The report is signed by Langley, among others, stating "no action needed, acceptable force used on combative subject was armed with a firearm which was still within reach." (*Id.*) Plaintiffs, citing to this document, allege Langley " 'rubber stamped' an approval of the treatment of [ ] Taranto while in police custody." (SAC ¶ 86.) "Defendant Langley's deliberate indifference to 'rubber stamp' his deputies['] misconduct during an election year is nothing more than an attempt to protect his position rather than addressing the misconduct of his deputies." (*Id.* ¶ 106.)

Finally, Plaintiffs attach Taranto's Information signed by Yeager for Menacing in the Second Degree, Criminal Possession of a Weapon in the Fourth Degree, Resisting Arrest, Obstructing Governmental Administration in the Second Degree, based upon the following facts, respectively:

The said defendant, at or about 03:10 hours on the aforesaid date, while in front of 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally place or attempt to place members of the Putnam County Sheriff's Office in reasonable fear of physical injury, serious physical injury or death. Specifically, your defendant placed Investigator Hunsberger, Deputy Diskin, Deputy Dalo, Deputy Yeager and Sergeant Quick in reasonable fear of physical injury, serious physical injury or death by displaying a Colt Mustang .380 pistol.

The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of southeast, County of Putnam, New York, was in possession of a Colt Mustang .380 pistol with intent to use the same unlawfully against another.

The said defendant, at or about 03:10 hours on the aforesaid date, while at 202 Apple Tree Ln in the Town of Southeast, County of Putnam, New York, did intentionally prevent or

attempt to prevent members of the Putnam County Sheriff's Office from effecting an authorized arrest of himself, in that the defendant did physically struggle with members to avoid being handcuffed.

**\*7** The said defendant, at or about 03:10 hours on the aforesaid date, at 202 Apple Tree Ln, in the Town of Southeast, County of Putnam, New York, did intentionally prevent or attempt to prevent members of the Putnam County Sheriff's Office from performing an official function by means of intimidation, physical force or interference, or by means of an independently unlawful act in that he menaced police officers with a firearm which interfered with an official police investigation.

(SAC Ex. 10.)

C. Procedural History

Plaintiffs filed their original Complaint on March 19, 2021, (Dkt. No. 1), their Amended Complaint on July 12, 2021, (Dkt. No. 14), and their Second Amended Complaint on January 10, 2022, (Dkt. No. 31). Defendants filed their Motions to Dismiss and accompanying Memorandum of Law on January 21, 2022. (*See* Not. of Mot. (Dkt. No. 32); Mem. of Law in Supp. of Mot. ("Defs.' Mem.") (Dkt. No. 33).) Plaintiffs filed their Opposition on February 18, 2022. (*See* Mem. of Law for Reply to Mot. to Dismiss ("Pls.' Mem.") (Dkt. No. 37).) Plaintiffs additionally filed a motion to amend that same day. (Dkt. No. 39).) Defendants filed their Reply (*see* Reply to Mot. ("Defs.' Reply Mem.") (Dkt. No. 40)), and their Opposition to Plaintiffs' motion to amend on March 4, 2022, (Dkt. No. 41). Plaintiffs filed their Reply to Defendants' Opposition to Plaintiffs' motion to amend on March 9, 2022. (Dkt. No. 42.)

II. Discussion

A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a Rule 12(b)(6) motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft*

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    6

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 242 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79. ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

 **\*8** "[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegation contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on a Rule 12(b)(6) motion to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, ... documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. 2021) (same).

### B. Analysis

#### 1. False Arrest

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A §

1983 false arrest claim "is substantially the same as a claim of false arrest under New York law." *Id.* New York law requires a plaintiff to show "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged." *Toussaint v. Cnty. of Westchester*, No. 21-CV-03817, 2022 WL 2834108, at \*5 (S.D.N.Y. July 20, 2022). "[T]he existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest ... under § 1983." *Dillon v. Rosen*, No. 22-CV-7035, 2022 WL 4538397, at \*3 (S.D.N.Y. Sept. 28, 2022) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 84 (2d Cir. 2007)); *see also Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest ... will defeat a claim of false arrest under the Fourth Amendment."). "[A] claim for false arrest will not lie so long as the arresting officer had probable cause to arrest the plaintiff for some crime." *Jaegly v. Couch*, 439 F.3d 149, 150 (2d Cir. 2006).

Generally speaking, officers have probable cause to arrest when they have "reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (internal quotation marks and alterations omitted). As the Second Circuit recently observed:

> To determine the existence of probable cause, a court considers the totality of the circumstances, based on 'a full sense of the evidence that led the officer to believe that there was probable cause to make an arrest.' The court considers those facts available to the officer at the time of the arrest and immediately before it. The significance of each of these factors may be enhanced or diminished by surrounding circumstances.

*Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (quotation marks and citations omitted).

Moreover, "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The qualified immunity defense, thus, is a broad shield that protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Kass v. City of N.Y.*, 864 F.3d 200, 206 (2d Cir. 2017) (quoting *Zalaski v. City*

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 243 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013)). "[I]n the qualified immunity context, an officer invoking the probable cause defense need only establish that he or she acted with arguable probable cause[.]" *Schlaepfer v. City of N.Y.*, No. 20-CV-3339, 2022 WL 4484571, at *9 (S.D.N.Y. Sept. 27, 2022) (quotation marks omitted); *Kass*, 864 F.3d at 206 ("An officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged."). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863, 2021 WL 1164185, at *12 (S.D.N.Y. Mar. 26, 2021) (quoting *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same).

**\*9** Defendants argue there existed probable cause to arrest Taranto for, among other offenses, criminal possession of a weapon in the fourth degree. (Defs.' Mem. 4–9.) "A person is guilty of criminal possession of a weapon in the fourth degree when ... [h]e or she possesses any dagger, dangerous knife, dirk, machete, razor, stiletto, imitation pistol, undetectable knife[,] or any other dangerous or deadly instrument or weapon with intent to use the same unlawfully against another[.]" N.Y. Penal Law § 265.01(2). "Crucially, for the charge of criminal possession of a weapon in the fourth degree, 'the element of intent to use a dangerous instrument unlawfully can be presumed from a finding that defendant possessed a dangerous instrument.' " *Curanaj v. Cordone*, No. 10-CV-5689, 2012 WL 4221042, at *11 (S.D.N.Y. Sept. 19, 2012) (quoting *People v. Campbell*, 450 N.Y.S.2d 210, 211 (App. Div. 1982)). Plaintiffs clearly alleged that Taranto was in possession of a firearm, (SAC ¶¶ 26–27), accordingly, at the least, Defendants had arguable probable cause to arrest Taranto. *See Curanaj*, 2012 WL 4221042, at *11 (holding that the "[d]efendants had arguable probable cause on the charge of Criminal Possession of a Weapon in the Fourth Degree" when the plaintiff clearly "possessed a dangerous instrument"—an ax—because "[f]rom that fact, the intent element is satisfied"); N.Y. Penal Law § 265.15 ("The possession by any person of any dagger, dirk, stiletto, dangerous knife or any other weapon, instrument, appliance or substance designed, made or adapted for use primarily as a weapon, is presumptive evidence of intent to use the same unlawfully against another."); *cf. Egan v. New York City,* No. 16-CV-1479, 2018 WL 4926445, at *9 (S.D.N.Y. Oct. 10,

2018) (holding that because the "criminal purpose of a laser pointer is not immediately apparent" possession of a laser pointer would not be "enough to provide probable cause in this case: there must be probable cause to believe that Plaintiff possessed the laser with the intent to use it unlawfully"); *Levy v. City of New York*, 935 F. Supp. 2d 575, 586 (E.D.N.Y. 2013) (noting in false arrest case for N.Y. Penal Law § 265.01(2) that "[b]ecause a kitchen knife is an inherently utilitarian utensil, the key inquiry is the manner in which the kitchen knife is used"). Thus, the Court grants the Motion to Dismiss the false arrest claim.

2. Denial of Fair Trial

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To state a fair trial right claim, a plaintiff must plausibly plead the following elements: "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

Probable cause is not a defense to a denial of fair trial claim. *See Heard v. City of New York*, 319 F. Supp. 3d 687, 697 (S.D.N.Y. 2018); *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at *11 (S.D.N.Y. July 10, 2018). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett*, 838 F.3d at 278; *see also Brandon v. City of New York*, 705 F. Supp. 2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of [a plaintiff's] fair right to trial based on the same alleged fabrication of evidence").

Plaintiffs make many conclusory allegations regarding fabrication of evidence. For instance, Plaintiffs allege "[a]fter knowing that the original information disseminated concerning [ ] Taranto was false, Defendants engaged in a course of conduct to continue its malicious prosecution

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 244 of 260

of [ ] Taranto after falsely arresting him and criminally charging him in an attempt to justify and cover-up their prior false statements and misconduct," that "Defendants thereafter tampered with potential witnesses seeking to obtain false testimony from them and coerce them to falsely testify against [ ] Taranto in criminal court," that "Defendants have fabricated evidence against [ ] Taranto in an effort to conceal their wrongful actions," that "[a]fter knowing that the original allegations concerning [ ] Taranto were false, Defendants engaged in a course of conduct to fabricate their claims concerning [ ] Taranto," and that Defendants "[f]abricat[ed] and contrive[ed] criminal charges lodged against Plaintiff." (SAC ¶¶ 76–77, 87, 99, 123.) Plaintiffs' Opposition similarly states "[a]s discussed herein, Plaintiffs have demonstrated, before discovery has proceeded, the extent and nature of the fabrication of evidence by the Defendants pursuant to the arrest and prosecution of [ ] Taranto," which "includes the criminal discovery turned over by the Defendants to the prosecutor after pleadings were docketed pursuant to this litigation despite the documents provided during criminal discovery having been previously available based upon the dates of creation." (Pls.' Mem 15.) However, the Opposition, like the Second Amended Complaint does not specifically point to particular instances of fabrication of evidence. [4]

**\*10** Conclusory statements that officers fabricated evidence do not suffice to state a claim for the denial of a fair trial. *See Longo v. Ortiz*, No. 15-CV-7716, 2016 WL 5376212, at *6 (S.D.N.Y. Sept. 26, 2016) (holding that the plaintiff failed to state denial of fair trial claim where he alleged "he was denied the right to a fair trial ... when the defendants fabricated evidence, gave false testimony, and made false extrajudicial statements ... to be used against [the plaintiff] at trial as well as to a Supreme Court judge in an effort to secure a search warrant, indictment and conviction" (internal quotation marks omitted)); *see also Harasz v. Katz*, 239 F. Supp. 3d 461, 493 (D. Conn. 2017) (holding that the plaintiff failed to state a denial of fair trial claim where he merely alleged that officers "did in fact participate in fabrication of evidence, ignored the truth when presented[,] and chose what to bring as the truth ... [and] did not want the truth to interfere with their witch hunt."). "Instead[,] plaintiffs must identify the actual fabrication," which Plaintiffs fail to do. *Hutchins v. Solomon*, No. 16-CV-10029, 2018 WL 4757970, *16 (S.D.N.Y. Sept. 29, 2018); *see also Thompson v. City of New York*, No. 18-CV-04105, 2020 WL 2097622, at *4 (S.D.N.Y. May 1, 2020) ("The [c]omplaint does not identify what evidence was fabricated; and the [c]omplaint fails to identify what, if any,

fabricated evidence the defendants offered or to whom it was offered and what effect the purported false evidence would have had on the jury."); *Cunningham v. City of New York*, No. 17-CV-5124, 2018 WL 4168964, at *5 (S.D.N.Y. Aug. 30, 2018) (dismissing fair trial claim where the complaint failed to assert that arresting report contained a fabrication); *Waddlington v. City of New York*, 971 F. Supp. 2d 286, 297 (E.D.N.Y. 2013) (dismissing fair trial claim, and noting that the "[p]laintiff at no point alleges with specificity what false information [defendant police officers] created or forwarded to the D.A.'s Office"); *cf. Long v. New York City,* No. 14-CV-9908, 2016 WL 4203545, at *3 (S.D.N.Y. Aug. 8, 2016) ("[The p]laintiff claims specific sentences in specific documents were intentionally falsified by Officer Vazquez.").

Plaintiffs additionally allege that an investigation that ended on July 9, 2020 "along with other documents provided by Defendants as part of [ ] Taranto's criminal prosecution, have been fabricated by the Defendants in an effort to conceal their wrong-doing." (SAC ¶ 94–95.) Again, Plaintiffs have not identified any specific fabrication. Furthermore, Plaintiffs have not alleged a causal connection between any fabrication contained within the investigation, which concluded a year after Taranto was arrested, and any deprivation. "The manufacture of false evidence, in and of itself ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right ... the deprivation of liberty of which [a plaintiff] complains [must] be shown to be the result of [the defendant's] fabrication of evidence." *Zahrey v. Coffey*, 221 F.3d 342, 348–49 (2d Cir. 2000) (internal quotation marks omitted) (noting that plaintiff had alleged the "eight months he was confined, from his bail revocation (after his arrest) to his acquittal" was the result of "the manufacture of false evidence"). Without such an allegation, Plaintiffs claim cannot stand. *Cf. Ricciuti*, 124 F.3d at 126–27, 130 (holding qualified immunity is unavailable where plaintiffs alleged that a fabricated confession caused prosecutors to add another charge); *Harris v. City of New York*, No. 15-CV-8456, 2017 WL 6501912, at *8 (S.D.N.Y. Dec. 15, 2017) ("[F]abricated evidence may cause a further deprivation if it adversely informs a prosecutor's charging and bail determinations."); *Long v. New York City*, No. 14-CV-9908, 2016 WL 4203545, at *5 (S.D.N.Y. Aug. 8, 2016) ("[F]abrication of evidence leading to pre-trial detention can satisfy the causation element for a fair trial claim.").

### 3. Deliberate Indifference to Medical Needs

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 245 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Because Taranto was a pre-trial detainee at the time he was allegedly denied adequate medical care, Plaintiffs' claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quotation marks omitted).

To establish a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must establish two elements: (1) that the "deprivation of medical care ... [was] 'sufficiently serious,' " and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.' " *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006)). The first element is objective and requires allegations that suggest that the detainee was subject to "conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-CV-65, 2017 WL 5624276, at *7 (S.D.N.Y. Nov. 20, 2017) (quotation marks omitted) (quoting *Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996)). The second element, which is applied somewhat "differently to claims under the Eighth Amendment [than] the Fourteenth Amendment," also imposes an objective standard, whereas the Eighth Amendment imposes a "subjective standard." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at *4 (S.D.N.Y. July 26, 2018) (citation omitted). That is, the law enforcement or prison official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

**\*11** Plaintiffs contend in their Opposition that "Taranto was detained at the scene for such an extended period of time" which "begs further inquiry of ... why he was not immediately transported to a hospital." (Pls.' Mem. 18.) Plaintiffs allege that before he was transported for treatment, Taranto was detained in the rear seat of a police vehicle, however the Second Amended Complaint does not allege the length of the detention. (SAC ¶ 44.) Plaintiffs additionally allege that "Taranto was eventually removed from the scene while he informed the Defendants that he was experiencing chest pains and sustained physical injuries to his face, head, and body" and transported to a hospital to received care. (*Id.* ¶¶ 45, 50.)

"When the basis for a ... claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the [detainee's] *underlying medical condition* alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious, to support a[ ] ... claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (citation and quotation marks omitted); *see also James v. Brown*, No. 14-CV-1767, 2016 WL 3945688, at *4 (S.D.N.Y. July 19, 2016) (noting that where an inmate alleges "an unreasonable delay or interruption in treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (alteration and citation omitted)). "[A] short interruption of care, even if the underlying medical condition is serious, does not constitute a serious medical need where the 'alleged lapses in treatment are minor.' " *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (quoting *Smith*, 316 F.3d at 186). "Where temporary delays or interruptions in the provision of medical treatment have been found to satisfy the objective seriousness requirement in this Circuit, they have involved either a needlessly prolonged period of delay, or a delay which caused extreme pain or exacerbated a serious illness." *Id.* (collecting cases). Where a plaintiff cannot show actual injury, he may nonetheless satisfy the objective prong by demonstrating that the delay of medical treatment exposed him to "an unreasonable risk of future harm." *Smith*, 316 F.3d at 188. However, "the inmate must show that the risk of future harm is 'so grave that it violates contemporary standards of decency.' " *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *3 (S.D.N.Y. Mar. 18, 2010) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

"Although in many cases, calling for medical assistance within an hour or so of the injury may have sufficed in meeting an official's duties, *see Pateman v. City of White Plains*, No. 17-CV-6156, 2020 WL 1497054, at *21 (S.D.N.Y. Mar. 25, 2020) (collecting cases), the Second Circuit has also noted that 'it's the particular risk of harm faced by a [detainee] due to the challenged deprivation of care' that is relevant to deliberate indifference claims, *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003) (citation omitted)." *Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 396 (S.D.N.Y. 2020). Therefore, "delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for the delay." *Id.* (quoting *Smith*, 316 F.3d at 186). For instance, in

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 246 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

*Maldonado*, this Court held that a pretrial detainee's estate plausibly alleged deliberate indifference to medical needs when the pretrial detainee was tasered, was not responding to NARCAN, and even though the defendant was told the pretrial detainee needed to be rushed to medical treatment immediately, there was a 20-minute delay in transporting the pretrial detainee to the emergency room. *Id.* at 389, 397. The pretrial detainee was pronounced dead at the hospital. *Id.* at 390. Here, Plaintiffs have not alleged how much time transpired between the incident and Taranto's arrival at the hospital—it is possible Taranto was transported to the hospital almost immediately after the alleged incident. *See Cooper v. City of New York*, No. 14-CV-3698, 2016 WL 4491719, at *1, 8 (E.D.N.Y. Aug. 25, 2016) (holding plaintiff who was attacked by police, became unconscious, and fell into a coma had not alleged deliberate indifference to medical needs when the "incident took place at 1:15pm, and it was reported at 1:32pm" and plaintiff was then admitted to the emergency room approximately 20 minutes later). Indeed, Plaintiffs allege that Taranto was removed from the scene "while" informing Defendants he was "experiencing chest pains and sustained physical injuries to his face, head, and body"—indicating there was no delay between Taranto's complaints and his transport to the hospital. (SAC ¶ 45.) Additionally, Plaintiffs have not alleged any fact indicating that any delay worsened Taranto's medical condition. Without any sense of the time that transpired between Taranto's injury and the subsequent transport to the hospital or any allegations as to whether any delay worsened or posed any specific risk to Taranto's medical condition, Plaintiffs have not plausibly alleged any delay constitutes deliberate indifference to medical needs. *See Smith*, 316 F.3d at 186 ("[It is] the particular risk of harm faced by a [detainee] due to the challenged deprivation of care, rather than the severity of the [detainee's] underlying medical condition, considered in the abstract, that is relevant.").

 **\*12**  Plaintiffs additionally allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (*Id.* ¶¶ 46, 48.) "While Plaintiff[s] allege[ ] that 'all defendants' failed to provide adequate medical treatment, that allegation is insufficient because it is conclusory." *Sterling v. Akinyombo,* No. 20-CV-10804, 2022 WL 2657223, at *5 (S.D.N.Y. July 8, 2022) (citation omitted). Plaintiffs have not alleged which

Defendants were involved in any deprivations of care or what medical attention was or was not provided at the scene. Such conclusory allegations cannot withstand Defendants' Motion to Dismiss. *See Price v. Koenigsmann*, No. 19-CV-4068, 2022 WL 125818, at *5 (S.D.N.Y. Jan. 13, 2022) (holding that factual allegations plaintiff makes that reference "Defendants" and their deliberate indifference to his medical needs "are vague and conclusory" and therefore cannot support a plausible deliberate indifference claim).

### 4. 1985(3) Conspiracy

To state a claim for conspiracy in violation of § 1985(3), a plaintiff must allege (1) a conspiracy, (2) with the intent or purpose to deprive a person of equal protection of the law, (3) an act in furtherance of the conspiracy, (4) which results in an injury to a person, or a person's property, or the deprivation of a federal constitutional right. *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015). "In order to maintain an action under [§] 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that [the] defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (citation and internal quotation marks omitted). "In addition, a plaintiff must allege that she is a member of a protected class and that the conspirators acted with class-based discriminatory motivation." *Arroyo-Horne v. City of New York*, No. 16-CV-3857, 2019 WL 3428577, at *5 (E.D.N.Y. July 30, 2019), *aff'd*, 831 F. App'x 536 (2d Cir. 2020).

Defendants argue that Plaintiffs failed to plead any specifics about the alleged conspiracy and failed to plead a factual basis supporting a meeting of the minds. (Defs.' Reply Mem. 4.) Plaintiffs argue that they have sufficiently pled a cause of action of conspiracy noting that the identities of the John Doe Defendants are unknown but that they were present on the scene at the time of Taranto's arrest and failed to intervene when Taranto was assaulted, failed to provide proper medical attention, and "covered-up the wrongdoing of the known Defendants." (Pls.' Mem. 15.) Plaintiffs also allege that "[i]n furtherance of the conspiracy, Defendants fabricated evidence against [Taranto], failed to provide evidence in a timely manner despite it being available during [ ] Taranto's criminal prosecution and engaged in acts to cover up the excessive use of force upon [ ] Taranto by the Defendants herein." (SAC ¶ 153.) However, Plaintiffs have not included any facts which support a plausible allegation that Defendants conspired together, let alone conspired to deprive Taranto's of

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 247 of 260

equal protection of the laws. Accordingly, the claim cannot stand. *See Ziglar v. Abbasi,* 582 U.S. 120, 154 (2017) ("To state a claim under § 1985(3), a plaintiff must first show that the defendants conspired—that is, reached an agreement—with one another."); *see also Arroyo-Horne,* 2019 WL 3428577, at *5 (dismissing 1985 conspiracy claim when the complaint "does not provide any allegations or include any facts from which the Court could conclude that any individual(s) conspired to deprive Plaintiff of equal protection of the laws or equal privileges and immunities under the laws."); *K.D. ex rel. Duncan v. White Plains Sch. Dist.,* 921 F. Supp. 2d 197, 308 (S.D.N.Y. 2013) (dismissing the plaintiff's section 1985(3) claim because the complaint did not "set forth any specific facts that indicate any sort of meeting of the minds ... let alone an agreement to violate [the plaintiffs' rights]" (emphasis omitted)); *Friends of Falun Gong v. Pacific Cultural Enter., Inc.*, 288 F. Supp. 2d 273, 279 (E.D.N.Y. 2003) (finding that the plaintiff failed to adequately plead a section 1985(3) claim because "the complaint [did] not include any facts that could support an inference of a conspiracy" and because the plaintiff "cite[d] no facts from which a meeting of the minds could be inferred").

**\*13** However, even if Plaintiffs have plausibly alleged concerted action by Defendants, the claim still fails. Defendants additionally argue that Plaintiffs' § 1985(3) should fail as "Plaintiffs failed to plead membership in a protected class under § 1985(3)." (Defs.' Reply Mem. 4.) The Court agrees. To establish a violation of § 1985(3), a plaintiff must establish, among other elements, that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus." *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 522 (S.D.N.Y. 2022), *report and recommendation adopted*, No. 19-CV-11265, 2022 WL 874769 (S.D.N.Y. Mar. 24, 2022) (quotation marks omitted). Plaintiffs have not attempted to do so. (*See generally* SAC.) Accordingly, the section 1985(3) conspiracy claim fails on this ground as well. *McDaniel,* 585 F. Supp. 3d at 522 (dismissing claims pursuant to § 1985 when the complaint "provides no factual assertions that would establish the requisite discriminatory animus"); *see also Joyner v. Alston & Bird LLP*, No. 21-CV-8549, 2022 WL 6244417, at *10 (S.D.N.Y. May 13, 2022), *report and recommendation adopted*, No. 21-CV-8549, 2022 WL 4115954 (S.D.N.Y. Sept. 9, 2022) (dismissing claim § 1985(3) in part because plaintiff had not alleged "discriminatory animus aimed at depriving her of a federal constitutional right").

### 5. 1983 "Cover-Up" Claim

"In a section 1983 claim alleging a cover-up by government agents, the constitutional right at issue is the First Amendment right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up." *Tavares v. New York City Health & Hosps. Corp.,* No. 13-CV-3148, 2015 WL 158863, at *7 (S.D.N.Y. Jan. 13, 2015) (citing *Christopher v. Harbury,* 536 U.S. 403, 413–14 & n. 11 (2002) (describing these claims as "backward-looking access claims")). "The Second Circuit has emphasized, however, that '[t]he viability of [such] claims is far from clear,' pointing out that the *Harbury* decision was careful not to endorse their validity." *Id.* (citing *Sousa v. Marquez,* 702 F.3d 124, 128 (2d Cir. 2012)).

Nevertheless, even assuming backward-looking access claims are actionable, Plaintiffs' fail. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed' by the alleged cover-up." *Sousa,* 702 F.3d at 128 (quoting *Broudy v. Mather,* 460 F.3d 106, 120 (D.C. Cir. 2006)). Plaintiffs' claims are clearly not foreclosed as they are bringing them in this very Action and have not argued that any claims have been foreclosed—accordingly the claim is dismissed. *See Tavares,* 2015 WL 158863, at *7–8 (dismissing "cover-up" claim when plaintiff "has not alleged that the DOCCS [d]efendants' actions prevented him from litigating his underlying Eighth Amendment and state-law medical malpractice claims against the City [d]efendants—indeed, he is bringing those very claims in this action.").

### 6. Individual Liability

Defendants argue that Plaintiffs "impermissibly plead all causes of action against all named Defendants instead of bringing each cause of action against only the involved [D]efendants." (Defs.' Mem. 14.) Specifically, Defendants argue that Plaintiffs' "Fourth Amendment false arrest and excessive force claims" and failure to intervene claims against Langley "who was not present at the scene on July 8, 2019" must fail for lack of personal involvement. (*Id.*)

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Sterling,*

Case 3:24-cv-00102-GTS-ML   Document 102   Filed 04/07/26   Page 248 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2022 WL 2657223, at *4 (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995)). "[A] plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Tangreti v. Bachmann,* 983 F.3d 609, 618 (2d Cir. 2020) (quotation marks omitted); *see also Leneau v. Ponte,* No. 16-CV-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) (dismissing allegations against a defendant for lack of personal involvement because the "[p]laintiff's general allegation that all defendants were involved in the alleged constitutional violations does not rescue the claims against" a particular defendant). Accordingly, "a plaintiff may not rely on a special test for supervisory liability" instead, "[t]he violation must be established against the supervisory official directly." *Tangreti,* 983 F.3d 616–18.

**\*14** The Court agrees that Plaintiffs have not alleged Langley's personal involvement in Plaintiffs' remaining constitutional claim, namely their excessive force claim. While Plaintiffs have pled that Langley "failed to intercede to terminate the aforementioned assault upon [ ] Taranto" they have not alleged he was present during the incident at issue or how he somehow permitted the use of force to occur. (SAC ¶ 71.) And while they allege Langley "was personally aware of the events complained of herein as they were occurring" they have not alleged any fact indicating this was the case. (*Id.* ¶ 73.) Such conclusory allegations do not sufficiently allege personal involvement. *See Falls v. Pitt,* No. 16-CV-8863, 2018 WL 3768036, at *6 (S.D.N.Y. Aug. 8, 2018) (finding personal involvement not established where the plaintiff failed to allege the defendants were "present" for the alleged violation or "participated directly" in or "somehow permitted" the alleged violation); *Lara-Grimaldi v. Cnty. of Putnam,* No. 17-CV-622, 2018 WL 1626348, at *11 (S.D.N.Y. Mar. 29, 2018) (holding personal involvement not established where the "[c]omplaint contain[ed] no allegations whatsoever that [the defendant] was involved in, aware of, or somehow permitted" the violation).

Plaintiffs additionally state in their Opposition that dismissal of Langley is inappropriate at this stage because he "established policy, was responsible for the training and discipline of officers and the overall operation of the Defendant police department." (Pls.' Mem. 19.) "While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal

involvement." *Koehl v. Bernstein,* No. 10-CV-3808, 2011 WL 2436817, at *19 (S.D.N.Y. June 17, 2011), *report and recommendation adopted by,* No. 10-CV-3808, 2011 WL 4390007 (S.D.N.Y. Sept. 21, 2011) (citation omitted). Plaintiffs appear to only allege a single instance of excessive force in their Second Amended Complaint, namely the incident at issue. (*See generally* SAC.) "Allegations involving only a single incident are generally insufficient to demonstrate the existence of an official policy or custom for purposes of establishing personal involvement under § 1983." *Parris v. N.Y. State Dep't Corr. Servs.,* 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Accordingly, this single alleged use of force is insufficient to plausibly allege personal involvement on the basis of a policy. *See Tubbs v. Venettozzi,* No. 19-CV-126, 2019 WL 2610942, at *8 (N.D.N.Y. June 26, 2019) (holding that allegations that Superintendent was made aware of complaints about due process violations and allowed a custom of due process violations in disciplinary hearings failed when plaintiff only alleged two such incidents); *Lindsey v. Butler,* 43 F. Supp. 3d 317, 331 (S.D.N.Y. 2014), *on reconsideration in part,* No. 11-CV-9102, 2014 WL 5757448 (S.D.N.Y. Nov. 5, 2014) (holding that plaintiff's claims that Commissioner Kelly "created or adopted" an unconstitutional policy were insufficient to plausibly allege personal involvement "[w]ithout more than the allegations related to the single incident in the station house"). Additionally, insofar as Plaintiffs seek to hold Langley liable on the basis of his supervisory position, the Second Circuit has made clear that in the wake of *Iqbal,* plaintiffs cannot rely on supervisory liability to establish personal involvement. *Tangreti,* 983 F.3d at 620 (holding it was insufficient to show that defendant "was negligent, or even grossly negligent, in her supervision of the correctional officers or in failing to act on the information she had" for the purposes of personal involvement); *see also Bridgewater v. Taylor,* 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011) (holding personal involvement not established where the plaintiff made conclusory claims that a supervisory official failed to provide proper training and supervision or created a policy).

### 7. Putnam County Sheriff's Office

**\*15** Defendants argue that "claims against the Putnam County Sheriff's Office must be dismissed because the police department is a non-suable entity." (Defs.' Mem. 23.) The Court agrees. Under law of the State of New York, "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Hoisington*

*v. County of Sullivan,* 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999). "[T]he Sheriff's Department [does not] exist separate and apart from the County and, as a result, [ ] can[not] be sued." *Sagaria v. Orange Cnty. Jail,* No. 20-CV-2287, 2021 WL 4392422, at *3 (S.D.N.Y. Sept. 24, 2021); *see also Gleeson v. County of Nassau,* No. 15-CV-6487, 2019 WL 4754326, at *14 (E.D.N.Y. Sept. 30, 2019) (holding Nassau County Sheriff's Department and Nassau County Correction Center were not proper parties because they are administrative arms of Nassau County); *Polite v. Town of Clarkstown,* 60 F. Supp. 2d 214, 216 (S.D.N.Y. 1999) ("Therefore, municipal departments in this State—such as the Clarkstown Police Department—are not amenable to suit, and no claims can lie directly against them.") Indeed, "Plaintiffs concede the Putnam County Sheriff's Office is not a suable entity." (Pls.' Mem. 26.)

### 8. *Monell* Claim

"To state a claim under [§ 1983], the plaintiff must show that a defendant, acting under color of state law, deprived him of a federal constitutional or statutory right." *Sykes v. Bank of Am.,* 723 F.3d 399, 405–06 (2d Cir. 2013). However, "Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978). Thus, "to prevail on a claim against a municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir. 2008); *see also Williams v. Lohard,* No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York,* 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[ ] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)); *Salvatierra v. Connolly,* No. 09-CV-3722, 2010 WL 5480756, at *10 (S.D.N.Y. Sept. 1, 2010) (dismissing a claim against agencies where the plaintiff did not allege that any policy or custom caused the deprivation of his rights), *report and recommendation adopted,* 2011 WL 9398 (S.D.N.Y. Jan. 3, 2011).

This multi-factor test, and particularly the fifth element, reflects the notion that "a municipality may not be held liable under § 1983 solely because it employs a tortfeasor." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997); *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 478 (1986) (holding that a municipality may not be liable under § 1983 "by application of the doctrine of respondeat superior." (italics omitted)); *Vassallo v. Lando,* 591 F. Supp. 2d 172, 201 (E.D.N.Y. 2008) (noting that "a municipal entity may only be held liable where the entity *itself* commits a wrong"); *Newton v. City of N.Y.,* 566 F. Supp. 2d 256, 270 (S.D.N.Y. 2008) ("As subsequently reaffirmed and explained by the Supreme Court, municipalities may only be held liable when the municipality itself deprives an individual of a constitutional right."). Instead, there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris,* 489 U.S. 378, 385 (1989); *see also City of St. Louis v. Praprotnik,* 485 U.S. 112, 122 (1988) ("[G]overnments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.").

**\*16** "In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.' " *Davis v. City of N.Y.,* 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd,* 75 F. App'x 827 (2d Cir. 2003). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton,* 566 F. Supp. 2d at 271; *see also City of Okla. City v. Tuttle,* 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. Cnty. of Westchester,* No. 20-CV-10076, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (quotation marks omitted)); *Santana v. City of N.Y.,* No. 15-CV-6715, 2018 WL 1633563, at *10 (S.D.N.Y. Mar. 29, 2018) ("[A] 'single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy.' ") (quoting *DeCarlo v. Fry,* 141 F.3d 56, 61 (2d Cir.

1998)); *Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 427 (S.D.N.Y. 2002) ("A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unconstitutional violation.").

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Atadzhanov v. City of New York,* No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citations omitted); *see also Patterson v. Cnty. of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability). Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell*'s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between[, for example,] the training inadequacies alleged, and the particular constitutional violation at issue." (emphasis omitted)); *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiffs' injury, *Monell* prohibits a finding of liability against the [c]ity."); *Hincapie v. City of New York,* 434 F. Supp. 3d 61, 77 (S.D.N.Y. 2020) (holding that the plaintiff "fails to state a *Monell* claim" because the plaintiff "has not

pled facts demonstrating a direct link between his injuries and the alleged municipal policy"); *Johnson v. City of New York*, No. 06-CV-9426, 2011 WL 666161, at *3 (S.D.N.Y. Feb. 15, 2011) (noting that after demonstrating the existence of a municipal policy or custom, "a plaintiff must establish a causal connection—an affirmative link—between the policy and the deprivation of his constitutional rights" (quotation marks omitted)).

Plaintiffs assert that the County is liable to Plaintiffs for the alleged constitutional deprivations based upon its maintenance of "a policy, practice or custom, officially or unofficially, of unconstitutional practices, including the use of force, the cover-up of police misconduct, the failure to maintain an independent police review board, the fabrication of evidence, the intimidation of witnesses, the failure to disclose discovery during criminal prosecution and the condoning of police misconduct." (SAC ¶ 161.) Plaintiffs further allege that the County "by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to emotionally disturbed persons and the use of weapons during police encounters." (*Id.* ¶ 162.)

**\*17** Plaintiffs do not allege that the County maintains a formal policy officially endorsed by the municipality. (*See generally id.*)[5] Accordingly, the Court need only analyze whether Plaintiffs have plausibly alleged that there existed a sufficiently widespread practice to constitute a custom, whether policymakers failed to provide adequate training or supervision so grossly that it rises to gross indifference, or whether actions by final policymakers constituted official policy. *See Atadzhanov*, 2022 WL 4331304, at *11 (listing the four modes of proving a policy, custom, or practice under *Monell*).

### a. Widespread Practice

To demonstrate a de facto policy or custom through a widespread practice, a plaintiff must "show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions." *Buari v. City of N.Y.*, 530 F. Supp. 3d 356, 398 (S.D.N.Y. 2021) (quoting *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004)). A practice can constitute a custom under *Monell* when the practice is "persistent and widespread," or "permanent and

Case 3:24-cv-00102-GTS-ML     Document 102     Filed 04/07/26     Page 251 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

well settled as to constitute a 'custom or usage' with the force of law" and to "imply the constructive knowledge of policymaking officials." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 400 (S.D.N.Y. 2021) (quoting *Sorlucco v. N.Y.C. Police Dep't,* 971 F.2d 864, 870–71 (2d Cir. 1992)); *see also Triano v. Town of Harrison*, 895 F. Supp. 2d 526, 532 (S.D.N.Y. 2012) (noting that to demonstrate a practice is sufficiently widespread and crystalized to constitute a custom under *Monell*, "a plaintiff must prove that the custom at issue is permanent and well-settled" (citing *Praprotnik*, 485 U.S. at 127)).

 **\*18** Plaintiffs allege that "Defendants maintain a pattern, policy and/or practice whereby criminal discovery is not provided in a timely fashion and/or at all" and cite to *DiPippo v. County of Putnam,* No. 17-CV-7948, 2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019). (SAC ¶¶ 83–84.) In *DiPippo*, plaintiff Anthony DiPippo alleged in part that he was denied a fair trial and wrongfully convicted based upon fabricated evidence during his criminal trials in 1994 and 2012. 2019 WL 1004152, at \*8. The court held that plaintiff had

> pleaded ample specific facts indicating that Defendants used extremely similar coercive investigative techniques on at least six witnesses within the [ ] investigation [at issue]. These techniques included: procuring testimony that implicated DiPippo in exchange for leniency, threatening witnesses with prosecutions against them if they did not provide inculpatory testimony, harassing and assaulting witnesses over extended periods of time, isolating witnesses and interrogating them for hours, forcing or attempting to force witnesses to sign false affidavits or other pre-written statements, administering sham polygraph examinations, failing to keep records of meetings with witnesses, using force on witnesses, and denying witnesses the opportunity to consult with counsel.

*Id.* at \*9. Based on these allegations, and the fact that "DiPippo was wrongfully convicted twice and tried three times by a jury" and the plaintiff "alleged facts that indicated that the [Putnam County Sheriff's Department] officers used similar unconstitutional methods in every trial" the court held that, that the plaintiff had sufficiently pled a *Monell* claim under a widespread practice theory. *Id.* at \*11.

Defendants argue that Plaintiffs' sole reliance on this case dooms their *Monell* claim as the case resolved by settlement without determination or admission of liability. (Defs.' Mem. 18–19.) Indeed, courts in this District have held that "citations to lawsuits, even if they did involve comparable conduct, do not alone establish a custom or practice that is widespread and persistent, *particularly if the lawsuits did not result in an adjudication of liability.*" *Bethune v. Westchester County*, No. 18-CV-3500, 2020 WL 1032508, at \*5 (S.D.N.Y. Mar. 2, 2020) (emphasis added) (granting a motion to dismiss where the plaintiff premised *Monell* liability on, inter alia, citations to several filed lawsuits); *see also Barnett v. Westchester County*, No. 18-CV-2483, 2020 WL 1032445, at \*5 (S.D.N.Y. Feb. 28, 2020) (same); *Vincent v. Winski*, No. 14-CV-7744, 2018 WL 1441370, at \*17 (S.D.N.Y. Mar. 22, 2018) (granting the defendants' motion to dismiss *Monell* claims where "the only facts that [the] [p]laintiff identifie[d] in support of any pattern of mishandling situations because of a failure to train ... consist[ed] of other litigations resulting in settlements"); *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at \*17 (S.D.N.Y. Mar. 26, 2015) (concluding that "lawsuits cited by [the] [p]laintiff in the [proposed amended complaint], even when combined with [other] allegations ..., are insufficient to plausibly support an inference of a widespread custom" to establish *Monell* municipal liability). *DiPippo* was settled without an admission of liability. *See* Stipulation of Discontinuance with Prejudice, *DiPippo*, 2019 WL 1004152, Dkt. No. 98. Accordingly, Plaintiffs cannot allege a widespread practice on the basis of *DiPippo* alone. *See McDonald v. City of Troy*, 542 F. Supp. 3d 161, 175–76 (N.D.N.Y. 2021) (holding that while "Plaintiffs' eight settled [excessive force] lawsuits over eight years is not the best record for a small city like Troy to sport .... [B]ecause plaintiff has not pointed to a single related case that actually resulted in a finding of liability on the City's part, that showing falls woefully short of establishing *Monell* liability"); *An v. City of New York,* 230 F. Supp. 3d 224, 229–30 (S.D.N.Y. 2017) (granting a motion to dismiss where a complaint sought to establish *Monell* liability based on "cites [to] six lawsuits filed between 2012 and 2016 and one newspaper report" but failed to plausibly allege a custom

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 252 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

because "the Complaint fail[ed] to allege that any of the six lawsuits, which were filed over a course of four years, resulted in a finding that the NYPD officers violated the plaintiffs' First Amendment rights"). [6]

### b. Failure to Train

**\*19** *Monell* liability can also exist " 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.' " *Fraser*, 2021 WL 1338795, at \*10 (quoting *Reynolds*, 506 F.3d at 192). One category of municipal acquiescence involves a failure to train public officials. However, a failure to train constitutes a policy or custom that is actionable under § 1983 only where "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers ... can reasonably be said to have been deliberately indifferent to the need." *City of Canton*, 489 U.S. at 390. The Second Circuit has held that a finding of deliberate indifference requires: (1) "that a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "that the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 440 (2d Cir. 2009) (alteration in original) (quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297–98 (2d Cir. 1992)). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

To set forth a failure to train claim, "a plaintiff must plausibly allege a specific deficiency in the municipality's training." *Tieman*, 2015 WL 1379652, at \*22. Here, Plaintiffs' claim fails first and foremost because they have not alleged a specific training deficiency. Indeed, Plaintiffs' Second Amended Complaint does not "contain sufficient factual matter" to state a training deficiency "that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Instead, Plaintiffs only broadly allege "Defendant Putnam County and/or Putnam County Sheriff's Office breached their duty to the public and the Plaintiff

specifically by deploying Deputies without first properly screening the hiring of and training of them," that the County failed to "train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters," and that "Langley has failed to train and/or retrain his deputies, including the Defendants herein, in the proper and lawful use of force," "the proper treatment of prisoners requiring medical attention," "proper response and/or treatment of emotionally disturbed persons," and the "requirement to timely transmit criminal discovery as part of a criminal prosecution." (SAC ¶¶ 108–111, 162, 201.) Simply put, the sum total of Plaintiffs' failure-to-train claim is based on a threadbare description of the County's training, and is the type of conclusory claim that courts routinely dismiss. *See, e.g.*, *Clarke v. Antonini*, No. 21-CV-1877, 2022 WL 4387357, at \*12 (S.D.N.Y. Sept. 22, 2022) (dismissing *Monell* claim where plaintiff failed to "allege a specific deficiency in either the [c]ity or the [c]ounty's training for his failure-to-train theory"); *Lehal v. Cent. Falls Det. Facility Corp.*, No. 13-CV-3923, 2016 WL 7377238, at \*11 (S.D.N.Y. Nov. 21, 2016) (dismissing failure to train claim when a "[p]laintiff's new allegations regarding a supposed lack of training are too general and speculative to support a *Monell* claim"); *Triano*, 895 F. Supp. 2d at 539–40 (dismissing *Monell* claim where the plaintiff "merely alleged that the [t]own failed to train its employees, without providing any supporting factual detail about alleged deficiencies in the training program"); *Walker v. City of New York*, No. 14-CV-808, 2015 WL 4254026, at \*11 (S.D.N.Y. July 14, 2015) (dismissing failure to train claim where the plaintiff "neither cites to procedural manuals and training guides, nor highlights the pertinent aspects of police training in order to prove the claim").

Furthermore, in addition to identifying a specific training deficiency, a plaintiff must "establish that that deficiency caused the constitutional deprivation." *Benn v. City of New York*, No. 18-CV-722, 2021 WL 3193022, at \*6 (S.D.N.Y. July 28, 2021) (citation omitted). Plaintiffs, however, only make conclusory assertions that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to properly train and/or supervise its officers resulting in the unlawful actions complained of herein." (SAC ¶ 115.) Plaintiffs' conclusory assertions do not suffice to plausibly allege that a deficiency in training caused Taranto's injury. *See King v. City of Beacon Police Dep't*, No. 20-CV-5815, 2021 WL 1550073, at \*3 (S.D.N.Y. Apr. 20, 2021) (dismissing *Monell* claims when a plaintiff's allegations that his injuries "resulted from a municipal policy or custom" were

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 253 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

"wholly conclusory"); *Acosta v. City of New York*, No. 11-CV-856, 2012 WL 1506954, at *11 (S.D.N.Y. Apr. 26, 2012) (dismissing *Monell* claim where the plaintiff merely alleged that the city "failed to train its police officers," because the plaintiff "failed to set forth factual allegations that would support a plausible inference that the [c]ity's 'policies' or 'customs' caused ... [the] alleged violations of [the] plaintiff's rights").

**\*20**  In sum, Plaintiffs have not pled a plausible *Monell* claim under a failure to train theory.

### c. Failure to Discipline or Supervise

"In *City of Canton*, the Supreme Court established the 'deliberate indifference' standard in the context of a claim for failure to train, but 'the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims,' including claims for failure to supervise and failure to discipline." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) (quoting *Reynolds*, 506 F.3d at 192).

"To establish *Monell* liability premised on a failure to supervise, a plaintiff must plead that (1) there was a pattern of allegations of or complaints about, or a pattern of actual, similar unconstitutional activity, and (2) the municipality consistently failed to investigate those allegations." *Lopes v. Westchester Cnty.*, No. 18-CV-8205, 2020 WL 1445729, at *5 (S.D.N.Y. Mar. 25, 2020). Alternatively, "a plaintiff may plead (1) that there was a pattern of actual similar constitutional violations and (2) the municipality consistently failed to discipline those involved." *Tieman*, 2015 WL 1379652 at *21 (emphasis omitted). To establish deliberate indifference for a failure to supervise and/or discipline claim, the plaintiff must show that "the need for more or better supervision to protect against constitutional violations was obvious," which may be established "through proof of repeated complaints of civil rights violations ... if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Buari,* 530 F. Supp. 3d at 400.

"[A]n allegation of numerous claims of [the underlying constitutional wrong] by itself is insufficient to raise an inference of deliberate indifference due to failure to supervise." *Tieman*, 2015 WL 1379652, at *21. Rather, a plaintiff must allege that "meaningful attempts to investigate

repeated claims ... are absent." *Id.* (quoting *Hart v. City of Binghamton*, No. 10-CV-1064, 2012 WL 1565085, at *5 (N.D.N.Y. May 2, 2012)). In other words, "[f]or deliberate indifference to be shown, the response must amount to a persistent failure to investigate the complaints or discipline those whose conduct prompted the complaints." *Hart*, 2012 WL 1565085, at *5. Plaintiffs do not make any such allegation, instead Plaintiffs allege that Langley, "as Sheriff of Putnam County and/or subordinates under his command, fail to ... supervise its officers resulting in the unlawful actions complained of herein," failed "to discipline subordinates upon findings of misconduct," and that the "attack against [ ] Taranto could have been prevented had Putnam County and/or Sheriff Langley acted properly by removing Deputies who have demonstrated violent tendencies, failed to act within the boundaries of law, properly train its officers, properly supervise its officers and/or to discipline officer misconduct." (SAC ¶¶ 75, 115.) While the *DiPippo* case points to misconduct that occurred in the Putnam County Sheriff's Office, Plaintiffs make no specific factual allegations regarding any failures to investigate complaints or discipline officers involved in that matter by the Putnam County Sheriff's Office's in the Second Amended Complaint. (*See generally* SAC.) The only relevant allegations in the Second Amended Complaint are that "Plaintiffs are presently aware of similar misconduct committed by the Defendants in the matter of *DiPippo v. County of Putnam, et al.* where Defendants, among other things, also failed to disclose criminal discovery," and that "[i]n the matter of *DiPippo v. County of Putnam*, Defendant Quick was also one of the defendants who failed to disclose and apparently hid criminal discovery." (*Id.* ¶¶ 84–85.) However, Plaintiffs have made no allegations regarding any prior lack of investigation into or disciplining of Quick, or any other officer for that matter, in the Second Amended Complaint, which dooms their claim. *See Esperanza v. City of New York,* 325 F. Supp. 3d 288, 309 (E.D.N.Y. 2018) ("Plaintiffs do not allege any specific facts regarding whether the [c]ity investigated or disciplined Lluka in response to the complaints of excessive force."); *Walker*, 2015 WL 4254026, at *11 (noting that "[e]ven if [the] [p]laintiff had shown an obvious need for more or better supervision by listing the numerous lawsuits and complaints, he has not stated any facts to show that the [c]ity has acted with deliberate indifference" where "he does not specifically claim that the [c]ity *failed to investigate* the list of lawsuits"). Cases finding failures to supervise or discipline have required more. *See, e.g.*, *Buari,* 530 F. Supp. 3d at 407–08 (ruling that the plaintiff sufficiently alleged failure to supervise when "in approximately 72 cases where courts had found prosecutorial

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 254 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

misconduct occurred [ ]including the use of and failure to correct false or misleading testimony and *Brady* violations[ ], officials could only identify one prosecutor from between 1975 and 1996 who had been disciplined in any respect"); *Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at *20–21 (S.D.N.Y. Sept. 7, 2016) (denying motion to dismiss on failure to discipline claim where officers were not disciplined in over thirty-five percent of substantiated complaints, which "plausibly suggest[ed] that the City did nothing"). [7]

### d. Final Policymaker

**\*21** "Actions by an individual with final decision-making authority in a municipality constitute official policy for purposes of a § 1983 claim." *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003). "[E]ven a single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983." *Amnesty*, 361 F.3d at 126 (internal quotation marks and citation omitted). When a non-decisionmaker committed the constitutional violation "a plaintiff must allege facts suggesting that an officer with final policymaking authority ordered, ratified, or 'was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions.' " *Hu v. City of New York*, 927 F.3d 81, 105 (2d Cir. 2019) (quoting *Amnesty Am.*, 361 F.3d at 126).

"An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Anthony*, 339 F.3d at 139. When alleging policymakers caused the violation, "the critical inquiry is not whether an official generally has final policymaking authority; rather, the court must specifically determine whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit." *Guity v. Uniondale Union Free School Dist.*, No. 18-CV-04369, 2019 WL 3402280, at *7 (E.D.N.Y. July 26, 2019) (alteration omitted). "Whether an official has final policymaking authority is a legal question, determined on the basis of state law." *Roe*, 542 F.3d at 37.

Plaintiffs do allege in the Second Amended Complaint that "Defendant Langley is the final decision/policy maker of the Putnam County Sheriff's Department and in is familiar with, creates and implements his Department's practices and policies." (SAC ¶ 107.) However, Plaintiffs do not point to any support for this proposition, which they must do to sufficiently allege Langley was a final policymaker with respect to the particular conduct challenged in this lawsuit. *See Coppola v. Town of Plattekill*, No. 17-CV-1032, 2018 WL 1441306, at *10 (N.D.N.Y. Mar. 22, 2018) ("[M]inimal, conclusory statements fall far short of satisfying Plaintiff's burden to allege facts creating a plausible inference that either of these defendants were final policymakers. Plaintiff does not direct the Court to New York State law, municipal charters, or any other source that could support her claim."); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093, 2016 WL 1274587, at *12–13 (S.D.N.Y. Mar. 31, 2016) (dismissing a *Monell* claim where the plaintiffs "allege[d] that 'Coughlin, as an administrator for the District, possesses policy making authority,' " but "cite[d] no state or county law that actually vests Coughlin with final policymaking authority over the maintenance and protection of student records"); *Canner v. City of Long Beach*, No. 12-CV-2611, 2015 WL 4926014, at *6 (E.D.N.Y. Aug. 18, 2015) (noting a prior order where the court dismissed the plaintiffs' *Monell* claim where the "plaintiffs did not reference any state law supporting their claim that [an official] was a final policymaker"); *see also Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir. 2000) ("Where a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law."); *Long v. Cnty. of Orleans*, 540 F. Supp. 3d 344, 352–53 (W.D.N.Y. 2021), *appeal dismissed* (Sept. 1, 2021) (holding at summary judgment that the "[p]laintiff's vague assertion of final policymaking authority by Sheriff Bower is simply insufficient to satisfy his burden" when the plaintiff "neither produced nor pointed to any evidence or legal authority supporting the conclusion that Sheriff Bower had final policymaking authority regarding the force to be used in effectuating an arrest or when probable cause for an arrest has been established" (quotation marks omitted)). Accordingly, the *Monell* claim cannot stand. [8]

### 9. State Claims

**\*22** Defendants move to dismiss all of Plaintiffs' state claims "except for state law claims for assault, battery and wrongful death, and Ms. Taranto's corollary claims for loss of consortium." (Defs.' Mem. 2.) [9]

Case 3:24-cv-00102-GTS-ML Document 102 Filed 04/07/26 Page 255 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

### a. Defamation

To state a claim for defamation under New York law, a plaintiff must allege "(1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on part of the publisher; (4) that either constitutes defamation per se or caused special damages." *Alvarado v. Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 790 (S.D.N.Y. 2019) (quotation marks omitted). Under New York law, "spoken defamatory words are slander; written defamatory words are libel." *Albert v. Loksen*, 239 F.3d 256, 265 (2d Cir. 2001); *see also Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir. 2000) ("Libel is a method of defamation expressed in writing or print.").

**\*23** A plaintiff must plead the defamatory statements with some particularity. N.Y. C.P.L.R. 3016(a) ("In an action for libel or slander, the particular words complained of shall be set forth in the complaint, but their application to the plaintiff may be stated generally."). Under Federal Rule of Civil Procedure 8's liberal pleading standards, this requires a plaintiff to "identify the allegedly defamatory statements, the person who made the statements, the time when the statements were made, and the third parties to whom the statements were published." *Neal v. Asta Funding, Inc.,* 13-CV-2176, 2014 WL 3887760, at \*3 (S.D.N.Y. June 17, 2014).

Plaintiffs argue they have sufficiently pled a cause of action for defamation because the "filing of false criminal allegations sufficiently demonstrates libel/slander per se." (Pls.' Mem. 26.) More specifically, Plaintiffs allege that "Defendants, individually and/or collectively, have defamed [Taranto] by libel per se and/or slander per se, libel and/or slander, based upon the false arrest of Plaintiff and release of false information concerning said arrest, the sum and substance of which defamatory statements was that [Taranto] engaged in acts constituting the crime of Menacing in the Second Degree and other alleged criminal acts despite knowing them to be false." (SAC ¶ 206.)

However, "[o]fficers may not be held liable for any allegedly defamatory statements in their criminal complaints, because 'individuals participating in a public function such as judicial proceedings are afforded protection from liability by an absolute immunity.' " *Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at \*11 (N.D.N.Y. Nov. 17, 2017); *Lockett v. City of Middletown*, No. 19-CV-08255,

2021 WL 1092357, at \*6 (S.D.N.Y. Mar. 22, 2021) (same). Accordingly, "[a] person filing a formal complaint charging another with a crime is ... entitled to absolute immunity from a civil suit for defamation." *Grant*, 2017 WL 5564605, at \*11 (citation omitted); *see also Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 488 (E.D.N.Y. 2016) ("[T]o the extent that Plaintiffs argue that the Felony Complaints and District Court Informations contained defamatory statements, the [Nassau County Police Department] officers who made those statements are protected from liability by an absolute immunity."); *Goncalves v. Reynolds*, 198 F. Supp. 2d 278, 282 (W.D.N.Y. 2001) (holding that absolute immunity shielded the defendant from liability for defamation where the "defendant's actions with respect to plaintiff's arrest and the bringing of the assault charge were clearly prosecutorial in nature, and were directly related to the decision to prosecute plaintiff"). Accordingly, Plaintiffs' defamation claim cannot stand.

### b. Negligence

The elements of a negligence claim under New York law are: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz–Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002) (citing *Merino v. New York City Transit Auth.,* 639 N.Y.S.2d 784 (App. Div. 1996)).

Plaintiffs argue they "have sufficiently pled negligence as an alternate theory of liability," because Defendants "owned [sic] a duty of care to [ ] Taranto who was deprived of his liberties while in Defendants['] custody, care and control." (Pls.' Mem. 25.) "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Toure v. Air France*, No. 21-CV-1645, 2022 WL 4079592, at \*3 (E.D.N.Y. Sept. 6, 2022) ("[A] plaintiff seeking damages for an injury resulting from a wrongful arrest and detention may not recover under broad general principles of negligence ... but must proceed by way of the traditional remedies of false arrest and imprisonment.") (citation omitted); *Durr v. Slator*, 558 F. Supp. 3d 1, 40 (N.D.N.Y. 2021) ("When a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." (citation and

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 256 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

quotation marks omitted)); *Dollard v. City of New York,* 408 F. Supp. 3d 231, 238–39 (E.D.N.Y. 2019) ("New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution.... To the extent that a claim for negligence and/or NIED is based upon injury incident to an arrest, a plaintiff must resort to the traditional tort remedies of false arrest, false imprisonment, and malicious prosecution."); *Sullivan v. City of New York,* No. 17-CV-3779, 2018 WL 3368706, at *18 (S.D.N.Y. July 10, 2018) ("New York courts have long held that, where a plaintiff brings false-arrest and false-imprisonment claims, she cannot also recover under broad principles of negligence."). Accordingly, Plaintiffs cannot maintain a negligence claim insofar as that claim overlaps with excessive force, false arrest, false imprisonment, and malicious prosecution causes of action.

 **\*24**  "However, a plaintiff may proceed with negligence claims brought against law enforcement officials if such claims are not duplicative of false arrest, false imprisonment, or malicious prosecution." *Lalonde v. City of Ogdensburg,* ––– F. Supp. 3d ––––, 2023 WL 2537626, at *29 (N.D.N.Y. Mar. 16, 2023). Accordingly, courts have allowed negligence actions pertaining to deprivations of adequate medical care to proceed. *See Durr,* 558 F. Supp. 3d at 40–41 (holding that plaintiff plausibly alleged both a deliberate indifference to medical claim needs claim and a negligence claim related to the failure to provide medical care upon his arrest).

"[I]t is well-established in New York that when the State assumes physical custody of inmates or detainees, who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard those individuals from harm." *Maldonado,* 460 F. Supp. 3d at 400–01 (quotation and citation omitted). Accordingly, courts have found that when a plaintiff is injured during an arrest and the arresting officers fail to provide medical care upon arrest, a plaintiff may proceed with a negligence claim. *See Durr,* 558 F. Supp. 3d at 41 (holding negligence claim survived when the "complaint plausibly alleges that Plaintiff was seriously injured during the course of his arrest and that the City Defendants, knowing that Plaintiff was in severe pain, declined to take him to the Upstate Emergency Department for treatment, despite being instructed to do so by healthcare personnel").

Plaintiffs allege that "Defendants refused to permit [ ] Taranto to receive proper medical attention at the scene or to be removed from the scene via ambulance," and that "[a]ny first aid provided at the scene by any Fire Department personnel or Emergency Medical Technician present at the scene was insufficient and inadequate to address [ ] Taranto's medical distress." (SAC ¶¶ 46, 48.) Federal Rule of Civil Procedure 8 "requires, at a minimum, that a complaint give each defendant fair notice of what the plaintiff's claim is and the ground upon which it rests." *Patrico v. Voya Fin., Inc.,* No. 16-CV-7070, 2017 WL 2684065, at *5 (S.D.N.Y. June 20, 2017) (quotation marks omitted). A complaint fails this standard when it "lump[s] all the defendants together in each claim and provid[es] no factual basis to distinguish their conduct." *Id.* Plaintiffs have brought the claims against multiple Defendants, namely Putnam County Sheriff's Office employees, not all of whom were present at the scene, and possibly Fire Department personnel, and Emergency Medical Technicians. (*See generally* SAC.) It is unclear from Plaintiffs' pleadings which Defendants prevented Taranto from receiving proper medical attention or what medical attention Taranto was prevented from receiving, as Plaintiffs have simply pled that "Defendants" were responsible for such actions and have not provided a "plausible factual basis to distinguish the conduct of each of the defendants." *Bardwil Indus. Inc. v. Kennedy,* No. 19-CV-8211, 2020 WL 2748248, at *3 (S.D.N.Y. May 27, 2020). On that basis, the negligence claim must fail. *See Nesbeth v. N.Y.C. Mgmt. LLC,* 17-CV-8650, 2019 WL 110953 (S.D.N.Y. Jan. 4, 2019) ("[I]t is well-established in this Circuit that plaintiffs cannot simply lump defendants together for pleading purposes" under Rule 8 (quotation marks omitted)); *Medina v. Bauer,* No. 02-CV-8837, 2004 WL 136636, at *6 (S.D.N.Y. Jan. 27, 2004) ("By lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8. Specifically, the allegations fail to give adequate notice to these defendants as to what they did wrong.").

### c. Negligent Hiring, Supervision, and Training

 **\*25**  Defendants argue that Plaintiffs' negligent-hiring, retention, training, and supervision claims are not actionable under New York law because all Defendants were acting within the scope of their employment. (Defs.' Mem. 21.) Indeed, Plaintiffs allege that, at all relevant times, Defendants "were acting within the scope of their employment and in furtherance of the purposes and business of Putnam County and/or the Putnam County Sheriff's Office, and/or Fire Department personnel and/or Emergency Medical Technicians." (SAC ¶ 7.) "New York law provides that an

Case 3:24-cv-00102-GTS-ML Document 102 Filed 04/07/26 Page 257 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

employer can be liable for the torts of an employee who acts within the scope of his or her employment under the theory of respondeat superior, but no claim may proceed against the employer for negligent hiring, retention, supervision or training." *Hurt v. City of New York*, No. 15-CV-7612, 2018 WL 4007639, at \*4 (S.D.N.Y. Aug. 22, 2018) (quotation marks omitted). An "exception to [this] general principle exists where the plaintiff is seeking punitive damages from the employer based on alleged gross negligence in the hiring or retention of the employee." *Nesheiwat v. City of Poughkeepsie*, No. 11-CV-7072, 2013 WL 620267, at \*2 (S.D.N.Y. Feb. 13, 2013).

"It is [ ] well settled that 'the State and its political subdivisions [such as counties] are not subject to punitive damages ... [as] the goals of punishment and deterrence are not served when punitive damages are imposed against the State, for in such circumstances, it ultimately is the innocent taxpayer who is punished.' " *Martinez v. Cnty. of Suffolk*, 999 F. Supp. 2d 424, 433 (E.D.N.Y. 2014) (citing *Hubbard v. Town of Sand Lake*, 667 N.Y.S.2d 496, 498 (App. Div. 1998)); *see also Ogunkoya v. Cnty. of Monroe*, No. 15-CV-6119, 2020 WL 3791850, at \*8 (E.D.N.Y. July 7, 2020) (noting that municipalities are not subject to punitive damages). "Thus, the negligent hiring claim ... is dismissed." *Martinez, 999 F. Supp. 2d at 433*.

### d. Prima Facie Tort

To survive a motion to dismiss on a claim of prima facie tort, a plaintiff must allege: (1) the defendant's intentional infliction of harm; (2) special damages resulting from the defendant's actions; (3) a lack of "excuse or justification"; and (4) that the defendant's act or acts would otherwise be lawful. *NE Brands LLC v. Seattle Pac. Indus., Inc.*, No. 19-CV-7420, 2020 WL 4287989, at \*2 (S.D.N.Y. July 27, 2020) (quoting *U.S. for Use and Benefit of Evergreen Pipeline Constr. Co., Inc. v. Merritt Meridian Constr. Corp.*, 95 F.3d 153, 161 (2d Cir. 1996)). "Special damages" refers to an injury made up of a "specific and measurable loss." *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985). Defendants argue that Plaintiffs have failed to allege any specific damages and their claim therefore fails. (Defs.' Mem. 22.) Plaintiffs have failed to respond to this argument. (*See generally* Pls.' Mem.)

Federal courts have the discretion to deem a claim abandoned when a defendant moves to dismiss that claim and the plaintiff fails to address in their opposition papers the

defendant's arguments for dismissing such a claim. *See, e.g.*, *Lipton v. Cnty. of Orange*, 315 F. Supp. 2d 434, 446 (S.D.N.Y. 2004) ("This Court may, and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the claim should be dismissed."); *Anti–Monopoly, Inc. v. Hasbro, Inc.*, 958 F. Supp. 895, 907 n.11 (S.D.N.Y. 1997) ("[T]he failure to provide argument on a point at issue constitutes abandonment of the issue ... which provides an independent basis for dismissal." (citations omitted)), *aff'd*, 130 F.3d 1101 (2d Cir. 1997); *see also Robinson v. Fischer*, No. 09-CV-8882, 2010 WL 5376204, at \*10 (S.D.N.Y. Dec. 29, 2010) (report and recommendation) (collecting cases). Because Plaintiffs have failed to address Defendants' argument for dismissing the prima facie tort claim, that claim is abandoned. *See Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at \*8 (E.D.N.Y. May 2, 2019) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." (alteration and quotation marks omitted) (collecting cases)); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, No. 08-CV-442, 2014 WL 4723299, at \*7 (S.D.N.Y. Sept. 23, 2014) ("At the motion to dismiss stage ... a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim.").

### III. Conclusion

**\*26** For the foregoing reasons, Defendants' Motion is granted in part and denied in part. Defendants' request that all of Plaintiffs' state causes of action be dismissed as a result of Plaintiffs' failure to comply with New York's General Municipal Law is denied. The remainder of Defendants' Motion is granted. Because this is the first adjudication of Plaintiffs' claims on the merits, Plaintiffs' claims are dismissed without prejudice. If Plaintiffs wish to file a third amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order. There will be no extensions. Plaintiffs are further advised that the third amended complaint will completely replace, not supplement, the instant Second Amended Complaint. The third amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiffs wish the Court to consider. If Plaintiffs fail to timely file a third amended complaint, the claims may be dismissed with prejudice.

The Court will hold a status conference on October 3, 2023, at 12:15 P.M.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6318280

---

## Footnotes

1   Plaintiffs have withdrawn their malicious prosecution and Eighth Amendment claims. (Mem. of Law for Reply to Mot. to Dismiss. 14, 16.)

2   The Arrest Report, Use of Force Form, Appearance Ticket, Criminal Court Information, Criminal Court Discovery, Photograph Hospital, Photograph Surgery, and Personnel Investigation, attached to Plaintiffs' Opposition, are also attached to the Second Amended Complaint.

3   Defendants note that the defendant in *DiPippo v. County of Putnam* was actually Quick's father. (Defs.' Mem. 18.)

4   Plaintiffs in their Opposition also point to "the statements of [ ] Langley, which purport to have one of his subordinates change the Use of Force Form with respect to the use of an impact weapon upon [ ] Taranto." (Pls.' Mem 15.) Plaintiffs do not make any such allegations in the Second Amended Complaint.

5   Plaintiffs posit that the municipal liability lies because of "the failure to maintain an independent police review board." (SAC ¶ 161.) However, an alleged absence of a formal policy is not a policy: "the absence of a policy is not a policy and is not actionable under *Monell*." *Zachary v. City of Newburgh*, No. 13-CV-5737, 2014 WL 1508705, at *5 (S.D.N.Y. Apr. 1, 2014) (citing *Monell*, 436 U.S. at 690–91); *see also Quinones v. New York City*, No. 19-CV-5400, 2020 WL 5665142, at *19 (S.D.N.Y. Aug. 17, 2020) ("[B]ut, under *Monell*, a municipality's failure to put a formal policy in place to prevent unlawful conduct is not the same thing as an actionable policy."), *report and recommendation adopted*, No. 19-CV-5400, 2020 WL 6901340 (S.D.N.Y. Nov. 23, 2020). "Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one [the Court] address[es] here seeking liability based not on affirmative conduct but on a government official's failure to act." *Reynolds v. Giuliani*, 506 F.3d 183, 191–92 (2d Cir. 2007) (citing *City of Canton*, 489 U.S. at 394–95 (O'Connor, J., concurring in part and dissenting in part) ("Where ... a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.")). When a municipality "does not have an adequate policy ...*Monell* liability exists 'where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Fraser v. City of N.Y.*, No. 20-CV-4926, 2021 WL 1338795, at *10 (S.D.N.Y. Apr. 9, 2021) (quoting *Reynolds*, 506 F.3d at 192). "Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*." *Id.*

6   Plaintiffs have not argued that they have plausibly alleged municipal liability on the basis of a widespread practice of excessive force. (Pls.' Mem. 22–24.) Indeed, Plaintiffs have not pointed to any other instances of excessive use of force beyond the incident described at hand. (*See generally* SAC.) This alone is fatal to Plaintiffs' *Monell* claim. *See Aragon v. New York*, No. 14-CV-9797, 2017 WL 2703562, at *6 (S.D.N.Y. June 22, 2017) (dismissing claims where "[the] [p]laintiff seems to allege the existence of a practice adopted by the [County] solely based on [the] [p]laintiff's alleged experience"); *Gordon v. City of New York*, No. 10-CV-5148,

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 259 of 260

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

2012 WL 1068023, at *4 (E.D.N.Y. Mar. 29, 2012) (dismissing *Monell* claim where the plaintiff's "allegation [was] unsupported by anything other than the facts of what occurred in his particular case").

7    In *DiPippo*, the court noted that Plaintiff alleged that "Stephens and other supervisors purportedly knew about Castaldo and Quick's misconduct, personally participated in it, and failed to document or disclose it. Stephens and other supervisors also allegedly failed to prevent Castaldo and Quick from engaging in misconduct, participated in it, encouraged it, and affirmatively misrepresented to prosecutors that no misconduct had occurred ... Stephens updated Thoubboron about all major investigatory developments. Hence, Thoubboron was either aware of the misconduct committed by Defendants Stephens, Castaldo, and Quick or willfully blind to it." 2019 WL 1004152, at *6. However, Plaintiffs have made no specific allegations in the Second Amended Complaint about any alleged failure to supervise or discipline.

Plaintiffs additionally allege that "[a]t all times mentioned herein and prior to the incidents described herein, Putnam County, by and through its policy makers, maintained a policy, practice or custom, officially or unofficially, of failing to adequately supervise, discipline and/or train its officers, including with respect to the use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters." (SAC ¶ 162.) Plaintiffs have not alleged any prior failures to supervise or discipline officers for use of force, tactics with respect to responding to emotionally disturbed persons and the use of weapons during police encounters.

8    Furthermore, Plaintiffs do not specifically argue in their Opposition that *Monell* liability is predicated upon an act of a final policymaker or point to a specific to act in their briefing. (Pls.' Mem. 22–24.)

9    Defendants aver that Plaintiffs' state law claims are precluded due to their failure to comply with General Municipal Law § 50-h. (Defs.' Mem 20–21.) Section 50-h states:

[w]herever a notice of claim is filed against a city, county, town, village, fire district, ambulance district or school district the city, county, town, village, fire district, ambulance district or school district shall have the right to demand an examination of the claimant relative to the occurrence and extent of the injuries or damages for which claim is made, which examination shall be upon oral questions unless the parties otherwise stipulate .... The action ... may not be commenced until compliance with the demand for examination if the claimant fails to appear at the hearing or requests an adjournment or postponement beyond the ninety day period.

N.Y. Gen. Mun. Law § 50-h(1);(5). In federal court, "a 'plaintiff's failure to attend a 50-h [h]earing—*no matter the reason*—is a complete bar to his state law claims[.]' " *Bird v. Cnty. of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12–13 (S.D.N.Y. June 23, 2022) (citation omitted); *see also Misek-Falkoff v. Metro. Transit Auth. (MTA)*, 843 N.Y.S.2d 155, 156 (App. Div. 2007) ("A party who has failed to comply with General Municipal Law § 50-h is generally precluded from commencing an action against a municipality[.]"); *Baumblatt v. Battalia*, 520 N.Y.S.2d 571, 574 (App. Div. 1987) (dismissing a complaint against a town because "the plaintiff failed to appear for examination on his original notice of claim as requested by the town's attorney pursuant to General Municipal Law § 50-h and this failure bars the commencement of an action against the town"). Plaintiffs' Second Amended Complaint only states that "Defendants have not held a hearing on this claim pursuant to General Municipal Law 50-h." (SAC ¶ 21.) This Court cannot determine at this stage whether this was due to Taranto's failure to attend the hearing.

Defendants also moved to dismiss Plaintiffs' intentional infliction of emotional distress claims against the County. (Defs.' Mem 21.) Plaintiffs "concede that a cause of action for intentional infliction of emotional distress against Putnam County cannot be maintained." (Pls.' Mem. 25.)

Taranto v. Putnam County, Not Reported in Fed. Supp. (2023)

Case 3:24-cv-00102-GTS-ML    Document 102    Filed 04/07/26    Page 260 of 260

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.